

## DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

00 NOV 20 PM 3: 08

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

—————————————————— x
:
HUBERT HELLER,                      :        Case No. 8:00-CV-1528-T-27C
:
            Plaintiff,              :
:
:
        vs.                         :
:
URSULA CABERTA,                     :
:
:
            Defendant.              :
—————————————————— x

F I L E D

Date |2|u|00  |1:40 Time

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT



# TABLE OF CONTENTS

I.   THIS COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANT  . . . 1

    A.   Personal Jurisdiction Is Established Because Caberta Was
Personally Served While Voluntarily Present in the
State of Florida . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   Caberta's Contacts with Florida Satisfy the Minimum Contacts Test  . . . . . . . 2

II.  THE FSIA DOES NOT BAR THIS ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   Defendant Is Not a "Foreign State" Under the FSIA . . . . . . . . . . . . . . . . . . . 4

    B.   If the FSIA Applies, Caberta's Conduct Falls Within
The "Commercial Activity" Exception  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. PLAINTIFF STATES A CLAIM UNDER 42 U.S.C. § 1985(3)
FOR VIOLATION OF HIS CIVIL RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.  PLAINTIFF HAS STATED A CAUSE OF ACTION FOR
INTERFERENCE WITH A BUSINESS RELATIONSHIP  . . . . . . . . . . . . . . . . . . . 15

    A.   Plaintiff Has Alleged Of A Cognizable Business Relationship . . . . . . . . . . . 15

    B.   Plaintiff Sufficiently Alleges Defendant's Knowledge of the
Relationship/Intentional and Unjustified Interference With
the Relationship.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    C.   Plaintiff Alleged Resulting Damage to Plaintiff. . . . . . . . . . . . . . . . . . . . . . 17

V.   PLAINTIFF HAS STATED A CLAIM UNDER FLORIDA'S
DECEPTIVE AND UNFAIR TRADE PRACTICES ACT . . . . . . . . . . . . . . . . . . . 18

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

i

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                          <u>**PAGES**</u>

*Action* v. *Gannon*,
450 F.2d 1227 (8th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Adler* v. *Federal Republic of Nigeria*,
107 F.3d 720  (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Alejandre* v. *Telefonica Larga Distancia de P.R., Inc.*,
183 F.3d 1277 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

*Antares Aircraft L.P.* v. *Federal Republic of Nigeria*,
999 F.2d 33  (2nd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Azar* v. *Lehigh Corp.*,
364 So.2d 860 (Fla. 2nd DCA 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Baer* v. *Baer*,
450 F. Supp. 481 (N.D. Cal. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bhan* v. *NME Hospitals, Inc.*,
929 F.d 1404 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Burger King* v. *Rudzewicz*,
471 U.S. 462  (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Burnham* v. *Superior Court*,
495 U.S. 604 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4

*Byrd* v. *Corporation Forestal y Industrial de Olancho*,
S.A., 182 F.3d 380 (5th Cir. 1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Cabiri* v. *Assasie-Gyimah*,
921 F. Supp. 1189 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Campo* v. *Tafor*,
704 So. 2d 730 (Fla. 4th DCA 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*Chuidian* v. *Phlippine National Bank*,
912 F.2d 1095 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

*Colombrito* v. *Kelly,*
764 F.2d 122 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.,*
693 So.2d 602 (Fla. 2d DCA 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Doe* v. *Bolkiah,*
74 F. Supp. 2d 969 (D. Haw. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Eastman Kodak Co.* v. *Kavlin,*
978 F. Supp. 1078  (S.D. Fla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Eaton* v. *Dorchester Development, Inc.,*
692 F.2d 727 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ethan Allen, Inc.* v. *Georgetown Manor, Inc.,*
647 So.2d 812 (Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17

*Fashion Originators' Guild of America* v. *FTC,*
312 U.S. 457 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Fearick* v. *Smugglers Cove, Inc.,*
379 So.2d 400 (Fla. 2nd DCA 1980)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Federal Trade Commission* v. *R.F. Keppel & Bros.,*
291 U.S. 304 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Federal Trade Commission* v. *Texaco,*
393 U.S. 223 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*First American Corp.* v. *Price Waterhouse LLP,*
154 F.3d 16 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*First City, Texas-Houston, N.A.* v. *Ratidian Bank,*
150 F.3d 172 (2nd Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Foremost-McKesson, Inc.* v. *Islamic Republic of Iran,*
905 F.2d 438 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*FTC* v. *Texaco,*
393 U.S. 223 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*General Elec. Capital Corp.* v. *Grossman,*
991 F.2d 1376 (8th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

iii

*Griffin* v. *Breckenridge,*
403 U.S. 88 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Hagen v. Viney,*
169 So. 391 (Fla. 1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Hilao* v. *Marcos,*
25 F.3d 1467 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6

*International Longshoreman's Ass'n* v. *NLRB,*
56 F.3d 205 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Jungquist* v. *Sheikh Sultan Bin Khalifa Al Nahyan,*
115 F.3d 1020 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Kadic* v. *Karadzic,*
70 F.3d 232 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Keveloh* v. *Carter,*
699 So.2d 285 (Fla. 5th DCA 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kinniburgh* v. *Burlington Northern R.R. Co.,*
568 F. Supp. 655 (D. Mont. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Larson* v. *Domestic and Foreign Commerce Corp.,*
337 U.S. 682 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Life Insurance Co. of N.A.* v. *Reichardt,*
591 F.2d 499 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lyes* v. *City of Riviera Beach, Florida,*
166 F.3d 1332 (11th Cir. 1999) *(en banc)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Marlowe* v. *Fisher Body,*
489 F.2d 1057 (6th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Moran* v. *The Kingdom of Saudi Arabia,*
27 F.3d 169 (5th Cir. 1994)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Munson* v. *Friske,*
754 F.2d 683 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*N.G.L. Travel Associates* v. *Celebrity Cruises, Inc.*,
764 So.2d 672 (Fla. DCA 3d 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*NLRB* v. *Jones & Laughlin Steel Corp.*,
301 U.S. 1 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Park* v. *City of Atlanta*,
120 F.3d, 1157 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pennoyer* v. *Neff*,
95 U.S. 714 (1877) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Phaneuf* v. *Republic of Indonesia*,
106 F.3d 302 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Posner* v. *Essex Insurance Co.*,
178 F.3d 1209 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Rankin* v. *Howard*,
457 F. Supp. 70 (D. Ariz. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Republic of Argentina* v. *Weltover*,
504 U.S. 607 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8, 9, 11, 12

*Republic of Panama* v. *BCCI Holdings*,
119 F.3d 935 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Saudi Arabia* v. *Nelson*,
507 U.S. 349 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Spiegel, Inc.* v. *F.T.C.*,
540 F.2d 287 (7th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*State* v. *Luke*,
489 So. 2d 1148 (Fla. 2d DCA 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Suris* v. *Gilmore Liquidating, Inc.*,
651 So.2d 1282 (Fla. 3d DCA 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Swift & Co.* v. *United States*,
196 U.S. 375 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tampa Bay Storm, Inc.* v. *Arena Football League, Inc.*,
1998 WL 182418 (M.D. Fla. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Taylor* v. *Gilmartin,*
686 F.2d 1346 (10th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Trajano* v. *Marcos,*
978 F.2d 493 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Turner* v. *Unification Church,*
473 F. Supp. 367 (D.R.I. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United Brotherhood of Carpenters & Joiners* v. *Scott,*
463 U.S. 825 (1983), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United World Trade* v. *Mangyshlakneft Oil Production Ass'n,*
33 F.3d 1232 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

*United Yacht Brokers* v. *Gillespie,*
377 So.2d 668 (Fla. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Urling* v. *Helms Exterminators, Inc.,*
468 So.2d 451 (Fla. 1st DCA 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Vermeulen* v. *Renault U.S.A., Inc.,*
975 F.2d 746 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Voest-Alpine Trading USA Corp.* v. *Bank of China,*
142 F.3d 887 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Volk* v. *Coler,*
845 F.2d 1422 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Walter Fuller Aircraft Sales, Inc.* v. *Republic of the Philippines,*
965 F.2d 1375 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ward* v. *Connor,*
657 F.2d 45 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wolfson* v. *Wolfson,*
455 So. 2d 577 (Fla. 4th DCA 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Word of Faith Outreach Center, Inc.* v. *Sawyer,*
90 F.3d 119 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Xuncax* v. *Gramajo,*
886 F. Supp. 162, 175 (D. Mass. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

vi

*Zimmerman v. D.C.A. at Welleby, Inc.,*
505 So.2d 1371 (Fla. 4th DCA 1987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATUTES

15 U.S.C. § 45, U.S. Federal Trade Commission Act, . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 1330(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1603(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1605(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8, 11

28 U.S.C. §1602, *et. seq.,*
Foreign Sovereign Immunities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1330. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

29 U.S.C. §158(b)(4)(ii),
Section 8(b)(4)(ii) of the National Labor Relations Act, . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1985(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-15

Fla. Stat. 501.204(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fla. Stat. 501.201, et seq.,
The Florida Deceptive and Unfair Trade Practices Act, . . . . . . . . . . . . . . . . . . . . . . . 18

Fla. Stat. Ann. § 501.202(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fla. Stat. § 48.193. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fla. Stat. § 48.031 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fla. Stat § 501.203(3)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fla. Stat Sec. § 501.204(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed.R.Civ.P. 4(k)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 4(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Civil Rights Act of 1871, Cong.Globe, 42d Congress, 1st Sess. 567 (1871) . . . . . . . . . . . 14

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANT

### A.    Personal Jurisdiction Is Established Because Caberta Was Personally Served While Voluntarily Present in the State of Florida

It is undisputed that Caberta was personally served with the summons and complaint on July 27, 2000, in Clearwater, Florida, while she was voluntarily present within this judicial district. (First Amended Complaint ("AC" or "Complaint"), ¶ 2; Ex. A, Aff. of Peter Thornburgh, dated July such 27, 2000.)  Therefore, as a matter of unbroken case law, extending well over a century, this Court has personal jurisdiction over Caberta. *Burnham* v. *Superior Court*, 495 U.S. 604 (1990); *Pennoyer* v. *Neff*, 95 U.S. 714 (1877); *Campo* v. *Tafor*, 704 So.2d 730, 732 (Fla. 4th DCA 1998).

Defendant's arguments regarding Florida's "long-arm" statute, § 48.193, Fla. Stat., and the existence of "minimum contacts" are simply irrelevant, not to say frivolous, because she was personally served here in the State of Florida, pursuant to Fed.R.Civ.P. 4(e)(2) (authorizing in-state personal service); *see also*  Fed.R.Civ.P. 4(k)(1)(A), § 48.031, Fla. Stat.

In the landmark case of *Pennoyer* v. *Neff*, the Supreme Court reiterated the rule that personal service upon a non-resident defendant while in the forum state gives the court personal jurisdiction over that person.  95 U.S. at 720-30.  In *Burnham*, the Court unanimously reaffirmed that jurisdiction based on in-state personal service on non-residents remains a bedrock principle of American law.  "Among the most firmly established principles of personal jurisdiction in American tradition is that the courts of a State have jurisdiction over nonresidents who are physically present in the state."  495 U.S. at 610 (Op. of Scalia, J.).

In *Burnham*, a New Jersey resident in California for business was personally served with process in a divorce proceeding, *unrelated* to his presence in the State.  Writing for four Justices, Justice Scalia stated that "jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and substantial justice.'"  *Id*. at 619.

In a concurring opinion for four other Justices, Justice Brennan agreed "the exercise of personal jurisdiction over a defendant based on voluntary presence in the forum will satisfy the requirements of due process." *Id.* at 639.

State and federal courts in Florida continue to follow the rule that personal service in the state provides *in personam* jurisdiction. *Hagen* v. *Viney*, 169 So. 391, 392-93 (Fla. 1936) (cited in *Burnham*, 495 U.S. at 612); *Campo* v. *Tafor*, 704 So. 2d 730, 732 (Fla. 4th DCA 1998); *Keveloh* v. *Carter*, 699 So.2d 285, 288 (Fla. 5th DCA 1997); *State* v. *Luke*, 489 So. 2d 1148, 1149 (Fla. 2d DCA 1986); *Wolfson* v. *Wolfson*, 455 So. 2d 577, 578 (Fla. 4th DCA 1984) (cited in *Burnham*, 495 U.S. at 616).

This rule has been applied with equal force to non-U.S. citizens. For example, the federal court in Manhattan had personal jurisdiction over the Bosnian Serb leader Radovan Karadzic because he was personally served while on a brief visit to New York City at the invitation of the United Nations. *See Kadic* v. *Karadzic*, 70 F.3d 232, 247 (2d Cir. 1995); *see also First American Corp.* v. *Price Waterhouse LLP*, 154 F.3d 16, 20, 21 (2d Cir. 1998) (rejecting argument that *Burnham* should not apply to non-U.S. citizens, and recognizing that "historical pedigree of transient jurisdiction provides a defendant voluntarily present in a particular state with 'clear notice that he is subject to suit in the forum'"); *Eastman Kodak Co.* v. *Kavlin*, 978 F. Supp. 1078, 1082 n.2 (S.D. Fla. 1997) (personal service on Bolivian citizen while in Florida "sufficed to subject her to the jurisdiction of this Court").

Caberta was personally served with the summons and complaint while voluntarily present in this judicial district. This Court has personal jurisdiction over her, and no inquiry into the Florida long-arm statute or "minimum contacts" is necessary or appropriate.

**B.    Caberta's Contacts with Florida Satisfy the Minimum Contacts Test**

Even if this Court declined to apply *Burnham*, plaintiff has alleged sufficient contacts with Florida to meet the constitutional requirement of minimum contacts. Given that Caberta has presented contrary evidence in her affidavit, plaintiff is entitled to discovery on these

2

contested jurisdictional facts, as addressed in Plaintiff's Opposition to Motion to Suspend Discovery (incorporated herein by reference); *Posner* v. *Essex Insurance Co.*, 178 F.3d 1209, 1214 n.7 (11th Cir. 1999) (plaintiff has "right to conduct jurisdictional discovery"); *Eaton* v. *Dorchester Development*, 692 F.2d 727, 729-31 (11th Cir. 1982) ("[p]laintiff must be given an opportunity to develop facts sufficient to support a determination on the issue of jurisdiction"). Moreover, plaintiff need only make out a prima facie case, and the allegations in the complaint are accepted as true. *Vermeulen* v. *Renault U.S.A., Inc.*, 975 F.2d 746, 746 (11th Cir. 1992).

The minimum contacts test "is satisfied if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King* v. *Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotations omitted); *see Republic of Panama* v. *BCCI Holdings*, 119 F.3d 935, 944-45 (11th Cir. 1997). This standard is easily met here.

Caberta purposefully engaged in a conspiracy to achieve her goal of a systematic economic boycott of businesses that employ or are owned by Scientologists. AC, ¶¶ 13,14. Part of Caberta's anti-Scientology conspiracy is purposefully directed at Scientologists and Scientology businesses in Florida. *Id.* ¶ 14. Caberta knows many Scientologists are located in Florida and conduct business in Florida involving international trade and contracts; that German Scientologists fled Germany to reside in Florida because of the religious persecution arising out of Caberta's unlawful and tortious conduct; and that German nationals in Florida conduct business with German businesses. *Id.* ¶ 14. Caberta specifically engages in activity in Florida for the purpose of harming Scientologists, including plaintiff, through her association with anti-Scientologists in Florida; visits Florida; received payments from anti-Scientologists in Florida; anti-Scientology publicity directed at Florida; and encourages coercion directed at German businesses to use the sect filter to injure Florida Scientologists. *Id.* ¶¶ 15-17. As this action arises directly from Caberta's activities purposefully directed at Florida, the minimum

3

contacts test (which is irrelevant under *Burnham*), is easily satisfied.

## II.     THE FSIA DOES NOT BAR THIS ACTION

Caberta claims that she is immune from suit pursuant to the Foreign Sovereign
Immunities Act ("FSIA"), 28 U.S.C. §1602, *et. seq.*, claiming she is a "foreign state" within
the meaning of the FSIA. Caberta misunderstands the scope of the FSIA, as the "FSIA does
not immunize a foreign official engaged in acts beyond the scope of his authority," even when
acting in an "official" capacity. *Hilao* v. *Marcos*, 25 F.3d 1467, 1470 (9th Cir. 1994). The
Complaint alleges that Caberta engaged in acts beyond the scope of her authority. More
telling, Caberta's own affidavit, which asserts that she was acting in an "official" capacity in
promulgating the "sect filter," fails to assert that she was acting within the scope of her
authority. Based on the Complaint and Caberta's affidavit, this Court cannot conclude that
Caberta was acting within the scope of her lawful authority in imposing the sect filter through
conspiracy with German businesses acting in the U.S.

Even if Caberta is found to be a "foreign state" acting within the scope of her authority
under the FSIA, the "commercial activity" exception to immunity applies to Caberta's
economic boycott of Scientology businesses through her employer's market power as a
purchaser of goods and services, and the Court has jurisdiction to proceed with this litigation.
28 U.S.C. §§ 1330, 1605(a)(2).

### A.     Defendant Is Not a "Foreign State" Under the FSIA

The FSIA "establishes a comprehensive framework for determining whether a court in
this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of
Argentina* v. *Weltover*, 504 U.S. 607, 610 (1992). "The FSIA thus provides the 'sole basis'
for obtaining jurisdiction over a foreign sovereign in the United States." *Id.* at 611; *Alejandre*
v. *Telefonica Larga Distancia de P.R.,* 183 F.3d 1277, 1282 (11th Cir. 1999).

"[T]he threshold issue is whether the party claiming FSIA immunity is a 'foreign state'
within the meaning of the statute." *Byrd* v. *Corporation Forestal y Industrial de Olancho,*

182 F.3d 380, 388 (5th Cir. 1999). "The party claiming FSIA immunity, ha[s] the initial burden of proof of establishing a prima facie case that [she] satisfies the definition of a 'foreign state' within the meaning of the FSIA." *Id.* Moreover, "the party claiming FSIA immunity retains the ultimate burden of persuasion throughout." *Id.* (citing *Moran* v. *The Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994)).

The courts – including those upon whom Caberta relies – have repeatedly affirmed, without dissent, the basic proposition that "[s]overeign immunity. . . will not shield an official who acts beyond the scope of his authority." *Chuidian* v. *Phlippine National Bank*, 912 F.2d 1095, 1106 (9th Cir. 1990); *see, e.g., Byrd*, 182 F.3d at 388 ("The FSIA's protections cease, however, when the individual officer acts beyond his official capacity"); *Phaneuf* v. *Republic of Indonesia*, 106 F.3d 302, 306 (9th Cir. 1992); *Hilao*, 25 F.3d at 1470 ("FSIA does not immunize a foreign official engaged in acts beyond the scope of his authority"), *cert. denied*, 513 U.S. 1126 (1995); *Trajano* v. *Marcos*, 978 F.2d 493, 497 (9th Cir. 1992); *Xuncax* v. *Gramajo*, 886 F. Supp. 162, 175 (D. Mass. 1995); *Doe* v. *Bolkiah*, 74 F. Supp. 2d 969, 974 (D. Haw. 1998). Plaintiff knows of no case to the contrary.

When a foreign government official acts outside the scope of her legal authority, she is stripped of her immunity under the FSIA, and her acts are considered individual, not sovereign. "[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered *individual* and *not sovereign* actions. The officer is not doing the business the sovereign has empowered him to do." *Chuidian*, 912 F.2d at 1106 (emphasis added) (quoting *Larson* v. *Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949)); *see Phaneuf*, 106 F.3d 302, 306 (9th Cir. 1997) (an official acts beyond the scope of his authority under the FSIA for "anything the sovereign has not empowered him to do").

This well-settled rule is consistent with the "restrictive theory" of sovereign immunity in the FSIA. "A lawsuit against a foreign official acting outside the scope of his authority does not implicate any of the foreign diplomatic concerns involved in bringing suit against

5

another government in United States courts." *Hilao*, 25 F.3d at 1472; *see Xuncax*, 886 F. Supp. at 175. In *Xuncax*, the court found the FSIA did not immunize the acts of the individual defendant, although committed in his official capacity as Minister of Defense of Guatemala, where such acts were beyond the lawful scope of his official authority. *Id.* at 176; *Cabiri* v. *Assasie-Gyimah*, 921 F. Supp. 1189, 1198 (S.D.N.Y. 1996) (alleged acts of torture by Chief of National Security of Ghana not immunized by FSIA); *Bolkiah*, 74 F. Supp. 2d at 974 (FSIA inapplicable where government official of Brunei acted outside scope of official duties by recruiting women to the royal palace for prostitution); *Phaneuf*, 106 F.3d at 306-07 & n.2 (remanding for factual determination whether Indonesian Ambassador to Syria, acted within the scope of his lawful authority); *Jungquist* v. *Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997) (where government official entered "into a corrupt bargain" that "could not have been authorized" by the government, official has no FSIA immunity).

Plaintiff expressly alleges that Caberta acted "outside the scope of her official duties," and "entirely outside the scope of other lawful authority," regardless of whether she acted in her official capacity. AC, ¶¶ 2, 23. The Complaint further alleges that her challenged actions were unlawful under German and international law (as well as Florida and United States law). *Id.* ¶ 23, and that even if Caberta acted within the scope of her duties as a Hamburg official, "those duties were nevertheless unlawful and unconstitutional in both the United States and Germany." *Id.* On a motion to dismiss asserting FSIA immunity, the facts in the complaint must be taken as true. *Saudi Arabia* v. *Nelson*, 507 U.S. 349, 351 (1993); *Voest-Alpine Trading USA Corp.* v. *Bank of China*, 142 F.3d 887 (5th Cir. 1998). Thus, on the face of the Complaint, defendant is not entitled to FSIA immunity because she "act[ed] beyond the scope of [her] authority." *Chuidian*, 912 F.2d at 1106.

These allegations are in fact *supported* by Caberta's own affidavit. Caberta does not assert she acted within the scope of her lawful authority, that she was authorized by Hamburg or German law to engage in the challenged conduct, or that her conduct did not violate

6

German law. Rather, Caberta only asserts that all her activities "ha[ve] been in her capacity as an employee of the government of Hamburg, Germany." Aff. ¶ 9. Such a statement does not establish entitlement to immunity under the FSIA. Indeed, her failure to assert that she acted within the scope of her lawful authority is significant because she relies on *Chuidian* in her Motion. *Chuidian* is the seminal case establishing that the FSIA does not apply when a foreign official acts outside the scope of her lawful authority. Certainly, Caberta would have asserted that her conduct was not in violation of German or Hamburg law, if such statement could have been made truthfully. Her silence on this basic issue of FSIA immunity speaks volumes.

Given Caberta's failure even to refute the allegations in the Complaint establishing the inapplicability of the FSIA, her motion to dismiss should be denied. At a minimum, Plaintiff is entitled to conduct discovery into the jurisdictional facts underlying this suit. *First City, Texas-Houston, N.A.* v. *Ratidian Bank*, 150 F.3d 172, 177 (2nd Cir. 1998) (district court abused its discretion in failing to afford FSIA discovery and dismissing complaint); *Walter Fuller Aircraft Sales, Inc.* v. *Republic of the Philippines*, 965 F.2d 1375, 1383 (5th Cir. 1992); *Foremost-McKesson, Inc.* v. *Islamic Republic of Iran*, 905 F.2d 438, 448 (D.C. Cir. 1990); *Alejandre*, 183 F.3d at 1289 (11th Cir. 1999). As addressed in Plaintiff's Opposition to Motion to Suspend Discovery, Plaintiff has narrowly tailored discovery requests to address the jurisdictional issues in this case. Given Caberta's assertion of FSIA immunity, this Court must either deny her motion on the face of the pleadings and her affidavit, or permit discovery in order to determine its FSIA jurisdiction.

In discovery, Plaintiff will show that Caberta's acts violated several provisions of the German Constitution and international human rights treaties, to which Germany is a signatory; that both the U.S. State Department and the U.S. Trade Representative have condemned Caberta's sect filters as an abuse of human rights; that the laws of the City of Hamburg and other authority creating Caberta's anti-Scientology task force did not authorize Caberta's conduct; and that judicial opinion in Germany has condemned the sect filters as unlawful.

**B.**   **If the FSIA Applies, Caberta's Conduct Falls Within The "Commercial Activity" Exception**

Assuming that the FSIA does apply to Caberta's acts, she – as a "foreign state" – is stripped of her immunity from suit because her acts constituted a "commercial activity" – namely an economic boycott of Scientologists through Hamburg's economic power in the marketplace. *See* 28 U.S.C. § 1605(a)(2); *Weltover*, 504 U.S. at 611. In such an event, the lawsuit against the "foreign state" proceeds, with jurisdiction based on the FSIA. *See id.* at 610-11; 28 U.S.C. § 1330(a). In her Motion, Caberta makes no argument that she was not engaged in a "commercial activity."

Caberta's activities fall within the third "commercial activity" exception: "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and the act causes a direct effect in the United States." The third clause of § 1605(a)(2) is satisfied if this lawsuit is "1) 'based ... upon an act outside the territory of the United States'; 2) that was taken 'in connection with a commercial activity' of [defendant] outside this country; and 3) that 'cause[d] a direct effect in the United States.'" *Weltover*, 504 U.S. at 611 (quoting § 1605(a)(2)). A substantial part of Caberta's conduct, [1] occurred outside the U.S. The FSIA defines "commercial activity" to mean:

> [E]ither a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose*.

28 U.S.C. § 1603(d) (emphasis added). This definition "leaves the critical term 'commercial' largely undefined." *Weltover*, 504 U.S. at 612. In addressing the term, the Court "conclude[d] that when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within

---

[3]   The Court would only address the "commercial activity" exception to FSIA immunity if it had already concluded that Caberta acted in her official capacity as an agent of the Hamburg government, *and* within the scope of her lawful authority under Hamburg and German law.

the meaning of the FSIA." *Id.* at 614.  As the Court explained:

> [B]ecause the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather, the issue is whether the particular actions that the foreign *state* performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce.

*Id.* at 614 (internal citations omitted). The Court contrasted *regulations* limiting foreign currency exchange – a "sovereign activity" because "such authoritative control of commerce cannot be exercised by a private party," with a *contract* to buy military supplies, "because private companies can similarly use sales contracts to acquire goods." *Id.* at 614.

In *Weltover*, Argentina argued that its issuance of bonds was not a "commercial activity," because the bonds were issued to control foreign exchange reserves and to stabilize the Argentine currency, not to raise capital or finance acquisitions.  *Id.* at 615-17.  The Court rejected this argument: "it is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so." *Id.* at 617.  Here, the "nature" of Caberta's conduct is a "commercial activity," because the primary and secondary economic boycotts by the Hamburg government, *in the marketplace to contract for goods and services*, of entities that do not adhere to the sect filter are "the *type* of actions by which a private party engages in trade and traffic or commerce," *Weltover*, at 614 (emphasis original), regardless of whether such activities are legal or illegal.  As the Court made clear in *Weltover*, "it is irrelevant" that the reason for the economic boycott is religious discrimination or, as Caberta claims, to prevent "infiltration and subversion by Scientologists."  (Caberta Aff. ¶ 10.)

Caberta enforces the use of and promotes the sect filter as an economic primary boycott concerning contracts between businesses and the Hamburg government and as a secondary boycott between businesses, where one of the businesses wishes to do business with the Hamburg government.  (AC, ¶¶ 10-14.)  "Businesses that fail to use the sect filters

face the prospect of losing government contracts, business ... [and] the systematic boycotting of such businesses." (*Id.* ¶ 13.) "Caberta advocates and promotes that individuals must require signed sect filters from all businesses and individuals with whom they do business ..." (*Id.* ¶ 10.) "Individuals and companies who refuse to sign these declarations are subject to economic sanctions – including commercial boycotts [and] individual firings ..." (*Id.* ¶ 11.) The sect filters are used "to boycott, disrupt and destroy any business relationship that any Scientologist may have with any business, person or government in Germany ..." (*Id.* ¶ 12.) Through Caberta's actions, co-conspirator POS has been pressured or coerced into joining Caberta's conspiracy against Scientologists, "because it has been required to do so as a condition of doing business in Germany with other businesses and German government entities and officials that have entered into the conspiracy." (*Id.* ¶ 20.)

The City of Hamburg does not require use of "sect filters" as a sovereign regulatory matter. There is no law that requires businesses to use "sect filters." Even Caberta does not identify any legal basis for the sect filter, asserting that it is "voluntary." (Caberta Aff. ¶ 11.) Thus, this is not a case in which Caberta is using the *sovereign* power of the foreign state to discriminate against Scientologists. Rather, the coercive, discriminatory power that Caberta exercises is through her employer's substantial *economic* power when it engages in "commercial activity" in the marketplace as purchaser of goods and services in the same way as a private party, threatening to refuse to do business with firms that do not sign the sect filter, or that do not require the firms that they do business with to sign the sect filter. Such behavior is no different than the use of economic power by labor unions to impose boycotts on disfavored businesses. Such activity is unquestionably "commercial"; indeed, Congress's power to regulate or to prohibit such use of economic power under antitrust and labor law is founded on its Commerce Clause powers. *See, e.g., Swift & Co. v. United States,* 196 U.S. 375 (1905); *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1 (1937).

In particular, Caberta's challenged conduct is little different than the sorts of boycotts

10

or "refusals to deal" in which private companies have engaged, whether or not permitted by the antitrust laws. *See Bhan* v. *NME Hospitals, Inc.*, 929 F.d 1404, 1411 (9th Cir. 1991). Indeed, the activity at issue here closely parallels the private vertical relationship boycott activity in *Fashion Originators' Guild of America* v. *FTC*, 312 U.S. 457 (1941). In that case, thousands of retailers "signed agreements to 'cooperate' with the Guild's boycott program," but many did so "only because constrained by threats that Guild members would not sell to [them]." *Id.* at 461-62; 465-68. Likewise, Caberta has used her employer's market power to conspire with other market participants to refuse to deal with businesses and entities who continue to deal with members of the Scientology religion – clearly a commercial activity.

Similarly, Section 8(b)(4)(ii) of the National Labor Relations Act, 29 U.S.C. §158(b)(4)(ii), "prohibits union actions to threaten or coerce persons engaged in commerce, where . . . the object of such action is to force a person to cease using or otherwise dealing in the products of another." *International Longshoreman's Ass'n* v. *NLRB*, 56 F.3d 205, 207 (D.C. Cir. 1995). Again, Caberta's alleged conduct closely parallels this type of commercial activity engaged in by private persons. Caberta has pressured or coerced persons engaged in commerce, including POSPartners, to force such persons to cease using or otherwise dealing in the products promoted by Heller. As *Weltover* makes clear, the reasons for Caberta's commercial boycott are irrelevant for FSIA purposes. 504 U.S. at 617. Thus, the second criteria of § 1605(a)(2) is satisfied as Caberta's acts were "in connection with a commercial activity" of the foreign state. *See Weltover*, 504 U.S. at 611.

The third criteria of § 1605(a)(2) is likewise satisfied because Caberta's acts "'cause[d] a direct effect in the United States.'" *Weltover*, 504 U.S. at 611. An effect is "direct" for the purpose of the commercial activity exception "if it follows as an immediate consequence of the defendant's ... activity." *Id.* at 618. To determine the location, courts "often look to the place where legally significant acts giving rise to the claim occurred in determining the place where a direct effect may be said to be located." *United World Trade* v.

11

*Mangyshlakneft Oil Production,* 33 F.3d 1232, 1239 (10th Cir. 1994). *See Weltover*, 504 U.S. at 619 ("Because New York was ... place of performance for Argentina's ultimate contractual obligations, the rescheduling of these obligations necessarily had a 'direct effect' in the United States."); *Antares Aircraft L.P.* v. *Republic of Nigeria*, 999 F.2d 33, 36 (2nd Cir. 1993); *General Elec. Cap. Corp.* v. *Grossman*, 991 F.2d 1376, 1385 (8th Cir. 1993).

Plaintiff suffered the direct effects of Caberta's use of the "sect filter" in the U.S. A substantial portion of the negotiations between plaintiff and co-conspirator POS Partner G.M.B.H occurred in Orlando, Florida. AC, ¶ 19. The goal of these negotiations was to sell software to POS, which would result in substantial commissions to the plaintiff to be paid in Florida. *Id. See, Adler* v. *Federal Republic of Nigeria*, 107 F.3d 720, 726 & n.4 (9th Cir. 1997) ("Nigeria's actions had a direct effect in the U.S. because Adler 'requested defendants to make payment in New York'"); *Weltover*, 504 U.S. at 619. Caberta's propagation of the anti-Scientologist "sect filter" both in Germany and in the U.S. through her co-conspirators denied plaintiff substantial commercial benefits which would have accrued in Florida. (AC, ¶20.) Caberta's actions thus had a direct effect on plaintiff in the United States.

## III.    PLAINTIFF STATES A CLAIM UNDER 42 U.S.C. § 1985(3)
FOR VIOLATION OF HIS CIVIL RIGHTS

Count III of plaintiff's Complaint alleges a conspiracy to deprive plaintiff and others "of the opportunity to engage in interstate and international commerce based upon their religious beliefs and practices" in violation of 42 U.S.C. § 1985(3). (AC, ¶ 38.) Defendant seeks dismissal of the § 1985(3) claim on two grounds, one of which misunderstands the nature of plaintiff's claim and the other which runs against the great weight of authority. Motion at 14-15. Contrary to defendant's assertions, Count III of Plaintiff's Complaint states a claim for violation of §1985(3) – a conspiracy to deprive plaintiff of his rights to travel to engage in interstate and international commerce, based on religious animus.

In order to prove a violation of 42 U.S.C. § 1985(3), the Supreme Court has held that a

plaintiff must show that: (1) two or more defendants conspired; (2) for the purpose of depriving, directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; (3) one or more of the conspirators acted in furtherance of the conspiracy; and (4) such act injured a person or his property or deprived him of exercising any right or privilege of a citizen of the United States. *Griffin* v. *Breckenridge*, 403 U.S. 88, 102-03 (1971). In *Griffin*, the Court held that § 1985(3) was intended to extend to private conspiracies as well as conspiracies involving state action. *Id.* at 101. *Griffin* specifically recognized § 1985(3) claims against private conspiracies intended to obstruct the right to travel and expressly disclaimed identifying the outer scope of § 1985(3). *Id.* at 102 n.9. The Court also held that a § 1985(3) claim required proof of an invidious discriminatory motive, though the Court did not define the scope of that term. *Id.* at 102. In *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825, 830 (1983), the Court held that an alleged conspiracy to violate First Amendment rights does not violate § 1985(3) unless it involves state action. The Court, however, distinguished *Scott* from *Griffin*'s holding that certain private party conspiracies are actionable under § 1985(3).

In her Motion, Caberta confuses her violation of Plaintiff's rights – interference with Plaintiff's right and privilege to engage in interstate and international business – with the anti-Scientology religious-based animus motivating her actions. *See* Motion at 14-15. Thus, Caberta simply misstates Plaintiff's action as one alleging interference with "the right to free exercise of religion." Motion at 14. Based on that misunderstanding, Caberta erroneously argues that the absence of an allegation of state action requires dismissal under *Scott*. However, plaintiff alleges that the actionable *conspiracy* is interference with Plaintiff's "opportunity to engage in interstate and international commerce," (AC, ¶ 38), a right derived from the right to engage in interstate travel, not a violation of First Amendment rights. It is Caberta's *motive* – or discriminatory animus – that is based on Plaintiff's religious beliefs.

This case is similar to *Griffin*, where private defendants conspired against the

13

plaintiffs' right to engage in interstate travel, "acting under a mistaken belief that [plaintiff] was a worker for Civil Rights for Negroes." *Griffin*, 403 U.S. at 103, or, more recently, in *Park* v. *City of Atlanta*, 120 F.3d, 1157, 1162 (11th Cir. 1997), where the Eleventh Circuit concluded that a § 1985(3) conspiracy may lie against private actors whose *actions* were the destruction of Korean-American businesses, who were *motivated* by anti-Korean bias.

Defendant further erroneously argues, contrary to the great weight of authority, that § 1985(3) does not permit an action predicated on religious-based animus. In *Griffin*, the Supreme Court acknowledged, without deciding, that § 1985(3) prohibits those conspiracies motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin*, 403 U.S. at 102. *Griffin* itself involved race-based animus, and thus did not address the full scope of prohibited class-based animus, but the vast majority of courts to consider whether § 1985(3) prohibits a conspiracy motivated by religious-based animus have concluded that it does. *See Colombrito* v. *Kelly,* 764 F.2d 122, 130-31 (2d Cir. 1985); *Munson* v. *Friske*, 754 F.2d 683, 695 (7th Cir. 1985); *Taylor* v. *Gilmartin*, 686 F.2d 1346, 1356-58 (10th Cir. 1982); *Ward v. Connor*, 657 F.2d 45, 48 (4th Cir. 1981); *Life Insurance Co. of N.A.* v. *Reichardt*, 591 F.2d 499, 505 & n.15 (9th Cir. 1979); *Marlowe* v. *Fisher Body*, 489 F.2d 1057, 1065 (6th Cir. 1973); *Action* v. *Gannon*, 450 F.2d 1227, 1232 (8th Cir. 1971); *Turner v. Unification Church*, 473 F. Supp. 367, 373 (D.R.I. 1978); *Rankin* v. *Howard*, 457 F. Supp. 70, 74-75 (D. Ariz. 1978); *Baer* v. *Baer*, 450 F. Supp. 481, 491 (N.D. Cal. 1978). *See also* Remarks of Senator Edmunds, Senate sponsor, in debate preceding passage of Civil Rights Act of 1871, Cong.Globe, 42d Congress, 1st Sess. 567 (1871) (if a "conspiracy was formed against [a] man . . . because he was a Catholic, or because he was a Methodist . . . then this section could reach it") (quoted in *Griffin*, 403 U.S. at 102 n.9).

Although the Eleventh Circuit has not reached the question of whether § 1985(3) conspiracies may be predicated on religious-based animus, it has held that gender-based conspiracies against women are actionable under § 1985(3), and has quoted with

14

approval another case recognizing religion as an actionable animus under § 1985(3). *See Lyes* v. *City of Riviera Beach, Florida*, 166 F.3d 1332, 1337 (11th Cir. 1999), quoting with approval the Seventh Circuit's conclusion in *Volk* v. *Coler*, 845 F.2d 1422 (7th Cir. 1988), "'[Section] 1985(3) extends beyond conspiracies to discriminate against persons based on race to conspiracies to discriminate against persons based on sex, *religion*, ethnicity or political loyalty.'" *Lyes*, 166 F.3d at 1338 (quoting *Volk*, 845 F.2d at 1434) (emphasis added).

The only two courts to conclude that § 1985(3) does not protect against religious-based conspiracies are those cited by the defendant: *Word of Faith Outreach Center, Inc.* v. *Sawyer*, 90 F.3d 119 (5th Cir. 1996), and *Kinniburgh* v. *Burlington Northern R.R. Co.*, 568 F. Supp. 655 (D. Mont. 1983). In *Lyes*, however, the Eleventh Circuit explicitly rejected the Fifth Circuit's narrow view of the scope of § 1985(3) conspiracies. *Lyes* at 1332. Thus, the Eleventh Circuit has strongly expressed its view that §1985(3) conspiracies may be predicated on religious-based animus, as well as gender-based conspiracies. This Court should follow the great weight of authority, including *Lyes*, and hold that § 1985(3) protects against religious-based conspiracies.

## IV.  PLAINTIFF HAS STATED A CAUSE OF ACTION FOR INTERFERENCE WITH A BUSINESS RELATIONSHIP

### A.  Plaintiff Has Alleged A Cognizable Business Relationship.

Although there was no signed contract, plaintiff engaged in communications with POSPartners, culminating in an agreement in which Heller would realize substantial profit but for interference by Caberta. AC ¶¶ 19-21. Defendant concedes a signed contract is unnecessary to establish the claim, as long as it is alleged, as here, that "the understanding between the parties would have been completed had defendant not interfered." *Ethan Allen, Inc.* v. *Georgetown Manor*, 647 So.2d 812, 814-15 (Fla.1994). But Defendant misconstrues the nature of the agreement between the parties that was the subject of Caberta's interference and mischaracterizes it as an "offer to agree" and "an agreement to agree." Motion at 8. That,

15

however, is not what the Complaint alleges.  Paragraph 21 of the Complaint states that:

> POS and Heller negotiated to the point that POS offered to enter into an
> agreement with RTI. ... Upon learning that Heller is a Scientologist, POS, as a
> result of Caberta's inducement, demanded that Heller sign one of Caberta's
> "sect filters."  Heller refused to sign Caberta's "sect filter," and POS refused to
> enter into the agreement or do business with him unless Heller signed
> Caberta's "sect filters..."

This was not a mere offer.  It was an actual agreement in principal and detail save only the
final barrier of plaintiff's refusal to sign the "sect filter."

Moreover, determination as to whether or not the agreement would have given rise to a
final enforceable contract is an issue for the trier of fact. "An action for intentional
interference is appropriate ... if the jury finds that an understanding between the parties would
have been completed had the defendant not interfered." *Ethan Allen*, 647 So.2d at 814, citing
*United Yacht Brokers v. Gillespie*, 377 So.2d 668 (Fla. 1979).  As the Complaint clearly
alleges, plaintiff and POSPartners had a deal, the consummation of which was destroyed
solely by Caberta's interference.

**B.    Plaintiff Sufficiently Alleges Defendant's Knowledge of the Relationship/
Intentional and Unjustified Interference With the Relationship.**

Contrary to Caberta's assertion, the Complaint alleges specific knowledge by Caberta
of the existence of business relationships among the class of persons to which plaintiff
belongs.  Caberta's expressed and intended activities to destroy such business relationships by
making employment in Germany conditional upon persons and companies signing the filter,
were designed so that no Scientologist would sign it.  AC, ¶ 11.  The Complaint also alleges
that Caberta knew that plaintiff and other Scientologists are doing business or attempting to
do business with German companies, and distributed her "sect filter" to numerous companies
with the intent to discriminate against and boycott *all* Scientologists, which would obviously
include plaintiff.  *See* AC, ¶¶ 12-13.  The Complaint further alleges Caberta's knowledge that
many German Scientologists fled to Florida to avoid religious persecution where

16

Scientologists continue to attempt to conduct affairs with German businesses. *See id.*

It is immaterial that plaintiff has not alleged specific knowledge by Caberta of the RTI/Heller contract with POSPartners. Nothing in *Ethan Allen*, 647 So.2d 812, 815 (Motion at 9) requires specific knowledge of a particular contract. Rather, it is sufficient for liability for tortious interference that Caberta be aware of the class of contracts she is targeting with the "sect filter." Permitting Caberta to avoid liability because Caberta intended to interfere with all contracts with Scientologists in Heller's position, even if she may not have had precise knowledge of the plaintiff's contract, is analogous to absolving a person of tort who fired shots into a crowd, not caring who she hit so long as she hit many of a certain *class* of people she intended to damage. Plaintiff does not assert a harm to the community at large. Caberta was not shooting at the entire community. Her intent was to cause economic harm *only* to Scientologists and she hit plaintiff, intending to cause the harm he suffered.

**C.     Plaintiff Alleged Resulting Damage to Plaintiff.**

Plaintiff has alleged specific monetary harm of lost commissions arising out of the lost contract with POSPartners, future income from the contract, and future income from other contracts. Defendant's assertion that it was only RTI that was injured, and not plaintiff, is simply wrong. Both were injured.

Moreover, plaintiff is not an "incidental beneficiary" as argued by Caberta – the business deal was created by him for his own benefit. Caberta's argument that Plaintiff could not have asserted a breach of contract claim against his own company if the contract was signed and POSPartners breached is irrelevant. This is not an interference with contract action. It is a claim for tortious interference with an advantageous business relationship and a business expectancy, AC, ¶ 24, which does not require the existence of a contract. *Azar* v. *Lehigh Corp.*, 364 So.2d 860, 862 (Fla. 2nd DCA 1978); *Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So.2d 1371,1373 (Fla. 4th DCA 1987); *Fearick* v. *Smugglers Cove, Inc.*, 379 So.2d 400, 403 (Fla. 2nd DCA 1980) ("The business relationship need not be founded on an

17

enforceable contract... A business relationship may be established if a commission was discussed by the broker and seller and the latter was aware that the broker was rendering services on his behalf.").

Caberta's arrogant argument that, notwithstanding plaintiff's "sad story," he was responsible for his damages and was "hoist on his own Scientological petard" when he refused to sign the sect filter, is offensive and revelatory of her biased motive, and her desire to harm plaintiff for his religious beliefs. (Motion at 11.)  As an analogy, imagine if the argument read, "Plaintiff was hoist on his own [Judaic] petard" when he lost the contract for refusing to swear that he did not follow the teachings of the Torah as a guiding principal in his life. *Id.* Caberta's argument that Plaintiff deserved his injuries because he withheld his religious affiliation, establishes Caberta's prejudiced state of mind, but provides no defense.

Finally, Caberta argues that because she was involved in a conspiracy with POSPartners, that she is the alter ego of POS and cannot be held to have interfered with herself.  Plaintiff is mistaken.  Caberta *is* a third party to the business arrangement who plaintiff alleges forced POS into her unlawful conspiracy and compelled POS into a position whereby Caberta could interfere with the business deal.  The fact that POS bowed to the pressure and permitted its business deal with plaintiff to be destroyed, does not provide legal justification for Caberta's tortious interference.

## V.    PLAINTIFF HAS STATED A CLAIM UNDER FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201, et seq., ("FDUTPA") like similar statutes in many states, was modeled after the U.S. Federal Trade Commission Act, 15 U.S.C. § 45.  The FDUTPA prohibits: "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. 501.204(1).  This broad prohibition is defined by the entire body of federal FTC law, as the FDUTPA indicates that the foregoing provision be construed

18

by giving "great weight" to the interpretations of the FTC Act by the federal courts. Sec. 501.204(2). The FDUTPA similarly states "violation of this part" includes the "standards of unfairness" set forth and interpreted by the FTC and the federal courts. Sec. 501.203(3)(b).

The FTC Act was enacted "to combat in their incipiency trade practices that exhibit a strong potential for stifling competition." *FTC* v. *Texaco*, 393 U.S. 223, 225 (1968). While there are few Florida decisions construing factual situations which give rise to a violation of the FDUTPA, the federal standards grafted into the law provide a ready basis to establish jurisdiction over abusive trade practices demonstrated by Caberta.

First, the U.S. Trade representative has already condemned the use of the sect filter and found that it impairs trade, substantively violating the rights of American citizens. The "sect filter" provided by POSPartners to Heller (Ex. B, Declaration of Hubert Heller; Ex. 1, consisting of email containing the sect filter and demand for compliance therewith), is the precise filter promulgated by Caberta, (Ex. 2, Heller Dec.) and so condemned by the U.S.

Second, Caberta characterizes her alleged conduct as simply giving POS "the means to ferret out the truth of Plaintiff's heretofore hidden association with Scientology." Motion at 14. However, "ferreting out" the religious beliefs of one with whom a company is doing business and then refusing to deal with the person because he refuses to renounce those beliefs, is unquestionably an unlawful and unfair business practice. As stated by the Supreme Court in finding a practice unfair, "A method of competition which casts upon one's competitors the burden of the loss of business unless they will descend to a practice which they are under a powerful moral compulsion not to adopt, even though it is not criminal, was thought to involve the kind of unfairness at which the statute was aimed." *Federal Trade Commission* v. *R.F. Keppel & Bros.*, 291 U.S. 304, 313 (1934).

A practice offends public policy when "the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel, Inc. v. F.T.C.*, 540 F.2d 287, 293 (7th Cir. 1976), cited with approval in *Urling* v. *Helms Exterminators, Inc.*, 468 So.2d

19

451, 453 (Fla. 1st DCA 1985), and in *Suris v. Gilmore Liquidating, Inc.*, 651 So.2d 1282 (Fla. 3d DCA 1995) . Caberta's sect filter has been rightfully condemned by the U.S. government, human rights groups and a German court. Her interference with the business affairs of plaintiff and other Scientologists because of her animosity for their religion qualifies as a violation of public policy prohibited by the FDUTPA.

Caberta also argues that because plaintiff is not a purchaser, but rather is a provider of goods, that he falls outside the scope of "consumer." Caberta's authority, *N.G.L. Travel Associates* v. *Celebrity Cruises, Inc.*, 764 So.2d 672, (Fla. DCA 3d 2000), while noting the "surprising dearth of case law" on the issue, does interpret the FDUTPA as precluding recovery by an entity which is not a purchaser of a service. Motion at 13. However, such a finding is unsupported by the statute. Indeed, this Court, (Kovachevich, District J.), rejected exactly the same argument advanced by Caberta in this case. Judge Kovachevich noted that, prior to 1993, FDUTPA's protections were limited to "consumers," but that in 1993, the Florida state legislature amended FDUTPA to provide protection not only to "the consuming public at large," but also to *legitimate business enterprises.*" Fla. Stat. Ann. § 501.202(2) (emphasis added). Citing *Suris v. Gilmore Liquidating, Inc.*, *supra*, (quoting the FDUTPA's new language including "business enterprises"), and *Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.*, 693 So.2d 602, 609 (Fla. 2d DCA 1997), Judge Kovachevich found the FDUTPA's definitions provision omitted the "consumer transaction" definition found prior to 1993, in favor of defining unlawful transactions as those concerning "trade or commerce" and which defined a protected transaction as one including "providing, offering, or distributing, any good or service, or any property ... or thing of value, wherever situated." *Tampa Bay Storm, Inc. v. Arena Football League, Inc.*, 1998 WL 182418 (M.D. Fla. 1998).

Thus, to the extent *N.G.L. Travel* would find that Florida law prohibits actions by "providers" rather than "purchasers," it is wrongly decided, based on the prior version of an amended statute, and is contrary to the interpretation of the FDUTPA in this District.

## CONCLUSION

For the above reasons, defendant's motion to dismiss should be denied.

Dated: November 20, 2000

Respectfully submitted,

Kendrick Moxon
MOXON & KOBRIN
1100 Cleveland Street, Suite 900
Clearwater, FL  33755
(727) 443-5620

F. Wallace Pope, Jr.
FBN #:  124449
JOHNSON, BLAKELY, POPE, BOKOR,
RUPPEL & BURNS, P.A.
P.O. Box 1368
Clearwater, Fla.  33757
(727) 461-1818

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT** has been served by First Class Mail, this 20th day of November, 2000 to John Merrett, 2716 Herschel St., Jacksonville, Florida, 32205.

Kendrick L. Moxon

# Exhibit A

**RETURN OF SERVICE AFFIDAVIT**
<u>URSULA CABERTA</u>

UNITED STATES DISTRICT COURT                          CASE: 8: 00CV 1528-T-27C
THE MIDDLE DISTRICT OF FLORIDA                        CIVIL DIVISION

SUMMONS IN A CIVIL CASE

HUBERT HELLER

vs.

URSULA CABERTA

Pursuant to the request of F. WALLACE POPE, JR., P.O. BOX 1368, CLEARWATER, FL. GIETZEN & ASSOCIATES, INC., received this process on July 27, 2000 at 09:50 A.M.

I, PETER THORNBURGH served same on <u>URSULA CABERTA</u>, at 25 BELLEVIEW BLVD., CLEARWATER, FL 34616 on JULY 27, 2000 at 11:00 A.M.

**INDIVIDUAL SERVICE**

By serving the within named person a copy of the above named document(s). FS 48.031(1)

The foregoing instrument was              GIETZEN & ASSOCIATES, INC.
acknowledged before me this day           1302 N. MARION ST.
by the process server who is              TAMPA, FL 33602
personally known to me.                   OFFICE (813) 223-3233
July 27th, 2000

_____                    _____
NOTARY                                    PETER THORNBURGH 47-5172226

INDEX   13343
                Robert W Gietzen
                My Commission CC845718
                Expires July 18, 2003

AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

MIDDLE ——— DISTRICT OF ——— FLORIDA

HUBERT HELLER, an individual

## SUMMONS IN A CIVIL CASE

v.

CASE NUMBER: 8: 00CV 1528-T-27C

URSULA CABERTA, an individual

Time 11:25 am
Date 7-27-00
Signature _____

TO: (Name and address of defendant)
URSULA CABERTA
Belleview Biltmore Hotel
25 Belleview Blvd.
Clearwater, FL

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

F. Wallace Pope, Jr.
JOHNSON, BLAKELY, POPE, BOKOR, RUPPEL & BURNS, P.A.
P.O. Box 1368
Clearwater, FL  33757
727-461-1818

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

SHERYL L. LOESCH

JUL 27 2000

CLERK

DATE

_Sheri Peacock_

(BY) DEPUTY CLERK

AO 440 (Rev. 10/93) Summons in a Civil Action

## RETURN OF SERVICE

| Service of the Summons and Complaint was made by me[1] | DATE 7·27·00 |
|---|---|
| NAME OF SERVER *(PRINT)* MARILYN BOSSARD | TITLE PROCESS SERVER |

*Check one box below to indicate appropriate method of service*

☒ Served personally upon the defendant. Place where served: BELLEVIEW BILTMORE

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☐ Other *(specify):* _____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing Information contained in the Return of Service and Statement of Service Fees is true and correct.

Peter Schingbergh / Pete Thornburg;

Executed on 7/27/11    11:25 am    _Marilyn Bossard_
                _Date_                      Signature of Server

+2931·88 ave N
Address of Server

47-5173226

(1)    As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# Exhibit B

## DECLARATION OF HUBERT HELLER

I, Hubert Heller, herewith declare and state:

1. I make the following statements of my own personal knowledge and if called to testify thereto, I could and would do so competently.

2. Attached hereto as Exhibit 1 is a true and correct copy of a fax sent to me by Peter Reich on behalf of POSPartners on April 17, 2000. The fax attaches a copy of a declaration POSPartners required me to sign, constituting a "sect filter" regarding Scientology practices established by the Founder of the religion, L. Ron Hubbard.

3. Attached hereto as Exhibit 2 is an article from the German business magazine, *Berliner Wirtschaft*. The articles quotes Ursula Caberta and provides a copy of the same sect filter. Caberta essentially states in the article that the filter may be utilized because no Scientologist would "put himself in danger by signing" the filter.

I declare under the penalties of perjury that the foregoing is true and correct. Signed this 9th day of November, 2000, in Duesseldorf, Germany.

Hubert Heller

# Exhibit
# 1

## Telefax-Deckblatt

| An | Mr. Hubert Heller | Von | Peter Reich |
|---|---|---|---|
| Firma | Retail Technologies International | Firma | POSPartner GmbH Gesellschaft für Kassensysteme |
| Ort | 33755 Clearwater FL | Ort | 53639 Königswinter-Thomasberg |
| Straße | 300 N. Osceola Ave. # C2 | Straße | Wiesenstrasse 9 a |
| Telefon | 001-727 461 1329 | Telefon | 02244-8801 29 |
| Fax-Nr. | 001-603 297 9225 | Fax-Nr. | 02244-8801 18 |
| Datum | 17.04.2000 16:00 | Seiten | (incl. Deckblatt) |

| RTI: Partnership for Germany |
|---|

Sehr geehrte Mr. Heller,

by chance I started a query at yahoo.com with your name, I received as a result your personal web-page.

You declare that Scientology is important for your personal life.

As you will know, german public and federal organizations observe scientologies activities in germany.

It is not our right or intention to make any comments to anybodys personal religious or philosophical interests or preferences.

But it is vital for POSPartner as a company and for me as the director to make sure, that any business-contact is free of any intentions mentioned. This covers both products and personal contacts to our staff, prospects and customers.

We have been advised to ask you to sign the declaration enclosed, to ensure that RTI´s intention as a company is not influenced by Ron Hubbards technology.

Please be so kind to return the declaration (I am sure that you can easily translate it) signed legaly for RTI.

Mit freundlichen Grüßen
POSPartner GmbH

Peter - R. Reich

Received: 17.Apr.00 09:35 AM  From: +493244880118  To: 6032979225    Get faxes by email. Free. eFax.com    Page: 2 of 3
17/04 '00 MO  16:34 FAX +49 2244 8801 18    PosPartner GmbH    ☒002

# ERKLÄRUNG

Ich, die/der Unterzeichnende

erkläre,

1)  daß ich bzw. mein Unternehmen nicht nach der Technologie von
    L. Ron Hubbard arbeite/arbeitet,

2)  daß weder ich noch meine Mitarbeiter nach der Technologie von L.
    Ron Hubbard geschult werde/werden bzw. keine Kurse und/oder
    Seminare nach der Technologie von L. Ron Hubbard besu-
    che/besuchen und

3)  daß ich die Technologie von L. Ron Hubbard zur Führung meines
    Unternehmens (zur Durchführung meiner Seminare) ablehne.

_____          _____
        Datum                              Unterschrift

21.08.1996

# Exhibit 2

# BARTRAM BAU SYSTEM

## DAS SYSTEM MIT DEN VIELEN GESICHTERN!

### Die Vorteile auf einen Blick:

● Betreuung von der Planung bis zur Bauabnahme

● Festpreiskalkulation für das schlüsselfertige Objekt

● Kurze Bauzeiten durch Vorfertigung und Trockenausbau

● Über 1.500-fach bewährte, werthaltige Konstruktion

● Verbindliche Bautermine und güteüberwachte Qualität


Verwaltung und Ausstellung


Produktion und Lager


Vertrieb und Service

## Kann man in Zukunft noch anders bauen?

### DIPL. ING. FR. BARTRAM
GmbH & Co. KG

Postfach 1261
24591 Hohenwestedt

Tel. 04871/38-0
Fax 04871/38 29

MITGLIED GÜTESCHUTZ BETON SCHLESWIG-HOLSTEIN



Scientologen. Da das Erreichen von Macht und Einfluß oberstes Ziel der Scientologen ist, konzentrieren sie sich vor allem auf Wirtschaftsbereiche, die Menschenkontakt und Einsicht in Firmendaten bieten. Zu ihren Tummelplätzen gehören Unternehmensberatung, Managerschulung und Headhunting ebenso, wie die Branchen der Stilberatung, Software, Franchising und Direktvertrieb.

Kein Wunder auch, wenn die Scientologen vor allem in den neuen Bundesländern aktiv sind. Schon jetzt schätzt Ursula Caberta, daß ein gutes Drittel der Gesamteinnahmen der Scientology-Sekte aus Deutschland und der Schweiz kommen.

Wie kann man sich aber vor der Hubbard-Organisation schützen? Namenslisten infiltrierter Unternehmen sind nach Auffassung der Expertin datenschutzrechtlich problematisch und längerfristig unwirksam, weil die cleveren Sektenmanager oft die Firmennamen ändern. Wirksamen Schutz aber bietet nach den Erfahrungen von Frau Caberta eine Erklärung, die möglichst bei jedem Verdacht auf Kontakt zu Scientology zum Bestandteil geschäftlicher Verträge gemacht werden sollte (s. Kasten). „Kein Scientologe wird die verbindliche Verzichtserklärung in dieser Form unterschreiben", erklärt die Referentin aus der Elbmetropole. Und hat man Zweifel, ob nicht auch das angebotene Führungsseminar aus der Werkstatt Hubbards kommt, so sollten die Kursunterlagen zur unverbindlichen Prüfung angefordert werden. „Dieser Gefahr, vor

## Vertragsklauseln als Sektenfilter

Geschäftsleute, die sicher gehen wollen, daß der Partner kein Anhänger der Scientology-Sekte ist, sollten sich die folgende Erklärung unterschreiben lassen oder sie noch besser zum Bestandteil des Vertrages machen:

### Erklärung

Ich, die/der Unterzeichnende erkläre,

1. daß ich bzw. mein Unternehmen nicht nach der Technologie von L. Ron Hubbard arbeite,

2. daß weder ich noch meine Mitarbeiter nach der Technologie von L. Ron Hubbard geschult werden bzw. keine Kurse und/oder Seminare nach der Technologie von L. Ron Hubbard besuchen und

3. daß ich die Technologie von L. Ron Hubbard zur Führung meines Unternehmens (zur Durchführung meiner Seminare) ablehne.

dem ersten Kontakt bereits entlarvt zu werden, setzen sich die Scientologen nicht aus," versichert Ursula Caberta. „La



*Außergewöhnlich groß war das Interesse von Firmen und Presse an der IHK-Veranstaltung über die Scientologen, zu der der Arbeitskreis für Sicherheit bei der IHK Berlin und die Berliner Wirtschaftsjunioren eingeladen hatten.*

**Umweltausschuß**

## Strategische Allianzen bilden

Der Umweltausschuß konnte zu seiner Sitzung am 15. März Staatssekretär Dr. Hans Heuer von der Senatsverwaltung für Wirtschaft und Technologie zu einer Diskussion über zukünftige Perspektiven der Berliner Umweltschutzwirtschaft begrüßen. Dabei orientierte man sich an den wesentlichen Aussagen des Ifo-Gut-

achtens „Standortbedingungen Berlins für umwelttechnische Produktionen und Dienstleistungen".

Das Ifo hat u. a. ermittelt, daß zwischen einem erheblichen Nachfragepotential an Umweltgütern und -dienstleistungen im Wirtschaftsraum in den nächsten fünf Jahren (Schätzung 37 Mrd.