IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HUBERT HELLER, an individual,

        Plaintiff,

v.                            Case No. 8:00 CV-1528-T-27C

URSULA CABERTA, an individual,

        Defendant.

_____/

**PLAINTIFF'S OPPOSITION TO "DEFENDANT'S
OBJECTION TO MAGISTRATE'S ORDER OF MAY 8, 2001"
and
OPPOSITION TO MOTION FOR STAY OF DISCOVERY**

**I - INTRODUCTION**

Since shortly after this case was filed in July of 2000, plaintiff has sought basic discovery. Defendant, Ursula Caberta has thwarted all discovery efforts. She has filed repeated motions to stay discovery, she has pretended she would appear for deposition, and then refused to appear. She thereafter argued that her alleged agreement to appear for deposition before she reneged somehow fulfilled her discovery obligations.

After hundreds of hours of efforts by plaintiff's counsel, an Order from this Court that discovery go forward and two Orders from Judge Jenkins, the end result has been that Ms. Caberta has provided no discovery whatsoever.

Moreover, defendant's repeated assertion that she agreed to appear in

Germany, but that plaintiff "unilaterally canceled" the deposition, is most disingenuous. The scheduled deposition was postponed because the American Embassy was unable to acquire the necessary approvals in time to take the deposition. After further attempts to re-schedule were impeded by Caberta, she then *refused to appear entirely* for deposition in Germany. Thus, plaintiff sought an Order simply compelling defendant to appear for deposition, which was granted by Judge Jenkins. Plaintiff therefore noticed defendant's deposition in this district, but she failed either to appear or even to inform counsel that she was not appearing.

After her no-show, Defendant moved for a protective order, arguing that her prior alleged *agreement* to appear was sufficient to eliminate any further deposition obligation. Judge Jenkins disagreed and again ordered defendant to appear – this time in this district – where this Court has already found personal jurisdiction.

Defendant demands in her Objection to the Magistrate Judge's Order that plaintiff be required to undertake the complicated provisions of the Hague Convention for any discovery. These provisions, such as letters rogatory, would simply mean more months of delay and, contrary to defendant's assertion, would be far more expensive than a simple deposition in this District. Such procedures would also provide little actual discovery, if any.

However, in a Supplemental Memorandum filed after defendant's initial Objection, Ms. Caberta reverses her position *again*, and claims she now is willing to appear in Germany to avoid Judge Jenkins' Order that her deposition be taken in this district. At the same time, her counsel has threatened that the new proposal may also be useless, stating, "Your best chance of obtaining deposition testimony from Ms. Caberta is to accept my offer before there is intervention at a diplomatic level, which

2

may occur at any moment, and bring the entire matter to a grinding halt before you get your shot at her." But discovery came to a grinding halt months ago – indeed, it never started.

The three discovery orders issued by this Court and Judge Jenkins have not encouraged defendant to meet her discovery obligations. Defendant has engaged the plaintiff in a very expensive game of delay, obstruction and intentionally created confusion for many months, resulting in literally no discovery. Defendant's motion to vacate the Magistrate's Judge's Order should therefore be denied, and defendant ordered to pay the reasonable attorneys' fees arising out of this latest round of motions.

## II – STATEMENT OF FACTS

### A. The Initial Discovery Order

In her two motions to dismiss denied by this Court, Ms. Caberta argued that she acted at all material times in her capacity as the so-called "sect commissioner" of the city of Hamburg, Germany and within the scope of her alleged authority in performing the torts alleged in the Complaint, and is therefore immune from suit pursuant to the Foreign Sovereign Immunities Act.

By Order dated December 16, 2000, this Court granted in part and denied in part defendant's motion to dismiss the First Amended Complaint, finding that the defendant's claims of immunity under the Foreign Sovereign Immunities Act were overcome by the allegations in the Complaint. The Court dismissed the state law claims without prejudice, giving leave to amend.

Plaintiff filed a Second Amended Complaint, re-pleading the state law claims. Ms. Caberta filed a further motion to dismiss, submitting affidavits of both herself and her direct superior in Hamburg, Willi Beiss, addressing the alleged scope of Ms.

Caberta's employment and duties. (Exs. 1 and 2.)  By Order dated February 15, 2001, this Court denied defendant's second motion to dismiss, denied the defendant's second motion to stay discovery, and gave leave to plaintiff to conduct discovery, "limited to the FSIA issues and this Court's exercise of jurisdiction over Defendant." (Ex. 3.)

**B. Plaintiff's Attempts to Acquire Deposition Discovery**

The history of many months of attempts by plaintiff to acquire Ms. Caberta's deposition is filled with numerous efforts by Caberta to impede any actual testimony. In light of the misrepresentations of defendant's counsel regarding this history, each letter and communication was set forth in the plaintiff's opposition to Caberta's motion to vacate the Magistrate Judge's deposition Order, filed by plaintiff on April 30, 2001. (Docket Number 67.)   Other than the following brief summary, plaintiff will not here repeat the cumbersome details of this history of attempts to acquire Ms. Caberta's deposition, but respectfully refers the Court to such paper and the exhibits referenced therein.

In sum:  plaintiff offered several times to go to Germany to take Ms. Caberta's deposition as a courtesy to the witness and to expedite discovery.   A deposition in Germany can *only* be accomplished by the voluntary appearance of the witness, and then held at the American Embassy.   Defendant's counsel declined for months, after which a motion to compel was filed on March 6, 2001.   Thereafter, defendant "agreed" to appear in Germany.  However, the date offered by defendant for her appearance left insufficient time to arrange the deposition through the U.S. Embassy, which required a minimum of 3 weeks lead time.  The purported agreed upon date of the deposition was therefore canceled by plaintiff and later dates were sought from Ms. Caberta's counsel. Caberta then made it clear that her alleged "agreement" to testify meant only that she

4

would testify to the extent her superiors allegedly permitted her to testify, and that she
would not necessarily provide *any* actual answers to deposition questions.[1] Then,
rejecting several attempts by plaintiff to re-schedule, defendant notified plaintiff and
the American Embassy that she refused to appear at all.[2]  Plaintiff therefore acquired

---

[1] For example, plaintiff's counsel, Kendrick Moxon, wrote several times to Ms.
Caberta's attorney in an effort to determine if a trip to Germany would be worthwhile
or fruitless.  After several evasive answers, plaintiff's counsel asked, in bold and
italicized language, "My question, again, is simply this:  **will Caberta now appear in
Germany and actually *testify*?**" (Ex. 4.)  In a responsive letter from Caberta's
counsel, John Merrett, dated April 17, 2001, he stated:  "There should be no confusion
regarding the deposition of the Defendant.  She has always been willing to provide
whatever her government will allow her to provide.  *I have repeatedly warned you
that that may be nothing at all....* However, as I said, if the Plaintiff will advance the
costs involved, I will meet you along with my client in Hamburg at an agreed time
*and we will find out together the state of inquiry permitted* by her government." (Ex.
5.) (emphasis added.)

[2] In an e-mail dated April 20, 2001 from the U.S. Embassy in Berlin to plaintiff's
counsel, the Judicial Coordinator stated that the depositions cannot go forward, "as the
witnesses have categorically refused to attend.... I am in possession of two letters on
headed paper from the Interior Ministry Hamburg stating that Herr Willi Beiss and
Frau Ursula Caberta refuse to attend." (Ex. 6.)  In the letter to the American Embassy
from Ms. Caberta's superior and affiant Willi Beiss, he stated in part:

> The performance of Rechtshilfe [legal aid] is governed in the
> relationship of the Federal Republic of Germany and the United States
> of America according to the Rules of the Agreement of The Hague of 18
> March 1970 about  depositions abroad in civil and trade matters ... A
> deposition ... in the country is basically not allowed, when it relates to
> German nationals, but through German-American exchange of notes
> about the hearing of witnesses through American consuls in the Federal
> Republic of Germany an exception to this restriction was agreed. For the
> hearing some prerequisites were defined already years ago. The German
> side reminded representatives of the American embassy during recent
> discussions to follow these prerequisites. Amongst others they are:
> "There is no enforcement to the persons to be questioned of any kind,
> neither to appear, nor to make statements, no[r] to make an oath."

5

an Order dated March 29, 2001 compelling the deposition.

Whipsawed and thwarted after months of obstruction in attempting to acquire Ms. Caberta's deposition in Germany, plaintiff thereafter noticed her deposition in this district – as is his right. Ms. Caberta failed to appear and after her no show, filed a motion to vacate Judge Jenkins' Order of March 29th. Plaintiff cross-moved to compel her deposition.

Following review of these lengthy papers and more than 45 exhibits, in her Order of May 8, 2001, Judge Jenkins found that it was factually and legally appropriate for the defendant to come to this district for her deposition. Judge Jenkins denied plaintiff's request for evidentiary sanctions without prejudice, noting that she was providing an additional 20 days to Ms. Caberta to comply. (Ex. 8.)

Caberta now claims that plaintiff should not be permitted a deposition on U.S. soil, but should be required to plow through the difficult Hague Convention procedures, to acquire far more limited discovery than is permitted under the federal rules. (Ex. 9.) The primary focus of her Objection is that defendant's air travel to the United States would be expensive and inconvenient. Thus, she argues, plaintiff should be required to undertake what is argued to be a *more convenient* and less expensive means of discovery, to wit:

- listing all questions sought to be asked of the defendant and translating all in writing in German;

- applying through U.S., diplomatic channels for permission to provide the questions to Caberta;

---

Referring to this legal basis I am letting you know also on behalf of Mrs Caberta that neither Mrs Caberta nor myself will appear at the planned witness deposition in the American Consulate in Hamburg." (Ex. 7.)

- negotiations through State Department channels in Germany with German authorities for leave of the Federal Ministry of Justice to permit the discovery to go forward;

- if granted, those questions which the Ministry of Justice believed pertinent and permissible, would be provided to a German Judge to ask of Caberta;

- when a German judge is selected and educated on the issues of the case, he could select what questions he deemed appropriate, and set a date for the questioning;

- counsel for the parties would then fly to Germany and attend a proceeding, in which a German judge would ask the questions of Caberta he believed appropriate, while her counsel and plaintiff's counsel stood by;

- plaintiff's counsel could seek leave on the spot to seek answers to follow up questions, but such permission is (according to the U.S. State Department), sometimes granted.

- if the German judge is convinced that the follow up questions are appropriate, the judge could pose them to the witness;

- no compulsion of responses is available should Caberta decline to respond or respond evasively;

- assuming Caberta answered the questions, no court reporter would record the answers, since court reporters are forbidden to make verbatim transcripts in German courts, but rather, a clerk would make a summary of the responses in German, which summary would be translated into English;

- counsel for the parties would return to the United States, where in all likelihood, they would debate the accuracy of the German summary and its evidentiary value.

If even half of the procedures listed above are accurate, the cost of the Hague procedure would far outstrip the cost of Caberta's trip to the States, requiring several dozens of hours of attorney time, involving several State Department officials, German Ministry of Justice officials, German judges, and eventually, travel to Germany.

Indeed, the instant motion and response have *already* consumed much more in attorneys' fees than the mere transportation expense of Ms. Caberta to travel to this district. Defendant's assertion that the Hague convention procedures contemplate that no one will bear the cost of transatlantic airfare (Objection at 4), is also quite incorrect – both plaintiff's counsel and defendant's counsel would necessarily fly to Germany. Defendant's "expense" argument is therefore a litigation ploy.

Notwithstanding Judge Jenkins' Order of May 8, 2001 requiring Ms. Caberta to appear in this district, and since Caberta's filing of the Objection thereto, she has now filed a supplemental memorandum indicating that she has reversed her position *again* and is now purportedly willing to appear for deposition in Germany.

Plaintiff's counsel made several attempts to learn if the offer was genuine and to acquire a firm representation from defendant's counsel that Ms. Caberta would actually provide testimony and not merely assert privileges to refuse to testify. (Exs. 10-14.) Ms. Caberta's counsel stated that she would assert a self-incrimination claim regarding receipt of funds from Robert Minton, and that he "believed" she would testify as to the scope of her work, but stated (in between various inaccurate, irrelevant and caustic comments):

> However, as you know, this case involves the German Republic and the State of Hamburg. I have no information about what they will do. You know everything I know about the situation. .... Your best chance of obtaining deposition testimony from Ms. Caberta is to accept my offer before there is intervention at a diplomatic level, which may occur at any moment, and bring the entire matter to a grinding halt before you get your shot at her.

(Ex. 14.)

Even if this new "offer" is accepted, the minimum time to set the deposition at the Embassy would be 3 more weeks, and defendant declines clearly even to represent

8

that she will provide responsive testimony.

In short, even now defendant seeks only to delay, obstruct and create confusion in avoidance of discovery.

## III. ARGUMENT

### A.    Plaintiff Is Not Required to Proceed under the Hague Convention or Other Diplomatic Channels to Acquire Defendant's Deposition

The affidavits of Ms. Caberta and Willi Beiss (Exs. 1 & 2), asserted that Ms. Caberta was essentially engaged in enforcement of a commercial boycott of Scientologists, and dissemination of a "sect filter" to identify and discriminate against members of the Scientology religion to stem the expansion of the religion in Germany – acts plaintiff contends violate German Constitutional law, treaties with the United States and international human rights law. These are the very types of activities which would fall within the scope of exceptions to the general immunity provisions of the FSIA. *See*, e.g., *Byrd v. Corporacion Forestal y Industrial de Olancho, S.A.*, 182 F.3d 380, 388 (5th Cir. 1999); *Chuidian v. Philippine National Bank*, 912 F.2d 1095 (9th Cir. 1990); *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996); *Trajano v. Marcos*, 978 F.2d 493, 497 (9th Cir. 1992); *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 306 (9th Cir. 1997).

To support her FSIA jurisdictional position, Ms. Caberta's affidavits asserted she acted within the scope of her allegedly official duties. Her arguments and affidavits gave rise to this Court's Order that discovery proceed on this issue.

Defendant cannot assert factual conclusions – particularly in testimonial form – and then refuse to be cross examined as to such matters. United States courts are not obligated to give up their discovery jurisdiction over a party over whom personal jurisdiction has already been found, in lieu of following complex Hague Convention

procedures. The Supreme Court has made it clear that the Hague Convention does not supplant the Federal Rules of Civil Procedure, but is "a permissive supplement ... for other means of obtaining evidence located abroad." *Societe Nationale Industrielle Aerospatiale v. U. S. District Court for Southern District of Iowa*, 482 U.S. 522, 536, 107 S.Ct. 2542, (1987). The Court also ruled, with respect to a French discovery blocking statute intended to stop American depositions:

> It is well settled that such statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute. *See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 204-206, 78 S.Ct. 1087, 1091-1092, 2 L.Ed.2d 1255 (1958). Nor can the enactment of such a statute by a foreign nation require American courts to engraft a rule of first resort onto the Hague Convention, or otherwise to provide the nationals of such a country with a preferred status in our courts. It is clear that American courts are not required to adhere blindly to the directives of such a statute. Indeed, the language of the statute, if taken literally, would appear to represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge, forbidding him or her to order any discovery from a party of French nationality, even simple requests for admissions or interrogatories that the party could respond to on the basis of personal knowledge.

482 U.S. 522, 107 S.Ct. 2542 at 2555-56, fn. 29.

A number of cases following *Societe Nationale Industrielle Aerospatiale* have held that litigants need not attempt to utilize Hague Convention procedures before utilizing discovery methods under the Federal Rules. *Hudson v. Hermann Pfauter GmbH & Co.*, 117 F.R.D. 33, 36 (N.D.N.Y. 1987); *Doster v. Schenk*, 141 F.R.D. 50 (M.D.N.C. 1991); *In re Aircrash Disaster Near Roselawn, Indiana Oct. 31, 1994*, 172 F.R.D. 295, 310 (N.D.Ill. 1997) (refusing to apply Convention instead of Federal Rules to request for document production because "[t]he overriding interest of our court

10

system is the just, speedy, and inexpensive determination of litigation. We find use of the Convention Letters of Rogatory to be an unnecessary, complicated, time consuming and expensive means of discovery, thus thwarting the interests of our court system.")

Thus, Ms. Caberta's endeavor to force plaintiff to use Convention procedures at the exclusion of the Federal Rules, must fail. Indeed, it is Caberta's intention that plaintiff's efforts to undertake discovery in Germany fail, as evidenced by her refusal to testify and persistent obstruction.

Moreover, the Hague Convention does not permit depositions as we know them. Rather, discovery is undertaken through the submission of specific questions through diplomatic channels to judicial authorities in Germany, where a judge may consider them and may ask the questions of a witness he considers appropriate. Given the animosity of the defendant[3] as well as the continued animosity of her government toward the plaintiff's religion generated largely by Ms. Caberta's campaign,[4] and the extremely constrained method of acquiring evidence via a German judge in which no verbatim record is made, it is unlikely that such a procedure would result in the production of useful testimony. While pretending plaintiff need go through the

---

[3] Ms. Caberta, as the Hamburg "sect commissioner," has been identified by the U.S. State Department as having violated human rights of Scientologists in Germany. (Ex. 15.) Ms. Caberta's commentary about Scientology (or if made regarding nearly any religion) would be shocking to the American conscience and our attitudes toward religious liberties, and harkens back to a less enlightened period of German history. Indeed, Ms. Caberta is quoted in the media as being proud to be referred to as the "new Goebbels" – the former Nazi minister of Propaganda. (See, e.g., Ex. 16.)

[4] A member of the Scientology religion received political asylum in the United States from a Florida federal court, arising out of official persecution against members of her religion in Germany. (Ex. 17.)

laborious and useless Hague Convention route, Caberta also refused to testify pursuant to the alternative letter agreement between Germany and the United States. As indicated both in the letter of Willi Beiss (Ex. 7), and the printed instructions from the American Embassy in Germany (Ex. 9), there exists a supplemental agreement between Germany and the United States permitting depositions to be set informally and taken at the American Embassy or consular offices in Germany. But, that agreement permits only wholly *voluntary* depositions.

Indeed, in Ms. Caberta's motion which was denied by Judge Jenkins, she conceded that "it was decided by the government of Hamburg and/or the German Republic that Defendant will not be permitted to give a deposition concerning her duties and activities with the government of Hamburg, including the declaration which is the subject of this action ..." Thus, defendant can easily hamstring any official attempts to acquire discovery, as she has done thus far.

Moreover, it appears that the Hague route has also been effectively exhausted by Caberta's refusal to appear. The U.S. Embassy legal staff attempting to facilitate the deposition have concurred that given these refusals, "that is all we can do as far as Hague Convention goes." (Ex. 18.) Thus, even a Hague Convention method would be useless and illusory at this point.

As noted above, since the filing of defendant's Objection, she has reversed herself and purportedly offered to appear voluntarily in Germany as opposed to appearing in this district. This new offer is also illusory, as the correspondence of May 18, 2001 regarding this alleged offer reveals. (Exs.10-14.)

Local Rule 3.04(b) states the general policy of this district, that a non-resident defendant who intends to be present at trial may reasonably be deposed at least once in

12

this district.  Although plaintiff repeatedly offered Ms. Caberta the option of scheduling her deposition in Germany, plaintiff's patience is exhausted, and defendant's counsel has made it clear that there will be no good faith cooperation. Plaintiff simply now seeks the deposition in the district to which he is entitled.

The local rule is consistent with substantial judicial authority.  Under *Aerospatiale* and the line of cases it endorsed, it is clear that the court is empowered to impose appropriate sanctions upon a foreign plaintiff over whom personal jurisdiction has been acquired, as in this case, including judgment for the plaintiff, if the defendant refuses to comply with a discovery order.  *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1474 (9th Cir. 1992); *Rachis v. Maschinenfaprik Hehl & Soehne*, 1986 WL 9274 (E.D.Pa. 1986); *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705-06 (1982) (failure to abide by discovery order subjects a party to Rule 37 sanctions, including a finding of jurisdiction pursuant to Rule 37(b)(2)(A), allowing designated facts to be established).

In that defendant may or may not actually provide testimony in Germany, there is no genuine reason for the deposition not to occur in this district, under Rules familiar to all concerned, and under which this Court must ultimately rest its decisions and procedures.

In the event that this Court reverses Judge Jenkins' Order and permits Caberta the opportunity to testify in Germany rather than in the States, certainly Caberta should be ordered to pay the reasonable fees incurred by plaintiff in the several about-faces requiring that plaintiff twice brief this issue.  (Ex. 19, Declaration of Kendrick L. Moxon.)

## IV - CONCLUSION

For the reasons stated above, defendant's Objection to the Magistrate's Order should be denied, and Ms. Caberta ordered to appear for deposition forthwith. Defendant and her counsel should also be sanctioned in the amount of the reasonable time expended in the amount of $5,455.00 as set forth in the accompanying declaration of counsel.  (Ex. 19.)

Dated: May 24, 2001                       Respectfully submitted,

Kendrick Moxon
Helena Kobrin
FBN #:  0259713
MOXON & KOBRIN
1100 Cleveland Street, Suite 900
Clearwater, FL  33755
(727) 443-5620

F. Wallace Pope, Jr.
FBN #:  124449
JOHNSON, BLAKELY, POPE, BOKOR,
RUPPEL & BURNS, P.A.
P.O. Box 1368
Clearwater, Fla.  33757
(727) 461-1818

Attorneys for Plaintiff

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused the foregoing **PLAINTIFF'S OPPOSITION TO "DEFENDANT'S OBJECTION TO MAGISTRATE'S ORDER OF MAY 8, 2001" and OPPOSITION TO MOTION FOR STAY OF DISCOVERY** to be served on this 24th day of May, 2001, by U.S. Mail, to John Merrett, 2716 Herschel St., Jacksonville, FL 32205.

_____
Attorney

15

Due to the physical nature of
exhibit, it is not scanned;
please see case file.