IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HUBERT HELLER, an individual,

        Plaintiff,

    v.                              Case No. 8:00 CV-1528-T-27C

URSULA CABERTA, an individual,

        Defendant.
_____/

## PLAINTIFF'S MOTION TO COMPEL FURTHER DEPOSITION OF DEFENDANT URSULA CABERTA; TO COMPEL RESPONSES TO DEPOSITION QUESTIONS; AND FOR FEES AND COSTS

### I - INTRODUCTION

On July 26, 2001, defendant Ursula Caberta's deposition finally went forward in Germany.  However, notwithstanding two orders from this Court and one Order from Judge Wilson, Ms. Caberta refused to obey as to the timing of the deposition, failing to appear on the first of two days the deposition was scheduled.  The second and only day of the deposition was marked with lengthy breaks by the witness, lengthy non-responsive speeches and argument by the witness, interruptions and commentary by Ms. Caberta's subordinate attending the deposition and time wasting protocol discussions and interruptions.

The total time expended in actually *questioning* the witness was only 4 hours and 20 minutes out of a deposition ordered by the Court for two days.  Moreover, the witness refused to answer many questions.  She also responded to many questions in an evasive and argumentative fashion requiring repetition of questions, many of which

were never directly answered.   Adding to that the inherent complication of the need to translate questions and answers (the primary reason why the deposition was initially ordered for two full days), the result was that the deposition was far less complete or productive than the Court intended and the plaintiff paid for.

The deposition went forward in Germany solely as an accommodation to the defendant and under the assumption that the defendant and her counsel would act in good faith and comply with the scheduling Orders of the Court to make the deposition viable.  Indeed, the Court specifically admonished counsel that in permitting the deposition to go forward in Germany rather than in this district, it expected the deposition to go smoothly and would issue sanctions if warranted.  Ms. Caberta and her counsel declined to heed that admonition, refused to comply with the Court's scheduling orders and wasted substantial time, resources and plaintiff's funds in the process.

Plaintiff accordingly moves that Ms. Caberta be ordered to appear in this district to complete her deposition, to respond to plaintiff's questions, and to pay the reasonable fees and costs incurred in the aborted German deposition necessitated by her conduct.

## II – STATEMENT OF FACTS

### A.    The Court's Initial Discovery Order

In her two motions to dismiss denied by this Court, Ms. Caberta argued that she acted at all material times in her capacity as the so-called "sect commissioner" of the city of Hamburg, Germany within the scope of her alleged authority in performing the torts alleged in the Complaint, and is therefore immune from suit pursuant to the Foreign Sovereign Immunities Act.

2

By Order dated December 16, 2000, Judge Whittemore granted in part and denied in part defendant's motion to dismiss the First Amended Complaint, finding that the defendant's claims of immunity under the Foreign Sovereign Immunities Act were overcome by the allegations in the Complaint. The Court dismissed the state law claims without prejudice, giving leave to amend.

Plaintiff filed a Second Amended Complaint, re-pleading state law claims, and Ms. Caberta filed a further motion to dismiss, submitting an affidavit addressing the alleged scope of her employment and duties. By Order dated February 15, 2001, Judge Whittemore Court denied defendant's second motion to dismiss, denied the defendant's second motion to stay discovery, and gave leave to plaintiff to conduct discovery, "limited to the FSIA issues and this Court's exercise of jurisdiction over Defendant." (Ex. 1, p. 5.) The central bases for establishing an exception to the the FSIA, are that the acts undertaken by Ms. Caberta are illegal under German and international law, and that the acts are commercial acts – either of which fall outside the protection of the FSIA.

**B.    Plaintiff's Attempts to Acquire Deposition Discovery**

The history of many months of attempts by plaintiff to acquire Ms. Caberta's deposition is filled with numerous efforts by Caberta to prevent the deposition. This history was set forth in the plaintiff's Opposition to Caberta's motion to vacate this Court deposition Order, filed by plaintiff on April 30, 2001. (Docket Number 67.) Other than the following brief summary, plaintiff will not here repeat the cumbersome details of the attempts to acquire Ms. Caberta's deposition, but respectfully refers the Court to such paper and the exhibits referenced therein.

In summary: starting in the summer of 2000, plaintiff offered several times to

3

go to Germany to take Ms. Caberta's deposition as a courtesy to the witness and to expedite discovery. A deposition in Germany can *only* be accomplished by the voluntary appearance of the witness, and then held at the American Embassy. Defendant's counsel declined to appear for months, after which a motion to compel was filed on March 6, 2001. Thereafter, defendant agreed to appear in Germany. However, the date offered by defendant for her appearance left insufficient time to arrange the deposition through the U.S. Embassy, which required a minimum of 3 weeks lead time. The purported agreed upon date of the deposition was therefore canceled and later dates were sought from Ms. Caberta's counsel without success. Plaintiff therefore acquired an Order from this Court dated March 29, 2001 compelling the deposition. (Ex. 2.) Then, rejecting several attempts to re-schedule, defendant refused to appear at all. (Ex. 3.)

As Ms. Caberta had refused to appear in Germany, plaintiff noticed her deposition in this district – as is his right. Ms. Caberta failed to appear or even communicate with plaintiff's counsel indicating she was not appearing. (Ex. 4, Declaration Kendrick L. Moxon.) After her no-show, Caberta filed a motion to vacate this Court's Order of March 29th. Plaintiff cross-moved to, again, compel her deposition.

In its Order of May 8, 2001, this Court found that it was factually and legally appropriate for the defendant to come to this district for her deposition. This Court further denied plaintiff's request for evidentiary sanctions without prejudice, noting that it was providing an additional 20 days to Ms. Caberta to comply. (Ex. 5.)

Defendant filed an Objection to the Order of May 8, 2001. While affirming this Court's Order, Judge Whittemore *sua sponte* also ruled on June 5, 2001, that Ms.

Caberta could elect to have her deposition taken in Germany. Defendant thereafter indicated she wished to appear in Germany, and asked for plaintiff's available dates. (Ex. 6.) Plaintiff immediately responded by letter faxed to defendant's counsel on June 15, 2001 seeking available dates. (Ex. 7.)

No response was received to this letter, so a nudge letter was faxed on June 19th, 2001, noting the failure of response, and reiterating that the Embassy requires 3 weeks lead time on scheduling depositions in Germany, and the need for advance booking of the interpreter and court reporter. (Ex. 8.)

On June 20th, a further letter was sent to defendant's counsel requesting dates for the deposition to avoid motion practice. (Ex. 9.)

On June 22nd, plaintiff's counsel wrote again to Mr. Merrett, stating:

> [O]ver a week ago you informed me that Ms. Caberta would agree to appear in Germany. Despite three letters, you have, however, failed to indicate *when* she would appear, thus preventing any arrangements from being made with the Embassy. My options are to either: 1) schedule the deposition at my convenience; or 2) file a motion to require you to meet your responsibilities; or 3) you could just give me the dates. If I don't hear from you by Monday, June 25, I will pursue option numbers 1 or 2.

(Ex. 10.)

Hearing again no response, a notice of deposition was sent on June 27th, noticing the deposition for July 25th and 26th. A formal request was sent to the Embassy in Germany for the deposition on June 28, 2001,[1] with a copy to defendant's counsel, and setting the dates for the deposition at July 25th and 26th as noticed and served. (Ex. 11.) The logistics involved in retaining a court reporter and interpreter

---

[1] The embassy charges $400.00 to process the request.

were complex and time consuming, as very few court reporters exist in Germany and both reporters and interpreters are very much in demand and book events weeks or *months* in advance.  Interpreters and court reporters are thus able to demand non-refundable retainers for their work, or obligations to pay a fixed and substantial rate. Plaintiff's counsel therefore waited several additional days after the notice of deposition was served in the event that the notice might spur defendant to file another motion for protective order or some informal objection to the date of the deposition, and in consideration of the expense involved in their retention.  After several days and no objection having been received to the noticed deposition dates, the court reporter and interpreter were retained at virtually the last possible time they could be booked, in light of the July 31st discovery cutoff.

On July 16th, the Embassy in Germany forwarded a letter from Ms. Caberta objecting to the dates of the deposition stating only that the deposition would have to be held on a later date.  (Ex. 12.)  Plaintiff's counsel immediately faxed a letter to defendant's counsel on July 16th, stating the deposition cannot be changed at this late date. (Ex. 13.)  Counsel spoke by telephone and attempted to reach an agreement on new dates if it was possible, but this attempt continued to be hindered by Ms. Caberta. (Ex. 14, Letter of July 17th.)  Plaintiff attempted to work out other contingencies on the 18th, and a number of letters were exchanged with Caberta's counsel on this date. (Ex. 15.)  Further attempts to re-schedule the deposition were, however, fruitless, as it was logistically too late to move the deposition and Ms. Caberta continued to make only illogical and essentially useless offers. (Ex. 16, Moxon letter of July 19th.)

Thus, Ms. Caberta's counsel agreed that the scheduled dates were the only

remaining possibility, and stated he *would* appear on July 25th and 26th, and so informed his client. (Ex. 17, Merrett letter of July 19th.)

Nevertheless, Caberta continued to object and on the morning of July 20th, "offered" at that late date, a total of two hours for her deposition on July 26th, asserting that she had to go to a conference in Berlin on the 25th and 26th.  (Ex. 18.)  The same letter indicated that Ms. Caberta was otherwise occupied on July 27th.  Plaintiff's counsel declined the offer precipitating the emergency motion heard by this Court on July 20th.  At that hearing, defendant's American attorney, John Merrett, and her identified German attorney, Runger Hintze, argued that she was busy at a planned conference in Berlin and sought to cancel the deposition.  Plaintiff offered that the deposition could proceed in Florida if defendant paid minimal costs incurred in arranging the deposition, but did not even demand or seek attorneys' fees at that time. Ms. Caberta's counsel rejected the offer to come to Florida at a later date.

This Court orally ruled that since the burden of missing part of her conference was far less than coming to Florida, and since Mr. Hintze represented to the court that she could come back to Hamburg from Berlin in only 1 ½ hours on a high speed train, and since it was Ms. Caberta's failure to cooperate to set the deposition that caused the situation, that she must appear at 2:00 p.m. on the 25th in Hamburg, continue as late as practicable that day to get as full a day as possible, and begin at 9:00 a.m. or as early as possible on the 26th in Hamburg to complete the deposition.

Ms. Caberta's counsel, John Merrett, thereafter contacted plaintiff's counsel and provided his personal contact information in Europe, and indicated he was leaving over the weekend for the deposition. (Ex. 4, Declaration of Kendrick Moxon.)

7

On Friday, July 20th after 5:30 p.m., attorney Robert Merkle contacted plaintiff's counsel and indicated he has just filed an appearance for Ms. Caberta and again attempted to stop the deposition upon which this Court had earlier that day ruled. When that demand was refused, Mr. Merkle asserted that he would file yet *another* motion for protective order unless the deposition was canceled.  Plaintiff's counsel declined.  Over the weekend, plaintiff's counsel left for Germany to meet with German counsel and prepare for the deposition scheduled for the 25th. (*Id.*)

Thereafter, on July 23rd, a further motion for protective order arrived by fax after 5:00 p.m. at plaintiff's counsel's Florida office, and was forwarded immediately to plaintiff's counsel already in Germany, arriving near midnight German time. Because the motion sought emergency relief the following day to cancel the deposition, plaintiff's counsel was required to stay up much of the night preparing a response to defendant's latest emergency motion, which was emailed to Florida for filing on the morning of the 24th. (*Id.*)

Judge Wilson, sitting in this Court's absence, denied Ms. Caberta's emergency motion on the 24th (Ex. 19), thus requiring that the deposition go forward.

On July 25th, plaintiff's counsel, his paralegal, a court reporter, an interpreter, and a videographer all appeared at the American Consulate in Hamburg before 2:00 p.m. for the start of Ms. Caberta's deposition. (Ex. 20, Transcript, July 25, 2000.)  Ms. Caberta's attorney, John Merrett, also appeared, and announced that Ms. Caberta *would not* be appearing until the following day. (*Id.*, pp. 4-5.)  With no witness and no alternative, the deposition was suspended until the following day.

C.    **Proceedings at the Deposition**

1. **A Great of Time Was Wasted by the Witness Arguing,
   Commenting and Giving Non-responsive or Evasive Answers.**

On July 26, 2001, Ms. Caberta appeared at the American Consulate at 9:00 a.m.

At the outset, lengthy speeches were made by Caberta's purported German

attorney, Mr. Hintze, and substantial additional time was wasted with speeches by the

consulate representative regarding the procedure, with oath signing, and other matters.

(Ex. 21, pp. 4-28.)  The questioning therefore did not begin until 9:53 a.m.

Ms. Caberta initially testified that she decided to leave Berlin to come to the

deposition "after discussion with relevant parties." (*Id.*, pp. 29-30.)  She made no

indication that she was unable to attend the previous day as ordered by the Court.

From the outset, the witness frequently refused directly to respond to questions,

but insisted upon making speeches on the record.  For example, a central issue in this

case is whether or not Ms. Caberta is authorized by any specific German law to

undertake the activities which she asserts are immune from tort liability.  Ms. Caberta

had previously produced only a single "report" which she wrote herself, in response to

an interrogatory seeking, "All orders, instructions, policies, guidelines, laws and statute

relating to your job scope, functions, responsibilities and duties."  She was therefore

asked at her deposition, first, if she had seen the interrogatory.  Refusing to answer the

question directly, the witness sought to inject commentary on the record. (*Id.*, pp. 31-

33.)  Asked again if the interrogatory response reflected the entirety of the responsive

records, Ms. Caberta spent pages declining to directly answer the question (*id.*, pp. 33-

37), which after further attempts, she finally answered after 16 minutes of otherwise

useless discussion. (*Id.*, p. 41, lines 7-10.)

The deposition was also marked with frequent interruptions by Ms. Caberta's subordinate in her office, Runger Hintze, who was previously identified to this Court as her German counsel. Mr. Hintze insisted upon speaking to the witness in German and coaching the witness during the pendency of questions. (*See, e.g.*, pp. 33, 36, 42, 49, 54, 66, 67, 83, 85, 86, 131, 133, 135, 138, 139.) In fact, Ms. Caberta admitted that Mr. Hintze is not a lawyer. (*Id.*, pp. 175-176.) Rather, he is Ms. Caberta's subordinate with some legal training. (*Id.*, p. 88.)

Ms. Caberta also frequently declined to directly respond to unprivileged questions, making unnecessary comments, and non-responsive remarks. (*See, e.g.*, p. 43, lines 3-14.) The situation of Ms. Caberta's refusal to directly respond to questions, but instead making irrelevant speeches, was greatly exacerbated by the need to translate her answers. Plaintiff's counsel, not able to understand German, could not know the lengthy German responses were irrelevant until after they were translated. For example, the simple question, "Is all of your work regarding Scientology official business?", was answered in a typical non-responsive fashion. (*Id.*, p. 54, line 11 to p. 55, line 6.) Had this question and non-responsive answer been given in English, it would have required only about 30 seconds. Here, the consecutive time stamp* indicates a time of just over 2 minutes.

The witness also insisted upon her non-responsive comments being accepted as her answers, and simply refused to directly answer questions until they were repeatedly asked. (*See, e.g.*, pp. 47-49, concerning whether or not Ms. Caberta wrote the "job description" for her position.) In other instances, the witness and her subordinate, Mr.

Hintze, saw fit to argue the scope of the deposition at great length.  (*Id.*, p. 85, line 20 - p. 88, line 4.)

Efforts to seek the aid of defendant's counsel to get the witness to answer questions were unavailing, as the witness continued her evasive and non-responsive answers – at one point declining to respond directly to questions and suggesting that plaintiff could sue someone else to get answers. (*See, e.g.*, p. 49, line 23 - p. 52, line 8.)

For some areas of questions, the witness simply played games and declined directly to answer.  For example, the witness was provided a copy of the affidavit she signed and filed in this case, and was asked if the statement made in one of the paragraphs was accurate. (*Id.*, p. 167.)   Her responses to repeated questions seeking only to learn the accuracy of the affidavit were (in order given):

- "If I declared this like that, it will be accurate.  What do you think?"

- [question repeated] "I made this Declaration and I don't know why you are asking this now."

- [question repeated] "If that is what I declare, then it will have to be correct."

- [question repeated] "It's a statement that I made and I do not make inaccurate statements."

- [question repeated] "I am not going to repeat the same nonsense all over again.  I already answered the question."

(*Id.*, pp. 167 - 168.)

Ms. Caberta never did answer the question.

At this point, Caberta's counsel demanded that the deposition address substantive issues relating to the defendant's dealings with plaintiff and the company

11

POS Partners, which had refused to honor the agreement with plaintiff based on alleged pressure and interference by Caberta. (*Id.*, p. 172.) Such questions were specifically beyond the scope of Judge Whittemore's discovery ruling, which, based on arguments from the defendant, limited the present scope of discovery to jurisdictional and FSIA issues. (See Ex. 1, Order, February 15, 2001, p. 5.) Caberta's counsel argued at the deposition that plaintiff was "clearly entitled" to inquire about "dealings [Caberta] had with POS Partners and Heller" and that plaintiff's refusal to so inquire was improper. Caberta's counsel therefore demanded that plaintiff cease asking jurisdictional questions, and stated: "And you will shortly be confronted with the facts in that regard [in a future dispositive motion] and you would be well advised to use the remaining hour to explore them rather than pretending surprise later on." (Ex. 21, p. 172.) While defendant's counsel declined to waive any right to object to questions outside the scope of the deposition, he asserted that questions relating to the facts and circumstances of the relationship and dealings between the parties and the third party company were "within the scope of the Court's Order." Thus, limited substantive questions were asked of the witness to avoid later discovery disputes.

Ms. Caberta also flatly refused to answer some particularly important questions on the issue of exception to immunity (because her acts are arguably outside the scope of any legitimate or authorized governmental activities.) (*See, e.g.*, p. 52, line 10-13, "Do you submit requests for funding to any governmental entity in which you identify what you are doing and what you intend to accomplish?") Ms. Caberta also refused to answer if she received money for speeches regarding Scientology outside of her government employment. Such refusal came only after a lengthy argument in which

she asserted that she had sufficiently answered the question by giving a partial and very incomplete response. (*Id.*, p. 59, line 23 - p. 65, line 4.)  This particular refusal and unnecessary argument wasted 8 ½ minutes.

Thereafter, the defendant was asked to affirm the accuracy of statements she made in an affidavit she filed in this case, in which she described a visit to the United States (paid by Minton and the Lisa McPherson Trust), regarding the use of the sect filter. (*Id.*, p. 148.)  The witness gave evasive, unresponsive and argumentative responses for more than 7 minutes before answering the question. (*Id.*, pp. 148 - 153, line 4.)

Ms. Caberta also identified records which were clearly responsive to the prior document requests and Court orders to produce, but which were not produced. (*See, e.g.*, pp. 44 – 45.)  Her refusal to provide records within her possession and custody, obviously prevented a reasonable or complete examination of the scope of her duties.

The witness also saw fit to argue the scope of entirely relevant and significant questions, such as, "Do you receive any money of any kind for any work that you do with respect to anything concerning Scientology which is not part of your job?"  In this instance, she refused to answer, then took a lengthy break, the deposition not resuming for more than 25 minutes.[2]

Ms. Caberta also asserted the equivalent of a Fifth Amendment self-incrimination privilege to refuse to testify regarding funds she had received from

_____

[2] In fairness to the witness, at two of the breaks called by plaintiff, the interpreter, who had a nursing child at home, requested extra time to collect milk.  However, the interpreter arrived back from breaks no more than 2 minutes after Caberta and her attorney returned to the room.

alleged co-conspirator Robert Minton. (*Id.*, pp. 65-66.)   The witness previously filed an affidavit as to the receipt of funds from Mr. Minton which left many facts unrevealed.  And, the witness refused even to answer if her previously filed affidavit was accurate, based upon a Fifth Amendment assertion.  Plaintiff concedes the witness has an apparent right to assert a self-incrimination privilege regarding whether or not she received bribes from Robert Minton or his company, as this is a central issue in the case.  However, Ms. Caberta's counsel ensured the questions for which she asserted a self-incrimination privilege wasted as much time as a possible, by refusing to permit a clear assertion thereof. (*Id.*, pp. 68-80.)  This same form of deposition misconduct was repeated and repeated by Ms. Caberta's counsel, John Merrett, with sarcastic remarks and commentary rather than moving the deposition forward or assisting to make the record clear. (*Id.*, pp. 77-78; 138.)

Ms. Caberta also obstructed the deposition by failing to conduct a search for records responsive to the document requests, and failing to produce records in compliance with this Court's Order of February 15, 2001 (*id.*, p. 134), taking the position that the records are located in her office but that she considers the records to be government files.  However, she stated that if there are documents she considers useful to the case, she *will* request authorization to use the documents! (*Id.*, pp. 139-140.)

### 2.    Caberta Refused to Answer Relevant and Unprivileged Questions

In addition to the evasive and non-responsive answers, Ms. Caberta also refused outright to answer other relevant questions without any assertion of privilege.  For example, the witness was questioned regarding whether or not she possessed any

records responsive to document Request number 10, which sought correspondence with alleged co-conspirator, Stacy brooks, the president of the Lisa McPherson Trust. She refused to answer, asserting the question "has nothing to do with this case." (*Id.*, p. 147, line 22 - p. 148, line 12.)

Worse, Ms. Caberta then stated that she would answer no questions regarding her relationship with the American alleged co-conspirators in this district without receiving authorization because, "it refers to part of my job." (*Id.*, p. 154, line 19 - p. 155, line 8.) She thereafter contradictorily refused to respond to any questions regarding the "Lisa McPherson trust or private trips" or expenses paid by the company on the grounds that "has nothing to do with the Caberta case." (*Id.*, p. 155, line 9 - p. 158, line 12.) Efforts to resolve the matter were fruitless. (*Id.*, pp. 158 - 160.) Eventually, the witness took another 10 minute break, and returned to assert a self-incrimination privilege as to any questions regarding the provision of favors for money relating to co-conspirator Robert Minton (recipient of an award from the defendant), or any communications with Minton or the other alleged co-conspirators, Stacy Brooks and the Lisa McPherson Trust. (*Id.*, pp. 160-161.)

As to a similar question, she refused to answer if her employees were paid by the city or by a private person to attend the award ceremony in which she gave Minton an award in Leipzig, asserting only lack of relevance. (*Id.*, p. 166, line 21 - p. 167, line 3.)

Similarly, Caberta was asked if she paid for her expenses of her trip to Florida to meet with alleged co-conspirators Minton and LMT, Inc. Her response: "It is none of your business. I am not going to answer that." (*Id.*, p. 170, lines 9-11.) Asked *when*

she received the money used for her trip, she responded, "Once again, I am not going to answer any questions apart from the POS Partner and Heller issue.  And please ask these questions now as the Court has ruled." (*Id.*, pp. 171-172.)

### 3.  Caberta Failed to Provide Records Prior to the Deposition Ordered by the Court

Ms. Caberta provided testimony indicating that a prior response to a document request was a false representation, which impeded the deposition.  On June 1, 2001, plaintiff filed a Motion to Clarify And/or Amend Order Regarding Production of Documents, relating to requests 9 through 17 of plaintiff's First Request for Production.  The motion argued that the response to these requests to produce was equivocal, asserting that "there are no records pertaining to the allegations of the complaint."  By Order dated June 21, 2001, this Court ruled," that if any records responsive to Requests 9 through 17 are in defendants possession, custody or control, they shall be produced to plaintiff within ten (10) days of this order." (Ex. 22.)  Such records sought information relating to correspondence with Robert Minton, Stacy Brooks, the Lisa McPherson Trust, Inc., and bank records reflecting the receipt of funds from Robert Minton, any agent of Minton, or from the Lisa McPherson Trust, Inc. (Ex. 23.)

Defendant failed to comply with the Court's Order.  Thus, a further motion was filed on July 12, 2001 to Compel Forthwith Compliance with Order Dated June 21, 2001.  This Court ordered defendant to file a response to such motion to compel no later than July 17th.  (Ex. 24.)  Spurred by the Order, a response was signed by defendant's counsel, John Merrett, and served stating that no records existed

16

responsive to the document requests. (Ex. 25.)  Ms. Caberta was shown the July 16th

response at her deposition and asked if the response was accurate, *i.e.*, that no records

existed.  Her answer was, "That's nonsense.  I have never seen this before.  I see it now

for the very first time, and I am not answering any questions on these items." (Ex. 21,

Depo., p. 161, line 7 - p. 162, line 16.)  She then refused to answer any questions

regarding whether or not she had conducted a search for any of the documents the

Court ordered her to produce.  (*Id.*, pp. 162-163.)  Ms. Caberta re-iterated that she had

not conducted any search for records and was seeing *the document request* for the first

time, and refused to comment further. (*Id.*, p. 163.)

Mr. Merrett took his client out of the room at that point.  (*Id.*, p. 164.)  When

she returned, she made the incredible assertion that her own personal bank records

were *government property* and that is why she did not search for them. (*Id.*, p. 164.)

Asked how her personal bank records could possibly be government property, she

refused to answer, saying her personal bank records are "none of your business ... have

nothing to do with this case, and I am not going to say any more on those." (*Id.*, pp.

164-165.)  Mr. Merrett interrupted to attempt to prevent further questioning, but the

question was again asserted, "are your personal bank records the property of the city?"

She responded, "I will not answer nonsense questions like that." (*Id.*, p. 166.)

In any event, her testimony demonstrated that 1) responsive records may exist

but the witness refused to say, and 2) defendant was not aware of the document

request, yet, a response was filed by her counsel asserting that no responsive

documents existed.

## III – ARGUMENT

### A.    The Witness Should Be Ordered To Appear in this District to Complete Her Deposition

This Court initially ordered Ms. Caberta's deposition to proceed in this district. As an accommodation to the defendant, Judge Whittemore provided her the option of having her deposition taken in Germany. This Court thereafter ordered the deposition to proceed for two full days, citing to the inherent difficulty with a translated deposition. Defendant provided no cooperation as to the dates of the deposition, causing plaintiff's counsel to expend considerable time attempting to work out dates, reporters, interpreters and government logistics in a country where depositions are unusual. After much dispute and litigation, and in deference to the desire of the witness to attend part of a conference on July 25th, the Court ordered the deposition to begin at 2:00 p.m. on the 25th, to continue as long as possible, and to resume on the early morning of the 26th so it could have a chance of completion.

Another emergency motion to compel was filed requiring extremely burdensome efforts on the part of plaintiff's counsel already in Germany, to respond. That motion was also denied.

Despite these rulings, the witness contumaciously refused to comply, and kept her own schedule. Despite the appearance of counsel, a paralegal, the reporter, the interpreter, a videographer, and State Department personnel, the witness did not appear. Thus, the planned extended-day deposition on the 25th discussed with the Court at the hearing on July 20th, never happened.

The second day of deposition on July 26th was marked with substantial time

consuming difficulties addressed above, including the fact that the court reporter had to leave before 5:00 p.m. to catch a flight – as was known to Ms. Caberta's counsel before anyone even came to Germany. Moreover, the witness destroyed substantial time with evasion and speeches in a manner that was clearly not calculated to cooperate to actually complete the deposition. These problems were exacerbated by the language barrier. The witness tended to make lengthy speeches in response to questions, and plaintiff's counsel could not know if her answers were responsive until they were translated. An analysis of the lines of the deposition during which time actual questions were posed and answers given (regardless of content), indicates only 4 hours and 20 minutes of actual Q and A. (Ex. 4, Declaration of Kendrick L. Moxon.)

The translation procedure itself also easily halved the useful length of the deposition. Thus, the 4 hour and 20 minutes actually spent in questions and answers is reasonably only about 2 hours of what would be accomplished in a normal deposition.

And, Ms. Caberta was not willing to make herself available on the 27th of July either, even had there been a court reporter or interpreter as her attorney suggested in his emergency motion, that he would attempt to arrange. The deposition was therefore not nearly completed, as many areas of questioning remained to be explored on jurisdictional FSIA issues. (Ex. 4, Declaration of Kendrick L. Moxon.)

Ms. Caberta should therefore be ordered to comply with the Court's prior Order to appear in this district, having effectively negated her prior acceptance of a deposition in Germany. Local Rule 3.04(b) states the general policy of this district, that a non-resident defendant who intends to be present at trial may reasonably be deposed at least once in this district.

Nearly a week was wasted in the travel and efforts involved in the one-day deposition, and the fault lies entirely with the defendant. Plaintiff is not nearly completed with the deposition. Completion was made impossible by virtue of the waste of time by the witness, addressed above, in refusing to appear for the time ordered, and then ensuring that the deposition could not proceed efficiently with evasion, obstruction, lengthy breaks, non-responsive speeches and interruptions. Ms. Caberta should be required to come into this district so that the deposition may be concluded and this case pass on to the next issue: determination of jurisdiction and immunity. Indeed, Caberta has already filed a renewed motion to dismiss which addresses issues about which she declined to testify or which were not reached.

**B.    Defendant Should Be Ordered to Respond to Questions**

As addressed above, Ms. Caberta refused to answer many questions relating to her relationship with Robert Minton and the Lisa McPherson Trust, Inc. in Clearwater, asserting a privilege against self-incrimination. However, there were many other questions for which no privilege was asserted, nor was any objection asserted by defendant's counsel. Rather, the only comment made by the witness was that the questions were irrelevant to this case. Those unprivileged questions sought to be compelled are:

> 1. Do you submit requests for funding to any governmental entity in which you identify what you are doing and what you intend to accomplish? (Ex. 21, p. 52.)

This question goes to the issue of the authorization of any governmental entity for the activities which Caberta claims are immune from tort liability, and which plaintiff claims are outside of the scope of her authority. If Ms. Caberta submitted a

request for funding for specific activities at issue which was approved or disapproved, it would be evidence on the issue of "government authorization."

> 2. Do you receive any monies that you deposit in you personal bank accounts from any of these speeches [about Scientology]? (*Id.*, p. 60.)

> 3. Do you receive any money beyond your expenses which you may keep, from your speeches about Scientology? (*Id.*, p. 60.)

> 4. Have you deposited any money in your private bank accounts that you have received for lectures given with respect to Scientology that is not part of your income received from the State of Hamburg? (*Id.*, p. 63.)

> 5. I want you to identify whether or not you've received any funds beyond actual expenses that you've incurred for any lecture, speech or advice regarding Scientology beyond the income you've received from the State of Hamburg? (*Id.*, p. 64.)

These questions relate to the receipt of money by Ms. Caberta for some of the activities at issue. If she received funds for these activities from private parties, plaintiff will demonstrate that under German law, the conduct is unlawful for a public official and is therefore outside the scope of any legitimate or authorized governmental activity. Ms. Caberta did not assert a self-incrimination privilege as to these questions.

> 6. Do you have any personal bank records that are property of the city? (*Id.*, p. 164.)

Leading up to this question, the witness was asked if any records existed responsive to document requests seeking financial records of funds received from Minton or Minton's company. Ms. Caberta's attorney took a break and spoke to his client privately. She then returned to the room and asserted that if the documents existed, they would be the property of the city. (*Id.*, p. 164.) With this seemingly

21

disingenuous assertion to avoid revelation that the defendant had misrepresented that no such documents existed, she was asked the obvious question quoted above. Her response to the question: "I will not say anything about my bank records because they are none of your business... That's nonsense." (*Id.*, pp. 164-65.) Defendant should be ordered to answer, for which no privilege was asserted.

> 7. When you appeared at the Alternate Charlemagne award ceremony in Leipzig last year, were the expenses of you and your employees paid for by the City or by someone else? (*Id.*, p. 166.)

This question addresses the allegation that Caberta provided special favors to Robert Minton, including her tortious conduct against Mr. Heller and others similarly situated. Her response was that she was acting as a private person with respect to the public "Alternate Charlemagne Award" given to Minton and resultant publicity and benefits. Thus, whether or not her expenses and those of her employees she brought to the awards ceremony in Leipzig were paid by the city or paid by another – such as Minton – would provide potentially controverting evidence regarding whether the act was a private or public act and therefore go to the issue of immunity.

> 8. In your computer system, do you maintain the names of some of the people that the companies are asking about [whether they are Scientologists]? (*Id.*, pp. 182-183.)

> 9. Do you have a computer system for locating records such as this [notes regarding sending out sect filters to companies for certain people]? (*Id.*, p. 187.)

These two questions address the location and existence of evidence concerning the plaintiff and the allegations in the complaint relating to Ms. Caberta's dissemination of "sect filters" to private companies. This goes to the issue of FSIA

immunity exception arising out of illegality, and the "commercial act" exception to the FSIA. Plaintiff should also be required to return to the deposition to answer a further set of questions, dealing with the failure to produce documents pursuant to the Court's Order of June 21, 2001, and because of the substantial additional time wasted in the deposition arising out of this issue. First, plaintiff had to file three different motions to get responses to the document requests, including a motion intended to acquire the documents *prior* to the deposition so that the documents could be utilized at the deposition on jurisdictional questions. Second, the amended "response" was demonstrably inaccurate or disingenuous, as evidenced by the questioning of Ms. Caberta indicating that she had never seen the response. Third, at the deposition, Ms. Caberta continued to refuse to address whether or not there were response records, first by asserting that her own bank records would belong to the City of Hamburg if they existed, and then outright refusing to answer the elementary cross examination questions which would reveal that unlikely assertion to be proven false.

The witness should be required to return to the deposition to answer these questions. [3]

### C.    Plaintiff Is Entitled to Reimbursement of Reasonable Fees and Costs

As indicated above, the only reason the deposition was held in Germany is because defendant objected so vehemently to the alleged expense and trouble of coming to the United States. It was a courtesy to the defendant. However, Ms. Caberta abused the courtesy provided to her. She ignored the Court's scheduling

---

[3]  A separate motion to compel and for sanctions will be addressed to the failure to comply with the Court's Order of June 21st.

order. She argued throughout the deposition; she evaded questions. She gave

numerous non-responsive answers. She brought her associate to disrupt the deposition.

She took long breaks.

In short, the deposition was not completed solely because of the conduct of the

defendant. To prevent what has now occurred, this Court provided a crystal clear

admonition on July 20th to both her American counsel and to Mr. Hintze, who

represented himself as her German counsel:

> All right. And I simply remind counsel that this is a very
> expensive trip and that you should make any effort to resolve any
> differences among yourselves so that there won't be any monetary
> sanctions considered. And I remind Ms. Caberta that this is better than
> having to come to the United States, so while this may be inconvenient
> for her in terms of her meeting, it sounds to me like there was every
> effort made to schedule this around your activities, but Plaintiff's counsel
> finally had to take certain action to get the deposition set down.

(Ex. 24, July 20, 2001, p. 16.)

Thus, in addition to requiring the witness's appearance in the district, she and

her counsel should also be required to reimburse plaintiff's counsel the costs and the

reasonable amount of the attorneys' fees expended by plaintiff's counsel in flying to

Germany, preparing the opposition to the second emergency motion, wasting an entire

first scheduled day of the deposition when Ms. Caberta failed to show, the wasted

second day of deposition when it was so completely obstructed, and the return trip to

the States.

Under *Societe Nationale Industrielle Aerospatiale v. U. S. District Court for

Southern District of Iowa,* 482 U.S. 522, 536, 107 S.Ct. 2542, (1987) and the line of

cases it endorsed, it is clear that the court is empowered to impose appropriate

sanctions upon a foreign plaintiff over whom personal jurisdiction has been acquired, as in this case, including judgment for the plaintiff, if the defendant refuses to comply with a discovery order. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1474 (9th Cir. 1992); *Rachis v. Maschinenfaprik Hehl & Soehne*, 1986 WL 9274 (E.D.Pa. 1986); *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705-06 (1982) (failure to abide by discovery order subjects a party to Rule 37 sanctions, including a finding of jurisdiction pursuant to Rule 37(b)(2)(A), allowing designated facts to be established).

The costs actually incurred by plaintiff's counsel in airfare, hotel, State Department fees, transportation, interpreter, videographer, and court reporter, is $8,707.93. (Ex. 4, Declaration of Kendrick L. Moxon.) The attorneys' fees expended at a reasonable rate of $250/hour, are $12,250.00. (*Id.*)

## IV - CONCLUSION

Ms. Caberta should be ordered to appear for the completion of her deposition in this district forthwith. Defendant and her counsel should also be jointly and severally sanctioned in the amount of the reasonable time expended in the amount of $8,707.93 and costs in the amount of $12,250.00 as set forth in the accompanying declaration of counsel.

Dated: September 4, 2001                    Respectfully submitted,

                                            Kendrick Moxon
                                            Helena Kobrin
                                            FBN #: 0259713
                                            MOXON & KOBRIN

1100 Cleveland Street, Suite 900
Clearwater, FL  33755
(727) 443-5620

F. Wallace Pope, Jr.
FBN #:  124449
JOHNSON, BLAKELY, POPE, BOKOR,
RUPPEL & BURNS, P.A.
P.O. Box 1368
Clearwater, Fla.  33757
(727) 461-1818

Attorneys for Plaintiff

## CERTIFICATION PURSUANT TO LOCAL RULE 3.01(g)

I hereby certify that I have attempted to confer with defendant's counsel, John

Merrett, to informally resolve the discovery dispute set forth in this motion to compel.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused the foregoing **PLAINTIFF'S MOTION TO COMPEL FURTHER DEPOSITION OF DEFENDANT URSULA CABERTA; TO COMPEL RESPONSES TO DEPOSITION QUESTIONS; AND FOR FEES AND COSTS** to be served on this 4th day of September, 2001, by U.S. Mail, to John Merrett, 11250 St. Augustine Road, Suite 15-393, Jacksonville, FL 32257-1147.

_____
Attorney

Due to the physical nature of exhibit, it is not scanned; please see case file.