IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HUBERT HELLER, an individual,

       Plaintiff,

v.                        Case No. 8:00 CV-1528-T-27C

URSULA CABERTA, an individual,

       Defendant.

_____/

## MOTION TO SUSPEND TIME TO FILE OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PENDING DEFENDANT'S COMPLIANCE WITH OUTSTANDING DISCOVERY ORDERS

### I - INTRODUCTION

The Court established a short time period within which to take discovery in this case relating to the issue of jurisdiction and purported official immunity of defendant, and both this Court and the Magistrate Judge ordered defendant Ursula Caberta to appear for deposition as to these issues prior to any further litigation of jurisdictional matters.

As a courtesy to the defendant, the Court permitted her deposition to go forward in Germany. However, the witness refused to appear for her first day of the two day deposition, and substantially obstructed the questioning on the second day. Defendant also failed to produce records she was ordered to produce prior to the deposition – and indeed, has still not produced the records.

A motion to compel Ms. Caberta to return to her deposition to complete it and to respond to appropriate questions, was accordingly filed with Judge Jenkins on

September 4, 2001. [1]

Because the Court's scheduling order regarding litigation of defendant's motion to dismiss was based upon the completion of the outstanding discovery owed by defendant, her motion should therefore be held in abeyance pending ruling on the motion by the Magistrate Judge and the production of further discovery thereafter.

Plaintiff files this motion now to avoid the necessity of a Rule 56(f) response and further lengthy delay in completing this initial phase of discovery and because any requirement that plaintiff respond to the summary judgment motion now, would moot the motion to compel pending before Magistrate Judge Jenkins.

Finally, appellate counsel in New York who drafted the appeal in this action will be preparing the summary judgment response. Their office, however, has been closed for the past several days because of the disaster in New York, and is not expected to be back in operation for several additional days. Moreover, plaintiff's counsel, Kendrick Moxon, who has been the primary counsel on this case since its inception, is in Los Angeles and unable to return to Florida at present with the closure of all airlines. However, all of the records and files in the case are in the firm's Clearwater office and cannot be transported to the west coast  Thus, regardless of the discovery issues addressed herein, it would be physically impossible to prepare any summary judgment response at present.

---

[1] The motion to compel was not filed sooner because plaintiff was unable to obtain the transcript or court reporter bills for a considerable time after the deposition.

2

## II – STATEMENT OF FACTS

### A. Background to the Motion

Plaintiff, Hubert Heller, is a citizen of Germany domiciled in Clearwater, Florida. As alleged in detail in the Second Amended Complaint (Ex. 1), Mr. Heller has been injured by the intentional acts of defendant, Ursula Caberta, a low level official of the City of Hamburg, Germany, through interference in his software distribution business activities. Ms. Caberta unofficially designates herself the "sect commissioner" of Hamburg. The amended complaint alleges that Ms. Caberta's conduct arose out of her activities targeting persons who conduct business in Germany, solely because they are members of the Scientology religion, such as Mr. Heller. A substantial contract negotiated by Mr. Heller in Florida with a German firm was destroyed by the efforts of Ms. Caberta to enforce a so-called "sect filter" upon the German company, requiring that it refuse to do business with any person who espouses beliefs of the Scientology religion, founded by L. Ron Hubbard.

Plaintiff contends that Ms. Caberta's conduct violated several provisions of the Constitution of the Federal Republic of Germany, and international human rights treaties, to which Germany is a signatory. In her two motions to dismiss denied by the District Court, Ms. Caberta argued that she acted at all material times in her capacity as an official of the government of Hamburg, and within the scope of her delegated authority in performing the acts alleged in the Complaint, and is therefore immune from suit pursuant to the Foreign Sovereign Immunities Act.

By Order dated December 16, 2000, the Court granted in part and denied in part defendant's motion to dismiss the First Amended Complaint, finding that the

3

defendant's claims of immunity under the Foreign Sovereign Immunities Act were overcome by the allegations in the Complaint. (Ex. 2.)  The Court dismissed the state law claims without prejudice, giving leave to amend.

Plaintiff filed a Second Amended Complaint, re-pleading the state law claims. Ms. Caberta filed a further motion to dismiss, addressing only the immunity and jurisdictional issues, and submitted her own affidavit in support. (Ex 3.)  The affidavit addressed the alleged scope of Ms. Caberta's employment and duties in the Hamburg City government.

By Order dated February 15, 2001, the Court denied the defendant's second motion to dismiss, and at the same time denied the defendant's second motion to stay discovery, giving leave to plaintiff to conduct discovery, "limited to the FSIA issues and this Court's exercise of jurisdiction over defendant for a period of 90 days from the date of this Order."  (Ex. 4.)

**B.    Ms. Caberta Refused to Provide Records or Respond to Questions Relating to Issues Raised in Her Motion for Summary Judgment**

As set forth in detail in plaintiff's pending motion to compel, Ms. Caberta greatly obstructed her recent deposition, and evaded this Court's stated intention to complete jurisdictional discovery.  A copy of the Motion to Compel memorandum, minus exhibits, is attached hereto as Exhibit 5 for the Court's convenience.  As noted therein:

1.  Ms. Caberta refused to comply with two Court Orders to appear for two days of deposition. (*Id.*, at pp. 3-9.)

2.  Ms. Caberta made long speeches and irrelevant comments rather than

4

answer questions, wasting much time.  (*Id.*, at pp. 9-16.)

3.  Ms. Caberta made numerous evasive and unresponsive replies to questions, failing to directly answer significant areas of questioning.  (*Id.*, at pp. 10-16.)

4.  The associate Ms. Caberta brought to the deposition with her often disrupted the proceedings and frequently spoke to the witness in German during the pendency of questions.  (*Id.*, at p. 10.)

5.  Ms. Caberta refused to permit cross examination of the same affidavits she has filed in support of her motion for summary judgment. For example, the witness was provided a copy of the affidavit she signed and filed in this case, and was asked if the statement made in one of the paragraphs was accurate. (*Id.*, at pp. 9-11.)   Her responses to repeated questions seeking only to learn the accuracy of one of the paragraphs of the affidavit were (in order given):

- "If I declared this like that, it will be accurate.  What do you think?"

- [question repeated] "I made this Declaration and I don't know why you are asking this now."

- [question repeated] "If that is what I declare, then it will have to be correct."

- [question repeated] "It's a statement that I made and I do not make inaccurate statements."

- [question repeated] "I am not going to repeat the same nonsense all over again.  I already answered the question."

(*Id.*, at pp. 11-12.)

Ms. Caberta never did answer the question or any other questions relating to the accuracy of several paragraphs of her affidavit.  This is particularly significant,

because Ms. Caberta relies upon her affidavit in support of the motion for summary judgment.

6. Defendant failed to comply with Court Orders to provide documents prior to the deposition. Because Caberta filed no response to plaintiff's First Document Request, plaintiff filed a motion to compel as to these records on March 6, 2001. In her Opposition to the motion to compel, Ms. Caberta provided answers which suggested that no responsive records exited as to Requests number 9-17, which dealt with communications with her named alleged co-conspirators as well as the receipt of funds from co-conspirators, establishing bribes to Ms. Caberta by an American businessman and his company. (Ex. 6.) Judge Jenkins found that no further responses were necessary, based on the apparent representation that no responsive records existed.

Plaintiff filed a Motion to Clarify And/or Amend the Order Regarding Production of Documents, arguing that the response was equivocal, asserting that "There are no responsive records which pertain to the allegations of the complaint." By Order dated June 21, 2001, Judge Jenkins ruled, that "if any records responsive to Requests 9 through 17 are in the defendant's possession, custody or control, they shall be produced to plaintiff within ten (10) days of this order." (Ex. 7.)

Defendant failed to comply with the Court's Order. Thus, a further motion was filed on July 12, 2001 to Compel Forthwith Compliance with Order Dated June 21, 2001 in order to get the records prior to the deposition, scheduled for July 25th. Judge Jenkins ordered defendant to file a response to such motion to compel no later than July 17th. (Ex. 8.) Spurred by the Order, an amended response was signed by

6

defendant's counsel, John Merrett, stating that no records existed responsive to the document requests. (Ex. 9.)  Ms. Caberta was shown the July 16th response at her deposition and asked if the response was accurate, *i.e.*, that no records existed.  Her answer was, "That's nonsense.  I have never seen this before.  I see it now for the very first time, and I am not answering any questions on these items." (Ex. 10, Depo., p. 161, line 7 - p. 162, line 16.)  She then refused to answer any questions regarding whether or not she had conducted a search for any of the documents the Court ordered her to produce.  (*Id.*, at pp. 162-163.)   Ms. Caberta re-iterated that she had not conducted any search for records and was seeing the document request for the first time, and refused to comment further. (*Id.*, at p. 163.)

Mr. Merrett took his client out of the room at that point.  (*Id.*, at p. 164.)  When she returned, she made the incredible assertion that her own personal bank records [relating to potential bribes to commit the torts at issue] were *government property* and that is why she did not search for them. (*Id.*, at p. 164.)  Asked how her personal bank records could possibly be government property, she refused to answer, saying her personal bank records are "none of your business ... and I am not going to say any more on those." (*Id.*, at pp. 164-165.)  In any event, her testimony demonstrated that: 1) responsive records may exist but the witness refused to say, and 2) defendant was not even *aware* of the document request, yet, a response was filed by her counsel asserting that no responsive documents existed.

Failure to produce the records prior to the deposition and the representation by counsel that Ms. Caberta possessed no such records (when she was not even aware of the request), also impeded completion of the deposition and failed to comply with the

7

Court's order to produce records needed for the response to defendant's summary judgment motion.

### III – PLAINTIFF'S RESPONSE TO THE SUMMARY JUDGMENT MOTION SHOULD BE HELD IN ABEYANCE PENDING RESOLUTION OF DISCOVERY MATTERS BY JUDGE JENKINS

Plaintiff could file a Rule 56(f) response to the summary judgment motion, as this Court has *already* ruled that plaintiff would be permitted to take discovery prior to any further response as to FSIA/jurisdictional issues.

However, any 56(f) issue is overcome by the failure of the defendant to provide discovery *already* ordered by the Court for this precise issue. And, such a procedure would both further delay the ultimate resolution of the jurisdictional issues. Moreover, if Rule 56(f) relief is denied and plaintiff ordered to respond on the merits without completing Ms. Caberta's deposition, such a procedure would moot consideration by Magistrate Judge Jenkins of the motion to compel Ms. Caberta's deposition.

As indicated above, plaintiff's appellate counsel in New York who filed plaintiff's response to Ms. Caberta's appeal in this action, will be preparing the summary judgment response. Their office, however, has been closed for the past several days because of the disaster in New York, and is not expected to be back in operation for several additional days.

Further, plaintiff's counsel, Kendrick Moxon, who has been the primary counsel on this case since its inception, is in Los Angeles and unable to return to Florida at present with the closure of all airlines. However, all of the records and files

in the case are in the firm's Clearwater office and cannot be transported to the west coast to prepare the opposition. Thus, regardless of the discovery issues addressed herein, it would be physically impossible to prepare any summary judgment response at present.

In the event the Court denies the relief requested herein, plaintiff requests an additional two weeks to file a Rule 56(f) response to summary judgment motion.

### IV - CONCLUSION

Ms. Caberta's motion for summary judgment should be held in abeyance pending resolution of the motion to compel Ms. Caberta's deposition under consideration by Judge Jenkins.

Dated: September 13, 2001                    Respectfully submitted,


Kendrick Moxon
Helena Kobrin FBN #: 0259713
MOXON & KOBRIN
1100 Cleveland Street, Suite 900
Clearwater, FL 33755
Phone: (727) 443-5620
Fax: (727) 443-5640

F. Wallace Pope, Jr. FBN #: 124449
JOHNSON, BLAKELY, POPE, BOKOR,
RUPPEL & BURNS, P.A.
P.O. Box 1368
Clearwater, Fla. 33757
Phone: (727) 461-1818
Fax:  (727) 441-8617

ATTORNEYS FOR PLAINTIFF

## CERTIFICATION PURSUANT TO LOCAL RULE 3.01(g)

I hereby certify that my partner attempted to confer with defendant's counsel, Robert Merkle, who declined to consent to the motion.

Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused the foregoing **MOTION TO SUSPEND TIME TO FILE OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PENDING DEFENDANT'S COMPLIANCE WITH OUTSTANDING DISCOVERY ORDERS** to be served on this 13th day of September, 2001, by Telefax (w/o exhibits) & U.S. Mail, to John Merrett, 11250 St. Augustine Road, Suite 15-393, Jacksonville, FL 32257-1147, and Robert Merkle, Merkle & Magri, P.A., 5510 West LaSalle St., Tampa, FL 33607.

Attorney

11

# EXHIBIT 1

RECEIVED

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA 01 JAN -8 PM 3: 52
TAMPA DIVISION

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

HUBERT HELLER, an individual,

Plaintiff,

v.                                          Case No. 8:00 CV-1528-T-27C

URSULA CABERTA, an individual,

Defendant.

_____/

## SECOND AMENDED COMPLAINT AND
## DEMAND FOR JURY TRIAL

Plaintiff, Hubert Heller, sues defendant, Ursula Caberta, and says:

## JURISDICTION, VENUE AND PARTIES

1.    Plaintiff, Hubert Heller, is a citizen of Germany, admitted to the United

States for permanent residence, and domiciled in Clearwater, in the State of Florida.

2.    Defendant, Ursula Caberta, is a citizen of Germany, and is employed by the

government of the City of Hamburg, Germany. Caberta is sued as an individual, for acts

she claimed to have undertaken in an official capacity, but which were undertaken outside

the scope of her official duties, and which were illegal under German, United States,

Florida and International law. Alternatively, she is sued for acts which, in addition to

being unlawful and unconstitutional under both U.S. and German Law, if considered to

be within the scope of her official duties, are nevertheless tortious commercial acts. The

acts complained of herein occurred, in part, in Pinellas County, Florida. Caberta conducts

commercial activity in and is present in Pinellas County, Florida, and was served in Pinellas County.

3.    Jurisdiction is based upon the provisions of 28 U.S.C. §§ 1331, 1343, 1350 and 1332, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.    Venue is proper in the Tampa Division of the Middle District of Florida pursuant to 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this District, and/or the defendant is subject to personal jurisdiction within this District at the time of the commencement of this action.

5.    Within the meaning of Florida Statutes, Section 48.193, and Rule 4, Fed.R.Civ. P., Caberta has committed tortious acts against plaintiff within the State of Florida; has caused injury to Heller within this State arising out of an act or omission outside this State at a time when Caberta was engaged in commercial activity, solicitation or service activities within this State; is engaged in substantial and not isolated activity within this State; and is operating, conducting, engaging in or carrying on commercial activities or business ventures in this State.

6.    All conditions precedent to the institution and maintenance of this action have been performed or have occurred.

## FACTS

7.    Caberta is the head of the Hamburg Germany task force designed to disrupt the business activities, civil rights and human rights of members of the Scientology religion.

2

8.    Both as an individual and as head of the task force, Caberta initiated a series of discriminatory and exclusionary measures designed to stigmatize, disenfranchise and ostracize Scientologists based solely on their association and beliefs.

9.    Caberta created, advocates, promotes and disseminates so-called "sect filters" both in the public and private sectors. These "sect filters" and accompanying declaration require individuals and companies to declare in writing:

(1)  That they do not "use the technology of L. Ron Hubbard;"

(2)  That they are not trained and do not participate in the "technology of L. Ron Hubbard;" and

(3)  That they reject the "technology of L. Ron Hubbard."

An example, with translation, of Caberta's "sect filters" is attached as Exhibit A. L. Ron Hubbard is the founder of the Scientology religion and the author of all Scientology scripture, sometimes referred to as the "religious technology" or the "technology" of Scientology.

10.   Caberta advocates and promotes that businesses and individuals must require signed sect filters from all businesses and individuals with whom they do business in order that they might prevent association with Scientologists and companies owned by Scientologists.

11.   Caberta's "sect filters" are designed and intended by her to make employment, commercial and contractual relations conditional on an individual attesting that he or she and/or his or her company rejects the teachings of L. Ron Hubbard. Caberta has publicly stated that the filter was carefully designed to ensure that no Scientologist could or would sign the filter, because the "technology of L. Ron Hubbard,"

3

the Founder of their religion, is utilized in all aspects of their lives. The purpose is therefore to identify and "filter" Scientologists, by identifying all persons who refuse to sign the filter. Individuals and companies who refuse to sign these declarations are subject to economic sanctions – including commercial boycotts, individual firings, discrimination and harassment based solely on their association and religious belief. Through the "sect filters" Caberta forces corporations and businesses to adopt a discriminatory and exclusionary policy toward Scientologists or to suffer serious economic consequences.

12. With knowledge that plaintiff and other Scientologists are doing business or attempting to do business with German companies, Caberta distributed copies of her "sect filter" to numerous companies and individuals throughout Germany, including governmental entities, businesses, chambers of commerce and banks. In the media, in speeches, conferences and over the internet, Caberta advocates the systematic use of her "sect filters" to discriminate against Scientologists, and personally or through one of her subordinates or co-conspirators, distributes it to businesses and chambers of commerce throughout Germany. It is Caberta's intent to boycott, disrupt and destroy any business relationship that any Scientologist may have with any business, person or government in Germany, the United States and elsewhere, and, as she describes it, to "clear Germany" of all Scientologists.

13. Businesses that fail to use the sect filters face the prospect of losing government contracts, business and social ostracism, or being labeled as companies that are owned by or employ Scientologists, thereby resulting in the systematic boycotting of such businesses.

14.   In seeking and obtaining the agreement of individuals, businesses and officials to use "sect filters," Caberta has engaged in a conspiracy with numerous such businesses and officials to achieve that goal.  It is part of the intention and effect of said conspiracy that the participants in said conspiracy will, in turn, require other businesses with which they do business to also use the "sect filters" thereby joining the conspiracy. It further is part of the intention and effect of said conspiracy that the use of "sect filters" be expanded beyond Germany, including to the United States, and in particular to the States of California and Florida, where, as Caberta knows, many Scientologist business people conduct businesses which involve international trade and contracts.  Caberta also is, or should be aware that among such business people in Florida are German nationals or former German nationals who conduct and/or are likely to conduct business with German businesses, and thus who are likely to be adversely affected by the use of the "sect filters" by German businesses.   Caberta is also aware that some German Scientologists have fled Germany to reside in Florida because of the persecution faced by Scientologists arising out of her unlawful and tortious conduct.

15.   Caberta is also engaged in continuous and systematic business contacts in the State of Florida.  She is a silent partner or joint venturer with Robert Minton, Stacy Brooks, Jesse Prince, and the Lisa McPherson Trust, Inc. ("LMT, Inc."), a Florida for-profit corporation engaged in the activity of attempting to damage or destroy the Scientology religion.  Caberta regularly communicates with LMT, Inc., and Minton, Young and Prince, for the purpose of contriving, creating, planning and disseminating false, deceptive and disparaging assertions regarding Scientologists, such as plaintiff. Plaintiff is aware that information placed into commerce, published in newspapers and

periodicals and assertions made by her is false, exaggerated, misleading, and deceptive,
but is done for the purpose of encouraging and demanding businesses in Germany and
elsewhere to adopt her sect filter and boycott and discriminate against Scientologists and
businesses owned by Scientologists in Germany and around the world – including in
Florida and other states. Among numerous false and deceptive statements made by
Caberta to induce or force companies to adopt the sect filter, are assertions that
Scientologists who have fled Germany to the United States did not leave because they
were fired or unable to get work because of the sect filter, but rather, because they "have
problems because of tax evasion and other things where they have been sued by the
court"; and that the sect filter was being applied only to "business consultants," when in
fact, it has been applied to all identified Scientologists in many types of businesses.

16.  In her personal capacity, Caberta has been paid an unspecified amount of
money by Florida businessman, Robert Minton, in return for which, in part, she has
traveled to Clearwater, Florida for the purpose of publicly attacking Scientology,
disseminating and requiring use of her sect filters, encouraging boycotts of businesses
owned by Scientologists and continuing the general conspiracies alleged herein. Minton
and LMT, Inc. have also paid Caberta to engage in propaganda in Clearwater, Florida, in
Germany, in Washington, D.C., and in International publications, to bolster investments
made by Minton in litigation in Florida. This payoff to Caberta was not publicly revealed
to her government employer in Germany, and thus was a private and unlawful payment
for favors to Minton and LMT, Inc. in the furtherance of their joint co-conspiracy to harm
Scientologists and companies owned by or employing Scientologists. She has discussed
and planned with Minton, the Chairman of the Board of LMT, Inc., of expanding LMT,

Inc., to Germany where she would become a principal in exchange for money received from Minton and LMT, Inc. She has assisted Minton in setting up press conferences in Germany through which Minton promoted his own investments, in Florida, and the interests of LMT, Inc. LMT, Inc., operating out of FLorida, continues to promote the use of Caberta's sect filters to this day.

17. On July 25, 2000, Caberta was present in Clearwater, Florida, and held a press conference paid by Minton and LMT, Inc., in which she publicly promoted in the United States and the State of Florida the use and dissemination of her "sect filters" to blacklist Scientologists.

18. RTI is a computer software company in Sacramento, California. RTI's clients are large and small retail companies and manufacturers of retail products in the United States and abroad. RTI has customers in 58 countries with over 18,000 installations of its point-of-sale inventory control software. The software controls ordering, receiving and distribution of products in stores, it monitors how well individual merchandise and products are selling, and it controls inventory of products essentially monitoring and controlling the flow of merchandise through a retail system. RTI is the market leader in this type of inventory control software, with installations in clothing stores, specialty shops, gift shops, sporting goods stores and many other types of businesses. A large market exists for RTI's products in Europe, and particularly in Germany.

19. Plaintiff, Hubert Heller, is Vice-President, International, of RTI, who is paid in large part on commission. Heller negotiated with the German firm, POSPartner G.M.B.H. (POS) to establish a distribution agreement whereby POS would distribute

7

RTI's software products in Germany. Heller would realize substantial commissions from such sale to POS as well as other sales in Germany exceeding $75,000. The negotiations occurred in part between Heller and representatives of POS in Orlando, Florida, in the Middle District of Florida.

20. While unknown to Heller at the time, POS has voluntarily or involuntarily joined the conspiracy, organized and instituted by Caberta as described above, to use and disseminate Caberta's sect filters. POS has instituted the use of "sect filters," and now requires those with whom it does business to use such filters, because it has been required to do so as a condition of doing business in Germany with other businesses and German government entities and officials that have entered into the conspiracy. It was and is part of Caberta's purpose in organizing, initiating and expanding the conspiracy, that businesses such as POS be pressured and coerced into using "sect filters" and, in turn, requiring their business partners or those with whom they do business to do likewise, including within the State of Florida.

21. POS and Heller negotiated to the point that POS offered to enter into an agreement with RTI. During the process of the negotiation, POS learned that Heller is a Scientologist. Heller has been a devoted member of the Church of Scientology since 1971. Upon learning that Heller is a Scientologist, POS, as a result of Caberta's inducement, demanded that Heller sign one of Caberta's "sect filters." Heller refused to sign Caberta's "sect filter," and POS refused to enter into the agreement or do business with him unless Heller signed Caberta's "sect filters," thereby causing substantial damage to Heller with respect to his contract with POS and as to other subsequent business activities in Germany.

8

22. Part of Caberta's program involved the dissemination of sect filters to the various chambers of commerce of cities in Germany, and the dissemination of the sect filter in the periodicals of the chambers of commerce to businesses. Because German states require mandatory membership of local businesses such as POS, in the chambers of commerce, Caberta thus assured the greatest possible spread of the unlawful filter throughout Germany. It was both foreseeable and intended by Caberta that the reach of the conspiracy which she organized, initiated and furthered, include POS and other companies which would do business with Scientologists and be extended into the State of Florida to affect and injure Scientologist business people such as plaintiff Heller. Caberta thus committed a tort within the State of Florida, and is subject to the jurisdiction of Florida Courts.

23. While purportedly carrying out her activities as an employee of the City of Hamburg, in fact, Caberta acted entirely outside the scope of her lawful authority. Her conduct specifically violated German constitutional law by persecuting members of the Scientology religion; calling for, organizing and instituting an unlawful commercial boycott of adherents to the Scientology religion; acting with private business persons who were secretly paying her for favors and assistance to harm Scientologists like Heller; and as part of an illegal conspiracy in which she and her city government was involved. To the extent that Caberta acted within the scope of her duties, those duties were nevertheless unlawful and unconstitutional in both the United States and Germany. Alternatively, if Caberta's activities described herein are deemed to be lawful in Germany, those activities are tortious commercial acts. Caberta is paid by Minton and LMT, Inc., to carry out the activities alleged herein, in part, to increase the value of his American investments, to

9

harass Scientologists, and to cause Scientologists to realize monetary losses.

## COUNT I

## TORTIOUS INTERFERENCE

24.    This is a count for tortious interference with an advantageous business relationship and a business expectancy.

25.    Plaintiff adopts and realleges the allegations of paragraphs 1 through 23 above.

26.    Heller had established an advantageous business relationship with POS. Caberta intentionally designed and implemented a strategy to interfer with that advantageous business relationship as well as all other similarly situated relationships. As a result of Caberta's actions, Heller has lost the benefit of the relationship and has been damaged. Defendant's actions constitute a willful, wanton and malicious interference with plaintiff's advantageous business relationship and prospective economic advantage with POS, and defendant's actions have damaged plaintiff. Caberta knew that her conduct had interfered with the business relationships and contracts of Scientologists such as Heller, and would and reasonably did know that her conduct described herein would continue to interfere with the advantageous business relationship of persons in Heller's class of persons espousing the beliefs and practices of the Scientology religion.

27.    Plaintiff demands judgment against defendant for damages, including, but not limited to, loss of profits, loss of business reputation, costs, expenses, increased overhead, prejudgment interest and such exemplary damages as may later be allowed by court on motion, and such other and further relief as to the court may appear just and proper.

10

## COUNT II

## UNFAIR AND DECEPTIVE TRADE PRACTICES

28. This is a count for unfair and deceptive trade practices pursuant to Florida's Deceptive and Unfair Trade Practices Act, Florida Statutes § 501.201, *et seq*. (1999).

29. Plaintiff adopts and realleges the allegations of paragraphs 1 through 27 above.

30. Florida Statutes § 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Florida Statutes § 501.202(2) provides that Florida's Deceptive and Unfair Trade Practices Act shall be construed liberally to promote the following policy:

> To protect the consuming public and *legitimate business enterprises* from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

(emphasis added).

31. Plaintiff's business activities constitute a "legitimate business enterprise" within the meaning of Section 501.202(2).

32. Plaintiff is a "consumer" within the meaning of Section 501.203(7).

33. Florida Statutes § 501.203(8) defines "Trade or commerce" to include "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. 'Trade or commerce' shall include the conduct of any trade or commerce, however denominated, including any

11

nonprofit or not-for-profit person or activity."

34.  Pursuant to Florida Statutes § 501.203(9), "'Thing of value' may include, *without limitation*, any moneys, donation, membership, credential, certificate, prize, award, *benefit*, license, interest, *professional opportunity*, or chance of winning" (emphasis added).

35.  Defendant is engaged in the conduct of "trade or commerce" within the meaning of § 501.203(8), in that she provides and offers certain services and things of value, as set forth herein.

36.  Defendant engages in commerce through the economic boycott that she conducts against Scientologists, businesses that employ Scientologists, and those businesses that refuse to sign her "sect filter."

37.  Through offering and providing her "sect filter," including in the State of Florida, as a condition of doing business in Germany, defendant offers and provides a service and things of value to individuals and businesses; that is, the benefit and professional opportunity to do business with the government of the City of Hamburg and with other German businesses that comply with defendant's "sect filter," and the avoidance of economic sanctions – including commercial boycotts, individual firings, and the disruption and destruction of business relations with persons, businesses, and governments in Germany, as set forth in paragraphs 10-14 above.

38.  Defendant further advertises and solicits the use of her services or things of value through her promotion, including in the State of Florida, of the use of her "sect filter" as the pre-condition for engaging in trade or commerce in Germany with her employer – the City of Hamburg – and other German individuals, businesses, and

governments.

39.  Defendant has further offered and provides her services to certain anti-Scientologists in the United States, including in the State of Florida, in exchange for cash payments and other economic opportunities from Minton and/or LMT, Inc., to promote the use of her "sect filter," to undertake lectures and press conferences for a fee and/or economic benefit and to promote and to engage in economic boycotts of Scientologists and businesses that would do business with Scientologists, as set forth in paragraphs 15-17, above.

40.  Defendant conducts her commercial activities, particularly her promotion and solicitation of her "sect filter," with the intent of economically harming Scientologists throughout the world, including in the United States and the State of Florida, and with the knowledge and expectation that she will cause economic harm to Scientologists, including Scientologists located in the State of Florida.

41.  Targeting Scientologists, including plaintiff, with defendant's "sect filter" both in the State of Florida and in Germany and the introduction of defendant's "sect filters" into the United States and the State of Florida for the purpose of discriminating based on a person's religious beliefs, in order to harm the person in their business activities constitutes an unfair method of competition, and/or an unconscionable act or practice, and/or an unfair or deceptive act or practice in the conduct of trade or commerce, within the meaning of Chapter 501, Florida Statutes.

42.  Florida Statutes § 501.211(1) provides, "without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to

13

enjoin a person who has violated, is violating, or is otherwise likely to violate this part."

43. Florida Statutes § 501.211(2) provides that "in any individual action brought by a consumer who has suffered a loss as a result of a violation of this part, such consumer may recover actual damages, plus attorneys' fees and court costs . . . ."

44. As a result of these unfair, unconscionable, and deceptive acts and practices by Caberta, in violation of Chapter 501, Florida Statutes, plaintiff has suffered a loss in the conduct of his legitimate business activities, as set forth in paragraphs 18-22, above, and is entitled to his actual damages, plus attorneys' fees and court costs.

## COUNT III
## CONSPIRACY TO DEPRIVE PLAINTIFF
## OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. §1985(3)

45. Plaintiff repeats and realleges paragraphs 1 - 44 above.

46. Defendant Caberta has conspired with numerous individuals, corporations, and government entities, known and unknown, including POS, and individuals in the United States, including Robert Minton, Stacy Brooks, Jesse Prince, Kennan Dandar, and LMT, Inc., to interfere with and deprive, both directly and indirectly, plaintiff and other individual Scientologists as well as United States businesses of the equal protection of the laws, or of equal privileges and immunities under the laws, by interfering with and depriving them of the opportunity to engage in interstate and international commerce based upon their religious beliefs and practices.

47. Defendant Caberta has entered into and undertaken to carry out said conspiracy on the basis of class based animus against adherents to and followers of the Scientology religion, against churches of Scientology, and against the Scientology religion.

14

48.   Pursuant to said conspiracy, defendant Caberta has engaged in the overt acts alleged above.

49.   Pursuant to said conspiracy, co-conspirator POS has engaged in the overt acts alleged above, including requiring plaintiff and RTI to sign a "sect filter," which would constitute an illegal boycott and illegal discrimination under the laws of the United States.

50.   As a result of said conspiracy, plaintiff has been injured in the manner set forth above, and in an amount to be determined by a jury.

51.   As a result of said conspiracy, plaintiff faces the substantial likelihood of suffering continuing, ongoing, and significant damage to his business, to his ability to engage in interstate and international commerce, and to his rights to the free exercise of religion, due process of law, and the equal protection of the laws.

## COUNT IV

## ALIEN TORT CLAIMS ACT

52. This is a count for violation of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350.

53.   Plaintiff adopts and realleges the allegations of paragraphs 1 through 51, above.

54.   ATCA provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

55.   Plaintiff is an alien, residing in the United States, who has been subjected to the tort of systematic religious discrimination, committed by defendant Caberta in violation of the law of nations.

15

56. Defendant is amenable to suit under ATCA, in that, acting as an official of the government of the City of Hamburg, Germany, and under color of law (albeit acting outside and beyond the scope of her lawful authority and beyond her official capacity under, and *ultra vires* of, Hamburg, German, and international law), she has engaged, and continues to engage, in systematic religious discrimination against Scientologists generally, and plaintiff Heller in particular, through her use, advocacy and promotion of her "sect filter" and her economic boycott of Scientologists and businesses that employ Scientologists.

57. Religious discrimination, as engaged in by defendant Caberta, is a tort committed in violation of the law of nations, as universally recognized in international human rights norms, conventions, declarations, and commentary, including, and without limitation, Articles 2, 18, 19, 23 of the Universal Declaration of Human Rights, adopted and proclaimed by United Nation's General Assembly Resolution 217A (III), of December 10, 1948; Articles 1, 13, 55 of the Charter of the United Nations, effective October 24, 1945; Articles 2, 18, 19, 26, 27 of the International Covenant on Civil and Political Rights, adopted December 16, 1966; Articles 2, 6 of the International Covenant on Economic, Social and Cultural Rights, adopted December 16, 1966; Articles 9, 10, 14 of the European Convention on Human Rights, adopted November 4, 1950; Articles 3, 44, 105 of the Charter of the Organization of American States, adopted 1948 (as amended); Articles 1, 12, 13, 16, 24 of the American Convention on Human Rights, dated July 18, 1978; the Declaration on the Elimination of All Forms of Intolerance and of Discrimination Based on Religion or Belief, United Nations General Assembly Res. 36/55, November 25, 1981; and *Restatement of the Law (Third), Foreign Relations Law*

16

*of the United States,* § 702(f), (g); *id.* cmt. j, m; *id.* Reporters' Note 8.

58.  As a result of Caberta's tortious conduct, committed in violation of the law of nations, Heller has been damaged and suffered economic losses in the conduct of his legitimate business activities.

WHEREFORE, plaintiff demands:

1.  An award of compensatory damages exceeding the sum of $75,000, exclusive of interest and costs;

2.  Punitive damages in an amount to be determined at trial;

3.  An award of plaintiff's reasonable attorneys fees pursuant to Florida Statutes, Section 501.2105 and 42 U.S.C. § 1988.

4.  An award of prejudgment interest, plus court costs;

5.  For a declaratory ruling that defendant's conduct violates Florida Statutes 501.201 et seq., and 42 U.S.C. § 1985.

6.  A permanent injunction prohibiting defendant from engaging in the unfair, deceptive and unconscionable trade practices alleged herein; and

7.  Such other and further relief as to the Court may appear just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 8, 2001                     Respectfully submitted,

Kendrick Moxon
Helena Kobrin

17

FBN #:  0259713
MOXON & KOBRIN
1100 Cleveland Street, Suite 900
Clearwater, FL  33755
(727) 443-5620

F. Wallace Pope, Jr.
FBN #:  124449
JOHNSON, BLAKELY, POPE, BOKOR,
RUPPEL & BURNS, P.A.
P.O. Box 1368
Clearwater, Fla.  33757
(727) 461-1818

Attorneys for Plaintiff

18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused the foregoing **SECOND AMENDED**

**COMPLAINT AND DEMAND FOR JURY TRIAL** to be served on this 8th day of

January 2001, by U.S. Mail, to the person on the below Service List.

_____
Attorney

## SERVICE LIST -

John Merrett
2716 Herschel Street
Jacksonville, Florida 32205
**Attorney for Ursula Caberta**

19

# EXHIBIT 2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HUBERT HELLER,

        **Plaintiff,**

vs.                      **Case No. 8:00–CV-1528-T-27C**

URSULA CABERTA,

        **Defendant.**

_____/

## ORDER

**THIS CAUSE** came on to be considered on Defendant's Motions to Dismiss (Dkt. 14, 15) and Defendant's Motion to Suspend Discovery (Dkt. 16). The Court having reviewed said motions, Plaintiff's responses thereto (Dkt. 35, 29, 19) and being otherwise fully advised in the premises, finds as follows:

### I.

In his First Amended Complaint ("Complaint"), Plaintiff claims that Defendant tortiously interfered with an advantageous business relationship (Count I), committed unfair and deceptive trade practices in violation of § 501.201, *Fla. Stat.* (1999) (Count II) and conspired to deprive Plaintiff of civil rights in violation of 42 U.S.C. § 1985(3) (Count III). Defendant has moved to dismiss the Complaint on the grounds that (1) she is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. 1602 *et seq.*, (2) the Court lacks personal jurisdiction over her, and (3) Plaintiff failed to state a cause of action in all counts.

### II.

The appropriate standard for testing the sufficiency of a complaint is whether it appears



beyond a reasonable doubt that the plaintiff can prove no set of facts to support his claim. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>South Florida Water Management Dist. v. Montalvo</u>, 84 F.3d 402, 406 (11th Cir. 1996); <u>Marshall County Bd. of Educ. v. Marshall County Gas Dist.</u>, 992 F.2d 1171, 1174 (11th Cir. 1993). The Court must view the complaint in the light most favorable to the plaintiff and construe the allegations in the complaint as true. <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984). The threshold is "exceedingly low" for a complaint to survive a motion to dismiss for failure to state a claim. <u>Ancata v. Prison Health Services, Inc.</u>, 769 F.2d 700, 703 (11th Cir. 1985).

## III.

### A.    Federal Sovereign Immunities Act

Defendant first maintains that she is immune from suit under the under the Federal Sovereign Immunities Act ("FSIA"). Pursuant to the FSIA, an agency or instrumentality of a foreign state is immune from lawsuits for acts committed in the United States. 28 U.S.C. § 1602 *et seq*. Individuals acting in their official capacities as employees of a foreign state are considered "agencies or instrumentalities of a foreign state" as provided in § 1603(b). However sovereign immunity does not shield a sovereign's employee from suit for acts not committed in her official capacity. <u>Chuidian v. Philippine Nat'l. Bank</u>, 912 F.2d 1095, 1105 (9th Cir. 1990).

In the Complaint, Plaintiff alleges that Defendant is an employee of the City of Hamburg, Germany and is the head of the Hamburg, Germany task force designed to disrupt the business activities, civil rights and human rights of the members of the Scientology religion. (Dkt. 12, ¶¶ 2, 7). Plaintiff further alleges that Defendant acted outside the scope of her lawful authority as an employee of the City of Hamburg, Germany when she "persecuted members of the Scientology

2

religion," interfered with Defendant's established advantageous business relationships and utilized unfair trade practices. (Dkt. 12, ¶¶ 23-26, 35). At this stage, viewing the allegations in the Complaint in a light most favorable to Plaintiff, Defendant is not entitled to sovereign immunity under the FSIA.

**B.    Personal Jurisdiction**

Next, Defendant maintains that this Court lacks personal jurisdiction over her on the grounds that § 48.193, *Fla. Stat.* does not provide a basis for jurisdiction as she was not doing business in Florida and does not have sufficient minimum contacts with the state to satisfy the requisites of long arm jurisdiction as described in International Shoe Co. v. Washington, 326 U.S. 310 (1945). However, Defendant does not dispute the fact that she was personally served with the Complaint while in Florida. (Dkt. 2). The Supreme Court reaffirmed long standing precedent in Burnham v. Superior Court of California, 495 U.S. 604, 612 (1990), when it held that "personal service upon a physically present defendant sufficed to confer jurisdiction, without regard to whether the defendant was only briefly in the State or whether the cause of action was related to his activities there." See also Hagen v. Viney, 169 So. 391 (Fla. 1936); Wolfson v. Wolfson, 455 So. 2d 577, 578 (Fla. 4th DCA 1984). As Defendant was personally served in Florida and does not allege that such service was the result of trickery or fraud, the Court finds that personal jurisdiction over Defendant exists.

**C.    Tortious Interference with an Advantageous Business Relationship**

Defendant maintains that Plaintiff has failed to state a cause of action for tortious interference with an advantageous business relationship because he has not and cannot allege facts satisfying the

elements of that claim.[1]  In the Complaint, Plaintiff has alleged that he negotiated on behalf of himself and RTI with a German company, POSPartner G.M.B.H. ("POS") to establish a business relationship in which POS would distribute RTI's software products in Germany.  (Dkt. 12, ¶¶ 19, 26).  Plaintiff alleged that he worked on a commission basis and that he would realize a substantial commission from the business relationship with POS.  (Dkt. 12, ¶ 19).  POS offered to enter into an agreement with Plaintiff, but would do so only if Plaintiff executed a "sect filter" rejecting the technology of L. Ron Hubbard.  (Dkt. 12 ¶¶ 9-14, 21).  According to Plaintiff, POS only required the execution of the "sect filter" because of the interference of Defendant.  (Dkt. 12, ¶ 20).  Plaintiff refused to execute the "sect filter" and POS withdrew its offer (Dkt. 12, ¶ 21), thereby damaging Plaintiff (Dkt. 12, ¶¶ 21, 26).

Plaintiff has not, however, alleged facts indicating that Defendant had knowledge of the business relationship between POS and Plaintiff.  It is not sufficient to allege that Defendant conspired to interfere with the ability of all Scientologists to enter into contracts with businesses, see (Dkt. ¶¶10-15, 26), without alleging Defendant had knowledge of Plaintiff's relationship with POS. Although the Defendant may not be aware of the specific terms of the contract at issue, the Defendant must know that the business relationship exists.  See Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994); Martin Petroleum Corp. v. Amerada Hess Corp., 769 So. 2d 1105 (Fla. 4th DCA 2000).

---

[1]  The elements of tortious interference with a business relationship are (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.  Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 815 (Fla. 1994) (citing Tamiami Trails Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985).

4

D.    Florida's Deceptive and Unfair Trade Practices Act

Defendant also contends that Plaintiff failed to state a cause of action under the Florida Deceptive and Unfair Trade Practices Act, § 501.204, *Fla. Stat.* That Act establishes a civil cause of action for unfair methods of competition, unconscionable acts or practices and unfair or deceptive acts or practices in conducting trade or commerce. The purpose of the statute is to provide protection for "the consuming public at large and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices . . . ." § 501.22(2). The statute includes in its definition of consumer "an individual; . . . firm; association; joint venture; partnership; . . . corporation; or any other group or combination." § 501.203(7). Additionally, the statute expressly provides that "'trade or commerce' means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. . . ." §501.203(8). Defendant maintains that Plaintiff failed to state a cause of action under § 501.204 since Plaintiff is not a consumer and Defendant has not engaged in a trade or commerce in violation of the statute.

In the Complaint, Plaintiff, an individual, alleges that he is a consumer as described in § 501.202(7). (Dkt. 12, ¶ 31). He further alleges that he was damaged when Defendant introduced "sect filters" into the United States and Florida to harm his business activities. (Dkt. 12, ¶ 35). According to Plaintiff, the "sect filter" is a three paragraph statement in which the "signer" declares that they do not work with and are not trained in the technologies of L. Ron Hubbard and that they reject such technologies. (Dkt. 12, § 9; Dkt. 12, Ex. A). Viewing the facts in a light most favorable

to Plaintiff, this Court cannot identify any good, service, property or thing of value[2] Defendant

provided, offered or distributed in violation of § 501.204.

E.      Civil Rights Claim - 42 U.S.C. § 1985(3)

Finally, Defendant maintains that Plaintiff has not and cannot allege a cause of action under

42 U.S.C. § 1985(3) as a matter of law because Plaintiff has not alleged that a state actor was

involved in the conspiracy and that the conspiracy was motivated by racial animus, rather than

religious animus.  To establish a violation of 42 U.S.C. § 1985(3),[3] Plaintiff must show that: (1) two

or more defendants conspired; (2) for the purpose of depriving, directly or indirectly, any person or

class of persons of the equal protection of the laws or of equal protection of the laws or of equal

privileges and immunities under the laws; (3) one or more of the conspirators acted in furtherance

of the conspiracy; and (4) such act injured a person or his property or deprived him of exercising any

right or privilege of a citizen of the United States.  Griffin v. Breckenridge, 403 U.S. 88, 102-03

(1971).

In the Complaint, Plaintiff alleges that Defendant violated 42 U.S.C. § 1985(3) by conspiring

to deprive Plaintiff of an opportunity to travel to engage in interstate and international business

---

[2] Section 501.203(9) expressly provides that a thing of value may include "any moneys, donation, membership, credential, certificate, prize, award, benefit, license, interest, professional opportunity, or chance of winning."

[3] Section 1985(3) provides, in part:
If two or more persons in any State or Territory conspire . . . for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

because of Plaintiff's religion. (Dkt. 12, ¶¶ 37-43). In Griffin, the Supreme Court clearly explains that § 1985(3) does encompass private action and that no state action is required. 403 U.S. at 96-101. The Court further explained in Griffin that the "language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." 403 U.S. at 102. Courts have concluded that § 1985(3) applies to discrimination based on religious animus. See Volk v. Coler, 845 F.2d 1422, 1338 (7th Cir. 1988); Colombrito v. Kelly, 764 F.2d 122, 130-31 (2d Cir. 1985); Taylor v. Gilmartin, 686 F.2d 1346, 1356-58 (10th Cir. 1982); Ward v. Connor, 657 F.2d 45, 48 (4th Cir. 1981); Marlowe v. Fisher Body, 489 F.2d 1057, 1065 (6th Cir. 1973). Additionally, the Eleventh Circuit stated in Lyes v. City of Rivera Beach, Florida, 166 F.3d 1332, 1336-1338 (11th Cir. 1999), that the scope of § 1985(3) is "broad" and quoted the following language from Volk, 166 F.3d at 1338, with approval: "'[Section] 1985(3) extends beyond conspiracies to discrimination against persons based on race to conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty.'" In Lyes, the Court concluded that sex-based conspiracies against women are actionable under § 1985(3). 166 F.3d 1338-1340. Given the broad language of the statute, the interpretation of § 1985(3) by the Supreme Court, the Eleventh Circuit and other circuit courts, the Court finds that Plaintiff has stated a cause of action in Count III of the Complaint. Accordingly, it is

**ORDERED AND ADJUDGED** that:

1. Defendant's Motion to Dismiss Amended Complaint (Dkt. 14) is granted in part and denied in part. Counts I and II are dismissed without prejudice. Plaintiff is granted leave to file an amended complaint within twenty (20) days of the date of this Order.

7

Defendant's motion is denied in all other respects.

2.      Defendant's Motion to Dismiss Amended Complaint for Prolixity and to Strike

Jurisdictional Amendments (Dkt. 15) is DENIED.

3.      Defendant's Motion to Suspend Discovery (Dkt. 16) is DENIED.

**DONE AND ORDERED** in chambers this __16th__ day of December, 2000.


_____
**JAMES D. WHITTEMORE**
**United States District Judge**


Copies to:
Counsel of Record
Courtroom Deputy
Law Clerk

8

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

HUBERT HELLER,

                Plaintiff,        Case No.: 8:00-CV-1528-T-27C

vs

URSULA CABERTA,

                Defendant.

## SECOND AFFIDAVIT OF URSULA CABERTA

COMES NOW Ursula Caberta, appearing for the purpose of contesting jurisdiction and seeking dismissal of this action and no other, and says:

1. She is the named defendant in the above-styled action.

2. She is a citizen and resident of Germany, and an employee of the government of Hamburg, Germany.

3. Her duties as an employee of the government of Hamburg, Germany are focused on the protection of legitimate businesses and other lawful entities from infiltration or other attack by Scientology and Scientologists, and her duties include

      A) the development and distribution of the Hubbard Declaration[1]; and

      B) the distribution of information concerning the character, nature, and activities of Scientology, which is not recognized as a religion in Germany, but is characterized as a totalitarian political and/or profitmaking enterprise.

4. All her activity concerning the Hubbard Declaration, including development and distribution of the Declaration, has been in her capacity as an employee of the

---

[1] This is the document described by Plaintiff as a "sect filter."

government of Hamburg, Germany, and has been within the course, scope and authority of her employment by the government of Hamburg, Germany.

5. All her activity, communication and pronouncements concerning Scientology and Scientologists, directed to businesses and other entities headquartered in or doing business in Germany, including the dissemination of the Hubbard Declaration, has been within the course, scope and authority of her employment of the government of Hamburg, Germany.


_____
URSULA CABERTA


BEFORE ME, the undersigned authority, personally appeared URSULA CABERTA, who presented _Personalausweis and Dienstausweis Nr. 701_ _Nr. 13205758+_____ as identification, and who did take an oath and said that the foregoing statements true and correct.

_Volker Briek, Senatsdirektor_
_____
OFFICER ADMINISTERING OATH
Freie und Hansestadt Hamburg
Behörde für Inneres
Amt für Innere Verwaltung und Planung
Johanniswall 4, 20095 Hamburg



# EXHIBIT 4

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

01 FEB 16 AM 10: 01

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

HUBERT HELLER,

        **Plaintiff,**

**vs.**                                     **Case No. 8:00-CV-1528-T-27EAJ**

URSULA CABERTA,

        **Defendant.**

_____/

## ORDER ON DEFENDANT'S SECOND MOTION TO DISMISS

    **THIS CAUSE** came on to be considered on Defendant's Second Motion to Dismiss for Lack of Jurisdiction Under the Federal Sovereign Immunities Act (Dkt. 42). The Court having reviewed said motion and being otherwise fully advised in the premises, finds as follows:

    Plaintiff has filed a Second Amended Complaint ("Complaint") (Dkt. 40) asserting causes of action for tortious interference with advantageous business relationships (Count I), unfair and deceptive trade practices (Count II), conspiracy to deprive Plaintiff of civil rights in violation of 42 U.S.C. § 1985(3) (Count III), and violation of the alien tort claims act, 28 U.S.C. § 1350 (Count IV): Factually, Plaintiff alleges that Defendant is an employee of the City of Hamburg, Germany and is the head of the Hamburg, Germany task force designed to disrupt the business activities, civil rights and human rights of the members of the Scientology religion. (Dkt. 40, ¶¶ 2, 7). Plaintiff alleges that Defendant created, advocates, promotes and disseminates "sect filters" or "Hubbard Declarations" that require individuals and companies to declare in writing:

    (1) That they do not use the technology of L. Ron Hubbard;
    (2) That they are not trained and do not participate in the technology of L. Ron Hubbard; and

(3) That they reject the technology of L. Ron Hubbard.

(Dkt. 40, ¶ 9). Plaintiff further alleges that in creating and disseminating the "sect filters," Defendant acted outside the scope of her lawful authority as an employee of the City of Hamburg, Germany and "persecuted members of the Scientology religion" interfered with Defendant's established advantageous business relationships and utilized unfair trade practices. (Dkt. 40, ¶¶ 23-26, 35).

Defendant moved to dismiss the Complaint on the grounds that since she acted in her official capacity when creating and disseminating the "sect filters" or "Hubbard Declaration," she is immune from suit under the Federal Sovereign Immunities Act, 28 U.S.C. § 1603, *et seq.* and that no exception to sovereign immunity applies. (Dkt. 42).

The Federal Sovereign Immunities Act ("FSIA") is the exclusive source of subject matter jurisdiction over all civil actions against foreign states. Alejandre v. Telefonica Larga Sistancia De Puerto Rico, Inc., 183 F.3d 1277, 1282 (11th Cir. 1999). Pursuant to the FSIA, an employee of a foreign state who is acting in her official capacity may be immune from suit unless an exception in 28 U.S.C. § 1605 applies. Chuidian v. Philippine National Bank, 912 F.2d 1095 (9th Cir. 1990).

When a Plaintiff asserts facts suggesting that an exception to the FSIA applies, the Defendant bears the burden of proving by a preponderance of the evidence that no exception applies. Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc., 179 F.3d 1279 (11th Cir. 1999); Meadows v. Dominican Republic, 817 F. 2d 517 (9th Cir. 1987). The Defendant must first produce evidence to establish that a foreign state is named in the lawsuit and that the Plaintiff's claims relate to public acts of the foreign state. Meadows, 817 F.2d at 522; Kline v. Kaneko, 685 F.Supp. 386 (S.D. N.Y. 1988). Once Defendant produces prima facie evidence of immunity, the burden of going forward shifts to the Plaintiff to produce evidence establishing that the foreign state is not entitled to immunity.

2

Meadows, 817 F.2d at 522.

Courts considering motions to dismiss are usually confined to reviewing the four corners of the complaint. Milburn v. United States, 734 F.2d 762, 765 (11th Cir. 1984). However, when a movant factually attacks the complaint and challenges the existence of subject matter jurisdiction, the district judge may rely on affidavits as well as the pleadings. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990); Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 855 (11th Cir. 1990); Kline, 685 F.Supp. at 389. The district court must accept the facts alleged in the complaint as true to the extent that they are uncontroverted by the defendant's affidavits. Cable/Home Communication Corp., 902 F.2d at 855. When the evidence conflicts, the district court must itself evaluate the merits of the jurisdictional claims. Lawrence, 919 F.2d at 1529.

Here, Defendant alleges in her affidavit that she acted in her official capacity as an employee of the government of Hamburg, Germany when she disseminated the "Hubbard Declaration." (Dkt. 43, pgs. 3-4). Defendant's employer has also submitted an affidavit stating that Defendant's actions in developing and distributing the "Hubbard Declaration" were performed as part of her job responsibilities in her capacity as an employee of the government of Hamburg, Germany. (Dkt. 43, pgs. 5-6).

Plaintiff alleges in response that Defendant was acting outside the scope of her employment with the government of Hamburg, Germany. (Dkt. 40, ¶ 2). Plaintiff has submitted an affidavit from Alexander Petz, an attorney practicing in the Federal Republic of Germany, to support his arguments. (Dkt. 45, Ex. A). According to Mr. Petz, "Caberta's conduct appears to violate several provisions of the [German] Basic Law," (Dkt. 45, Ex. A, ¶ 7), and that "she has thereby violated . . . her vowed obligation towards her employer," (Dkt. 45, Ex. A, ¶ 8). According to Mr. Petz, Scientology is a

3

recognized religion, (Dkt. 45, Ex. A, ¶¶ 11, 12), that is protected from persecution, (Dkt. 45, Ex. A, ¶ 7). These averments do not relate to Defendant's employment, her responsibilities in that employment, or whether her dissemination of the "sect filters" or "Hubbard Declaration" constituted a public act on behalf of the government of Hamburg, Germany.

Plaintiff asserts in his pleadings that additional discovery on the FSIA issue is required before he can introduce evidence supporting his contentions that Defendant acted outside the scope of her employment. (Dkt. 45, pgs. 5-7). The Eleventh Circuit has held that a case should not be dismissed for lack of jurisdiction when a plaintiff contends that through discovery he could obtain facts establishing jurisdiction. Colonial Pipeline Co. v. Collins, 921 F.2d 1237 (11th Cir. 1991); Majd-Pour v. Georgiana Community Hospital, Inc., 724 F.2d 901 (11th Cir. 1984); see also Coca-Cola Foods v. Empresa Comercial Internacional de Frutas S.A., 1997 WL 370121 (M.D. Fla. 1997). Given Plaintiff's arguments that by conducting additional discovery he will be able to establish that FSIA immunity does not apply to Defendant and that this Court has jurisdiction, this Court will deny Defendant's Motion to Dismiss. However, Defendant need not respond to the Complaint at this time.

Plaintiff may conduct limited discovery for a period of 90 days from the date of this Order to discover evidence supporting this Court's exercise of jurisdiction over Defendant. This discovery shall be limited to the FSIA issue. Not later than 115 days from the date of this Order, unless that period is extended for good cause, Defendant shall renew its motion to dismiss or respond to the Complaint. Both parties are advised to be cognizant of the provisions of Fed. R. Civ. P. 11 and to refrain from filing any pleadings that are unmeritorious and unsupported by law or fact. See Majd-Pour, 724 F.2d at 903.

4

Accordingly, it is

**ORDERED AND ADJUDGED** that:

1.    Defendant's Second Motion to Dismiss for Lack of Jurisdiction Under the Federal

Sovereign Immunities Act (Dkt. 42) is DENIED without prejudice.

2.    Defendant's Motion to Suspend Discovery (Dkt. 43) is DENIED.

3.    Plaintiff is permitted to conduct discovery, limited to the FSIA issue and this Court's

exercise of jurisdiction over Defendant for a period of 90 days from the date of this

Order. Not later than 115 days from the date of this Order, unless the time period is

extended for good cause shown, Defendant may renew her motion to dismiss or

answer the Complaint, in accordance with the terms of this Order.

**DONE AND ORDERED** in chambers this  *15*th  day of February, 2001.


JAMES D. WHITTEMORE
United States District Judge


Copies to:
Counsel of Record
Courtroom Deputy
Law Clerk

5

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HUBERT HELLER, an individual,

    Plaintiff,

v.                                                   Case No. 8:00 CV-1528-T-27C

URSULA CABERTA, an individual,

    Defendant.
_____/

**PLAINTIFF'S MOTION TO COMPEL FURTHER DEPOSITION
OF DEFENDANT URSULA CABERTA; TO COMPEL RESPONSES
TO DEPOSITION QUESTIONS; AND FOR FEES AND COSTS**

### I - INTRODUCTION

On July 26, 2001, defendant Ursula Caberta's deposition finally went forward

in Germany. However, notwithstanding two orders from this Court and one Order

from Judge Wilson, Ms. Caberta refused to obey as to the timing of the deposition,

failing to appear on the first of two days the deposition was scheduled. The second

and only day of the deposition was marked with lengthy breaks by the witness,

lengthy non-responsive speeches and argument by the witness, interruptions and

commentary by Ms. Caberta's subordinate attending the deposition and time wasting

protocol discussions and interruptions.

The total time expended in actually *questioning* the witness was only 4 hours

and 20 minutes out of a deposition ordered by the Court for two days. Moreover, the

witness refused to answer many questions. She also responded to many questions in

an evasive and argumentative fashion requiring repetition of questions, many of which

were never directly answered.   Adding to that the inherent complication of the need to translate questions and answers (the primary reason why the deposition was initially ordered for two full days), the result was that the deposition was far less complete or productive than the Court intended and the plaintiff paid for.

The deposition went forward in Germany solely as an accommodation to the defendant and under the assumption that the defendant and her counsel would act in good faith and comply with the scheduling Orders of the Court to make the deposition viable.  Indeed, the Court specifically admonished counsel that in permitting the deposition to go forward in Germany rather than in this district, it expected the deposition to go smoothly and would issue sanctions if warranted.  Ms. Caberta and her counsel declined to heed that admonition, refused to comply with the Court's scheduling orders and wasted substantial time, resources and plaintiff's funds in the process.

Plaintiff accordingly moves that Ms. Caberta be ordered to appear in this district to complete her deposition, to respond to plaintiff's questions, and to pay the reasonable fees and costs incurred in the aborted German deposition necessitated by her conduct.

## II – STATEMENT OF FACTS

### A.    The Court's Initial Discovery Order

In her two motions to dismiss denied by this Court, Ms. Caberta argued that she acted at all material times in her capacity as the so-called "sect commissioner" of the city of Hamburg, Germany within the scope of her alleged authority in performing the torts alleged in the Complaint, and is therefore immune from suit pursuant to the Foreign Sovereign Immunities Act.

By Order dated December 16, 2000, Judge Whittemore granted in part and denied in part defendant's motion to dismiss the First Amended Complaint, finding that the defendant's claims of immunity under the Foreign Sovereign Immunities Act were overcome by the allegations in the Complaint. The Court dismissed the state law claims without prejudice, giving leave to amend.

Plaintiff filed a Second Amended Complaint, re-pleading state law claims, and Ms. Caberta filed a further motion to dismiss, submitting an affidavit addressing the alleged scope of her employment and duties. By Order dated February 15, 2001, Judge Whittemore Court denied defendant's second motion to dismiss, denied the defendant's second motion to stay discovery, and gave leave to plaintiff to conduct discovery, "limited to the FSIA issues and this Court's exercise of jurisdiction over Defendant." (Ex. 1, p. 5.) The central bases for establishing an exception to the the FSIA, are that the acts undertaken by Ms. Caberta are illegal under German and international law, and that the acts are commercial acts – either of which fall outside the protection of the FSIA.

### B.    Plaintiff's Attempts to Acquire Deposition Discovery

The history of many months of attempts by plaintiff to acquire Ms. Caberta's deposition is filled with numerous efforts by Caberta to prevent the deposition.   This history was set forth in the plaintiff's Opposition to Caberta's motion to vacate this Court deposition Order, filed by plaintiff on April 30, 2001. (Docket Number 67.) Other than the following brief summary, plaintiff will not here repeat the cumbersome details of the attempts to acquire Ms. Caberta's deposition, but respectfully refers the Court to such paper and the exhibits referenced therein.

In summary: starting in the summer of 2000, plaintiff offered several times to

go to Germany to take Ms. Caberta's deposition as a courtesy to the witness and to expedite discovery.  A deposition in Germany can *only* be accomplished by the voluntary appearance of the witness, and then held at the American Embassy. Defendant's counsel declined to appear for months, after which a motion to compel was filed on March 6, 2001. Thereafter, defendant agreed to appear in Germany. However, the date offered by defendant for her appearance left insufficient time to arrange the deposition through the U.S. Embassy, which required a minimum of 3 weeks lead time.  The purported agreed upon date of the deposition was therefore canceled and later dates were sought from Ms. Caberta's counsel without success. Plaintiff therefore acquired an Order from this Court dated March 29, 2001 compelling the deposition. (Ex. 2.) Then, rejecting several attempts to re-schedule, defendant refused to appear at all. (Ex. 3.)

As Ms. Caberta had refused to appear in Germany, plaintiff noticed her deposition in this district – as is his right.  Ms. Caberta failed to appear or even communicate with plaintiff's counsel indicating she was not appearing.  (Ex. 4, Declaration Kendrick L. Moxon.)  After her no-show, Caberta filed a motion to vacate this Court's Order of March 29th.  Plaintiff cross-moved to, again, compel her deposition.

In its Order of May 8, 2001, this Court found that it was factually and legally appropriate for the defendant to come to this district for her deposition.  This Court further denied plaintiff's request for evidentiary sanctions without prejudice, noting that it was providing an additional 20 days to Ms. Caberta to comply. (Ex. 5.)

Defendant filed an Objection to the Order of May 8, 2001. While affirming this Court's Order, Judge Whittemore *sua sponte* also ruled on June 5, 2001, that Ms.

4

Caberta could elect to have her deposition taken in Germany.  Defendant thereafter indicated she wished to appear in Germany, and asked for plaintiff's available dates. (Ex. 6.)  Plaintiff immediately responded by letter faxed to defendant's counsel on June 15, 2001 seeking available dates. (Ex. 7.)

No response was received to this letter, so a nudge letter was faxed on June 19th, 2001, noting the failure of response, and reiterating that the Embassy requires 3 weeks lead time on scheduling depositions in Germany, and the need for advance booking of the interpreter and court reporter.  (Ex. 8.)

On June 20th, a further letter was sent to defendant's counsel requesting dates for the deposition to avoid motion practice. (Ex. 9.)

On June 22nd, plaintiff's counsel wrote again to Mr. Merrett, stating:

> [O]ver a week ago you informed me that Ms. Caberta would agree to appear in Germany.  Despite three letters, you have, however, failed to indicate *when* she would appear, thus preventing any arrangements from being made with the Embassy.  My options are to either: 1) schedule the deposition at my convenience; or 2) file a motion to require you to meet your responsibilities; or 3) you could just give me the dates.  If I don't hear from you by Monday, June 25, I will pursue option numbers 1 or 2.

(Ex. 10.)

Hearing again no response, a notice of deposition was sent on June 27th, noticing the deposition for July 25th and 26th.  A formal request was sent to the Embassy in Germany for the deposition on June 28, 2001,[1] with a copy to defendant's counsel, and setting the dates for the deposition at July 25th and 26th as noticed and served.  (Ex. 11.)  The logistics involved in retaining a court reporter and interpreter

---

[1] The embassy charges $400.00 to process the request.

were complex and time consuming, as very few court reporters exist in Germany and both reporters and interpreters are very much in demand and book events weeks or *months* in advance. Interpreters and court reporters are thus able to demand non-refundable retainers for their work, or obligations to pay a fixed and substantial rate. Plaintiff's counsel therefore waited several additional days after the notice of deposition was served in the event that the notice might spur defendant to file another motion for protective order or some informal objection to the date of the deposition, and in consideration of the expense involved in their retention. After several days and no objection having been received to the noticed deposition dates, the court reporter and interpreter were retained at virtually the last possible time they could be booked, in light of the July 31st discovery cutoff.

On July 16th, the Embassy in Germany forwarded a letter from Ms. Caberta objecting to the dates of the deposition stating only that the deposition would have to be held on a later date. (Ex. 12.) Plaintiff's counsel immediately faxed a letter to defendant's counsel on July 16th, stating the deposition cannot be changed at this late date. (Ex. 13.) Counsel spoke by telephone and attempted to reach an agreement on new dates if it was possible, but this attempt continued to be hindered by Ms. Caberta. (Ex. 14, Letter of July 17th.) Plaintiff attempted to work out other contingencies on the 18th, and a number of letters were exchanged with Caberta's counsel on this date. (Ex. 15.) Further attempts to re-schedule the deposition were, however, fruitless, as it was logistically too late to move the deposition and Ms. Caberta continued to make only illogical and essentially useless offers. (Ex. 16, Moxon letter of July 19th.)

Thus, Ms. Caberta's counsel agreed that the scheduled dates were the only

remaining possibility, and stated he *would* appear on July 25th and 26th, and so informed his client. (Ex. 17, Merrett letter of July 19th.)

Nevertheless, Caberta continued to object and on the morning of July 20th, "offered" at that late date, a total of two hours for her deposition on July 26th, asserting that she had to go to a conference in Berlin on the 25th and 26th. (Ex. 18.) The same letter indicated that Ms. Caberta was otherwise occupied on July 27th. Plaintiff's counsel declined the offer precipitating the emergency motion heard by this Court on July 20th. At that hearing, defendant's American attorney, John Merrett, and her identified German attorney, Runger Hintze, argued that she was busy at a planned conference in Berlin and sought to cancel the deposition. Plaintiff offered that the deposition could proceed in Florida if defendant paid minimal costs incurred in arranging the deposition, but did not even demand or seek attorneys' fees at that time. Ms. Caberta's counsel rejected the offer to come to Florida at a later date.

This Court orally ruled that since the burden of missing part of her conference was far less than coming to Florida, and since Mr. Hintze represented to the court that she could come back to Hamburg from Berlin in only 1 ½ hours on a high speed train, and since it was Ms. Caberta's failure to cooperate to set the deposition that caused the situation, that she must appear at 2:00 p.m. on the 25th in Hamburg, continue as late as practicable that day to get as full a day as possible, and begin at 9:00 a.m. or as early as possible on the 26th in Hamburg to complete the deposition.

Ms. Caberta's counsel, John Merrett, thereafter contacted plaintiff's counsel and provided his personal contact information in Europe, and indicated he was leaving over the weekend for the deposition. (Ex. 4, Declaration of Kendrick Moxon.)

7

On Friday, July 20th after 5:30 p.m., attorney Robert Merkle contacted plaintiff's counsel and indicated he has just filed an appearance for Ms. Caberta and again attempted to stop the deposition upon which this Court had earlier that day ruled. When that demand was refused, Mr. Merkle asserted that he would file yet *another* motion for protective order unless the deposition was canceled. Plaintiff's counsel declined. Over the weekend, plaintiff's counsel left for Germany to meet with German counsel and prepare for the deposition scheduled for the 25th. (*Id.*)

Thereafter, on July 23rd, a further motion for protective order arrived by fax after 5:00 p.m. at plaintiff's counsel's Florida office, and was forwarded immediately to plaintiff's counsel already in Germany, arriving near midnight German time. Because the motion sought emergency relief the following day to cancel the deposition, plaintiff's counsel was required to stay up much of the night preparing a response to defendant's latest emergency motion, which was emailed to Florida for filing on the morning of the 24th. (*Id.*)

Judge Wilson, sitting in this Court's absence, denied Ms. Caberta's emergency motion on the 24th (Ex. 19), thus requiring that the deposition go forward.

On July 25th, plaintiff's counsel, his paralegal, a court reporter, an interpreter, and a videographer all appeared at the American Consulate in Hamburg before 2:00 p.m. for the start of Ms. Caberta's deposition. (Ex. 20, Transcript, July 25, 2000.) Ms. Caberta's attorney, John Merrett, also appeared, and announced that Ms. Caberta *would not* be appearing until the following day. (*Id.*, pp. 4-5.) With no witness and no alternative, the deposition was suspended until the following day.

### C.    Proceedings at the Deposition

#### 1.  A Great of Time Was Wasted by the Witness Arguing, Commenting and Giving Non-responsive or Evasive Answers.

On July 26, 2001, Ms. Caberta appeared at the American Consulate at 9:00 a.m.

At the outset, lengthy speeches were made by Caberta's purported German attorney, Mr. Hintze, and substantial additional time was wasted with speeches by the consulate representative regarding the procedure, with oath signing, and other matters. (Ex. 21, pp. 4-28.)  The questioning therefore did not begin until 9:53 a.m.

Ms. Caberta initially testified that she decided to leave Berlin to come to the deposition "after discussion with relevant parties." (*Id.*, pp. 29-30.)  She made no indication that she was unable to attend the previous day as ordered by the Court.

From the outset, the witness frequently refused directly to respond to questions, but insisted upon making speeches on the record.  For example, a central issue in this case is whether or not Ms. Caberta is authorized by any specific German law to undertake the activities which she asserts are immune from tort liability.  Ms. Caberta had previously produced only a single "report" which she wrote herself, in response to an interrogatory seeking, "All orders, instructions, policies, guidelines, laws and statute relating to your job scope, functions, responsibilities and duties."  She was therefore asked at her deposition, first, if she had seen the interrogatory.  Refusing to answer the question directly, the witness sought to inject commentary on the record. (*Id.*, pp. 31-33.)  Asked again if the interrogatory response reflected the entirety of the responsive records, Ms. Caberta spent pages declining to directly answer the question (*id.*, pp. 33-37), which after further attempts, she finally answered after 16 minutes of otherwise

useless discussion. (*Id.*, p. 41, lines 7-10.)

The deposition was also marked with frequent interruptions by Ms. Caberta's subordinate in her office, Runger Hintze, who was previously identified to this Court as her German counsel. Mr. Hintze insisted upon speaking to the witness in German and coaching the witness during the pendency of questions. (*See, e.g.*, pp. 33, 36, 42, 49, 54, 66, 67, 83, 85, 86, 131, 133, 135, 138, 139.) In fact, Ms. Caberta admitted that Mr. Hintze is not a lawyer. (*Id.*, pp. 175-176.) Rather, he is Ms. Caberta's subordinate with some legal training. (*Id.*, p. 88.)

Ms. Caberta also frequently declined to directly respond to unprivileged questions, making unnecessary comments, and non-responsive remarks. (*See, e.g.*, p. 43, lines 3-14.) The situation of Ms. Caberta's refusal to directly respond to questions, but instead making irrelevant speeches, was greatly exacerbated by the need to translate her answers. Plaintiff's counsel, not able to understand German, could not know the lengthy German responses were irrelevant until after they were translated. For example, the simple question, "Is all of your work regarding Scientology official business?", was answered in a typical non-responsive fashion. (*Id.*, p. 54, line 11 to p. 55, line 6.) Had this question and non-responsive answer been given in English, it would have required only about 30 seconds. Here, the consecutive time stamp* indicates a time of just over 2 minutes.

The witness also insisted upon her non-responsive comments being accepted as her answers, and simply refused to directly answer questions until they were repeatedly asked. (*See, e.g.*, pp. 47-49, concerning whether or not Ms. Caberta wrote the "job description" for her position.) In other instances, the witness and her subordinate, Mr.

Hintze, saw fit to argue the scope of the deposition at great length. (*Id.*, p. 85, line 20 - p. 88, line 4.)

Efforts to seek the aid of defendant's counsel to get the witness to answer questions were unavailing, as the witness continued her evasive and non-responsive answers – at one point declining to respond directly to questions and suggesting that plaintiff could sue someone else to get answers. (*See, e.g.*, p. 49, line 23 - p. 52, line 8.)

For some areas of questions, the witness simply played games and declined directly to answer. For example, the witness was provided a copy of the affidavit she signed and filed in this case, and was asked if the statement made in one of the paragraphs was accurate. (*Id.*, p. 167.) Her responses to repeated questions seeking only to learn the accuracy of the affidavit were (in order given):

- "If I declared this like that, it will be accurate. What do you think?"

- [question repeated] "I made this Declaration and I don't know why you are asking this now."

- [question repeated] "If that is what I declare, then it will have to be correct."

- [question repeated] "It's a statement that I made and I do not make inaccurate statements."

- [question repeated] "I am not going to repeat the same nonsense all over again. I already answered the question."

(*Id.*, pp. 167 - 168.)

Ms. Caberta never did answer the question.

At this point, Caberta's counsel demanded that the deposition address substantive issues relating to the defendant's dealings with plaintiff and the company

POS Partners, which had refused to honor the agreement with plaintiff based on alleged pressure and interference by Caberta. (*Id.*, p. 172.) Such questions were specifically beyond the scope of Judge Whittemore's discovery ruling, which, based on arguments from the defendant, limited the present scope of discovery to jurisdictional and FSIA issues. (See Ex. 1, Order, February 15, 2001, p. 5.) Caberta's counsel argued at the deposition that plaintiff was "clearly entitled" to inquire about "dealings [Caberta] had with POS Partners and Heller" and that plaintiff's refusal to so inquire was improper. Caberta's counsel therefore demanded that plaintiff cease asking jurisdictional questions, and stated: "And you will shortly be confronted with the facts in that regard [in a future dispositive motion] and you would be well advised to use the remaining hour to explore them rather than pretending surprise later on." (Ex. 21, p. 172.) While defendant's counsel declined to waive any right to object to questions outside the scope of the deposition, he asserted that questions relating to the facts and circumstances of the relationship and dealings between the parties and the third party company were "within the scope of the Court's Order." Thus, limited substantive questions were asked of the witness to avoid later discovery disputes.

Ms. Caberta also flatly refused to answer some particularly important questions on the issue of exception to immunity (because her acts are arguably outside the scope of any legitimate or authorized governmental activities.) (*See, e.g.*, p. 52, line 10-13, "Do you submit requests for funding to any governmental entity in which you identify what you are doing and what you intend to accomplish?") Ms. Caberta also refused to answer if she received money for speeches regarding Scientology outside of her government employment. Such refusal came only after a lengthy argument in which

she asserted that she had sufficiently answered the question by giving a partial and very incomplete response. (*Id.*, p. 59, line 23 - p. 65, line 4.)  This particular refusal and unnecessary argument wasted 8 ½ minutes.

Thereafter, the defendant was asked to affirm the accuracy of statements she made in an affidavit she filed in this case, in which she described a visit to the United States (paid by Minton and the Lisa McPherson Trust), regarding the use of the sect filter. (*Id.*, p. 148.)  The witness gave evasive, unresponsive and argumentative responses for more than 7 minutes before answering the question. (*Id.*, pp. 148 - 153, line 4.)

Ms. Caberta also identified records which were clearly responsive to the prior document requests and Court orders to produce, but which were not produced. (*See, e.g.*, pp. 44 – 45.)  Her refusal to provide records within her possession and custody, obviously prevented a reasonable or complete examination of the scope of her duties.

The witness also saw fit to argue the scope of entirely relevant and significant questions, such as, "Do you receive any money of any kind for any work that you do with respect to anything concerning Scientology which is not part of your job?"  In this instance, she refused to answer, then took a lengthy break, the deposition not resuming for more than 25 minutes.[2]

Ms. Caberta also asserted the equivalent of a Fifth Amendment self-incrimination privilege to refuse to testify regarding funds she had received from

---

[2] In fairness to the witness, at two of the breaks called by plaintiff, the interpreter, who had a nursing child at home, requested extra time to collect milk.  However, the interpreter arrived back from breaks no more than 2 minutes after Caberta and her attorney returned to the room.

alleged co-conspirator Robert Minton. (*Id.*, pp. 65-66.)   The witness previously filed

an affidavit as to the receipt of funds from Mr. Minton which left many facts

unrevealed.  And, the witness refused even to answer if her previously filed affidavit

was accurate, based upon a Fifth Amendment assertion.  Plaintiff concedes the witness

has an apparent right to assert a self-incrimination privilege regarding whether or not

she received bribes from Robert Minton or his company, as this is a central issue in the

case.  However, Ms. Caberta's counsel ensured the questions for which she asserted a

self-incrimination privilege wasted as much time as a possible, by refusing to permit a

clear assertion thereof. (*Id.*, pp. 68-80.)  This same form of deposition misconduct was

repeated and repeated by Ms. Caberta's counsel, John Merrett, with sarcastic remarks

and commentary rather than moving the deposition forward or assisting to make the

record clear. (*Id.*, pp. 77-78; 138.)

 Ms. Caberta also obstructed the deposition by failing to conduct a search for

records responsive to the document requests, and failing to produce records in

compliance with this Court's Order of February 15, 2001 (*id.*, p. 134), taking the

position that the records are located in her office but that she considers the records to

be government files.  However, she stated that if there are documents she considers

useful to the case, she *will* request authorization to use the documents! (*Id.*, pp. 139-

140.)

 **2.    Caberta Refused to Answer Relevant and Unprivileged Questions**

 In addition to the evasive and non-responsive answers, Ms. Caberta also refused

outright to answer other relevant questions without any assertion of privilege.  For

example, the witness was questioned regarding whether or not she possessed any

records responsive to document Request number 10, which sought correspondence with alleged co-conspirator, Stacy brooks, the president of the Lisa McPherson Trust. She refused to answer, asserting the question "has nothing to do with this case." (*Id.*, p. 147, line 22 - p. 148, line 12.)

Worse, Ms. Caberta then stated that she would answer no questions regarding her relationship with the American alleged co-conspirators in this district without receiving authorization because, "it refers to part of my job." (*Id.*, p. 154, line 19 - p. 155, line 8.)  She thereafter contradictorily refused to respond to any questions regarding the "Lisa McPherson trust or private trips" or expenses paid by the company on the grounds that "has nothing to do with the Caberta case." (*Id.*, p. 155, line 9 - p. 158, line 12.)  Efforts to resolve the matter were fruitless. (*Id.*, pp. 158 - 160.) Eventually, the witness took another 10 minute break, and returned to assert a self-incrimination privilege as to any questions regarding the provision of favors for money relating to co-conspirator Robert Minton (recipient of an award from the defendant), or any communications with Minton or the other alleged co-conspirators, Stacy Brooks and the Lisa McPherson Trust. (*Id.*, pp. 160-161.)

As to a similar question, she refused to answer if her employees were paid by the city or by a private person to attend the award ceremony in which she gave Minton an award in Leipzig, asserting only lack of relevance. (*Id.*, p. 166, line 21 - p. 167, line 3.)

Similarly, Caberta was asked if she paid for her expenses of her trip to Florida to meet with alleged co-conspirators Minton and LMT, Inc.  Her response: "It is none of your business. I am not going to answer that." (*Id.*, p. 170, lines 9-11.)  Asked *when*

she received the money used for her trip, she responded, "Once again, I am not going to answer any questions apart from the POS Partner and Heller issue. And please ask these questions now as the Court has ruled." (*Id.*, pp. 171-172.)

### 3. Caberta Failed to Provide Records Prior to the Deposition Ordered by the Court

Ms. Caberta provided testimony indicating that a prior response to a document request was a false representation, which impeded the deposition. On June 1, 2001, plaintiff filed a Motion to Clarify And/or Amend Order Regarding Production of Documents, relating to requests 9 through 17 of plaintiff's First Request for Production. The motion argued that the response to these requests to produce was equivocal, asserting that "there are no records pertaining to the allegations of the complaint." By Order dated June 21, 2001, this Court ruled," that if any records responsive to Requests 9 through 17 are in defendants possession, custody or control, they shall be produced to plaintiff within ten (10) days of this order." (Ex. 22.) Such records sought information relating to correspondence with Robert Minton, Stacy Brooks, the Lisa McPherson Trust, Inc., and bank records reflecting the receipt of funds from Robert Minton, any agent of Minton, or from the Lisa McPherson Trust, Inc. (Ex. 23.)

Defendant failed to comply with the Court's Order. Thus, a further motion was filed on July 12, 2001 to Compel Forthwith Compliance with Order Dated June 21, 2001. This Court ordered defendant to file a response to such motion to compel no later than July 17th. (Ex. 24.) Spurred by the Order, a response was signed by defendant's counsel, John Merrett, and served stating that no records existed

responsive to the document requests. (Ex. 25.) Ms. Caberta was shown the July 16th response at her deposition and asked if the response was accurate, *i.e.*, that no records existed. Her answer was, "That's nonsense. I have never seen this before. I see it now for the very first time, and I am not answering any questions on these items." (Ex. 21, Depo., p. 161, line 7 - p. 162, line 16.) She then refused to answer any questions regarding whether or not she had conducted a search for any of the documents the Court ordered her to produce. (*Id.*, pp. 162-163.) Ms. Caberta re-iterated that she had not conducted any search for records and was seeing *the document request* for the first time, and refused to comment further. (*Id.*, p. 163.)

Mr. Merrett took his client out of the room at that point. (*Id.*, p. 164.) When she returned, she made the incredible assertion that her own personal bank records were *government property* and that is why she did not search for them. (*Id.*, p. 164.) Asked how her personal bank records could possibly be government property, she refused to answer, saying her personal bank records are "none of your business ... have nothing to do with this case, and I am not going to say any more on those." (*Id.*, pp. 164-165.) Mr. Merrett interrupted to attempt to prevent further questioning, but the question was again asserted, "are your personal bank records the property of the city?" She responded, "I will not answer nonsense questions like that." (*Id.*, p. 166.)

In any event, her testimony demonstrated that 1) responsive records may exist but the witness refused to say, and 2) defendant was not aware of the document request, yet, a response was filed by her counsel asserting that no responsive documents existed.

# III – ARGUMENT

### A.    The Witness Should Be Ordered To Appear in this District to Complete Her Deposition

This Court initially ordered Ms. Caberta's deposition to proceed in this district. As an accommodation to the defendant, Judge Whittemore provided her the option of having her deposition taken in Germany. This Court thereafter ordered the deposition to proceed for two full days, citing to the inherent difficulty with a translated deposition. Defendant provided no cooperation as to the dates of the deposition, causing plaintiff's counsel to expend considerable time attempting to work out dates, reporters, interpreters and government logistics in a country where depositions are unusual. After much dispute and litigation, and in deference to the desire of the witness to attend part of a conference on July 25th, the Court ordered the deposition to begin at 2:00 p.m. on the 25th, to continue as long as possible, and to resume on the early morning of the 26th so it could have a chance of completion.

Another emergency motion to compel was filed requiring extremely burdensome efforts on the part of plaintiff's counsel already in Germany, to respond. That motion was also denied.

Despite these rulings, the witness contumaciously refused to comply, and kept her own schedule. Despite the appearance of counsel, a paralegal, the reporter, the interpreter, a videographer, and State Department personnel, the witness did not appear. Thus, the planned extended-day deposition on the 25th discussed with the Court at the hearing on July 20th, never happened.

The second day of deposition on July 26th was marked with substantial time

consuming difficulties addressed above, including the fact that the court reporter had to leave before 5:00 p.m. to catch a flight – as was known to Ms. Caberta's counsel before anyone even came to Germany. Moreover, the witness destroyed substantial time with evasion and speeches in a manner that was clearly not calculated to cooperate to actually complete the deposition. These problems were exacerbated by the language barrier. The witness tended to make lengthy speeches in response to questions, and plaintiff's counsel could not know if her answers were responsive until they were translated. An analysis of the lines of the deposition during which time actual questions were posed and answers given (regardless of content), indicates only 4 hours and 20 minutes of actual Q and A. (Ex. 4, Declaration of Kendrick L. Moxon.)

The translation procedure itself also easily halved the useful length of the deposition. Thus, the 4 hour and 20 minutes actually spent in questions and answers is reasonably only about 2 hours of what would be accomplished in a normal deposition.

And, Ms. Caberta was not willing to make herself available on the 27th of July either, even had there been a court reporter or interpreter as her attorney suggested in his emergency motion, that he would attempt to arrange. The deposition was therefore not nearly completed, as many areas of questioning remained to be explored on jurisdictional FSIA issues. (Ex. 4, Declaration of Kendrick L. Moxon.)

Ms. Caberta should therefore be ordered to comply with the Court's prior Order to appear in this district, having effectively negated her prior acceptance of a deposition in Germany. Local Rule 3.04(b) states the general policy of this district, that a non-resident defendant who intends to be present at trial may reasonably be deposed at least once in this district.

Nearly a week was wasted in the travel and efforts involved in the one-day deposition, and the fault lies entirely with the defendant. Plaintiff is not nearly completed with the deposition. Completion was made impossible by virtue of the waste of time by the witness, addressed above, in refusing to appear for the time ordered, and then ensuring that the deposition could not proceed efficiently with evasion, obstruction, lengthy breaks, non-responsive speeches and interruptions. Ms. Caberta should be required to come into this district so that the deposition may be concluded and this case pass on to the next issue: determination of jurisdiction and immunity. Indeed, Caberta has already filed a renewed motion to dismiss which addresses issues about which she declined to testify or which were not reached.

**B.    Defendant Should Be Ordered to Respond to Questions**

As addressed above, Ms. Caberta refused to answer many questions relating to her relationship with Robert Minton and the Lisa McPherson Trust, Inc. in Clearwater, asserting a privilege against self-incrimination. However, there were many other questions for which no privilege was asserted, nor was any objection asserted by defendant's counsel. Rather, the only comment made by the witness was that the questions were irrelevant to this case. Those unprivileged questions sought to be compelled are:

> 1. Do you submit requests for funding to any governmental entity in which you identify what you are doing and what you intend to accomplish? (Ex. 21, p. 52.)

This question goes to the issue of the authorization of any governmental entity for the activities which Caberta claims are immune from tort liability, and which plaintiff claims are outside of the scope of her authority. If Ms. Caberta submitted a

request for funding for specific activities at issue which was approved or disapproved,

it would be evidence on the issue of "government authorization."

> 2. Do you receive any monies that you deposit in you personal
> bank accounts from any of these speeches [about Scientology]? (*Id.*, p.
> 60.)

> 3. Do you receive any money beyond your expenses which you
> may keep, from your speeches about Scientology? (*Id.*, p. 60.)

> 4. Have you deposited any money in your private bank accounts
> that you have received for lectures given with respect to Scientology that
> is not part of your income received from the State of Hamburg? (*Id.*, p.
> 63.)

> 5. I want you to identify whether or not you've received any
> funds beyond actual expenses that you've incurred for any lecture,
> speech or advice regarding Scientology beyond the income you've
> received from the State of Hamburg? (*Id.*, p. 64.)

These questions relate to the receipt of money by Ms. Caberta for some of the

activities at issue. If she received funds for these activities from private parties,

plaintiff will demonstrate that under German law, the conduct is unlawful for a public

official and is therefore outside the scope of any legitimate or authorized governmental

activity. Ms. Caberta did not assert a self-incrimination privilege as to these questions.

> 6. Do you have any personal bank records that are property of the
> city? (*Id.*, p. 164.)

Leading up to this question, the witness was asked if any records existed

responsive to document requests seeking financial records of funds received from

Minton or Minton's company. Ms. Caberta's attorney took a break and spoke to his

client privately. She then returned to the room and asserted that if the documents

existed, they would be the property of the city. (*Id.*, p. 164.) With this seemingly

disingenuous assertion to avoid revelation that the defendant had misrepresented that no such documents existed, she was asked the obvious question quoted above.   Her response to the question: "I will not say anything about my bank records because they are none of your business... That's nonsense." (*Id.*, pp. 164-65.) Defendant should be ordered to answer, for which no privilege was asserted.

> 7.  When you appeared at the Alternate Charlemagne award ceremony in Leipzig last year, were the expenses of you and your employees paid for by the City or by someone else? (*Id.*, p. 166.)

This question addresses the allegation that Caberta provided special favors to Robert Minton, including her tortious conduct against Mr. Heller and others similarly situated.  Her response was that she was acting as a private person with respect to the public "Alternate Charlemagne Award" given to Minton and resultant publicity and benefits.  Thus, whether or not her expenses and those of her employees she brought to the awards ceremony in Leipzig were paid by the city or paid by another – such as Minton – would provide potentially controverting evidence regarding whether the act was a private or public act and therefore go to the issue of immunity.

> 8.  In your computer system, do you maintain the names of some of the people that the companies are asking about [whether they are Scientologists]? (*Id.*, pp. 182-183.)

> 9.  Do you have a computer system for locating records such as this [notes regarding sending out sect filters to companies for certain people]? (*Id.*, p. 187.)

These two questions address the location and existence of evidence concerning the plaintiff and the allegations in the complaint relating to Ms. Caberta's dissemination of "sect filters" to private companies.  This goes to the issue of FSIA

immunity exception arising out of illegality, and the "commercial act" exception to the FSIA. Plaintiff should also be required to return to the deposition to answer a further set of questions, dealing with the failure to produce documents pursuant to the Court's Order of June 21, 2001, and because of the substantial additional time wasted in the deposition arising out of this issue. First, plaintiff had to file three different motions to get responses to the document requests, including a motion intended to acquire the documents *prior* to the deposition so that the documents could be utilized at the deposition on jurisdictional questions. Second, the amended "response" was demonstrably inaccurate or disingenuous, as evidenced by the questioning of Ms. Caberta indicating that she had never seen the response. Third, at the deposition, Ms. Caberta continued to refuse to address whether or not there were response records, first by asserting that her own bank records would belong to the City of Hamburg if they existed, and then outright refusing to answer the elementary cross examination questions which would reveal that unlikely assertion to be proven false.

The witness should be required to return to the deposition to answer these questions. [3]

### C.  Plaintiff Is Entitled to Reimbursement of Reasonable Fees and Costs

As indicated above, the only reason the deposition was held in Germany is because defendant objected so vehemently to the alleged expense and trouble of coming to the United States. It was a courtesy to the defendant. However, Ms. Caberta abused the courtesy provided to her. She ignored the Court's scheduling

_____

[3]  A separate motion to compel and for sanctions will be addressed to the failure to comply with the Court's Order of June 21st.

23

order.  She argued throughout the deposition; she evaded questions.  She gave

numerous non-responsive answers.  She brought her associate to disrupt the deposition.

She took long breaks.

In short, the deposition was not completed solely because of the conduct of the

defendant.  To prevent what has now occurred, this Court provided a crystal clear

admonition on July 20th to both her American counsel and to Mr. Hintze, who

represented himself as her German counsel:

> All right. And I simply remind counsel that this is a very
> expensive trip and that you should make any effort to resolve any
> differences among yourselves so that there won't be any monetary
> sanctions considered.  And I remind Ms. Caberta that this is better than
> having to come to the United States, so while this may be inconvenient
> for her in terms of her meeting, it sounds to me like there was every
> effort made to schedule this around your activities, but Plaintiff's counsel
> finally had to take certain action to get the deposition set down.

(Ex. 24, July 20, 2001, p. 16.)

Thus, in addition to requiring the witness's appearance in the district, she and

her counsel should also be required to reimburse plaintiff's counsel the costs and the

reasonable amount of the attorneys' fees expended by plaintiff's counsel in flying to

Germany, preparing the opposition to the second emergency motion, wasting an entire

first scheduled day of the deposition when Ms. Caberta failed to show, the wasted

second day of deposition when it was so completely obstructed, and the return trip to

the States.

Under *Societe Nationale Industrielle Aerospatiale v. U. S. District Court for

Southern District of Iowa,* 482 U.S. 522, 536, 107 S.Ct. 2542, (1987) and the line of

cases it endorsed, it is clear that the court is empowered to impose appropriate

sanctions upon a foreign plaintiff over whom personal jurisdiction has been acquired, as in this case, including judgment for the plaintiff, if the defendant refuses to comply with a discovery order. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1474 (9th Cir. 1992); *Rachis v. Maschinenfaprik Hehl & Soehne*, 1986 WL 9274 (E.D.Pa. 1986); *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705-06 (1982) (failure to abide by discovery order subjects a party to Rule 37 sanctions, including a finding of jurisdiction pursuant to Rule 37(b)(2)(A), allowing designated facts to be established).

The costs actually incurred by plaintiff's counsel in airfare, hotel, State Department fees, transportation, interpreter, videographer, and court reporter, is $8,707.93. (Ex. 4, Declaration of Kendrick L. Moxon.) The attorneys' fees expended at a reasonable rate of $250/hour, are $12,250.00. (*Id.*)

## IV - CONCLUSION

Ms. Caberta should be ordered to appear for the completion of her deposition in this district forthwith. Defendant and her counsel should also be jointly and severally sanctioned in the amount of the reasonable time expended in the amount of $8,707.93 and costs in the amount of $12,250.00 as set forth in the accompanying declaration of counsel.

Dated: September 4, 2001          Respectfully submitted,

Kendrick Moxon
Helena Kobrin
FBN #: 0259713
MOXON & KOBRIN

25

1100 Cleveland Street, Suite 900
Clearwater, FL  33755
(727) 443-5620

F. Wallace Pope, Jr.
FBN #:  124449
JOHNSON, BLAKELY, POPE, BOKOR,
RUPPEL & BURNS, P.A.
P.O. Box 1368
Clearwater, Fla.  33757
(727) 461-1818

**Attorneys for Plaintiff**

## CERTIFICATION PURSUANT TO LOCAL RULE 3.01(g)

I hereby certify that I have attempted to confer with defendant's counsel, John

Merrett, to informally resolve the discovery dispute set forth in this motion to compel.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused the foregoing **PLAINTIFF'S MOTION TO COMPEL FURTHER DEPOSITION OF DEFENDANT URSULA CABERTA; TO COMPEL RESPONSES TO DEPOSITION QUESTIONS; AND FOR FEES AND COSTS** to be served on this 4th day of September, 2001, by U.S. Mail, to John Merrett, 11250 St. Augustine Road, Suite 15-393, Jacksonville, FL 32257-1147.

_____
Attorney

28

# EXHIBIT 6

Apr 30 01 03:51p                                                              p.2

## IN THE UNITED STATES DISTRICT COURT
### Middle District of Florida

HUBERT HELLER,                          Case No.: 8:00 CV-1528-T-27C
                    Plaintiff

vs

URSULA CABERTA,
                    Defendant

_____

## DEFENDANT'S RESPONSE TO MOTION TO COMPEL

Plaintiff seeks entry of an order compelling production of documents by
Defendant in response to two requests for production served by Plaintiff. The motion is
not well founded and is in fact of a piece with the misleading behavior heretofore
exhibited by Plaintiff's counsel in the course of this litigation.

The first request for production bears a certificate of service dated September 25,
2000. Leaving aside the initial objection to the fishing expedition attempted in this
request, and the intervening stay of discovery entered by the Court, Plaintiff's First
Request for Production was responded to in full well before the filing of the present
Motion to Compel. The objection was supplemented by a letter faxed to Plaintiff's
counsel on April 5, 2001 (and attached as an exhibit to Plaintiff's Motion and to this
response). As supplemented by the said letter, Defendant's responses to the 36 categories
of document production sought in the First Request were as follows.

Requests 1 through 8: Defendant has neither possession nor control of any
responsive documents

Requests 9 through 17: There are no responsive records which pertain to the
allegations of the complaint

Requests 18 through 30: Defendant has neither possession nor control of any responsive documents

Requests 31 through 36: None.

Defendant also went on to advise Plaintiff that if records responsive to requests 1 through 8 and 18 through 30 exist, they are property of and possessed by the government of Hamburg and/or Germany.

Plaintiff's Second Request for Production requested documents in 22 categories and bears a certificate of service dated March 6, 2001. Defendant served a formal response with a service date of March 30, 2001, and supplemented the response in the aforementioned letter of April 5, 2001. As supplemented by the said letter, Defendant's responses to the 22 categories of document production sought in the Second Request were as follows.

Requests 1 through 6: Defendant has neither possession nor control of any responsive documents

Request 7: None

Requests 8 through 11: Defendant has neither possession nor control of any responsive documents

Request 12: Objected to on grounds of scope, relevance, and confidentiality

Requests 13 through 15: Defendant has neither possession nor control of any responsive documents

Request 16 through 18: None

Requests 19 through 22: Defendant has neither possession nor control of any responsive documents

As she did in response to the First Request for Production, Defendant went on to advise Plaintiff that if records responsive to requests 1 through 6, 8 through 11, 13 through 15, and 19 through 22 exist, they are property of and possessed by the government of Hamburg and/or Germany.

The only outstanding objection is Defendant's objection to request number 12 of the Second Request for Production. That item calls for production of all records relating to any response made by or on behalf of Defendant in response to criminal allegations that Defendant accepted a "bribe or loan" from Robert Minton. Defendant objected that the request is beyond the scope of discovery authorized by the Court, calls for production of irrelevant material, and that the requested matters, if extant, are privileged under German law.

In his Motion to Compel, Plaintiff makes the tortured and fatuous argument that the materials are discoverable on the issue of sovereign immunity because:

a)  Robert Minton invoked his 5th Amendment privilege in response to questions about financial dealings with Defendant;

b)  In a civil action, adverse inferences may be drawn from the invocation of the 5th Amendment;

c)  The "reasonable inference" from Minton's invocation of the 5th Amendment is that Minton bribed Defendant to take actions against Scientologists

d)  Therefore, any response to a criminal investigation involving financial dealings between Defendant and Minton is relevant to the issue of sovereign immunity.

This purported reasoning suffers from a number of defects. The first and most glaring of these is its predication upon a misleadingly clipped quotation from *Baxter vs Palmigiano*, 425 US 308, 319; 96 S.Ct. 1551; 47 L.Ed.2d (1976). Plaintiff quoted this portion of the opinion: "Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them:" substituting a period for the colon in the original text, Plaintiff omitted the succeeding clause, to-wit: "the Amendment 'does not preclude the inference where the privilege is claimed by a *party to a civil cause.*'" (emphasis in original) Each of the authorities cited by Plaintiff in support of the "inference" argument concurs with the omitted portion of the holding in *Baxter*, that the inference extends only to parties to the civil action. Minton, the individual who invoked the 5th Amendment, is not a party to the action. Furthermore, although Plaintiff cited *United States v. Local 560 of Int'l Brotherhood of Teamsters, etc.*, 780 F.2d 267 (3d Cir. N.J. 1985) for the proposition that Minton's exercise of his constitutional right gives rise to an inference of criminal venality, Plaintiff overlooked the holding of the court in *Local 560* that "there must be sufficient independent evidence — besides the mere invocation of the privilege -- upon which to base the negative inference." It is thus apparent that, even were Plaintiff attempting to draw an inference based on the acts of a *party*, more would be required than what Plaintiff has offered.

Second, Plaintiff overlooks the fact that Defendant attested in her earlier sworn filings to the nature of her financial dealings with Minton. There is no evidence

whatever that there was any connection between the loan made by Minton and the actions alleged in the current complaint. Even if Plaintiff's fantasy were substantiated, it would not establish simple relevance to the question whether Defendant acted (if at all) within the scope of her employment; Plaintiff offers neither legal nor logical support for the proposition that concurrent venality strips an act of its official character. A road crew foreman bribed to repave my block before the next one still acts as a public official when he has the asphalt poured.

Plaintiff has made no colorable showing of a connection between Defendant's response, if any, to a foreign criminal inquiry and the Court's determination of her entitlement to immunity. Plaintiff has sought in item number 7 of his Second Request for Production "[a]ll records of receipt of funds for any work relating to Scientology, except [Defendant's] official salary." The response was "None." Discovery does not extend to fishing expeditions. This request is clearly a fishing expedition.

Plaintiff is entitled only to production of documents "which are in the possession, custody or control of" Defendant. Rule 26, Fed. R.Civ.Pro. None of the documents requested, with the possible exception of the document requested in Request No. 12 of Plaintiff's Second Request for Production, meets this description.

Plaintiff's Motion is ill-founded, and should be denied. The point of this exercise, as of Plaintiff's duplicitous behavior in securing the Court's prior order[1],

---

[1] It will be recalled that, having prematurely filed a Motion to Compel depositions, and thereafter acknowledging in writing that the Motion was mooted by agreement of the parties, Mr. Moxon failed to inform the Court of the agreement and then affirmatively misinformed the Court that the issue was live and

is in all likelihood concealment of Plaintiff's own failure to act appropriately and

with dispatch in pursuing the discovery permitted by the Court. Plaintiff canceled

depositions and missed the opportunity to proceed; Plaintiff refuses to proceed

under the Hague Convention despite repeated representations that both Defendant

and her superiors will respond to inquiries under that system; Plaintiff consumes

paper and ink detailing an issue (the reach of the Court's discovery authority)

which has not, to date, been implicated in this action; Plaintiff dallies with a

motion to compel production of 58 categories of documents, 57 of which counsel

knows are not possessed by Defendant, rather than proceed with available and

meaningful discovery efforts. This behavior should not be countenanced, much less

encouraged by judicial imprimatur.

JOHN M. MERRETT, ESQUIRE
2716 Herschel Street
Jacksonville, Florida 32205
Telephone 904.388.8891
Florida Bar No. 0742848

I hereby certify that copies of the foregoing were furnished by facsimile
transmission to K.L. Moxon and Dan Leipold, Esq. this 30th day of April, 2001

John M. Merrett

---

that Defendant had not responded, securing the entry of an order compelling depositions he had already
unilaterally canceled.

# EXHIBIT 7



**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

HUBERT HELLER,

    Plaintiff,

vs.                                        Case No.:  8:00-CIV-1528-T-27C

URSULA CABERTA,

    Defendant.

_____/

**O R D E R**

Before the court is Plaintiff's **Motion to Clarify and/or Amend Order Regarding Production of Documents** (Dkt. 76) filed June 1, 2001.  To date, defendant has not responded to this motion.

Plaintiff seeks clarification of this court's May 8, 2001 order (Dkt. 71) which granted plaintiff's motion to compel production of documents and request for sanctions (Dkt. 64) with regard to document request 12, but denied the motion in all other respects.  Specifically, plaintiff seeks clarification with respect to plaintiff's document requests 9 through 17 in the First Request for Production.

The Local Rules of this district provide that a party shall respond within ten (10) days to any motion to which it is opposed.  See Local Rule 3.01(b), M.D. Fla.  As the time for responding has passed and defendant has not filed a response, defendant is deemed



to have no objection to the relief requested in plaintiff's motion to clarify and/or amend order regarding production of documents. Accordingly, plaintiff's motion (Dkt. 76) is **GRANTED** to the extent that if any records responsive to Requests 9 through 17 are in the defendant's possession, custody or control, they shall be produced to plaintiff within **ten (10) days** of this order.

**DONE AND ORDERED** at Tampa, Florida this _____ day of June, 2001.

ELIZABETH A. JENKINS
United States Magistrate Judge

Copies to:
    Counsel of Record

2

# EXHIBIT 8

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

01 JUL 12 PM 3: 35

............ COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

HUBERT HELLER,

          **Plaintiff,**

v.                    **CASE NO.: 8:00-CV-1528-T-27C**

URSULA CABERTA,

          **Defendant.**
_____/

## O R D E R

This cause comes before the court for consideration of plaintiff's **Emergency Motion to Shorten Time on Motion to Compel Forthwith Compliance with Order Dated June 21, 2001** (Dkt. 85) filed July 12, 2001. Plaintiff requests that the court require defendant file an expedited response to plaintiff's Motion to Compel Forthwith Compliance with Order Dated June 21, 2001 and Request for Sanctions (Dkt. 84) also filed on July 12, 2001.

As plaintiff is scheduled to depose defendant in Germany on July 25 and July 26, 2001 and desires production of documents prior to the deposition, it is, upon consideration, **ORDERED THAT:**

(1) Defendant shall file a response to plaintiff's motion to compel on or before **Tuesday, July 17, 2001.**

**DONE and ORDERED** at Tampa, Florida this _12th_ day of July, 2001.

ELIZABETH A. JENKINS
United States Magistrate Judge

Copies to:
Counsel of Record

# EXHIBIT 9

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

HUBERT HELLER,                                          Case No.: 8:00CV-1528-T-27C

                    Plaintiff

vs

URSULA CABERTA,

                    Defendant

_____

### RESPONSE TO ORDER DATED JULY 12, 2001

In response to the Court's Order dated July 12, 2001, Defendant says:

1.  As set forth in Plaintiff's Corrected Emergency Motion, the Court's order of June 21, 2001 required that "if any records responsive to Requests 9 through 17 are in the defendant's possession, custody or control, they shall be produced to plaintiff within ten (10) days of this order."

2.  The cited language is plain and not subject to interpretation.

3.  No records responsive to Requests 9 through 17 are in the defendant's possession, custody or control.

4.  Defendant has complied with the order of June 21, 2001.

                                              JOHN M. MERRETT, ESQUIRE
                                              2716 Herschel Street
                                              Jacksonville, Florida 32205
                                              Telephone: 904.388.8891
                                              Florida Bar No.: 0742848

# EXHIBIT 10

ORIGINAL

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               MIDDLE DISTRICT OF FLORIDA
                      TAMPA DIVISION
 3
    HUBERT HELLER, an individual, )
 4                                 )
                    Plaintiff,     )
 5                                 )
              v.                   ) Case No. 8:00
 6                                 ) CV-1528-T-27C
    URSULA CABERTA, an individual,)
 7                                 )
                    Defendant.     )
 8                                 )
    _____ )
 9
             DEPOSITION UPON ORAL EXAMINATION
10                          OF
                      URSULA CABERTA
11
              On Thursday, July 26, 2001
12              Commencing at 9:09 A.M.

13                   Taken at:

14      American Consulate General Hamburg
                Alsterufer 27/28
15          20354 Hamburg, Germany

16

17

18

19

20

21

22

23

24

25      REPORTED BY:  RICK C. WEISS, CSR, CM, RPR
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel: (011 44) 1483 222650 / 171 4055010
Fax: (011 44) 211912

161

1

2    answer questions regarding the Lisa McPherson          15:30:30

3    Trust, Robert Minton, Stacy Brooks or financial        15:30:34

4    transactions involving any items, on the advice of     15:30:40

5    German counsel, on the grounds that answers may        15:30:44

6    tend to subject her to prosecution.                    15:30:46

7                    (Whereupon, document entitled

8    "RESPONSE TO ORDER DATED JULY 12, 2001" signed by

9    Mr. Merrett, containing certificate of service was

10   marked as Caberta Deposition Exhibit No. 11)

11   BY MR. MOXON:

12            Q.    I have marked as Exhibit 11            15:30:50

13   response to order dated July 12th 2001.               15:30:52

14                    In this, your attorney represents    15:30:58

15   that you have no records responsive to Requests 9     15:31:02

16   through 17 in defendant's first request for           15:31:06

17   production.                                           15:31:10

18                    This is just dated last week, June   15:31:22

19   21st.                                                 15:31:26

20            A.    You are asking that I am not going     15:31:32

21   to say anything on those points.                      15:31:34

22            Q.    I didn't ask a question yet at all.    15:31:36

23                    Is this representation that's made   15:31:46

24   in Exhibit No. 11 true with respect to category       15:31:50

25   Request number 14, which is, quote,                   15:31:54

162

1

2          "All bank records reflecting or          15:31:58

3          concerning the receipt of funds from     15:32:00

4          Robert Minton," end quote?                15:32:02

5     A.     I don't understand this.  I see         15:33:32

6  this for the first time now, and I am not going to  15:33:34

7  answer any questions regarding items 9 through 17.  15:33:36

8     Q.     My question is simply this:  Last       15:33:42

9  week, you filed in this case a statement saying     15:33:46

10  that you had no documents which are responsive to  15:33:50

11  Request number 14.                                 15:33:56

12          Is that response accurate enough?        15:34:02

13     A.     That's nonsense.  I have never seen     15:34:14

14  this before.  I see it now for the very first      15:34:16

15  time, and I am not answering any questions on      15:34:20

16  these items.                                       15:34:22

17     Q.     Did you conduct any search to          15:34:28

18  determine whether or not you had any records       15:34:30

19  responsive to Request number 14?                   15:34:32

20     A.     I will not answer any questions        15:34:44

21  with regard to those items, as I said.             15:34:46

22     Q.     I am not asking you for any            15:34:48

23  substantive information.  I only want to know if   15:34:52

24  you conducted a search to locate any records?      15:34:58

25     A.     I will not answer that question.       15:35:06

163

| | | |
|---|---|---|
| 1 | | |
| 2 | Q.    The same for number 15, same | 15:35:14 |
| 3 | question? | 15:35:20 |
| 4 | A.    All items that we just mentioned | 15:35:24 |
| 5 | here. | 15:35:26 |
| 6 | MR. MERRETT: Let me talk to her a | 15:35:36 |
| 7 | minute. | 15:35:38 |
| 8 | (PRIVATE DISCUSSION BETWEEN COUNSEL AND WITNESS) | 15:35:38 |
| 9 | BY MR. MOXON: | 15:35:38 |
| 10 | Q.    Do you wish to amend your answer? | 15:36:08 |
| 11 | A.    I did not search, no.  I don't know | 15:36:22 |
| 12 | anything about this. | 15:36:26 |
| 13 | Q.    You have no knowledge whatsoever of | 15:36:28 |
| 14 | the response that was made on your behalf, which | 15:36:30 |
| 15 | is identified as Exhibit 11? | 15:36:36 |
| 16 | A.    I see this for the first time now. | 15:36:44 |
| 17 | Q.    Well, you may have seen it for the | 15:36:46 |
| 18 | first time. | 15:36:48 |
| 19 | Did you know that a response was | 15:36:48 |
| 20 | going to be made on your behalf saying that you | 15:36:52 |
| 21 | had possessed no records responsive to any of | 15:36:54 |
| 22 | those categories? | 15:36:56 |
| 23 | A.    I did not search for those | 15:37:08 |
| 24 | documents, and that's all I am going to say on | 15:37:12 |
| 25 | this. | 15:37:14 |

164

```
 1

 2          Q.     My question is simple, and I am        15:37:14

 3   trying to avoid any problem that you have with it    15:37:18

 4   just by attempting this.  Let me ask my question.    15:37:22

 5               MR. MERRETT: Hang on.  Before you        15:37:26

 6   do that, let's take about two.                       15:37:28

 7          (MR. MERRETT LEAVES THE ROOM WITH             15:37:34

 8            MR. HINTZE AND THE WITNESS)                  15:37:34

 9               MR. MOXON:  Begin again, please.         15:38:42

10               THE WITNESS: Okay.  I will answer.       15:38:44

11   If these documents exist, they are the property of   15:39:02

12   the city, and I did not look for any documents.      15:39:08

13               And that's why I can not say that.       15:39:12

14   BY MR. MOXON:                                         15:39:12

15          Q.     Your bank records are property of      15:39:14

16   the city?                                             15:39:16

17               MR. MERRETT: Object.  Misleading,        15:39:18

18   deliberately misinterpreting to say if they exist.   15:39:20

19               MR. MOXON:  Okay.                         15:39:24

20   BY MR. MOXON:                                         15:39:24

21          Q.     Do you have any personal bank          15:39:26

22   records that are property of the city?               15:39:26

23          (MR. HINTZE SPEAKING IN GERMAN)               15:39:26

24          A.     I will not say anything about my       15:39:40

25   personal bank records, because that is none of       15:39:42
```

165

1

2     your business.                                      15:39:46

3           Q.     Do you refuse to answer whether or     15:39:50

4     not your bank records are property of the city?     15:39:52

5           A.     That's nonsense.  All I am saying       15:40:10

6     is that these questions have nothing to do with      15:40:14

7     this case, and I am not going to say any more on     15:40:18

8     those.                                               15:40:22

9           Q.     Let me ask the question again,          15:40:22

10    then.                                                15:40:24

11                 MR. MERRETT: Let's not.  You are        15:40:24

12    being abusive.  You have already asked the           15:40:26

13    question.  She has already given you the answer      15:40:28

14    you are going to get.                                15:40:28

15                 MR. MOXON:  If she could give just      15:40:32

16    me a clear answer, then I would go on to the next    15:40:32

17    question, instead of arguing with me.                15:40:36

18                 MR. MERRETT: Could you read back        15:40:40

19    the last answer for Mr. Moxon?                       15:40:40

20                 MR. MOXON:  I have heard what her       15:40:42

21    answer is.                                           15:40:44

22                 MR. MERRETT: Well, she is not going     15:40:44

23    to give you any further answer.                      15:40:46

24                 MR. MOXON:  The answer was:             15:40:48

25    "That's nonsense."                                   15:40:48

1
2                    CERTIFICATE OF COURT REPORTER
3                         I, Frederick C. Weiss, California
4       CSR # 3606, Registered Professional Reporter, do
5       hereby certify that I took the stenotype notes of
6       the foregoing deposition, and that the transcript
7       thereof is a true and accurate record transcribed
8       to the best of my skill and ability.
9                         I further certify that I am neither
10      counsel for, related to, nor employed by any of
11      the parties to the action in which this deposition
12      was taken, and that I am not a relative or
13      employee of any attorney or counsel employed by
14      the parties hereto, nor financially or otherwise
15      interested in the outcome of the action.
16
17
18
19
20
21      *Frederick C. W*
22      Frederick (Rick) C. Weiss
23
24      _____
25      DATE

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
Tel: (011 44) 1483 222650 / 171 4055010
Fax: (011 44) 211912