FILED

01 DEC -    3: 37

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**HUBERT HELLER,**
    **Plaintiff**

vs.                                    **Case No.: 8:00CV-1528-T-27C**

**URSULA CABERTA,**
    **Defendant**
_____/

### DEFENDANT'S OBJECTION TO MAGISTRATE'S ORDER
### ON PLAINTIFF'S MOTION TO COMPEL

On November 16, 2001, the Magistrate entered an Order (attached as Exhibit C)[1] on

Plaintiff's Motion to Compel Further Deposition of Defendant Ursula Caberta; to Compel

Responses to Deposition Questions; and for Fees and Costs ("Motion to Compel"). The

Magistrate basically ordered the Defendant to come from Germany for another day of deposition

and ordered certain monetary sanctions against Defendant. This is Defendant's objection to that

Order.

### **BACKGROUND**

On or about January 8, 2001, Plaintiff filed a Second Amended Complaint which alleges

---

[1]     The exhibits appear at various places in the record and because of their volume most have
not been included here. Attached to Defendant's Renewed Motion to Dismiss are: Ex. 1)
Affidavit of Ursula Caberta; Ex. 2) Second Affidavit of Ursula Caberta; Ex. 3) Affidavit of Ursula
Caberta; Ex. 4) Affidavit of Willi Beiss; Ex. 5) Affidavit of Rudiger Hintze; Ex. 6) Deposition (in
Germany) of Ursula Caberta; Ex. 7) Affidavit of Stacy Brooks; Ex. 8) July 17 and 18, 2000
letters of Plaintiff's counsel; Ex. 9) Affidavit of Priscilla Coates; and Ex. 10) Affidavit of Stacy
Brooks. Exhibit A (Affidavit of Kennan Dander) and Exhibit B (deposition (in Florida) of Ursula
Caberta) are attached to Defendant's Response to Plaintiff's Motion to Compel. Exhibits C and
D are attached hereto. The transcript of the hearing before the Magistrate is attached to
Supplement to Defendant's Motion to Recuse Magistrate.

that Defendant is an employee of the State of Hamburg, Germany and is the head of a Hamburg task force which is purportedly designed to disrupt the business activities of the Scientology organization.  Plaintiff alleges that the Defendant created a document known as the "Hubbard Declaration" or "sect filter" that requires individuals or companies to declare in writing that they reject and do not use the technology of L. Ron Hubbard.  Plaintiff asserts that Defendant distributed the Hubbard Declaration to a German business by the name of POSpartner G.M.B.H. ("POS").  Plaintiff further alleges that he was an employee of RTI who was attempting to make a sale to POS and that POS requested him to sign the Hubbard Declaration.  Plaintiff alleges that he is a Scientologist, that he refused to sign the Hubbard Declaration and that POS consequently refused to enter into an agreement or do business with the company for which he worked which purportedly caused him damage.

Defendant filed a second motion to dismiss the Second Amended Complaint on the grounds that since Defendant's activities with respect to the Hubbard Declaration were undertaken in her official capacity as an employee of the State of Hamburg, she is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604.  On February 15, 2001, this Court entered an Order (attached as Exhibit D) denying Defendant's second motion to dismiss "[g]iven Plaintiff's arguments that by conducting additional discovery he will be able to establish that FSIA immunity does not apply to Defendant and that this Court has jurisdiction."  The Court further ordered that the Plaintiff may conduct limited discovery "to discover evidence supporting this Court's exercise of jurisdiction over Defendant" and that Defendant may thereafter renew her motion to dismiss.  In putting the burden on Plaintiff to establish that

FSIA immunity does not apply to Defendant, this Court noted that "Defendant alleges in her affidavit that she acted in her official capacity as an employee of the government of Hamburg, Germany when she disseminated the 'Hubbard declaration'" and that her employer also "submitted an affidavit stating that Defendant's actions in developing and distributing the 'Hubbard Declaration' were performed as part of her job responsibilities in her capacity as an employee of the government of Hamburg, Germany."[2] Ex. D, p. 3. Moreover, this Court specifically pointed out that issues such as whether Defendant's conduct violated German law or whether Scientology is a recognized religion are not relevant to the limited FSIA inquiry. *Id.* Consequently, the issue for discovery is whether the creation and alleged dissemination of the Hubbard Declaration by Defendant to POS, if at all, was part of the Defendant's job responsibilities in her capacity as an employee of the government of Hamburg, Germany.

Plaintiff subsequently took the deposition of Defendant in Germany. Following her deposition, Defendant filed her Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction ("FSIA") and Motion for Summary Judgment as to Liability ("Renewed Motion to Dismiss") and Plaintiff filed the Motion to Compel which is at issue here. On November 6, 2001, the Magistrate entered an order granting the Motion to Compel and requiring Defendant to come to the United States for another day of deposition and ordering sanctions against Defendant.

---

[2]     This Court's identification of the precise relevant activity was necessary under applicable law. *See De Sanchez v. Banco Central*, 770 F.3d 1385, 1391 (5th Cir. 1985) (application of the FSIA's commercial activity exception requires defining "with precision the relevant activity" which "requires focusing on the acts of the named defendant, not on other acts that may have had a casual connection with the suit").

## Defendant's Official Duties in Germany

In Germany, Scientology is considered an extremist, totalitarian political organization hostile to the German Constitution and is monitored by the office for the protection of the Constitution. Ex. 2, ¶3; Ex. 4, ¶36; Ex. 6, pp. 112-113, 114, 124-125, 133. Defendant, a German citizen, is employed by the State of Hamburg, Germany and is the head of the Scientology Working Group ("SWG"), an agency of the Hamburg Ministry of the Interior. Ex. 4, ¶2; Ex. 6, pp 34, 43. The SWG was created and authorized by the Hamburg Senate and operates under the supervision of Willi Beiss. The purpose and official duties of the SWG and the Defendant include, *inter alia*, the monitoring and investigation of, and the provision of information about, Scientology; helping people who want to leave Scientology; and providing protection against Scientology to businesses seeking to prevent infiltration, other attack or harm to their employees by Scientology. Ex. 2, ¶3; Ex. 4, ¶3, 6, 8; Ex. 6, pp. 39, 44, 109-110, 123, 194, 195.

Some years ago as part of her government duties, Defendant created the instrument which is referred to in this case as the "Hubbard Declaration" or "sect filter." Ex. 6, p. 96. The Hubbard Declaration, a copy of which is attached to Plaintiff's complaints, is an affidavit in which the affiant abjures use of the "technology" (i.e., the writings and practices) of L. Ron Hubbard, the founder of Scientology. The Hubbard Declaration was created by the Hamburg government because many companies in Germany were asking for help in order to protect themselves against being infiltrated and subverted by Scientologists. Ex. 1, ¶10; Ex. 6, pp. 91, 92, 93, 94, 107, 123, 194. The Hubbard Declaration is sent out by the Hamburg government to those companies who request it. Ex. 6, pp. 99, 100. The companies then decide for themselves whether they want to

-4-

use it or not. Ex. 6, p. 110. All of the Defendant's activities concerning the Hubbard Declaration, including development and distribution of the Hubbard Declaration, have been in her capacity as an employee of the State of Hamburg, Germany and undertaken within the course, scope, duties and authority of her employment by the government of Hamburg. Ex. 1, ¶9; Ex. 2, ¶3, 4, 5; Ex. 4, ¶3, 4,5.

In April, 2000, the SWG was contacted by a representative of POS. Ex. 5, ¶3. Rudiger Hintze, an employee of the SWG, handled the phone call. *Id.* The POS representative told Mr. Hintze that the POS had become engaged in negotiations with a company called RTI, which was represented in the negotiations by Plaintiff, Hubert Heller. *Id.* The POS representative indicated that POS had discovered that Plaintiff was a Scientologist, that POS was concerned that Plaintiff might insinuate the Scientology doctrine and practices into POS, and that POS wanted the assistance of the SWG to prevent such infiltration of the company. In response, Mr. Hintze sent POS a copy of the Hubbard Declaration. Ex. 5, ¶4. Mr. Hintze was the only person from the SWG to have any substantive communication with POS. Ex. 5, ¶6. **Defendant had no knowledge of or involvement in the communication or activity between the SWG and POS.** Ex. 3, ¶2, 3; Ex. 5, ¶7. **Indeed, prior to this lawsuit, Defendant had no knowledge of the existence of the Plaintiff or the aforementioned events concerning POS.** Ex. 3, ¶4; Ex. 6, p. 175. After the Hubbard Declaration was sent to POS, the SWG had no involvement in what the company did with it. Ex. 6, pp. 100, 185.

**Defendant's Trip to Florida And
Mr. Moxon's Abusive Treatment of Defendant**

Defendant came to the State of Florida for the first and only time in July, 2000. Ex. 1, ¶3,

-5-

4.   When she arrived at the Tampa Airport, she was greeted by an organized group of Scientologists who yelled epithets at her, including that she was a "Nazi criminal." Ex. 7.  During her vacation, she met with people involved with the Lisa McPherson Trust ("LMT") and gave a talk on July 25, 2000, about the activities of the Scientology Working Group in Hamburg.[3]  Ex. 7, ¶2.  Those people included Robert Minton and Stacy Brooks, who was the President of the LMT.  The purpose of the LMT is to expose abusive and deceptive practices of the Scientology organization and to help those who have been victimized by it.  Ex. 10, ¶1.

During her vacation in Florida, Defendant was served with the instant lawsuit on July 27, 2000.  During her trip, the Scientology organization also served Defendant with a subpoena to give a deposition in a state lawsuit brought by the Estate of Lisa McPherson against the Scientology organization alleging the wrongful death of Lisa McPherson by the Scientology organization in Clearwater, Florida.  Mr. Moxon, who represents the Scientology organization as well as Plaintiff here, took that deposition which has been filed as Exhibit B.  *See* n. 1 *infra*.  As is clearly reflected by that deposition, Defendant had no involvement in and no knowledge of the facts of that lawsuit.  In fact, Mr. Moxon did not even ask any questions of the Defendant about the gravamen of that case.  Instead, virtually the entire deposition was spent insulting her and asking irrelevant, harassing questions about her contacts with the LMT, Robert Minton (who

---

[3]     Defendant's activities in Florida in late July, 2000, when she was also served in this case, of course, have absolutely nothing to do with the injuries claimed by Plaintiff in this case.  Indeed, Plaintiff's approach to POS and POS's approach to the SWG occurred prior to April 17, 2000, the date on which Plaintiff was asked by POS to sign the Hubbard Declaration.  *See* Plaintiff Heller Affidavit (Ex. B to Plaintiff's Memorandum of Law In Opposition to Defendant's Motion to Dismiss (Document 35)).

Mr. Moxon believes is funding the Lisa McPherson lawsuit (Ex. B, p. 67)) and Stacy Brooks. During the deposition, Mr. Moxon accused the Defendant of engaging in "genocide" for the German government and asked her whether she considered herself to be a Nazi. Ex. B, pp. 58, 83, 125. As Defendant was leaving the deposition, Mr. Moxon not once, but twice saluted Defendant with the "Hitler Salute" of Nazi Germany and said "Heil Hitler!." Ex. A. When this was made a matter of record, Mr. Moxon did not deny it. Ex. A; B, pp. 129-130.

## Scientology's History of Sham and Oppressive Lawsuits

Mr. Moxon and the Scientology organization have a recognized record of involvement in sham lawsuits in the names of members of Scientology when in fact the real party in interest in prosecuting the suit is the Scientology organization and the purpose of the lawsuits is to beat other parties into submission. *See* Affidavits of Priscilla Coates (Ex. 9) and Stacy Brooks (Ex. 10) concerning fifty lawsuits brought against Coates and Cult Awareness Network by the Scientology organization to destroy the Cult Awareness Network whose purpose was to educate the public about the unethical and illegal practices employed by destructive cults; *Hart v. Cult Awareness Network*, 13 Cal.App.4th 777 (1993); *Church of Scientology v. Wollersheim*, 42 Cal.App.4th 628, 648 (1996)(Court found that lawsuit involving Mr. Moxon was "consistent with a pattern of conduct by the Church to employ every means, regardless of merit, to frustrate or undermine Wollersheim's petition activity" and was being pursued "to bludgeon the opposition into submission" for having prevailed in a prior lawsuit.)

## Defendant Is a Target of the Scientology Organization

As the head of the SWG in Germany, Defendant has also become the target of

Scientology attack.  In addition to the events described above, the Scientology organization in Germany (through its President, Helmuth Bloebaum, and represented by its German attorney, Wilhelm Blumel) has made a false penal charge against the Defendant to authorities in Germany that she allegedly accepted a benefit (a loan from Mr. Minton) to carry out an official act ("vorteilsnahme").  Since this false charge is presently under investigation and in light of the Scientology organization's history of bludgeoning its targets with legal claims,  the Defendant has quite rightly refused to answer questions in this case concerning her relationship with Mr. Minton, all of which are irrelevant anyway.

### The Deposition in Germany

Defendant's deposition in Hamburg, Germany was set to start at 2:00 p.m. on July 25, 2001, and to continue on July 26.  However, as explained at the hearing before the Magistrate, the Defendant was not advised by her then attorney, Mr. John Merrett, of the deposition and the Defendant learned about it for the first time on July 12, less than two weeks before the deposition, as a result of a letter from the United States Embassy in Berlin which was forwarded to her.  Transcript of hearing ("Tr."), p. 38.  The Defendant had a conflict on those dates because of a job obligation in Berlin that involved issues of great importance to the State of Germany.  Tr, p. 36.  The Defendant immediately contacted the American Embassy who told her that she did not have to appear, but she advised the Embassy that she was willing to give a deposition, but that she could not appear at that time because of her job obligation.  *Id.*, pp. 38-39.  As a result, the attorneys in the United States tried to find an alternative date.  At a hearing on Monday, July 20, 2001,  the Defendant's then attorney, Mr. Merrett, explained to the Magistrate that the Defendant

had a previously scheduled meeting on July 25 which she must attend. Mr. Merrett, again without Defendant's knowledge, suggested that she could be present at the deposition at 2:00 p.m. on July 25, 2001, which the Magistrate then ordered. *Id.,* p. 39. Mr. Hintze, who was a legal advisor at the Defendant's place of employment (but, apparently, not an "attorney") was on the phone for the hearing, but did not believe it was his role to correct anything the Defendant's attorney said. *Id.,* p. 40. Mr. Hintze did immediately contact the Defendant after the hearing who indicated she simply could not appear on July 25. *Id.,* p. 40. At that point, the undersigned law firm was immediately hired to try to get further relief from the Magistrate which this firm attempted to do through an emergency motion filed on Monday, July 23, 1002. *Id.,* p. 40. However, by then, the Magistrate was not available and another Magistrate ruled against the emergency motion not to have a deposition on July 25. Because the Defendant had no choice in the matter, she attended her required job duty and could not and did not appear on July 25. However, she did appear on July 26, although it was her understanding from the American Embassy that she did not have to.

The deposition of Defendant in Germany was overseen by the American Vice Consul in Hamburg. Ex. 6, pp. 6, 12. Pursuant to an agreement between the United States and Germany, the American Vice Consul specifically advised Defendant that the circumstances under which her deposition was being taken included "that no compulsion [may be] brought to bear on the person to be questioned to make him appear or provide information"; "that no coercive measures [may be] threatened in the event that a person does not appear or refuses to provide information"; and that Defendant "may refuse to answer any question or part of a question and may cease to

participate in the proceedings at any time." Ex. 6, pp. 13-14, 65, 159-160.

Mr. Moxon brought with him to the deposition Helmuth Bloebaum, who he identified as his purported "consultant from Germany," and Wilhelm Blumel, his purported local German counsel. Ex. 6, p. 4. These are actually the Scientology representatives who were making the false penal charge in Germany against Defendant. Ex. 6, pp. 4-5, 67; Ex. B, p.2.

Mr. Moxon was supposed to limit his inquiry to the issue of FSIA immunity. As discussed above, this would include whether the Defendant engaged in any activity concerning POS and Plaintiff, and if so, whether it was in her official capacity. Similarly, early in the deposition, Defendant advised Mr. Moxon that the State of Hamburg through a letter from Willi Beiss only authorized her to give evidence about official operations and procedures with respect to the circumstances relating to POS. Ex. 6, pp. 52-53, 83; Ex. 3 to the deposition.

Despite this, Mr. Moxon spent only about 25 minutes late in the deposition on these matters. *See* Ex. 6, pp. 174-187. For the most part, as with the deposition in Florida, Mr. Moxon simply used this deposition to attempt to ask questions about persons or entities who are concerned about Scientology activities, including the LMT, Mr. Minton and Ms. Brooks, and financial transactions regarding Mr. Minton. Mr. Moxon was primarily attempting to obtain irrelevant information which he, Mr. Bloebaum and Mr. Blumel felt could be used concerning the charges which the Scientology organization is attempting to have brought against Defendant in Germany. For example, Mr. Moxon wasted considerable time repeatedly asking about any money

-10-

Defendant received from Mr. Minton.[4] Ex. 6, pp. 65-85, 89, 146-160, 164-170, 190-192. Mr. Moxon even asked such irrelevant questions as the identity of the building in which Mr. Minton purportedly gave a press conference in Germany, whether Mr. Minton was seeking asylum in Germany and who was paying Defendant's legal fees. Ex. 6, p. 188.[5]

**The Magistrate's Order**

In her discussion, the Magistrate makes several broad assertions. First, the Magistrate asserts that the Defendant outright refused to answer certain questions. This will be discussed *supra* concerning those specific questions. Next, the Magistrate asserts that Defendant's associate, Mr. Hintze, interrupted the deposition and made statements on the record and that he spoke in German with the witness when Plaintiff's counsel does not speak German. First, the American Vice Consul, who conducted the deposition, specifically advised the Defendant that she could speak to Mr. Hintze, who was a representative of the Hamburg Ministry of the Interior.

---

[4]    Mr. Moxon asked similar questions in the Florida deposition. Ex. B, pp. 17, 23, 26, 30-31, 48, 87, 88, 89, 91, 115-116.

[5]    Mr. Moxon asked similar questions in the Florida deposition. Ex. B, pp. 40, 61-63, 113. Moreover, like the deposition in Florida, Mr. Moxon repeatedly made argumentative and insulting editorial remarks to the Defendant. Ex. 6, pp. 112-113 ("Considered by her, anyway"); 115-116 (asserts witness "offended by the word religion"); 117-118 (court reporter did not record remarks); 125-128 (accused Defendant of giving a speech when she gave a detailed answer to one of Mr. Moxon's questions); 135-139 (argued with the witness about whether she made efforts to locate documents which she could not even produce because they did not belong to her); 47-49 (asked 4 times who wrote Defendant's job description, although Defendant initially testified she did not know, and then argued about whether Defendant refused to answer the question or not.); and 119-120, 143-144, 146 (asked approximately 7 times if the Hubbard Declaration was on the web or home page). Defendant was even subjected to the totally irrelevant, outrageous question of whether she had created a sect filter "to protect the German people against Jewish business practices." Ex. 6, pp. 123-124. In addition to the anti-Semitic assertion that there is a particular "Jewish business practice," this question was nothing more than a less obvious continuation of the "Heil Hitler!" salutes that Mr. Moxon gave the Defendant at her Florida deposition.

Ex. 6, pp. 6, 38, 45. Further, the Magistrate ignored that Plaintiff's counsel had with him his purported local German counsel, Mr. Blumel, and his purported consultant from Germany, Mr. Bloebaum, who both spoke German. Moreover, while criticizing the Defendant because Mr. Hintze purportedly interrupted and gave commentary, the Magistrate totally ignored the fact that both Mr. Bloebaum and Mr. Blumel interrupted and gave commentary both in English and in German. Ex. 6, pp. 56, 86, 102, 104, 105, 128, 144 and 158.[6] Despite this, the Magistrate's Order sanctions the Defendant, and does not even mention the Plaintiff's conduct.

The Magistrate charges that Defendant's then counsel, Mr. Merrett, "more than once, instructed Defendant not to answer specific questions." This is misleading when the transcript is read in context. As a result of the penal allegations made by the Scientology organization against Defendant in Germany, the Defendant refused to answer various questions regarding Mr. Minton on grounds similar to the Fifth Amendment privilege in the United States. Ex. 6, pp. 65, 66, 67, 73-74, 77-78. To the extent that Mr. Merrett indicated that the deponent need not say anything until he told her to or otherwise answered any question for her, it was clearly to assist her in preserving this privilege. Ex. 6, pp. 65-82. The Magistrate inconsistently recognized at page 19 of her Order that this is perfectly proper. Moreover, and unaddressed by the Magistrate, it is clear that Mr. Moxon was attempting to harass the Defendant at that point with repeated questions about her purported financial transactions with Mr. Minton to which she asserted a

---

[6]     Indeed, the Vice Consul had to admonish Mr. Moxon to listen to the interpreter when he and Mr. Bloebaum were talking so loud that no one could hear the interpreter. Ex. 6, pp. 126-127. Later, after Mr. Bloebaum again interjected himself to call the Defendant's testimony a lie, the Vice Consul had to again repeat her request that discussions within Mr. Moxon's team take place at a time when someone was not speaking on the record. Ex. 6, pp. 144-145.

privilege and which in any event are absolutely irrelevant to the limited discovery permitted by the Court in this case (including paragraph 6 of an affidavit used with respect to the issue of personal jurisdiction and not relevant here).

The Magistrate also criticizes Mr. Merrett for taking breaks on two occasions to confer with his client while questions were pending. On the first such alleged occasion, there was literally no question pending. Tr., pp. 162-164. Mr. Merrett did take a break after which the Defendant clarified prior responses (or refusal to answer) to questions about searching for certain requested documents by observing that if the documents existed, they were the property of Hamburg and not hers to produce. The issue of whether she could produce such documents certainly involves the right or privilege of the German government to prohibit her from producing documents that belong to it. *See* pp. 13-14 of the Magistrate's Order stating that an attorney and the deponent may confer during the deposition to determine whether a privilege should be asserted or to enforce a Court-ordered limitation on the scope of discovery. Next, the Magistrate complained that Mr. Merrett conferred with the Defendant about a general question about submitting funding requests to the government (Tr., p. 52). However, this question required an answer which the German government in a written directive prohibited her from responding to and which clearly raised the issue of whether the question was outside the Court's order limiting the deposition to the jurisdiction issue. This break was therefore also within the Magistrate's own guidelines for conferring with the witness.[7]

_____

[7]    Indeed, after the break, Mr. Merrett presented Mr. Moxon with the authorization from the Interior Ministry which did not allow her to testify regarding budgetary or other operational matters of the Interior Ministry except with respect to POS and the Plaintiff. Ex. 6, pp. 52-53.

The Magistrate next asserts that the "Defendant also failed to comply with Plaintiff's request to produce." This is not supported by the pages of the deposition cited by the Magistrate. For example, the Magistrate cited pages 134 and 139-140 for the proposition that Defendant admitted that there may be documents responsive to the document requests but that she did not look for them. This is misleading since the Magistrate ignored the Defendant's testimony or her attorney's remarks making it crystal clear that none of those documents were in her personal possession, but belonged to the State of Hamburg.[8] Ex. 6, pp. 46, 135-136, 138, 139, 140, 164.

**No Further Deposition Is
<u>Necessary or Should be Permitted</u>**

As in the state court deposition, much of the deposition here involved asking questions about Mr. Minton and Defendant's relationship to him and others associated with the LMT. Had these questions not been asked, the deposition could easily have been completed in the one day on which the Defendant testified. The Magistrate avoided this important issue by stating that it is "unnecessary to determine whether questions concerning these entities is [sic] relevant to the sovereign immunity issue in this case" since Defendant declined to testify as to those questions.

---

[8]    The only documents concerning which there may be an issue involve a request for any banking records of the Defendant which might reflect receipt of any funds from Mr. Minton. Since the Defendant has not saved older banking statements, the Defendant does not have bank statements which may be responsive to this request. She has not requested her bank to provide her with copies of any such statements. In Germany, according to the witness, she has the privilege or right of not requesting the bank to produce her banking records on the grounds that they may be used to incriminate her, and the Defendant asserts that right in this case. Moreover, any bank statements reflecting the receipt of funds from Mr. Minton or any financial transaction between Mr. Minton and the Defendant exceed the jurisdictional issue to which discovery is limited. They have absolutely nothing to do with whether the Defendant disseminated the Hubbard Declaration to POS as part of her official duties.

-14-

Ex. C, p. 10. However, what the Magistrate ignored is that much of the deposition involved questions regarding those matters and the deposition could well have been completed if Mr. Moxon had not harassed the Defendant with such unnecessary questions. The Magistrate is penalizing the Defendant with sanctions and the cost of returning to Florida for another day of deposition while specifically not deciding whether the Plaintiff wasted the time in which the deposition could have been completed by asking questions irrelevant to the jurisdictional issue.

Further, the Magistrate ignored the fact that there is absolutely no additional evidence that can change the basic facts that clearly establish that Plaintiff has immunity under the FSIA. Although Plaintiff asserted that there are other matters (other than 9 questions set forth in the Motion to Compel) which he wants to inquire about, he carefully avoided in his 25-page brief to the Magistrate setting forth what these matters are or what information he would seek to obtain that would be relevant to the issue of FSIA immunity or the Motion for Summary Judgment (which is part of the Renewed Motion to Dismiss). *See Terrell vs Brewer*, 935 F.2d 1015, 1018 (9th Cir. 1991) ("The party seeking additional discovery [under F.R.Civ.P. 56(f)] also bears the burden of showing that the evidence sought exists); *Pacific Service Stations Co. vs Mobil Oil Corp.*, 689 F.2d 1055, 1066 (Em. Ct. App. 1982) ("[A] court need not allow further discovery when there is no reason to believe that it will lead to the denial of a pending motion for summary judgment.")

Plaintiff has had every opportunity to find evidence to show that Defendant had any involvement at all in the events described in the current complaint. Plaintiff spent that opportunity pursuing other matters, focusing on Defendant's finances and relationship with Mr. Minton and

-15-

largely ignoring the question of whether and how Defendant was involved in that of which Plaintiff complains.

### The Defendant Should Not Have Been Ordered
### to Respond to the Questions Set Forth in the Magistrate's Order

The Magistrate has set forth eleven specific questions which she is requiring the Defendant to answer. However, these questions were either answered or beyond the limitation of discovery imposed by this Court. In fact, the questions show the completely irrelevant nature of the Plaintiff's questions at the Defendant's deposition. Each question will be addressed in turn.

        1. **Do you submit requests for funding to any government entity in which you identify what you are doing and what you intend to accomplish?**

This question is not limited to the facts of this case involving Defendant's activities, if any, with respect to POS or the Plaintiff. In response to this question Defendant and her attorney noted for the record and introduced an exhibit indicating that she was not allowed by the German government to answer such a question unless it was limited to POS or the Plaintiff. Ex. 6, pp. 52-53. Despite knowing that the Defendant could only answer such a question with specific reference to POS or the Plaintiff, Plaintiff's attorney did not then even bother to ask the same question with respect to POS or the Plaintiff. This is demonstrative of Mr. Moxon's efforts to literally avoid asking relevant questions and the Magistrate's failure to consider the Plaintiff's misconduct here.

        2. **Do you receive any monies that you deposit in your personal bank accounts from any of these speeches?**
        3. **Do you receive any money beyond your expenses which you may keep, from your speeches about Scientology?**
        4. **Have you deposited any money in your private bank accounts**

-16-

**that you have received from lectures given with respect to Scientology that is not part of your income received from the State of Hamburg?**

> **5.    I want you to identify whether or not you've received any funds beyond actual expenses that you've incurred for any lecture, speech or advice regarding Scientology beyond the income you've received from the State of Hamburg?**

Plaintiff's counsel asserted that these questions relate to the receipt of money by Defendant for "some of the activities at issue." However, the questions do not identify any activities at issue here. These are merely general, open-ended questions about money which the Defendant may have received from speeches at conferences, none of which have anything to do with POS or Plaintiff. During Defendant's deposition, Plaintiff's attorney did not restrict these types of questions to activities concerning POS or Plaintiff, and Plaintiff's attorney and the Magistrate have offered absolutely no explanation for how such general questions about money from speeches are relevant to POS or Plaintiff's claim or the dissemination of the Hubbard Declaration to POS.

> **6.    Do you have any personal bank records that are property of the city?**

Whether or not the Defendant has any personal bank records that are or are not the property of the city has absolutely nothing to do with the issue of whether the Defendant is immune from a case allegedly involving her activities with respect to Plaintiff, POS, or the dissemination of the Hubbard Declaration to POS. Plaintiff apparently suggests that Defendant's personal bank records may constitute financial records of funds received from Mr. Minton. However, any records showing funds received from Mr. Minton also have nothing to do with this case. It is simply information that Plaintiff is attempting to obtain so that the Scientology

organization can attempt to pursue its false charges against Defendant in Germany.

> 7.    **When you appeared at the Alternate Charlemagne award ceremony in Leipzig last year, were the expenses of you and your employees paid for by the City or by someone else?**

Plaintiff asserted that this "question addresses the allegation that Defendant provided special favors to Robert Minton, including her tortious conduct against Plaintiff and others similarly situated." First, the evidence is conclusive, and there has been no proffer otherwise, that the Defendant had absolutely nothing to do with Plaintiff, much less engaged in any tortious conduct toward him. Whether the Defendant appeared at the Alternate Charlemagne Award Ceremony and who paid her or the employees' expenses has nothing to do with anything concerning POS, Plaintiff or the dissemination of the Hubbard Declaration to POS, and the Magistrate has suggested nothing to show its relevance. Even if the question had something to do with some purported "special favor" to Mr. Minton, that in itself has absolutely nothing to do with the allegations in this case regarding the Defendant's purported involvement with POS and Plaintiff.

> 8.    **In your computer system, do you maintain the names of some of the people that the companies are asking about?**
> 9.    **Do you have a computer system for locating records such as this?**

This is an example of Mr. Moxon's efforts to use a lawsuit for intelligence gathering, rather than attempting to discover relevant facts. Here, Plaintiff's attorney is attempting to explore the type of record keeping done by the German government which the witness indicated she did not feel that she was authorized to talk about. Ex. 6, pp. 182-183, 187. Plaintiff asserted that these questions "address the location and existence of evidence concerning the Plaintiff and

the allegations in the Complaint relating to Ms. Caberta's dissemination of 'sect filters' to private companies." However, these questions are not limited to POS or Plaintiff, but seek to discover general information about the filing system. **Defendant actually answered any questions concerning what was in the file concerning POS Partners or Plaintiff.** *See* Ex. 6, pp. 177-178, 179. Defendant specifically described what was in the file and observed that as far as she knew, there were not any computer files concerning the incident involving POS. Ex. 6, p. 179. Consequently, Plaintiff's attorney has any information that he needs with respect to the records concerning POS or Plaintiff.

    10.    **Who wrote your job description?**

According to the Magistrate's order, the Defendant "outright refused to answer this question." Contrary to the Magistrate's assertion, the Defendant did answer this question by responding, "I don't know who wrote the job description, and I think it is none of your business who wrote it." (emphasis added). Ex. 6, p. 47. Indeed, this is not even a question which the Plaintiff asserted was not answered at the deposition.

    11.    **Do you have any specific orders from any senior official in**
           **Hamburg telling you what to do in your job?**

The Defendant also answered this question by stating, "Once again, my job description lays down the scope of my responsibilities. And it's not necessary to have anything else, unless anything specific is asked of me to be done, although I cannot remember such a case at the moment." Ex. 6, p. 47. This was a clear answer to the question, and even the Plaintiff did not complain that this question was not answered.

<u>**Plaintiff Is Not Entitled to Any Fees or Costs**</u>

For the reasons set forth above, Defendant did not refuse to answer any relevant questions or otherwise refuse to provide any relevant information and no additional deposition is warranted. Plaintiff had plenty of time to explore the relevant issues. In an attempt to exploit Defendant's unavoidable failure to appear at 2:00 p.m. on July 25, Plaintiff's attorney spent most of the deposition asking irrelevant questions and deliberately avoided the relevant area of inquiry in an attempt to insist on another day of deposition and to request fees and costs. The eleven questions set forth by the Magistrate were either answered or were clearly beyond the scope of the limitations placed on this deposition by the Court.

Finally, the Defendant was specifically advised by the American Vice Consul at the deposition that no sanctions could be entered for any failure to appear or to provide information at the deposition. Totally contrary to the representation of the American government to the witness at the deposition, the Magistrate is now imposing a sanction on the Defendant. This is a totally unfair application of the law. Further, in light of the absence of any subject matter jurisdiction in this case, this Court lacks any jurisdiction to impose sanctions.

WHEREFORE, for the reasons stated above, the Magistrate's Order should be reversed and the Plaintiff's Motion to Compel be denied.

Robert W. Merkle
Florida Bar No.: 0138183
Ward A. Meythaler
Florida Bar No.: 0832723
Merkle & Magri, P.A.
5510 West LaSalle Street
Tampa, Florida 33607

-20-

TEL: (813) 281-9000
FAX: (813) 281-2223

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been furnished by U.S. Mail on this 6 day of December, 2001, to K. Moxon, 1100 Cleveland Street, Suite 900, Clearwater, FL 33755.

**Ward A.** Meythaler

-21-



FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HUBERT HELLER,

        Plaintiff,

v.                   CASE NO.: 8:00-CV-1528-T-27C

URSULA CABERTA,

        Defendant.
_____/

## O R D E R

Before the court is plaintiff's **Motion to Compel Further Deposition of Defendant Ursula Caberta; to Compel Responses to Deposition Questions; and for Fees and Costs** (Dkt. 105), and defendant's response (Dkt. 117).   Oral argument was held on Wednesday, October 24, 2001.

### BACKGROUND

Defendant, Ursula Caberta ("Caberta"), is employed by the government of Hamburg, Germany.[1]   Plaintiff brought this action against defendant alleging tortious interference with an advantageous business relationship; unfair and deceptive trade practices pursuant to Florida Statute § 501.204(1), et seq.; conspiracy to commit civil rights violations pursuant to 42 U.S.C.

_____

[1]Defendant is the head of the Working Group of Scientology at the Ministry of the Interior in Hamburg, Germany. (Deposition Transcript at 6) (Dkt. 109, Ex. 6) (hereafter "Deposition Transcript").

EXHIBIT
C
ALL-STATE LEGAL®

§ 1985(3); and violation of the Alien Tort Claims Act, 28 U.S.C. § 1350.[2]

Plaintiff filed this motion after encountering problems in conducting defendant's deposition, including defendant's failure to appear for the first day of a two-day deposition, scheduled for July 25-26, 2001 in Germany.[3]  Plaintiff seeks an order requiring that 1) defendant appear in this district to complete her deposition; 2) defendant answer specific questions that she failed to answer in her deposition; and 3) defendant reimburse plaintiff for his reasonable attorney's fees and costs in conducting the deposition in Germany.

Pursuant to this court's order, defendant's deposition was scheduled to begin at 2:00 p.m. on July 25, 2001, to continue into the evening hours, and to resume on July 26, 2001 for seven hours. Defendant failed to appear on July 25, 2001, but appeared for the deposition on the following day.

At the deposition, defendant was evasive and nonresponsive to certain questions, and her associate, Runger Hintze ("Hintze"), often wasted time by interrupting and giving commentary.  Moreover,

_____

[2]The district judge has authorized defendant's deposition on the issue of whether she is immune from this suit.

[3]On July 17, 2001, this court granted plaintiff's motion requesting that the length of defendant's deposition be increased from one to two days due to the need for a German interpreter. (Dkt. 91).  Plaintiff noticed the deposition on June 27, 2001. (Dkt. 82, Ex. C).

at the deposition, defendant refused to answer certain questions propounded by plaintiff's counsel.

On February 15, 2001, the district judge limited the scope of discovery to the issue of whether defendant is immune from liability pursuant to the Foreign Sovereign Immunities Act ("FSIA"). However, the district judge advised the parties that plaintiff's right to discovery "should not be thwarted by third party restrictions or diplomatic protocol." (Dkt. 46).

## DISCUSSION

Plaintiff has repeatedly tried to depose defendant.[4] When the deposition was finally conducted, plaintiff was impeded in his efforts. First, defendant outright refused to answer certain questions, such as 1) the name of the person who wrote her job description (Deposition Transcript at 47), 2) whether she submits requests for funding to any governmental entity in which she identifies what she is doing and what she intends to accomplish (Deposition Transcript at 52), and 3) whether she receives money beyond her expenses from her speeches regarding Scientology

---

[4]On March 29, 2001, this court granted plaintiff's motion to compel the deposition of defendant. (Dkt. 56). Then, on May 8, 2001, this court denied defendant's motion for protective order and denied defendant's request to vacate that part of the court's March 29, 2001 order requiring her to appear in this district for a deposition. (Dkt. 70). This court again addressed the issue during a telephonic discovery conference on July 20, 2001, during which the court ordered that defendant be deposed in Germany on July 25-26, 2001, as scheduled by plaintiff. Finally, on July 24, 2001, the court denied defendant's emergency motion for protective order. (Dkt. 100).

(Deposition Transcript at 60). She also refused to answer questions relating to Robert Minton and the Lisa McPherson Trust. (Deposition Transcript at 65-80, 148). Moreover, defendant wasted time by giving unresponsive and evasive answers to questions, such as whether she could affirm the accuracy of statements that she made in an affidavit in this case.[5] (Deposition Transcript at 148-53).[6]

With regard to the question of who wrote defendant's job description, defendant responded "I don't know who wrote the job description, and I think it is not your business who wrote it." She further stated that "If you like, you may sue the Senator for the interior and then you can find out who draws whose job description." (Deposition Transcript at 47, lines 19-25). The argumentative nature of defendant's responses is apparent throughout the deposition. She repeatedly stated "it's none of your business" in response to a question.

Second, defendant's associate, Hintze, interrupted the deposition and made narrative statements on the record. He also

---

[5]Additionally, she refused to answer questions relating to the Lisa McPherson Trust or its president, Stacy Brooks ("Brooks"), asserting that "it has nothing to do with this case." (Deposition Transcript at 148).

[6]Plaintiff asserts that he expended $8,707.93 in traveling to Germany, hiring an interpreter, videographer, and court reporter, and other related expenses, and $12,250.00 in attorneys' fees for traveling, preparing, and conducting the deposition.

4

spoke in German with the witness on numerous occasions in connection with pending questions, even though plaintiff's counsel does not speak German.[7]  At the July 20, 2001 telephonic hearing before the court, Hintze was represented as being a staff attorney in defendant's office.  (Dkt. 102 at 3).  Although he apparently has some legal training, Hintze is not an attorney.  Moreover, he appears to be a prospective witness in this case.[8] (Deposition Transcript 175-81).

Third, defendant's counsel, John M. Merrett ("Merrett"), more than once, instructed defendant not to answer specific questions. For example, Merrett instructed his client not to answer questions until he permitted her to do so.[9]  Moreover, he also answered questions for her or insisted on conferring with his client before she answered a pending question.[10]

---

[7]See e.g. Deposition Transcript at 7, 8, 9, 11, 33, 36, 42, 45, 49, 52, 54, 62, 64, 83, 86, 113, 128, 131, 135, 138, 139, 164.

[8]According to defendant, Hintze was involved in supplying the Hubbard Declaration to the German company involved in this case.  (Deposition Transcript at 175-77).  Hintze identified himself at the deposition as a representative of the Ministry of the Interior in Hamburg.  (Deposition Transcript at 6). Defendant said Hintze was her subordinate.  (Deposition Transcript at 88).  His affidavit has been submitted by defendant with her renewed motion to dismiss for lack of subject matter jurisdiction.  (Dkt. 109, Ex. 5).

[9]See e.g. Deposition Transcript at 69-82, 164.

[10]See e.g. Deposition Transcript at 48, 69-81, 138, 166-67.

5

Defendant also failed to comply with plaintiff's request to produce and this court's June 21, 2001 order (Dkt.80) requiring that any records responsive to Document Request Numbers 9-17, in defendant's possession, be produced to plaintiff within ten (10) days of the order.[11] During her deposition, defendant admitted that there might be documents responsive to Interrogatory Number 2, but she did not look for them. (Deposition Transcript at 134). Similarly, defendant admitted that she did not try to locate any documents responsive to the document requests. (Deposition Transcript at 139-40). In fact, she stated that "it was not necessary [to locate the documents] so far."[12] (Deposition Transcript at 139).

Fifth, the deposition was scheduled for two days to commence on July 25, 2001. As stated previously, defendant did not attend the first day of the deposition. Furthermore, according to plaintiff, the actual time spent questioning the defendant was only four hours and twenty minutes, out of the scheduled seven hours.

---

[11]See e.g. Deposition Transcript at 134, 140, 147-48, 161-63.

[12]At her deposition, defendant stated that "even if these documents exist . . . they belong to the Free and Hanseatic City of Hamburg, and I can not just use them according to my own discretion." (Deposition Transcript at 139). The fact that defendant did not even bother to look for the documents requested by plaintiff demonstrates a lack of cooperation in discovery in this case.

6

The deposition transcript is replete with examples of evasive, argumentative, and nonresponsive testimony by defendant.

Finally, Merrett interrupted plaintiff's counsel and took breaks with his client while questions were pending. For example, Moxon asked defendant if she conducted any search to determine whether she had any records responsive to Document Request Numbers 14 and 15. While these questions were pending, Merrett engaged in a private discussion with defendant. Then, he suggested that they take a two-minute break and then left the room with defendant and Hintze. (Deposition Transcript at 162-64).

In addition, when asked whether she submits request for funding to any governmental entity in which defendant identifies what she is doing and what she intends to accomplish, defendant took a break to confer with counsel and Hintze. (Deposition Transcript at 52). The deposition resumed approximately ten minutes later. (Id.). At that point, defendant evaded answering the question by stating that "I do not refuse to answer. I am not allowed to answer, because my answer would have to be authorized by this agency." (Deposition Transcript at 53-54).

The court has reviewed the deposition in its entirety. Plaintiff has not been provided an adequate opportunity to depose defendant on the issue of FSIA immunity. Defendant has violated this court's order to appear for deposition on July 25, 2001 and

7

when she did appear, she was frequently uncooperative and did not answer questions.

Requiring defendant to appear in Germany to complete her deposition would be a futile act without court supervision given the difficulties encountered in plaintiff's efforts to depose her in Germany.  Conducting the deposition in the Middle District of Florida at the United States Courthouse will be beneficial to both parties as the court will be available to rule on any issues that may arise during the deposition.

For these reasons, and the reasons stated at the hearing, defendant shall submit to a deposition in this district within **thirty (30) days** of this order.[13]  <u>See</u> Local Rule 3.04(b), M.D. Fla.[14]  The deposition shall be conducted at the United States District Court, 801 North Florida Avenue, Tampa, in the attorney witness room on floor 11A, on a date convenient to the parties, the witness, counsel, and the court.

The scope of the questions **shall** be limited to the jurisdictional issue under the FSIA of whether defendant's actions

_____

[13]At the October 24, 2001 hearing, the court instructed the parties to reserve a room in the courthouse for the deposition pending this order.  November 21, 2001 at 9:30 a.m. has been reserved by the parties.

[14]Local Rule 3.04(b) provides that a non-resident defendant who intends to be present in person at trial may reasonably be deposed at least once in this district either during the discovery stages of the case or within a week prior to trial as the circumstances seem to suggest.  Local Rule 3.04(b), M.D. Fla.

in developing, disseminating, or distributing the "Hubbard Declaration" were in her official capacity as an employee of the government of Hamburg, Germany. (See Dkt. 46 at 3). Inquiry regarding defendant's employment and her responsibilities are relevant to this issue. Moreover, inquiry into issues pertaining to the FSIA's commercial act exception[15] are relevant as well.

The parties disagree about whether inquiry into defendant's relationship with Robert Minton ("Minton") and the Lisa McPherson

---

[15]Pursuant to 28 U.S.C. § 1605(a)(2),

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). This is known as the "commercial act exception." A state engages in commercial activity "where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns . . . a foreign state engages in commercial activity . . . only where it acts in the manner of a private player within the market." Honduras Aircraft Registry, Ltd. v. Gov't of Honduras, 129 F.3d 543, 547 (11th Cir. 1997)(quoting Saudia Arabia v. Nelson, 507 U.S. 349, 360 (1993)), cert. denied 524 U.S. 952 (1998). The commercial activity that provides the jurisdictional nexus with the United States must also be the activity on which the lawsuit is based. Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 533 (5th Cir. 1992) (citation omitted), cert. denied 506 U.S. 956 (1992). Isolated or unrelated commercial actions by a foreign state in the United States do not satisfy the exception. Id.

9

Trust is within the limited scope of the sovereign immunity issue.[16]

When questioned about her dealings with Minton, defendant asserted her Fifth Amendment privilege against self-incrimination. (Deposition Transcript at 73, 161). She likewise refused, on Fifth Amendment grounds, to answer questions concerning whether Minton gave her any money to assist the Lisa McPherson Trust. (Deposition Transcript at 78, 161). Likewise, she refused to answer any questions about Stacy Brooks ("Brooks") or any financial transactions among the Trust, Minton, or Brooks. (Deposition Transcript at 161). Plaintiff has not challenged defendant's assertion of her privilege against self-incrimination as to these matters.[17] It is therefore unnecessary to determine whether questions concerning these entities is relevant to the sovereign immunity issue in this case.

---

[16]In an order dated February 15, 2001 (Dkt. 46), the district judge noted that plaintiff's averments regarding whether defendant violated several provisions of the German Basic Law and whether Scientology is a recognized religion in Germany that is protected from persecution, did "not relate to Defendant's employment, her responsibilities in that employment, or whether her dissemination of the 'sect filters' or 'Hubbard Declaration' constituted a public act on behalf of the government of Hamburg, Germany." (Dkt. 46 at 3-4).

[17]In a civil case, a litigant may claim a Fifth Amendment privilege both during pretrial discovery and trial; however, at trial, a jury will be entitled to draw an adverse inference from the assertion of privilege. See Arango v. United States Dep't of the Treasury, 115 F.3d 922, 926 (11th Cir. 1997) (citations omitted); Clark v. City of Munster, 115 F.R.D. 609, 617 (N.D. Ind. 1987) (citation omitted). Whether an adverse inference should be drawn against defendant is not before the court at this time.

The following questions shall be answered by defendant at her deposition (See Dkt. 105 at 20-22):[18]

1) Do you submit requests for funding to any governmental entity in which you identify what you are doing and what you intend to accomplish?

2) Do you receive any monies that you deposit in your personal bank accounts from any of these speeches [about Scientology]?

3) Do you receive any money beyond your expenses which you may keep, from your speeches about Scientology?

4) Have you deposited any money in your private bank accounts that you have received for lectures given with respect to Scientology that is not part of your income received from the State of Hamburg?

5) Identify whether or not you have received any funds beyond actual expenses that you have incurred for any lecture, speech or advice regarding Scientology beyond the income you have received from the State of Hamburg.

6) Do you have any personal bank records that are property of the City?

---

[18]Questions 1)-5), and 7) are relevant to the issue of whether defendant has immunity under the FSIA, and whether she was acting in her governmental capacity. Question 6) relates to documents originally sought by plaintiff, and is within the limited scope of discovery. Finally, questions 8)-9) relate to documents sought by plaintiff that also relate to the issue of sovereign immunity.

11

7) When you appeared at the Alternate Charlemagne award ceremony in Leipzig last year, were your expenses, and those of your employees, paid for by the City or by someone else?

8) In your computer system, do you maintain the names of some of the people that the companies are asking about [whether they are Scientologists]?

9) Do you have a computer system for locating records such as this [notes regarding sending out sect filters to companies for certain people]?

Next, the following questions, from the transcript of defendant's deposition, shall also be answered:

1) Who wrote your job description? (Deposition Transcript at 47, line 18).

2) Do you have any specific orders from any senior official in Hamburg telling you what to do in your job? (Deposition Transcript at 47, lines 6-8).

Any follow-up questions shall be permitted and any other questions relevant to the issue of sovereign immunity.

Finally, as previously ordered by this court, defendant shall produce any documents in her possession or control that are responsive to plaintiff's Request to Produce, specifically those documents referenced in the deposition transcript. The documents shall be produced **two (2) days** prior to the deposition.

12

## CONDUCT OF CABERTA'S DEPOSITION

The following guidelines, which were set forth in <u>Quantachrome Corp. v. Micromeritics Instrument Corp.</u>, 189 F.R.D. 697, 701 (S.D. Fla. 1999), shall govern the conduct of the deposition of defendant and any other depositions conducted in this case:

1) counsel shall limit his or her objections and instructions to those permissible under Rule 30;

2) counsel shall not make any objection or statement in the presence of the deponent that might suggest the answer to a pending question; and

3) prior to the commencement of questioning, counsel for defendants shall instruct the deponent that the deponent should ask deposing counsel, not her own counsel, for clarification of any question.  <u>See</u> <u>id.</u>

The parties shall also be guided by the provisions concerning conferences between the deponent and counsel addressed in standard 18 of the Civil Discovery Standards adopted by the American Bar Association in August 1999:

**Standard 18 - Conferring with the Witness**

a.    During the Deposition

i.    An attorney for a deponent should not initiate a private conference with the deponent during the taking of the deposition except to determine whether a privilege should be asserted or to enforce a court-ordered limitation on the scope of discovery.  Subject to the provisions of subparagraph (a)(ii) and (b) below, a deponent and the attorney may confer during any recess in a deposition.

13

ii. An attorney for a deponent should not request or take a recess while a question is pending except to determine whether a privilege should be asserted or to ascertain whether the answer to the question would go beyond a court-ordered limitation on discovery.

iii. In objecting to or seeking to clarify a pending question, an attorney for a deponent should not include any comment that coaches the witness or suggests an answer.

iv. Any discussion among counsel about the subject matter of the examination should at the request of the examining attorney occur only when the deponent has been excused from the deposition room.

v. An attorney shall not instruct or permit another attorney or any other person to violate the guidelines set forth in sections a(i)-a(iv) with respect to that attorney's client.

b. During a Recess

i. During a recess, an attorney for a deponent may communicate with the deponent; this communication should be deemed subject to the rules governing the attorney-client privilege.

ii. If, as a result of a communication between the deponent and his or her attorney, a decision is made to clarify or correct testimony previously given by the deponent, the deponent or the attorney for the deponent should, promptly upon the resumption of the deposition, bring the clarification or correction to the attention of the examining attorney.

iii. The examining attorney should not attempt to inquire into communications between the deponent and the attorney for the deponent that are protected by the attorney-client privilege. The examining attorney may inquire as to the circumstances that led to any clarification or correction, including inquiry into any matter that was used to refresh the deponent's recollection.

Conferring with the Witness, Civil Discovery Standards, Standard 18, A.B.A. Sec. of Litig. (August 1999) (available at www.abanet.org/litigation/taskforces/standards.html).

Instructing a witness not to **answer** a question due to a relevancy objection is a **treacherous practice**, especially in light of the 1993 amendment to Federal Rule of Civil Procedure 30(d)(1). The court expects that counsel will be **especially** mindful of this rule in Caberta's deposition, and in **all future** depositions.

Counsel for the parties are **experienced** litigators and should be mindful of the admonition by the court in <u>Quantachrome</u>:

> In closing, the primary purpose of the Rules of Civil Procedure is to 'secure the just, speedy, and inexpensive determination of every action.' **Fed.R.Civ.P.** 1. The constant sniping and bickering between the instant parties have operated to draw out this action **and** increase the expense at every turn, effectively defeating the very purpose for which we have the Rules and a liberal **discovery** process.
>
> The Court has **previously noted that there** is no love loss [sic] between these parties. That **said**, the Court refuses to believe that it must actually **issue an** order for the parties to play nice. The Court **understands** that the parties are competitors in their field. Nonetheless, if counsel for both parties will attempt to inject a little more civility into this civil action, perhaps the litigation will flow more smoothly and expeditiously toward resolution.

<u>Quantachrome</u>, 189 F.R.D. at 701-02.

### SANCTIONS

Plaintiff seeks sanctions in the amount of $8,707.93 for costs incurred by plaintiff's counsel for airfare, hotel, State Department fees, transportation, interpreter, videographer, and court reporter. (Dkt. 105 at 25). Plaintiff also seeks attorneys' fees in the amount of $12,250.00 for 49 hours at $250.00 per hour. (<u>Id.</u>).

Rule 37, Federal Rules of Civil Procedure, provides for sanctions in discovery-related disputes under certain circumstances. See <u>Carlucci v. Piper Aircraft Corp., Inc.</u>, 775 F.2d 1440, 1446 (11th Cir. 1985) ("[A]ll federal courts have the power, by statute, by rule, and by common law, to impose sanctions against recalcitrant lawyers and parties litigant. . . the Federal Rules of Civil Procedure provide, in Rule 37(b), that failure by a party or his counsel to make or cooperate in court-ordered discovery may, at the trial court's discretion, lead to the imposition of sanctions of several sorts.").

Subsection (d), in particular, provides that sanctions are appropriate against a party who fails to appear at a properly noticed deposition. Fed. R. Civ. P. 37(d).[19] See also <u>Lee v. Walters</u>, 172 F.R.D. 421, 425-29 (D. Or. 1997) (court ordered defendant, its attorney, or both to pay plaintiff's reasonable expenses, including attorney's fees, that were caused by their failure to attend duly-noticed depositions); <u>Blue Grass Steel, Inc. v. Miller Bldg. Corp.</u>, 162 F.R.D. 493, 495 (E.D. Penn. 1995) (court

_____

[19]Federal Rule of Civil Procedure 37(d) states:

If a party . . . fails . . . to appear before the officer who is to take the deposition, after being served with a proper notice . . . the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under [other subsections of this rule].

Fed. R. Civ. P. 37(d).

16

granted attorney's fees and costs to defendant for bringing the motion to compel after corporate party failed to show up for deposition).

The party seeking sanctions need not establish that the deponent wilfully failed to appear at the deposition, unless extreme sanctions such as dismissal or default are sought.  <u>See</u> Fed. R. Civ. P. 37(d), advisory committee's note.[20]  <u>See also</u> <u>Bankatlantic v. Blythe Eastman Paine Webber, Inc.</u>, 12 F.3d 1045, 1049 (11th Cir. 1994).

In the instant case, defendant did not attend her scheduled deposition on July 25, 2001.  Even though she asserts that she was obligated to attend a work-related meeting in Berlin on the morning of July 25, 2001, her attorney represented to the court at the July 20, 2001 hearing, that defendant could travel back to Hamburg by 2:00 p.m. on July 25, 2001 in time for the deposition.  (Dkt. 102 at 12, 15).

Moreover, the court was fully apprised of the issue when it denied defendant's emergency motion on July 20, 2001.  (Dkt. 94).  Likewise, Judge Wilson denied the second emergency motion on July 24, 2001.  (Dkt. 100).

---

[20]The advisory committee's note to Rule 37(d) states that "[t]he resulting flexibility as to sanctions eliminates any need to retain the requirement that the failure to appear or respond be 'wilful.'"  Fed. R. Civ. P. 37(d), advisory committee's note.  Moreover, "in view of the possibility of light sanctions, even a negligent failure should come within Rule 37(d)."  <u>Id.</u>

Accordingly, plaintiff is entitled to his reasonable attorney's fees and costs associated with defendant's failure to appear for her deposition on July 25, 2001 at 2:00 p.m.

Similarly, Rule 37(a)(2)(B), **Federal Rules** of Civil Procedure, provides "if a deponent **fails to answer a** question propounded or submitted under Rules 30 or 31 . . . **the discovering** party may move for an order compelling an answer." **Fed. R. Civ. P.** 37(a)(2)(B). Then, if the court **grants the motion and finds** that the party's nondisclosure or lack of **response** was not "substantially justified or that no "other circumstances make an **award** of expenses unjust," reasonable attorney's fees and costs **may be** awarded to the moving party. Fed. R. Civ. P. 37(a)(4)(A). <u>See also</u> <u>Gober v. City of</u> <u>Leesburg</u>, 197 F.R.D. 519, 521–22 (M.D. **Fla.** 2000) (defendant was not substantially justified in withholding social security number at deposition, thus plaintiff's **reasonable** attorney's fees and costs were granted for bringing the **motion** to compel).

In the case at bar, defendant **appeared** for the second scheduled day of her deposition, but **gave evasive** answers and even failed to answer certain questions **propounded** by plaintiff's counsel. Moreover, at the deposition, **Hintze, who** is a prospective witness for defendant, often **interrupted and** engaged in commentary on the record, and spoke **with the defendant** in German while questions were pending.

18

While defendant's counsel is permitted to direct defendant not to answer a deposition question when necessary to preserve a privilege, to enforce a limitation on evidence directed by the court, or to protect a witness from an examination that is being conducted in bad faith, <u>Gober</u>, 197 F.R.D. at 520 (citing Fed. R. Civ. P. 30(d)(1)); defendant frustrated the purpose of the deposition by engaging in dilatory tactics. Thus, she has not established that she was "substantially justified" in refusing to answer deposition questions that fall within the scope of the jurisdictional issue under FSIA. Defendant, however, may have been justified in asserting her Fifth Amendment privilege, and shall not be required to answer those questions for which she has already asserted the privilege.

Accordingly, because plaintiff obtained some information from defendant during the deposition, imposing the entire amount of sanctions sought would be unjust. Plaintiff is entitled to the reasonable attorney's fees and costs in connection with defendant's failure to attend the first day of her deposition on July 25, 2001.

As for the second day of deposition testimony, the request for sanctions is under advisement pending defendant's compliance with this order.

19

CONCLUSION

Accordingly, upon due consideration, it is hereby **ORDERED THAT**:

(1)  Plaintiff's motion to compel (Dkt. 105) is **GRANTED** to the extent that defendant shall submit to a deposition in this district within thirty (30) days of this order, defendant shall answer questions as mentioned <u>supra</u>, and defendant shall produce documents responsive to plaintiff's document requests within **ten (10) days** of this order; and

(2) The request for sanctions is **GRANTED** to the extent that defendant shall reimburse plaintiff for the reasonable expenses and attorney's fees incurred in connection with the failed first day of defendant's deposition in Germany, one-half of the reasonable expenses and attorney's fees, as well as the expenses incurred in filing the instant motion to compel.   Airfare and ground transportation shall not be included.[21]  The parties shall confer in good faith in an effort to stipulate to the amount of reasonable attorney's fees and expenses.  If the parties are unable to agree, plaintiff shall file an affidavit as to expenses and fees within

---

[21]The request for sanctions for the second day of deposition testimony is under advisement pending defendant's compliance with this court's order.

twenty (20) days of the date of this order and defendant may file a counter-affidavit within ten (10) days thereafter.

**DONE and ORDERED** at Tampa, Florida this _____16th_____ day of November, 2001.

_____
ELIZABETH A. JENKINS
United States Magistrate Judge

Copies to:
Counsel of Record

21

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

01 FEB 16 A 10: 01

CLERK U.S. DISTRICT COURT
MIDDLE DIST. OF FLORIDA

HUBERT HELLER,

        **Plaintiff,**

vs.                               **Case No. 8:00-CV-1528-T-27EAJ**

URSULA CABERTA,

        **Defendant.**
_____/

## ORDER ON DEFENDANT'S SECOND MOTION TO DISMISS

      **THIS CAUSE** came on to be considered on Defendant's Second Motion to Dismiss for Lack of Jurisdiction Under the Federal Sovereign Immunities Act (Dkt. 42). The Court having reviewed said motion and being otherwise fully advised in the premises, finds as follows:

      Plaintiff has filed a Second Amended Complaint ("Complaint") (Dkt. 40) asserting causes of action for tortious interference with advantageous business relationships (Count I), unfair and deceptive trade practices (Count II), conspiracy to deprive Plaintiff of civil rights in violation of 42 U.S.C. § 1985(3) (Count III), and violation of the alien tort claims act, 28 U.S.C. § 1350 (Count IV). Factually, Plaintiff alleges that Defendant is an employee of the City of Hamburg, Germany and is the head of the Hamburg, Germany task force designed to disrupt the business activities, civil rights and human rights of the members of the Scientology religion. (Dkt. 40, ¶¶ 2, 7). Plaintiff alleges that Defendant created, advocates, promotes and disseminates "sect filters" or "Hubbard Declarations" that require individuals and companies to declare in writing:

      (1) That they do not use the technology of L. Ron Hubbard;
      (2) That they are not trained and do not participate in the technology of L. Ron Hubbard; and



(3)  That they reject the technology of L. Ron Hubbard.

(Dkt. 40, ¶ 9).  Plaintiff further alleges that in creating and disseminating the "sect filters," Defendant acted outside the scope of her lawful authority as an employee of the City of Hamburg, Germany and "persecuted members of the Scientology religion" interfered with Defendant's established advantageous business relationships and utilized unfair trade practices.  (Dkt. 40, ¶¶ 23-26, 35).

Defendant moved to dismiss the Complaint on the grounds that since she acted in her official capacity when creating and disseminating the "sect filters" or "Hubbard Declaration," she is immune from suit under the Federal Sovereign Immunities Act, 28 U.S.C. § 1603, *et seq*. and that no exception to sovereign immunity applies.  (Dkt. 42).

The Federal Sovereign Immunities Act ("FSIA") is the exclusive source of subject matter jurisdiction over all civil actions against foreign states.  <u>Alejandre v. Telefonica Larga Sistancia De Puerto Rico, Inc.</u>, 183 F.3d 1277, 1282 (11th Cir. 1999).  Pursuant to the FSIA, an employee of a foreign state who is acting in her official capacity may be immune from suit unless an exception in 28 U.S.C. § 1605 applies.  <u>Chuidian v. Philippine National Bank</u>, 912 F.2d 1095 (9th Cir. 1990).

When a Plaintiff asserts facts suggesting that an exception to the FSIA applies, the Defendant bears the burden of proving by a preponderance of the evidence that no exception applies.  <u>Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.</u>, 179 F.3d 1279 (11th Cir. 1999); <u>Meadows v. Dominican Republic</u>, 817 F. 2d 517 (9th Cir. 1987).  The Defendant must first produce evidence to establish that a foreign state is named in the lawsuit and that the Plaintiff's claims relate to public acts of the foreign state.  <u>Meadows</u>, 817 F.2d at 522; <u>Kline v. Kaneko</u>, 685 F.Supp. 386 (S.D. N.Y. 1988).  Once Defendant produces prima facie evidence of immunity, the burden of going forward shifts to the Plaintiff to produce evidence establishing that the foreign state is not entitled to immunity.

2



Meadows, 817 F.2d at 522.

Courts considering motions to dismiss are usually confined to reviewing the four corners of the complaint. Milburn v. United States, 734 F.2d 762, 765 (11th Cir. 1984). However, when a movant factually attacks the complaint and challenges the existence of subject matter jurisdiction, the district judge may rely on affidavits as well as the pleadings. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990); Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 855 (11th Cir. 1990); Kline, 685 F.Supp. at 389. The district court must accept the facts alleged in the complaint as true to the extent that they are uncontroverted by the defendant's affidavits. Cable/Home Communication Corp., 902 F.2d at 855. When the evidence conflicts, the district court must itself evaluate the merits of the jurisdictional claims. Lawrence, 919 F.2d at 1529.

Here, Defendant alleges in her affidavit that she acted in her official capacity as an employee of the government of Hamburg, Germany when she disseminated the "Hubbard Declaration." (Dkt. 43, pgs. 3-4). Defendant's employer has also submitted an affidavit stating that Defendant's actions in developing and distributing the "Hubbard Declaration" were performed as part of her job responsibilities in her capacity as an employee of the government of Hamburg, Germany. (Dkt. 43, pgs. 5-6).

Plaintiff alleges in response that Defendant was acting outside the scope of her employment with the government of Hamburg, Germany. (Dkt. 40, ¶ 2). Plaintiff has submitted an affidavit from Alexander Petz, an attorney practicing in the Federal Republic of Germany, to support his arguments. (Dkt. 45, Ex. A). According to Mr. Petz, "Caberta's conduct appears to violate several provisions of the [German] Basic Law," (Dkt. 45, Ex. A, ¶ 7), and that "she has thereby violated . . . her vowed obligation towards her employer," (Dkt. 45, Ex. A, ¶ 8). According to Mr. Petz, Scientology is a

recognized religion, (Dkt. 45, Ex. A, ¶¶ 11, 12), that is protected from persecution, (Dkt. 45, Ex. A, ¶ 7). These averments do not relate to Defendant's employment, her responsibilities in that employment, or whether her dissemination of the "sect filters" or "Hubbard Declaration" constituted a public act on behalf of the government of Hamburg, Germany.

Plaintiff asserts in his pleadings that additional discovery on the FSIA issue is required before he can introduce evidence supporting his contentions that Defendant acted outside the scope of her employment. (Dkt. 45, pgs. 5-7). The Eleventh Circuit has held that a case should not be dismissed for lack of jurisdiction when a plaintiff contends that through discovery he could obtain facts establishing jurisdiction. Colonial Pipeline Co. v. Collins, 921 F.2d 1237 (11th Cir. 1991); Majd-Pour v. Georgiana Community Hospital, Inc., 724 F.2d 901 (11th Cir. 1984); see also Coca-Cola Foods v. Empresa Comercial Internacional de Frutas S.A., 1997 WL 370121 (M.D. Fla. 1997). Given Plaintiff's arguments that by conducting additional discovery he will be able to establish that FSIA immunity does not apply to Defendant and that this Court has jurisdiction, this Court will deny Defendant's Motion to Dismiss. However, Defendant need not respond to the Complaint at this time.

Plaintiff may conduct limited discovery for a period of 90 days from the date of this Order to discover evidence supporting this Court's exercise of jurisdiction over Defendant. This discovery shall be limited to the FSIA issue. Not later than 115 days from the date of this Order, unless that period is extended for good cause, Defendant shall renew its motion to dismiss or respond to the Complaint. Both parties are advised to be cognizant of the provisions of Fed. R. Civ. P. 11 and to refrain from filing any pleadings that are unmeritorious and unsupported by law or fact. See Majd-Pour, 724 F.2d at 903.

4

Accordingly, it is

**ORDERED AND ADJUDGED** that:

1.     Defendant's Second Motion to Dismiss for Lack of Jurisdiction Under the Federal

Sovereign Immunities Act (Dkt. 42) is DENIED without prejudice.

2.     Defendant's Motion to Suspend Discovery (Dkt. 43) is DENIED.

3.     Plaintiff is permitted to conduct discovery, limited to the FSIA issue and this Court's

exercise of jurisdiction over Defendant for a period of 90 days from the date of this

Order. Not later than 115 days from the date of this Order, unless the time period is

extended for good cause shown, Defendant may renew her motion to dismiss or

answer the Complaint, in accordance with the terms of this Order.

**DONE AND ORDERED** in chambers this _15th_ day of February, 2001.

_____
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record
Courtroom Deputy
Law Clerk

5