IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HUBERT HELLER, an individual,

       Plaintiff,

v.                    **Case No. 8**:00 CV-1528-T-27C

URSULA CABERTA, an individual,

       Defendant.

_____/

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE'S
## ORDER ON PLAINTIFF'S MOTION TO COMPEL

## I - INTRODUCTION

One would think after reading Judge Jenkins' lengthy order summarizing the events

that occurred at the deposition of defendant Ursula Caberta, and then reading the defendant's

Objection to Judge Jenkins' Order, that they are addressing different depositions. The latter

is advocacy inaccurately portraying the facts and circumstances to defend a client in

understandable trouble for violation of court orders and for engaging in "evasive,

argumentative and nonresponsive testimony." (Ex. 1, Order at 7.) The former represents an

adjudication by a highly experienced judge who after having "reviewed the deposition in its

entirety," (*id.*), ruled appropriately in accordance with that review.

Ursula Caberta's deposition finally went forward in Germany, *solely* as an

accommodation provided by this Court to the defendant and under the assumption that the

defendant and her counsel would act in good faith to make the deposition viable. However,

notwithstanding one order from this Court, two orders from Judge Jenkins, and one Order

from Judge Wilson, Ms. Caberta refused to obey as to the timing of the deposition, failing to

appear on the first of two days the deposition was scheduled, made lengthy non-responsive speeches and argument, and refused to answer many questions. The deposition was marked with repeated interruptions and commentary by Ms. Caberta's subordinate and improper instructions and rude commentary from her counsel. She also responded to many questions in an evasive and argumentative fashion requiring substantial repetition of questions, many of which were never directly answered. Indeed, Ms. Caberta refused to respond to any questions cross-examining *her own affidavits* that she filed in this case.

The total time expended in actually questioning the witness was only 4 hours and 20 minutes out of a deposition ordered by the Court for two days. Adding to that the inherent complication of the need to translate questions, answers, and irrelevant monologue by Ms. Caberta, the deposition was a huge waste of effort and money.

Nor does Ms. Caberta's Objection squarely address the issues at hand. Rather, it attacks the plaintiff because he is a Scientologist and asks that any adjudication of his claims utilize a different and discriminatory standard for that reason; it attacks plaintiff's counsel with an utterly incorrect rendition of a deposition that occurred in a *different, unrelated* case; it attacks the Magistrate Judge unjustifiably and unprofessionally and ascribes to the court bad motivation in ruling against Ms. Caberta; and it skews the record beyond recounting in the limited space here available to respond.

Judge Jenkins' substantial expenditure of time and effort in reading the entirety of the transcript, reviewing the papers and lengthy exhibits, and conducting an hour-long oral argument, accurately reflect the *actual* nature of the deposition. The Order is neither "clearly erroneous or contrary to law," and should be affirmed.

## II – STATEMENT OF FACTS

### A.    Background to the Discovery Order

In her motions to dismiss, Ms. Caberta argued that she acted at all material times in her capacity as the so-called "sect commissioner" of the city of Hamburg, Germany within

2

the scope of her alleged authority in performing the torts alleged in the Complaint, and is therefore immune from suit pursuant to the Foreign Sovereign Immunities Act.

By Order dated February 15, 2001, this Court denied defendant's second motion to dismiss, denied the defendant's second motion to stay discovery, and gave leave to plaintiff to conduct discovery, "limited to the FSIA issues and this Court's exercise of jurisdiction over Defendant." (Ex. 2, p. 5.) The central bases presented for establishing an exception to the the FSIA, are: (1) that the acts undertaken by Ms. Caberta are illegal under German and international law; and (2) that the acts are commercial acts. Either circumstance takes defendant outside the protection of the FSIA.

The history of many months of attempts by plaintiff to acquire Ms. Caberta's deposition is filled with numerous efforts by Caberta to prevent the deposition. This history was set forth in the plaintiff's Opposition to Caberta's objection to Judge Jenkins' initial deposition Order, filed by plaintiff on April 30, 2001. (Docket Number 67.)  Other than the following brief summary, plaintiff will not here repeat the cumbersome details of the attempts to acquire Ms. Caberta's deposition, but respectfully refers the Court to such paper and the exhibits referenced therein. (*See also*, Ex. 1, Order, p. 3, n. 4.)

In summary: starting in the summer of 2000, plaintiff offered several times to go to Germany to take Ms. Caberta's deposition as a courtesy to the witness and to expedite discovery.   A deposition in Germany can *only* be accomplished by the voluntary appearance of the witness, and then held at the American Embassy.  Ms. Caberta refused to appear, after which a motion to compel was filed on March 6, 2001.  Thereafter, defendant "agreed" to appear in Germany.  However, the date offered by defendant for her appearance left insufficient time to arrange the deposition through the U.S. Embassy, which required a minimum of 3 weeks lead time.  Later dates were sought from Ms. Caberta's counsel without success.  Plaintiff therefore acquired an Order from Judge Jenkins dated March 29, 2001 compelling the deposition. (Ex. 3.)  Thereafter, defendant again refused to appear in

3

Germany or anywhere else. (Ex. 4.) Plaintiff, accordingly, noticed her deposition in this

district – as is his right. Ms. Caberta failed to appear or even communicate with plaintiff's

counsel indicating she was not appearing. (Ex. 5, Declaration Kendrick L. Moxon.) *After*

her no-show, Caberta filed a motion to vacate Judge Jenkins' Order of March 29th. Plaintiff

cross-moved to, again, compel her deposition.

In an Order dated May 8, 2001, Judge Jenkins Court found that it was factually and

legally appropriate for the defendant to come to this district for her deposition, providing 20

days to Ms. Caberta to comply. (Ex. 6.) Defendant filed an Objection to the Order before

this Court. While affirming Judge Jenkins' Order, this Court *sua sponte* also ruled on June 5,

2001, that Ms. Caberta could elect to have her deposition taken in Germany.

Defendant thereafter indicated she wished to appear in Germany and plaintiff

immediately responded by letter faxed to defendant's counsel on June 15, 2001 seeking

available dates. (Ex. 7.) No response was received to this letter, so a further letter was faxed

on June 19th, 2001, noting the failure of response, and reiterating that the Embassy requires 3

weeks lead time on scheduling depositions in Germany, and the need for advance booking of

the interpreter and court reporter. (Ex. 8.) On June 20th and June 22nd, further letters were

sent to defendant's counsel requesting dates for the deposition. (Ex. 9.)

Still hearing again no response, a notice of deposition was sent on June 27, 2001,

noticing the deposition for July 25th and 26th. A formal request was sent to the Embassy in

Germany for the deposition on June 28, 2001, with a copy to defendant's counsel, and setting

the dates for the deposition at July 25th and 26th. (Ex. 10.) The logistics involved in retaining

a court reporter and interpreter were complex and time consuming, as very few court

reporters exist in Germany and both reporters and interpreters are much in demand and book

events *months* in advance. Plaintiff's counsel therefore waited several additional days and

no objection having been received to the noticed deposition dates, the court reporter and

interpreter were retained at the last possible time they could be booked, in light of this

4

Court's July 31st discovery cutoff.

On July 16th, three weeks after the notice was served on defendant, and only 9 days before the deposition, Ms. Caberta sent a letter to the American Embassy in Germany objecting to the dates of the deposition, (Ex. 11), who having no control over the matter, simply forwarded the letter to plaintiff's counsel. (*Id.*) Plaintiff's counsel immediately faxed a letter to defendant's counsel on July 16th, expressing the near impossibility of changing the deposition at that late date. (Ex. 12.) Counsel attempted to reach an agreement on new dates but this attempt continued to be hindered by Ms. Caberta. (Ex. 13, Letter of July 17th.) Further attempts to re-schedule the deposition were fruitless, as it was logistically too late to move the deposition and Ms. Caberta continued to make only illogical, useless offers. (Ex. 14, Moxon letter of July 19th.)

Thus, Ms. Caberta's counsel agreed that the scheduled dates were the only remaining possibility, and stated he would appear on July 25th and 26th, as would his client. (Ex. 15.)

Nevertheless, Caberta continued to object and on the morning of July 20th, "offered" at that late date, a total of only two hours for her deposition on July 26th. (Ex. 16.) Plaintiff's counsel declined the offer precipitating an emergency motion from defendant to quash the deposition, heard by Judge Jenkins on July 20th. At that hearing, defendant's attorney, John Merrett, and her identified German attorney, Runger Hintze, argued that Ms. Caberta was busy and sought to cancel the deposition. Plaintiff offered that the deposition could proceed in Florida at a convenient time; however Ms. Caberta's counsel rejected the offer.

After hearing argument, Judge Jenkins ruled that since Ms. Caberta's counsel represented to the court that she could come back to Hamburg from her meeting in Berlin in only 1 ½ hours, and since it was Ms. Caberta's failure to cooperate to set the deposition that caused the situation, that she must appear at 2:00 p.m. on the 25th in Hamburg, continue as late as practicable that day to get as full a day as possible, and begin at 9:00 a.m. or as early as

possible on the 26th in Hamburg to complete the deposition.

Over the weekend, plaintiff's counsel left for Germany to meet with German counsel and prepare for the deposition scheduled for the 25th. (Ex. 4.) However, on Monday, July 23rd, a further motion for protective order arrived by fax after 5:00 p.m. at plaintiff's counsel's Florida office, and was forwarded immediately to plaintiff's counsel already in Germany, arriving near midnight German time. Because the motion sought emergency relief the following day to cancel the deposition, plaintiff's counsel was required to stay up much of the night preparing a response to defendant's second emergency motion, which was emailed to Florida for filing on the morning of the 24th. (Id.)

Judge Wilson, sitting in Judge Jenkins' absence, denied Ms. Caberta's emergency motion on the 24th (Ex. 17), thus requiring that the deposition go forward as scheduled.

On July 25th, plaintiff's counsel, his paralegal, a court reporter, an interpreter, and a videographer all appeared at the American Consulate in Hamburg before 2:00 p.m. for the start of Ms. Caberta's deposition. (Ex. 18, Transcript, July 25, 2000.) Ms. Caberta's attorney, John Merrett, also appeared, and announced that Ms. Caberta *would not* be appearing until the 26th, (id., pp. 4-5), in violation of the Court's Order. (Ex. 1, pp. 7-8.) With no witness and no alternative, the deposition was suspended until the following day.

### B.    Proceedings at the Deposition

#### 1. A Great Deal of Time Was Wasted by the Witness Arguing, Commenting and Giving Non-responsive or Evasive Answers.

On July 26, 2001, Ms. Caberta appeared at the American Consulate at 9:00 a.m.

At the outset, lengthy speeches were made by Caberta's purported German attorney, Mr. Hintze, and substantial additional time was expended with speeches by the consulate representative regarding the procedure, with oath signing, and other matters. (Ex. 19, pp. 4-28.) The questioning therefore did not begin until 9:53 a.m.

Contrary to the assertion in defendants' motion, Ms. Caberta made no indication that

she was *unable* to attend the previous day as ordered by the Court, and literally no evidence exists other than assertions of counsel that she was unable to attend on the 25th.  Counsel's latest assertion that Ms. Caberta "understood" from the American Embassy that she did not have to appear on the 25th (Objection at 9), is the first time this excuse has been made in the three motions and two hearings addressing this issue, and is flatly contradicted by correspondence from the Embassy. (Ex. 20.) [1]

From the outset, the witness frequently refused directly to respond to questions, but insisted upon making speeches on the record.  (Ex. 1, Order, pp. 4, 7. )  For example, a central issue in this case is whether or not Ms. Caberta is authorized by any specific German law to undertake the activities which she asserts are immune from tort liability.  Ms. Caberta had previously produced only a single "report" which she wrote herself, in response to an interrogatory seeking, "All orders, instructions, policies, guidelines, laws and statute relating to your job scope, functions, responsibilities and duties."  She was therefore asked at her deposition, first, if she had seen the interrogatory.  Refusing to answer directly, the witness sought to inject commentary on the record. (Ex. 19, pp. 31-33.)  Asked again if the interrogatory response reflected the entirety of the responsive records, Ms. Caberta spent several pages declining to directly answer the question (*id.*, pp. 33-37), which after further attempts, she finally answered after 16 minutes of otherwise useless discussion. (*Id.*, p. 41, lines 7-10.)

The deposition was also marked with frequent interruptions by Ms. Caberta's

---

[1]  Defendant similarly argues that she relied on the consulate official who stated that Ms. Caberta could refuse to answer questions.  The consulate's misstatement of law was corrected immediately by plaintiff's counsel, who stated that of course any witness could refuse to answer questions, but that if she did, a motion to compel would be filed before this Court and plaintiff would seek an order compelling the answers. (Ex. 19, pp.11-16.)  Moreover, when this Court ordered Ms. Caberta's deposition to go forward, it specifically admonished defendant that "discovery should not be thwarted by third party restrictions or diplomatic protocol." (Order, June 5, 2001, p. 3.)  And of course, she was represented by counsel who certainly knew better.

subordinate in her office, Runger Hintze, who was previously identified to the Court as her German counsel. (Ex. 1, Order, pp. 4-5.) Mr. Hintze insisted upon speaking to the witness in German and coaching her during the pendency of questions. (*See, e.g.*, pp. 33, 36, 42, 49, 54, 66, 67, 83, 85, 86, 131, 133, 135, 138, 139.) In fact, Ms. Caberta admitted that Mr. Hintze is not a lawyer. (*Id.*, pp. 175-176.) Rather, he is Ms. Caberta's subordinate with some legal training. (*Id.*, p. 88.)

Ms. Caberta also frequently declined to directly respond to unprivileged questions, making unnecessary and non-responsive remarks. (*See, e.g.*, p. 43, lines 3-14.) (*See also*, Ex. 1, Order, pp. 4, 7-8.) Ms. Caberta's refusal to directly respond to questions, but instead making irrelevant speeches, exacerbated the need to translate her answers. Plaintiff's counsel, not able to understand German, could not know the lengthy German responses were irrelevant until after they were translated. For example, the simple question, "Is all of your work regarding Scientology official business?", was answered in what became a typical non-responsive fashion. (Ex. 19, p. 54, line 11 to p. 55, line 6.) Had this question and non-responsive answer been given in English, it would have required only about 30 seconds. Here, the consecutive time stamp indicates a time of just over 2 minutes. (*Id.*)

The witness also insisted upon her non-responsive comments being *accepted* as her answers, and simply refused to directly answer questions until they were repeatedly asked. (Ex. 1, Order, pp. 7-8.) (*See, e.g.*, Ex. 19, pp. 47-49, concerning whether or not Ms. Caberta wrote the "job description" for her position.) In other instances, the witness and her subordinate, Mr. Hintze, saw fit to argue the scope of the deposition at great length. (*Id.*, p. 85, line 20 - p. 88, line 4.)

Efforts to seek the aid of defendant's counsel to get the witness to answer questions were unavailing, as the witness continued her evasive and non-responsive answers – at one point suggesting plaintiff could sue someone else to get answers. (*See, e.g.*, p. 49, line 23 - p. 52, line 8.)

For some questions, the witness simply played games and declined to answer. For example, the witness was provided a copy of the affidavit she signed and filed in this case, and was asked if the statement made in one of the paragraphs was accurate. (*Id.*, p. 167.) Her responses to repeated questions seeking only to learn the accuracy of the affidavit were (in order given):

- "If I declared this like that, it will be accurate. What do you think?"
- [question repeated] "I made this Declaration and I don't know why you are asking this now."
- [question repeated] "If that is what I declare, then it will have to be correct."
- [question repeated] "It's a statement that I made and I do not make inaccurate statements."
- [question repeated] "I am not going to repeat the same nonsense all over again. I already answered the question."

(*Id.*, pp. 167 - 168.)

Ms. Caberta never did answer the question.

Defendant's refusal to allow cross examination on her affidavits is particularly significant, as the pending Motion to Dismiss addressing FSIA immunity, attaches three of her own affidavits, and indeed, defendant makes repeated reference to her affidavits in the instant motion relating to underlying facts she wishes this Court to find. Similarly, Ms. Caberta attached an affidavit of Stacy Brooks to her motion to dismiss and refers to it in the instant objection (Objection, p. 1) and also referred to dealings with Ms. Brooks in her own affidavit, but again, utterly refused to respond to any questions relating to Stacy Brooks. (Ex. 19, pp. 75, 76, 81, 147, 148, 156, 157.)

Late in the deposition, Caberta's counsel demanded that the deposition address substantive issues relating to the defendant's dealings with plaintiff and the company POS Partners, which had refused to honor the agreement with plaintiff based on alleged pressure and interference by Caberta. (*Id.*, p. 172.) Such areas of questioning were deemed by

9

plaintiff's counsel to be beyond the scope of this Court's discovery ruling, which, based on arguments from the defendant, limited the scope of discovery to jurisdictional and FSIA issues. (See Ex. 1, Order, February 15, 2001, p. 5.) Yet, Caberta's counsel demanded that plaintiff cease asking jurisdictional questions, and stated: "And you will shortly be confronted with the facts in that regard and you would be well advised to use the remaining hour to explore them rather than pretending surprise later on." (Ex. 19, p. 172.) Thus, limited substantive questions were asked of the witness in an attempt to avoid later discovery disputes. Defendant now argues that these "25 minutes" in which Ms. Caberta largely provided a monologue regarding POS and Mr. Heller, (*id*., pp. 172-188), was the only "relevant" portion of the deposition. (Objection at 10.) This assertion is disingenuous, as this testimony manifestly went to the merits of the complaint, and not FSIA issues.

Defendant also refused to answer if she received money for speeches regarding Scientology outside of her government salary. Such refusal came only after lengthy argument in which she asserted that she had adequately answered a question by giving a very incomplete response. (Ex. 19, p. 59, line 23 - p. 65, line 4.) This refusal and unnecessary argument wasted 8 ½ minutes. Contrary to defendants argument that this line of questioning was irrelevant to the FSIA issue, answers to the questions show that she was engaged in commercial activities relating to the acts at issue in this lawsuit beyond any arguably official duties. It would thus provide evidence both of the "acting outside the scope" exception to the FSIA, and the "commercial exception" to the FSIA.

At her deposition, Ms. Caberta was also asked to affirm the accuracy of statements she made in an affidavit she filed in this case, in which she described a visit to the United States

(paid by Minton and the Lisa McPherson Trust), regarding the use of the sect filter. (*Id.*, p. 148.) The witness gave evasive, unresponsive and argumentative responses for more than 7 minutes before answering the question. (*Id.*, pp. 148 - 153, line 4.) Contrary to defendant's arguments that questions regarding Minton, Stacy Brooks and the Lisa McPherson Trust, Inc. are irrelevant, these matters are entirely germane to FSIA immunity as outside the scope of any authorized activity. As set forth in the Second Amended Complaint, Ms. Caberta:

> "... is also engaged in continuous and systematic business contacts in the State of Florida. She is a silent partner or joint venturer with Robert Minton, Stacy Brooks, Jesse Prince, and the Lisa McPherson Trust, Inc. ("LMT, Inc."), a Florida for-profit corporation engaged in the activity of attempting to damage or destroy the Scientology religion. Caberta regularly communicates with LMT, Inc., and Minton ... for the purpose of encouraging and demanding businesses in Germany and elsewhere to adopt her sect filter and boycott and discriminate against Scientologists and businesses owned by Scientologists in Germany and around the world – including in Florida and other states.....
>
> 16. In her personal capacity, Caberta has been paid an unspecified amount of money by Florida businessman, Robert Minton, in return for which, in part, she has traveled to Clearwater, Florida for the purpose of publicly attacking Scientology, disseminating and requiring use of her sect filters, encouraging boycotts of businesses owned by Scientologists and continuing the general conspiracies alleged herein. Minton and LMT, Inc. have also paid Caberta to engage in propaganda in Clearwater, Florida, in Germany, in Washington, D.C., and in International publications, to bolster investments made by Minton in litigation in Florida.

(Complaint, ¶¶ 15-17.)

Ms. Caberta also asserted a self-incrimination privilege to refuse to testify regarding funds she had received from co-conspirator Minton. (Ex. 19, pp. 65-66.) The witness previously filed an affidavit as to the receipt of funds from Mr. Minton which left many facts unrevealed. Whether or not Ms. Caberta received bribes from Minton or his company to undertake the torts at issue – and outside the scope of her authority – is a central issue in the case. And, as noted above, defendant continues to make reference to these affidavits both in

11

the pending Motion to Dismiss and even in the instant **Objection**, (see Objection, pp. 1, 3, 4), even though *she refused to permit cross examination thereon* at her deposition. Moreover, Ms. Caberta's counsel ensured the questions for which she asserted a self-incrimination privilege wasted as much time as a possible, by refusing to permit a clear assertion thereof. (*Id.*, pp. 68-80.) This deposition misconduct was repeated and repeated by Ms. Caberta's counsel, who with sarcastic remarks in the context of the self-incrimination assertions and unprofessional commentary, frayed the nerves of all present. (*i.e.*, *id.*, pp. 77-78; 138.)

Ms. Caberta also obstructed the deposition by failing to conduct a search for records responsive to the document requests, and failing to produce records in compliance with Judge Jenkins' Order of February 15, 2001 (*id.*, p. 134), taking the position that the records are located in her office but that she considers the records to be government files. However, she stated that if there are documents she considers useful to the case, she *will* request authorization to use the documents! (*Id.*, pp. 139-140.)

### 2. Caberta Refused to Answer Relevant and Unprivileged Questions

In addition to the evasive and non-responsive answers, Ms. Caberta also refused outright to answer other relevant questions without any assertion of privilege.

For example, Ms. Caberta flatly refused to answer particularly important questions on FSIA, such as "Do you submit requests for funding to any governmental entity in which you identify what you are doing and what you intend to accomplish?" (*Id.*, p. 52, lines 10-13.) Defendant's argument that this particular question was outside the scope of the Court's Order is ridiculous, and Judge Jenkins properly identified this question as one which the witness wrongly refused to answer. Plaintiff did not ask for the details of the funding request, if money was allocated, or how much money was allocated, if any. The point of the question was to determine if the government remotely knew what Ms. Caberta even was *doing* as evidenced by a request for funding for what she was doing, and if so, the scope of her

proposed activities would presumably be set forth in the funding request.  What better evidence of whether she was acting outside the scope of authorized activities?

As another example, Ms. Caberta was questioned regarding whether or not she possessed any records responsive to document Request number 10, which sought correspondence with alleged co-conspirator, Stacy brooks, the president of the Lisa McPherson Trust.  She refused to answer, asserting the question "has nothing to do with this case." (*Id.*, p. 147, line 22 - p. 148, line 12.)

Then, contradicting herself, Ms. Caberta stated that she would answer no questions regarding her relationship with the American alleged co-conspirators without receiving authorization because, "it refers to part of my job." (*Id.*, p. 154, line 19 - p. 155, line 8.)  She thereafter confoundingly refused to respond to any questions regarding the "Lisa McPherson Trust or private trips" or expenses paid by the company on the grounds that "has nothing to do with the Caberta case." (*Id.*, p. 155, line 9 - p. 158, line 12.)  Indeed, in her objection, defendant refers to this trip as a "vacation" to Florida.  Efforts to resolve this tangle  were fruitless, (*Id.*, pp. 158 - 160), the witness refusing to answer cross-examination questions on these issues.  Eventually, the witness took another 10 minute break, and returned to assert a self-incrimination privilege as to any questions regarding the provision of official favors for money relating to co-conspirator Minton (recipient of an award from the defendant), or any communications with the other alleged co-conspirators, Stacy Brooks and the Lisa McPherson Trust. (*Id.*, pp. 160-161.)

Similarly, Caberta was asked if she paid for the expenses of her trip to Florida to meet with alleged co-conspirators Minton and LMT, Inc.  Her response: "It is none of your business.  I am not going to answer that." (*Id.*, p. 170, lines 9-11.)  Asked *when* she received the money used for her trip, she responded, "Once again, I am not going to answer any questions apart from the POS Partner and Heller issue.  And please ask these questions now as

13

the Court has ruled." (*Id.*, pp. 171-172.) [2]

She also refused to answer questions regarding whether her office employees were paid by the city or by a private person to attend the award ceremony in which Ms. Caberta gave Minton an award in Leipzig, asserting only lack of relevance. (Ex. 19, p. 166, line 21 - p. 167, line 3.) This, however, could be part of the payoff, evidencing activity outside the scope of her authority.

Defendant's argument that Caberta was justified in not answering these questions because she considered them *irrelevant*, is frivolous and so found by Judge Jenkins.

### 3. Judge Jenkins Correctly Found that Ms. Caberta Failed to Provide Records Prior to the Deposition Previously Ordered by the Court

Ms. Caberta provided testimony indicating that her response to a document request

---

[2] At her own deposition in this case, LMT, Inc. President, Stacy Brooks, admitted that Ms. Caberta's expenses were paid by LMT during the trip to Florida where Ms. Caberta gave a press conference for LMT. (Ex. 21, pp. 30-31.) And, Mr. Minton asserted a Fifth Amendment self-incrimination privilege in his own deposition (referencing the Foreign Corrupt Practices Act), as to each of the following questions:

1. Did you pay for Ms. Caberta's expenses when she was in Florida giving that press conference? (Ex. 22, p. 34.)
2. Did you, in fact, loan money to Ms. Caberta as an individual? (*Id.*, p. 36.)
3. Is there any contract between you and Ursula Caberta with respect to setting up an LMT, Inc. office in Germany? (*Id.*, p. 42.)
4. Has Ms. Caberta assisted your business endeavors in any manner? (*Id.*, p. 55.)
5. At your request, has Ms. Caberta directed any business away from anyone? (*Id.*, p. 56.)

Adverse inferences may be drawn from the invocation of the Fifth Amendment by Caberta and her co-conspirator in this civil case. *Baxter v. Palmigiano*, 425 U.S. 308, 319, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) ("our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties in civil actions when they refuse to testify in response to probative evidence offered against them.") *See also, United States v. Ianniello,* 824 F.2d 203, 208 (2d Cir.1987) (negative inference drawn from the refusal of any of the defendants to answer questions on material issue was permissible in civil context).

The reasonable inference, of course, is that Minton bribed Ms. Caberta to undertake acts against a class of persons that included Mr. Heller – and obviously the acceptance of bribes cannot be within the scope of her lawful functions and duties.

was a misrepresentation, which also impeded the deposition. On June 1, 2001, plaintiff filed a Motion to Clarify Order Regarding Production of Documents, relating to requests 9 through 17 of plaintiff's First Request for Production, which included requests for financial records of bribes or payments by Minton to undertake the acts at issue in this case. By Order dated June 21, 2001, Judge Jenkins ruled," that if any records responsive to Requests 9 through 17 are in defendants possession, custody or control, they shall be produced to plaintiff within ten (10) days of this order." (Ex. 23.)

Defendant failed to comply with the Court's Order. Thus, a further motion was filed on July 12, 2001 to Compel Forthwith Compliance with Order Dated June 21, 2001. Judge Jenkins ordered defendant to file a response to such motion to compel no later than July 17th. (Ex. 24.) Spurred by the Order, a response was signed by defendant's counsel, stating that no records existed responsive to the document requests. (Ex. 25.) Ms. Caberta was shown the July 16th response at her deposition and asked if the response was accurate, *i.e.*, that no records existed. Her answer was, "That's nonsense. I have never seen this before. I see it now for the very first time, and I am not answering any questions on these items." (Ex. 19, Depo., p. 161, line 7 - p. 162, line 16.) She then testified that she had not conducted any search for records and refused to comment further. (*Id.*, p. 163.) (*See*, Ex. 1, Order, p. 6.)

Defense counsel took his client out of the room at that point. (*Id.*, p. 164.) When she returned, she made the incredible assertion that her own personal bank records were *government property* and that is why she did not search for them. (*Id.*, p. 164.) Asked how her personal bank records could possibly be government property, she refused to answer, saying her personal bank records are "none of your business ... have nothing to do with this case, and I am not going to say any more on those." (*Id.*, pp. 164-165.) The question was again asserted, "are your personal bank records the property of the city?" She responded, "I will not answer nonsense questions like that." (*Id.*, p. 166.)

In any event, her testimony demonstrated that: 1) responsive records may exist but the witness refused to say; and 2) defendant was not aware of the document request, yet, a response was filed by her counsel asserting that no responsive documents existed.  Thus, the deposition was required to proceed without the ordered document production.

## III – ARGUMENT

### A.    Judge Jenkins' Order Should Be Affirmed

This Court may set aside a magistrate judge's ruling only if the magistrate judge's order is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); *U.S. ex rel. Mueller v. Eckerd Corp.*, 35 F.Supp.2d 896 (M.D. Fla. 1999); *see also* 28 U.S.C. § 636(b)(1)(A).  Under this standard, the district court may set aside a magistrate judge's ruling only if the district court is "left with the definite and firm conviction that a mistake has been made."  *U.S. v. Block 44, Lots 3, 6*, 177 F.R.D. 692, 693 (M.D. Fla. 1997); This standard is "a very difficult one to meet." *Tai-Pan, Inc. v. Keith Marine, Inc.*, 1997 WL 714898 at *11 (M.D. Fla. 1997). Judge Jenkins' careful and detailed adjudication is entirely consistent with this Court's Order of June 5, 2001, and entirely consistent with the law.

After Ms. Caberta refused to appear in Germany, Judge Jenkins ordered Ms. Caberta's deposition to proceed in this district, pursuant to Local Rule 3.04(b).  As an accommodation to the defendant, this Court provided defendant the option of having her deposition taken in Germany.  Judge Jenkins Court thereafter ordered the deposition to proceed for two days, citing to the inherent difficulty with a translated deposition.  As addressed above, defendant provided no cooperation as to the dates of the deposition, causing plaintiff's counsel to expend considerable time attempting to work out dates, reporters, interpreters and government logistics in a country where depositions are unusual.  In deference to the desire of the witness to attend part of a conference on July 25th, Judge Jenkins ordered the deposition to begin at

16

2:00 p.m. on the 25th, so it could have a chance of completion on the 26th. Another emergency motion to quash was filed requiring extremely burdensome efforts on the part of plaintiff's counsel already in Germany, to respond. That motion was also denied.

*Despite* these rulings, the witness contumaciously refused to comply. Despite the appearance of counsel, a paralegal, the reporter, the interpreter, a videographer, and State Department personnel, the witness did not appear. Thus, the Ordered deposition on the 25th never happened.

The deposition on July 26th was marked with substantial time consuming difficulties addressed above, and as so found by Judge Jenkins. Moreover, the witness destroyed substantial time with evasion and speeches in a manner that was clearly not calculated to cooperate to actually complete the deposition. The witness tended to make lengthy speeches in response to questions, and plaintiff's counsel could not know if her answers were even responsive until they were translated. And, an analysis of the lines of the deposition during which time actual questions were posed and answers given (regardless of content), indicates only 4 hours and 20 minutes of actual Q and A, (Ex. 4, Declaration of Kendrick L. Moxon), a computation not disputed by defendant.

The translation procedure itself also easily halved the useful length of the deposition. Thus, the time actually spent in questions and answers is reasonably only about 2 hours of what would be accomplished in a normal deposition. The deposition was therefore not nearly completed, as many areas of questioning remained to be explored on jurisdictional FSIA issues, including the commercial exception issue as found by Judge Jenkins.

Defendants' Objections as to specific questions Judge Jenkins ordered to be answered are also frivolous. For example, questions relating to whether Caberta received funds from private parties for speeches regarding Scientology and for instructions on the use if the "sect filter" above her income received from her government position, go to demonstrating that she

17

is acting outside of the scope of her authority, *and* that she is engaged in commercial activities with respect to the matters at issue.

Judge Jenkins thus properly found that Ms. Caberta should be required to come into this district so that the deposition may be concluded and this case pass on to the next issue: final determination of jurisdiction and immunity. Yet, without a continued deposition, said adjudication will be impossible, as Ms. Caberta's renewed motion to dismiss raises issues about which she refused to testify or which were not reached in the aborted deposition, and it is supported by affidavits about which she refused to be cross-examined.

**B.     Defendant's Improper Commentary and Attacks Upon Counsel and the Plaintiff Should Be Stricken and Counsel Admonished**

A rather cursory examination of the deposition reveals constant baiting by Ms. Caberta and her counsel while plaintiff's counsel simply attempted to get on with the deposition and avoid a filibuster and distraction. This conduct was in contravention of this Court's prior admonition to counsel, and defendant's and her counsel's misconduct is specifically referenced by Judge Jenkins.

The Objection carries forward this method of "advocacy" by various slurs against the Scientology religion, (Objection at 4, 5-7), misrepresenting facts from other cases, (*Id.,* at 7), and scurrilous opinions regarding the "real reasons" for material questions posed to the witness. (*Id.,* at 10) [3] This sort of irrelevant, inaccurate and unprofessional attack upon

_____

[3]  One particularly annoying misstatement is an (irrelevant) allegation that plaintiff's counsel, *in another case,* before this action was even filed, said "Heil Hitler" to Ms. Caberta. (Objection at 7.) Defendant's counsel knows this is not true, because he was so informed by telephone, as well as in the proposed reply memorandum on the Motion to Compel Ms. Caberta's deposition (which was not allowed by Judge Jenkins). The assertion that Ms. Caberta was asked in the unrelated case if she considered herself to be a Nazi is a further inaccurate representation. What occurred in the deposition in the different case was merely a

counsel is an appalling means to challenge Judge Jenkins' order or prevent discovery of the defendant in this case. These "arguments" should be stricken or ignored.

### C.   Judge Jenkins Properly Found Plaintiff Is Entitled to Reimbursement of Reasonable Fees and Costs

As indicated above, the only reason the deposition was held in Germany was as a courtesy to the defendant. However, Ms. Caberta abused the courtesy provided to her. She ignored the Court's scheduling order. She argued throughout the deposition; she evaded questions. She gave numerous non-responsive answers. She brought her associate to disrupt the deposition. She took long breaks.

In short, the deposition was not completed solely because of the conduct of the defendant. Yet, prior to the deposition, Judge Jenkins provided a crystal clear admonition to both Ms. Caberta's American counsel and to Mr. Hintze, represented as her German counsel:

> All right. And I simply remind counsel that this is a very expensive trip and that you should make any effort to resolve any differences among yourselves so that there won't be any monetary sanctions considered. And I remind Ms. Caberta that this is better than having to come to the United States, so while this may be inconvenient for her in terms of her meeting, it sounds to me like there was every effort made to schedule this around your activities, but Plaintiff's counsel finally had to take certain action to get the deposition set down.

(Ex. 27, July 20, 2001, p. 16.)

Under *Societe Nationale Industrielle Aerospatiale v. U. S. District Court for Southern District of Iowa,* 482 U.S. 522, 536, 107 S.Ct. 2542, (1987) and the line of cases it endorsed, it is clear that the court is empowered to impose appropriate sanctions upon a foreign plaintiff over whom personal jurisdiction has been acquired, as in this case, including judgment for the

---

request to Ms. Caberta to authenticate a statement attributed to her by a newspaper interview in which *she* stated she was "proud" to be referred to as the "new Goebbels." (Ex. 26.)

plaintiff, if the defendant refuses to comply with a discovery order. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1474 (9th Cir. 1992); *Rachis v. Maschinenfaprik Hehl & Soehne*, 1986 WL 9274 (E.D.Pa. 1986); *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705-06 (1982) (failure to abide by discovery order subjects a party to Rule 37 sanctions, including a finding of jurisdiction pursuant to Rule 37(b)(2)(A), allowing designated facts to be established). Certainly limited fees and costs are appropriate.

## CONCLUSION

Defendant's arguments do not come close to the legal standard necessary to overturn the Magistrate Judge's lengthy and careful discovery ruling. This Court provided Ms. Caberta the option of appearing for her deposition in Germany, and that offer was mightily abused, with, as found by Judge Jenkins, a display of refusal to appear on the first day of her deposition, and "evasive, argumentative and nonresponsive testimony." The Objection does not help her cause, by making irrelevant and unprofessional arguments, distorting the facts and providing no valid basis for the witness to have conducted herself in the manner she chose. The Order should be affirmed in its entirety, and defendant and her counsel admonished that future failure to comply with the Orders of this Court and of Judge Jenkins are likely to lead to the imposition of far more serious sanctions than those already levied.

Dated: December 19, 2001

Respectfully submitted,

_____

Kendrick Moxon
Helena Kobrin
FBN #: 0259713
MOXON & KOBRIN
1100 Cleveland Street, Suite 900
Clearwater, FL 33755
(727) 443-5620

20

F. Wallace Pope, Jr.
FBN #:  124449
JOHNSON, BLAKELY, POPE, BOKOR,
RUPPEL & BURNS, P.A.
P.O. Box 1368
Clearwater, Fla.  33757
(727) 461-1818

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE'S ORDER ON PLAINTIFF'S MOTION TO COMPEL** to be served on this 19th day of December, 2001, by U.S. Mail, to John Merrett, 11250 St. Augustine Road, Apartment 15-393, Jacksonville, FL 32257-1147; and Ward Meythaler of Merkle & Magri, P.A., 5510 West LaSalle St., Tampa, FL 33607.

_____

Attorney

22

# DOCUMENT ATTACHMENTS, OR EXHIBITS NOT SCANNED

## FOR THE FOLLOWING REASON(S):

____    **PHYSICAL SIZE OF PAPER** (LARGER OR SMALLER THAN 8 ½ X 11)

____    **EXCEEDS PAGE LIMIT**

____    **DOUBLE-SIDED PAGES**

____    **BINDING CANNOT BE REMOVED WITHOUT DAMAGING DOCUMENT**

____    **CASE LAW**

____    **SOCIAL SECURITY RECORD/ANSWER TRANSCRIPT**

X    Attachments Not scanned

# PLEASE REFER TO COURT FILE FOR COMPLETE DOCUMENT