

HUBERT HELLER, an individual,

        Plaintiff,          Case No. 8:00-CV-1528-T-27C

   vs.

URSULA CABERTA, an individual,

        Defendant.

_____/

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**
**AND FOR SUMMARY JUDGMENT AND CROSS-MOTION**
**FOR SANCTIONS FOR VIOLATION OF COURT ORDERS AND**
**MEMORANDUM OF LAW**

Kendrick Moxon
MOXON & KOBRIN
Helena Kobrin (FBN #0259713)
1100 Cleveland Street, Suite 900
Clearwater, FL 33755
(727) 443-5620

JOHNSON, BLAKELY, POPE, BOKOR,
RUPPEL & BURNS, P.A.
F. Wallace Pope, Jr. (FBN #124449)
P.O. Box 1368
Clearwater, Fla. 33757
(727) 461-1818

*Attorneys for Plaintiff*
*Hubert Heller*

160

# TABLE OF CONTENTS

**PAGES**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.      THIS COURT SHOULD REJECT CABERTA'S FSIA
           DEFENSE AS A SANCTION UNDER RULE 37(b)(2) . . . . . . . . . . . . . . 7

    II.    A DEFAULT JUDGMENT IS AN APPROPRIATE SANCTION
           UNDER THE CIRCUMSTANCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    III.   DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED . . . . . . . 12

           A.    This Court Should Deny the Motion to Dismiss Under
                 Rule 37(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           B.    The Available Evidence Shows that Caberta Is Not Protected
                 By the FSIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           C.    Even If a "Foreign State," Caberta Is Not Immune from Suit
                 Under the FSIA's "Commercial Activity" Exception for Her
                 Economic Boycott . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    IV.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
           SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           A.    This Court Should Refuse to Consider the Motion . . . . . . . . . . . . . 18

           B.    Rule 56(f) Mandates Denial of the Motion . . . . . . . . . . . . . . . . . . . 19

           C.    There is No Evidentiary Basis for Caberta's Motion
                 for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

**CASES**                                                                            **PAGES**

*A.I.A. Holdings* v. *Lehman Brothers, Inc.*, 2000 WL 1538003
(S.D.N.Y. October 17, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Aquamar, S.A.* v. *Del Monte Fresh Produce N.A., Inc.*,
179 F.3d 1279 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Arango* v. *U.S. Dept. of the Treasury*,
115 F.3d 922 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Aztec Steel Co.* v. *Florida Steel Corp.*,
691 F.2d 480 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*BankAtlantic* v. *Blythe Eastman Paine Webber*,
12 F.3d 1045 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Baxter* v. *Palmigiano*,
425 U.S. 308 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bigio* v. *Coca-Cola Co.*,
239 F.3d 440 (2nd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Buchanan* v. *Bowman*,
820 F.2d 359 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

*Byrd* v. *Corporacion Forestal y Industrial de Olancho*,
182 F.3d 380 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cabiri* v. *Assasie-Gyimah*,
921 F. Supp. 1189 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Chuidian* v. *Philippine Nat'l Bank*,
912 F.2d 1095 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

*Church of Scientology v. City of Clearwater*,
2 F.3d 1514 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Coca-Cola Foods* v. *Empresa Comercial Internacional de Frutas S.A.*,
1997 WL 370121 (M.D. Fla. June 12, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Coca-Cola Foods,*
1997 WL 370121 at \*9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11, 12

*In re Chase & Sanborn Corp.,*
872 F.2d 397 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Inmuno Vital, Inc.* v. *Telemundo Group, Inc.,*
203 F.R.D. 561 (S.D. Fla. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Insurance Corp. of Ireland, Ltd.* v. *Compagnie des*
*Bauxites de Guinee ("CBG"),*
456 U.S. 694 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7-9

*Jungquist* v. *Sheikh Sultan Bin Khalifa Al Nahyan,*
115 F.3d 1020 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Kadic v. Karadzic,*
70 F.3d 232 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Malautea* v. *Suzuki Motor Co., Ltd.,*
987 F.2d 1536 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*National Hockey League* v. *Metropolitan Hockey Club, Inc.,*
427 U.S. 639 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Phipps v. Blakeney,*
8 F.3d 788 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Rural Water Systems Insurance Benefit Trust* v. *Group*
*Insurance Administrators, Inc.,*
160 F.R.D. 605 (D. Kan. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Scott* v. *Ross,*
140 F.3d 1275 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Shawmut Boston Int'l Banking Corporation* v. *Duque-Pena,*
767 F.2d 1504 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Snook* v. *Trust Co.,*
859 F.2d 865 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sussman* v. *Salem, Saxon and Nielsen, P.A.,*
154 F.R.D. 294 (M.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*U.S.* v. *Two Parcels of Real Property Located in Russell County, Ala.*,
92 F.3d 1123 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Verlinden B.V.* v. *Central Bank of Nigeria*,
461 U.S. 480 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Vermeulen* v. *Renault, U.S.A., Inc.*,
985 F.2d 1534 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Watkis* v. *Payless Shoe Source, Inc.*
174 F.R.D. 113 (M.D. Fla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*WSB-TV* v. *Lee*,
842 F.2d 1266 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## STATUTES

Fed. R. Civ. P. 26(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Civ. P. 37(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 37(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 10

Fed. R. Civ. P. 37(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Fed. R. Civ. P. 37(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

Fed. R. Civ. P. 37(b)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 37(b)(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 34(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Civ. P. 56(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Section 1605(a)(2) of the FSIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 1605(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1605(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

15 U.S.C. § 78dd-2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 1985(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## **OTHER AUTHORITIES**

*Jurisdictional Discovery Under the Foreign Sovereign Immunities Act,*
13 Emory Int'l L. Rev. 445, 489 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Restatement (Third) of Foreign Relations Law of the*
*United States* § 702 & cmts j & m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# INTRODUCTION

Plaintiff Hubert Heller respectfully submits this memorandum of law in opposition to defendant Ursula Caberta's motion to dismiss and for summary judgment and in support of his cross-motion for sanctions, pursuant to Fed. R. Civ. P. 37(b), as a result of Ursula Caberta's clear violations of this Court's discovery Orders, including her refusal to attend her Court-ordered deposition, and to produce documents. Defendant Caberta has asserted that she is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), yet she has refused to comply with numerous Orders of this Court to provide the limited and necessary discovery to test that assertion, and despite the fact that she has *personally*, and apparently illegally, been paid at least $75,000 by Robert Minton, an anti-Scientology activist in the U.S., to carry out her religiously discriminatory conspiracy in the United States, including use of the sect filter (matters upon which both Caberta and Minton have refused to testify on grounds of self-incrimination). This Court has permitted defendant numerous opportunities to comply with its Orders, but defendant has repeatedly defied those Orders. The time has come to put an end to Caberta's disobedience.

First, Caberta's refusal to comply with the Court's discovery Orders, including to appear for her deposition, mandates, as a discovery sanction under Fed.R.Civ.P. 37(b)(2), a finding that Caberta does not have immunity under the FSIA in this case. Such a sanction is necessary both to vindicate the Court's authority and to resolve fairly the FSIA issue. *See Insurance Corp. of Ireland, Ltd.* v. *Compagnie des Bauxites de Guinee* ("*CBG*"), 456 U.S. 694 (1982). Although unnecessary to the imposition of such a sanction, the result is fully consistent with the available evidence, which shows that Caberta has engaged in her religious discrimination conspiracy in the U.S. outside the scope of her lawful authority and for personal and illegal motives and profit.

1

Second, because Caberta has made clear that neither she nor any of her co-workers with relevant information will participate in any further discovery in this case, including on the merits, and because of the serious, repetitive and willful nature of her disobedience of numerous Court Orders, the entry of a judgment of default is both appropriate and necessary. Any further proceedings on the merits will be nothing more than an exercise in futility.

Third, Caberta's violations of the Court Orders and the evidence that she was acting in her individual capacity for personal gain mandate denial of her motion to dismiss. Indeed, Caberta has forfeited any right to invoke this Court's authority or be heard on her motion by refusing to comply with the Court's numerous discovery Orders directed to her FSIA defense.

Finally, Caberta's motion for summary judgment on the merits of the case is frivolous. Discovery on the merits has not even commenced, pursuant to this Court's Orders; thus, Rule 56(f) alone mandates denial of the motion. Further, Caberta has submitted *no* evidence that could possibly entitle her to summary judgment. Moreover, the available evidence, and all favorable inferences to be drawn therefrom, establish that Minton paid Caberta at least $75,000 to spread her religiously discriminatory "sect filter" to the United States, including specifically against plaintiff Heller, for which Caberta is now under criminal investigation in Germany. Indeed, Caberta now explicitly admits that her subordinate, acting under her direction and supervision as the primary propagator of the sect filter for personal gain, in fact supplied the sect filter to POSPartners to be used against Heller, as part of Caberta's coercive and religiously discriminatory economic boycott of Scientologists in the United States.

## STATEMENT OF THE CASE

On March 4, 2002, through a third party bank subpoena in an unrelated action, plaintiff discovered a copy of a check from Minton to Caberta in the amount of $75,000, dated June 26, 2000, which states "per agreement." (Ex. 1, check, *see* Point III.B., *infra*). The check is dated soon after Caberta's office sent the "sect filter" to POSPartners to be used against plaintiff Heller in the United States. There is *no* evidence that this payment was "a loan," as Caberta previously swore falsely to this Court, regarding an undisclosed amount of funds admittedly received from Minton (Dkt. 109, Ex. 1). Caberta is under criminal investigation in Germany because of the payment from Minton, and reportedly has "confessed that she might not have sufficiently separated her official and private spheres." (Ex. 2, *Bild Zeitung* article). This newly discovered $75,000 check explains Caberta's and Minton's assertion of the self-incrimination privilege, puts the lie to Caberta's FSIA defense, and explains why Caberta has so bitterly resisted document and deposition discovery in this case, including violations of this Court's discovery Orders.

On January 30, 2002, this Court "ORDERED AND ADJUDGED that Defendant *shall* appear for deposition as Ordered by Judge Jenkins on or before February 25, 2002," limited solely to Caberta's FSIA defense (Dkt. 147) (emphasis added). In clear and direct violation of the January 30 Order, Caberta failed and refused to appear for her deposition on or before February 25, and further informed the Court on February 22 that she would not comply with the Court's Order and appear for her deposition as Ordered (Dkt. 151).[1] This express violation of

---

[1]     Instead of appearing as Ordered, on February 22, 2002, Caberta filed a document self-styled as "Notice of Inability to Appear for Court Ordered Deposition" (Dkt. 151). Caberta also attached an inadmissible, hearsay letter from a Hamburg official, Willi Beiss, a non-attorney, in
(continued...)

this Court's Order to appear for her deposition was the culmination by Caberta of over a year of obstruction and delay, including violations of previous Court Orders for which she has been previously sanctioned, including her still extant refusal to produce documents as repeatedly Ordered by the Magistrate Judge or to appear as Ordered for a deposition in Germany. In total, this Court and the Magistrate Judge have issued a remarkable total of *ten* separate Orders that discovery take place, all met by Caberta's defiance and disobedience.

Plaintiff has sought Caberta's deposition for over a year and a half, since Fall 2000, when plaintiff's counsel offered to travel to Germany to take her deposition. Defendant ignored repeated requests to set her deposition in Germany and moved to suspend all discovery on October 6, 2000 (Dkt. 16). By Order of December 16, 2000, this Court denied Caberta's Motion to Suspend Discovery (Dkt. 36). Caberta continued to refuse to respond to requests to provide dates to be deposed in Germany, and on January 23, 2001, Caberta filed yet another motion to suspend discovery (Dkt 43). By Order of February 15, 2001, the Court again denied Caberta's motion and Ordered that discovery "limited to the FSIA issue and this Court's exercise of jurisdiction over Defendant" be conducted within 90 days (Dkt. 46 at 5).

After Caberta continued to refuse to provide dates for her deposition or to produce documents, Heller moved on March 7, 2001 to compel Caberta's deposition and document

---

(...continued)
which he opined on the legal merits of the case and his views of immunity under U.S. law. Beiss's letter was written prior to the revelation that Caberta received the $75,000 from Minton. The non-party, non-intervenor German government also submitted a document regarding its views on public international law. This document simply ignored this Court's previous holding that the FSIA controls determination of sovereign immunity, not the views of a non-party foreign government. *See* Dkt. 145 (citing *Verlinden B.V.* v. *Central Bank of Nigeria*, 461 U.S. 480, 486-89 (1983)).

production (Dkt. 50). On March 29, 2001, the *third* Order commanding discovery issued, whereby Magistrate Judge Jenkins ordered Caberta to appear for deposition within 20 days, and to respond to plaintiff's First Document Request within 11 days (Dkt. 56). Caberta continued to refuse to respond to requests for dates for her deposition, refused to appear for her deposition within 20 days, as ordered, and refused to produce the Ordered documents, despite her failure to seek or to obtain a stay. On May 8, 2001, the Magistrate Judge denied Caberta's motion to vacate the Magistrate Judge's March 29 Order, and issued a *fourth* Order, directing Caberta to appear for her deposition in this District within 20 days and further Ordering production of additional responsive documents (Dkt. 70, 71, 80).[2/] Again without a stay, Caberta failed to appear for her court-Ordered deposition or to produce the Ordered documents.

On June 5, 2001, this Court denied Caberta's objections to the Magistrate Judge's May 8 Order and entered a *fifth* Order directing Ms. Caberta to appear for deposition (Dkt. 77). Despite her repeated obstruction, delay and disobedience, this Court generously permitted Caberta to be deposed in Germany, and further directed completion of FSIA discovery by July 31, 2001. In a *sixth* Order, on July 20, 2001, the Magistrate Judge denied Caberta's last-ditch motion to prevent the deposition and Ordered Caberta to appear on July 25 and 26 in Germany, as previously ordered (Dkt. 94; Dkt. 91).[3/] A *seventh* Order was issued by Judge Wilson on July

---

[2/]      Among the documents ordered produced were all correspondence between Minton and Caberta and bank records reflecting receipt of funds from Minton (Dkt. 64 Ex. 4 (Plaintiff's First Document Requests 13-17)).

[3/]      At the July 20 telephone hearing, Rudiger Hintze falsely represented to the Court that he was a staff attorney in Caberta's office. (Dkt 102 at 3). In fact, as the Magistrate Judge found, Hintze is Caberta's subordinate and "is not an attorney." (Dkt. 133 at 5).

24, denying still another motion to prevent Caberta's deposition (Dkt. 100).

In direct violation of these numerous Court Orders, Caberta simply refused to appear for her deposition on July 25. On the second day, July 26, as the Magistrate Judge found, and as this Court has affirmed, Caberta improperly obstructed the deposition, refusing to answer numerous questions, giving evasive answers, and permitting Hintze, her non-attorney subordinate and prospective witness, to interrupt the deposition with speeches and to consult improperly with Caberta in German while questions were pending (Dkt. 133 at 18-20; Dkt. 147).

In an *eighth* Order, on November 16, 2001, the Magistrate Judge ordered Caberta to appear in this District within 30 days to complete her deposition, and sanctioned her for her deposition misconduct and her failure to appear by ordering Caberta to pay part of plaintiff's attorneys' fees and costs (Dkt. 133, 146). Undeterred, Caberta filed objections to that Order, moved for a continuance, and again refused to appear as Ordered, despite the absence of a stay (Dkt 136; Dkt 145 at 1-2).[4] In a *ninth* Order, on January 25, 2002, the Magistrate Judge denied

---

[4]     Caberta also refused to comply with the Magistrate Judge's November 16, 2001 Order that she produce, within 10 days, documents that the Court had repeatedly ordered produced, including bank records concerning receipt of funds from Minton, his agents, or the Lisa McPherson Trust, Inc. (Dkt. 133). In direct violation of the Court Order, on December 6, 2001, Caberta stated her refusal to produce bank statements, and asserted a purported privilege, but failed to produce a privilege log. Caberta, however, waived any privilege claim in never raising it in response to the Document Requests or prior motions to compel or Court Orders, in never previously producing a privilege log, and in not filing Objections to the November 16 Order to produce documents. Indeed, prior to December 6, 2001, Caberta's sole asserted objection to production of these documents was that they did not "pertain[] to the allegations of the complaint." (Dkt. 64 Ex. 11; *see* Dkt.71 at 2). *(See* Fed.R.Civ.P.34(b) requiring timely assertion of objections, with reasons); *id.* 26(b)(5) (specifying rules for assertion of privilege, including identifying documents); *A.I.A. Holdings* v. *Lehman Brothers, Inc.*, 2000 WL 1538003 (S.D.N.Y. October 17, 2000); *Rural Water Systems Insurance Benefit Trust* v. *Group Insurance Administrators, Inc.*, 160 F.R.D. 605 (D. Kan. 1995).

6

the motion, held that the Objections and motion for continuance did not excuse her failure to comply with the Court's Orders, and directed that "[d]efendant shall be afforded a *final opportunity* to submit to a deposition in this district" within thirty days. (Dkt. 145) (emphasis added). As noted above, in a *tenth* and final Order, on January 30, 2002, this Court overruled defendant's objections, Ordered that Caberta *"shall* appear for deposition" "on or before by February 25, 2002," and overruled Caberta's objections to the sanctions imposed in the November 16 Order (Dkt. 147). Caberta refused to appear.

## ARGUMENT

## I.   THIS COURT SHOULD REJECT CABERTA'S FSIA DEFENSE AS A SANCTION UNDER RULE 37(b)(2)

Caberta cannot interpose an FSIA defense and then disobey this Court's Orders that she submit to discovery directed to that defense. Therefore, this Court should refuse to permit Caberta to support her defense and should find that she is not a "foreign state" entitled to the protections of the FSIA as a sanction for her noncompliance. *See* Fed. R. Civ. P. 37(b)(2)(A) ("If a party ... fails to obey an order to provide or permit discovery, . . . the court . . . may make . . . [a]n order that the matters regarding which the order was made . . . *shall be taken to be established* for the purposes of the action") (emphasis added); *CBG*, 456 U.S. at 709.[5/]

In *CBG*, the Supreme Court held that a district court properly presumes jurisdiction under Rule 37(b)(2)(A) when a party asserts a jurisdictional defense and then refuses to comply with

---

[5/]     This Court may also refuse to allow defendant to support her defense, *see* Fed. R. Civ. P. 37(b)(2)(B), and may take as established designated facts which establish the inapplicability of the FSIA, *see id.* 37(b)(2)(A); Point II B, *infra* (setting out facts showing inapplicability of FSIA). The effect of these sanctions would be identical to this Court's presuming jurisdiction under Rule 37(b)(2)(A) – denial of Caberta's FSIA defense.

the district court's orders that it provide jurisdictional discovery. 456 U.S. at 709. The

defendants in *CBG* asserted a lack of personal jurisdiction, but failed to comply with the district

court's discovery orders regarding its purported defense. As a sanction for this noncompliance,

the district court presumed personal jurisdiction. The Court unanimously upheld the sanction,

holding that "[b]y submitting to the jurisdiction of the court for the limited purpose of

challenging jurisdiction, the defendant agrees to abide by that court's determination on the issue

of jurisdiction." *CBG*, 456 U.S. at 706; *see Shawmut Boston Int'l Banking Corporation* v.

*Duque-Pena*, 767 F.2d 1504 (11th Cir. 1985). In a detailed and carefully reasoned decision in

this District applying *CBG*, in circumstances far less egregious than the instant case, Chief Judge

Kovachevich, affirming an opinion of Magistrate Judge Jenkins, likewise presumed personal

jurisdiction as a Rule 37(b)(2)(A) sanction over a defendant who failed to comply with the

court's discovery orders. *See Coca-Cola Foods* v. *Empresa Comercial Internacional de Frutas*

*S.A.*, 1997 WL 370121 (M.D. Fla. June 12, 1997). Given defendant's noncompliance there, the

court held that presuming jurisdiction was "both just and specifically related to the claim at

issue." *Coca-Cola Foods*, 1997 WL 370121 at *7.

As the Court noted in *CBG*, the personal jurisdiction defense is waivable, including by

failing to comply with discovery orders. 456 U.S. at 704-05. Like personal jurisdiction, and

unlike traditional forms of subject matter jurisdiction, the FSIA defense of sovereign immunity

can be waived. *See* 28 U.S.C. § 1605(a)(1) ("[a] foreign state shall not be immune from the

jurisdiction of courts of the United States . . . in any case . . . in which the foreign state has

waived its immunity either explicitly or by implication"); *Aquamar, S.A.* v. *Del Monte Fresh*

*Produce N.A., Inc.*, 179 F.3d 1279, 1300 (11th Cir. 1999); *Vermeulen* v. *Renault, U.S.A., Inc.*, 985

F.2d 1534, 1553 (11th Cir. 1993) (Roney, J., concurring) (explaining waivability of sovereign immunity); *see also* Steven R. Swanson, *Jurisdictional Discovery Under the Foreign Sovereign Immunities Act*, 13 Emory Int'l L. Rev. 445, 489 (1999) (court may use Rule 37 to presume FSIA jurisdiction as sanction for noncompliance with discovery orders). Under *CBG*, Caberta's failure to comply with this Court's discovery orders concerning her FSIA defense waives the defense.[6/]

A finding of FSIA immunity is the minimum sanction this Court should impose for Caberta's noncompliance with this Court's discovery Orders. Plaintiff cannot reasonably be required to defend against a claim of FSIA immunity while Caberta refuses to provide discovery regarding her defense. Moreover, a sanction presuming jurisdiction is necessary to vindicate this Court's authority and to deter other litigants from disobeying this Court's orders. *See National Hockey League* v. *Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (sanctions for discovery violations serve "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent"); *Sussman* v. *Salem, Saxon and Nielsen, P.A.*, 154 F.R.D. 294, 299 (M.D. Fla. 1994) ("the system of justice must be vindicated and likeminded parties must be deterred"); *see also Coca-Cola Foods*, 1997 WL 370121 at *7 (presuming jurisdiction as a sanction is "both just and specifically related to the claim at issue"). Given Caberta's flagrant disregard of this

---

[6/]    In a concurrence, Justice Powell advocated that a plaintiff should establish a *prima facie* case prior to a court's finding of jurisdiction as a sanction. *See CBG*, 456 U.S. at 715-16 (Powell, J., concurring in the judgment). However, eight Justices rejected his view, and held that the violation of the Court's discovery orders was sufficient for the sanction. *Id.* at 709. Even under Justice Powell's rejected view, this Court should presume jurisdiction because plaintiff has substantial evidence that Caberta is not immune under the FSIA, as demonstrated, *supra*, Point III.B.

Court's discovery Orders, this Court should presume jurisdiction under the FSIA.[7]

## II. A DEFAULT JUDGMENT IS AN APPROPRIATE SANCTION UNDER THE CIRCUMSTANCES

Caberta has made clear, in her February 22, 2002 Notice to the Court and through her more than a year of obstruction and disobedience, that she will not participate in discovery in this case and will not obey this Court's discovery orders. Given her history of disobedience, and her clear statement that she will not submit to the Court's authority, it is futile for this Court to go through another year or more of fruitless efforts to try to compel Caberta and her co-workers to comply with plaintiff's discovery requests directed to the merits. Under the circumstances, the burden is on Caberta and her attorneys *to represent affirmatively* to this Court that Caberta will permit good faith discovery on the merits, including that her co-workers who have submitted affidavits and declarations in this case, will submit to discovery and that Caberta will produce responsive documents. Unless Caberta and her counsel make these *express representations,* this Court should enter a default judgment now.[8]

Rule 37(b)(2)(C) authorizes the entry of a default judgment against a defendant who willfully disobeys discovery orders to plaintiff's prejudice. *See* Fed. R. Civ. P. 37(b)(2)(C); *Malautea* v. *Suzuki Motor Co., Ltd.,* 987 F.2d 1536 (11th Cir. 1993); *Buchanan* v. *Bowman,* 820

---

[7]     This Court's previous Rule 37(b)(2) sanction – an award of plaintiff's partial attorneys' fees – has been without effect and, indeed, ignored by Caberta who has still not made payment. The Rule 37(b)(2)(D) sanction of contempt would be ineffective in this case against Caberta, who does not reside within the United States, and would not address the problem of the withholding of discovery relevant to the FSIA defense.

[8]     Without an explicit representation that Caberta will comply with future discovery requests and this Court's Orders, any "lesser sanction" than the sanction of default would be futile. *See Phipps v. Blakeney,* 8 F.3d 788, 790 (11th Cir.1993); *Watkis v. Payless ShoeSource, Inc.,* 174 F.R.D. 113, 117-18 (M.D. Fla. 1997).

F.2d 359 (11th Cir. 1987); *Aztec Steel Co.* v. *Florida Steel Corp.*, 691 F.2d 480, 481 (11th Cir. 1982). Caberta's willful disobedience of this Court's Orders is clear and indisputable. Similarly, the prejudice plaintiff suffers from this disobedience is clear, as plaintiff is unable to obtain the relevant evidence from defendant and other core participants. *See BankAtlantic* v. *Blythe Eastman Paine Webber*, 12 F.3d 1045, 1052 (11th Cir. 1994); *Inmuno Vital, Inc.* v. *Telemundo Group, Inc.*, 203 F.R.D. 561, 573 (S.D. Fla. 2001) (presuming prejudice because "it is impossible to know how helpful the documents would have been to Plaintiff because Defendants have not permitted Plaintiff to inspect the documents").

Caberta's self-styled "Notice of Unavailablity" falls far short of the showing required in this Circuit to establish true "inability" to comply with this Court's discovery Orders. Caberta created the need for a deposition in this District through her sanctioned non-appearance and misconduct during her deposition in Germany, and cannot now claim a purported "inability" to attend. Further, as is clear from her "Notice," Caberta is "unable" to appear for a deposition solely because she and Beiss, a supervisor who has submitted an affidavit, but has refused to be deposed, believe that this case should not be allowed to proceed. Further, she vaguely alludes to "legal consequences" if she were to appear, but does not make the specific showing that she suffers any true legal impediment to testifying, nor that she has made "all reasonable efforts to comply" with this Court's discovery orders. *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir. 1989); *see BankAtlantic*, 12 F.3d at 1048-50; *Coca-Cola Foods*, 1997 WL 370121 at *9 ("party resisting discovery *must* provide the Court with *specific* information of *sufficient particularity* and *specificity* to allow the Court to determine whether the discovery sought is indeed *prohibited* by foreign law") (emphasis added) (internal quotation omitted).

## III.  DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED

### A.  This Court Should Deny the Motion to Dismiss Under Rule 37(b)(2)

Given Caberta's disobedience of this Court's discovery Orders, this Court should refuse to consider her motion to dismiss, including her "evidence" and argument in support. *See* Fed. R. Civ. P. 37(b)(2)(B).  Caberta cannot be permitted to raise her jurisdictional defense and offer affidavits, and then refuse to submit to Court-ordered discovery, including examination of the affiants. *See* Point I, *supra*; *Coca-Cola Foods*, 1997 WL 370121 at * 7 ("denial of defendants' motion to dismiss . . . is appropriate" as sanction for non-compliance with discovery orders).

### B.  The Available Evidence Shows that Caberta Is Not Protected By the FSIA

Even if this Court were to consider Caberta's motion, she has failed to establish her FSIA defense.  "The party claiming FSIA immunity, . . . ha[s] the initial burden of proof of establishing a prima facie case that [she] satisfies the definition of a 'foreign state' within the meaning of the FSIA" and "retains the ultimate burden of persuasion throughout." *Byrd* v. *Corporacion Forestal y Industrial de Olancho*, 182 F.3d 380, 388 (5th Cir. 1999); *see also* Dkt. 46 at 2.  This Court has already held – and established as law of the case –  that "sovereign immunity does not shield a sovereign's employee from suit for acts not committed in her official capacity." Dkt 36 at 2 (citing *Chuidian* v. *Philippine Nat'l Bank*, 912 F.2d 1095, 1105 (9th Cir. 1990)).

The evidence establishes that Caberta acted in her personal capacity and outside the scope of her lawful authority in propagating the sect filter in the United States.  Indeed, she was paid $75,000 by Minton as part of their religiously-discriminatory conspiracy and her systematic religious discrimination against U.S. Scientologists, including plaintiff Heller.  The evidence

shows that in early to mid-April 2000, Minton met with Caberta for several days in Hamburg (Ex. 3, Brooks Depo. at 52-53). Precisely at this time, between April 10 and April 14, Caberta's direct subordinate, Rudiger Hintze, admittedly sent the sect filter to POSPartners to be used against Heller and RTI in the U.S. (Ex. 4, Hintze Aff. ¶ 3). Then, on April 17, out of fear of the economic consequences, POSPartners sent Heller and RTI the sect filter and demanded that they sign it (Ex. 5, Heller Decl. ¶¶ 7, 12, Ex. C thereto). RTI's and Heller's refusal to sign the sect filter caused POSPartners to withdraw from the distribution agreement, in order to protect POSPartners from Caberta's economic boycott (*Id.*, ¶¶ 10-12, Ex. C thereto; *see also* Declaration of Carl Rohrig (Ex. 6)). Two months later, on June 26, 2000, Minton paid Caberta $75,000 by check as "per agreement." Caberta is now under criminal investigation in Germany for these apparent bribes and has reportedly "confessed that she might not have sufficiently separated her official and private spheres" (Ex. 2).[9/] Caberta falsely testified that she had received a "loan" from Minton in an undisclosed amount. However, neither she nor Minton produced a loan agreement or any evidence that she has made any payments on this purported "loan." (Ex. 7, Caberta Affidavit, October 9, 2000, ¶¶ 6, 14).

In combination with this evidence, the adverse inferences this Court should draw from Caberta's and Minton's repeated assertions of a privilege against self-incrimination confirm that Minton paid Caberta $75,000 in exchange for her propagation of the sect filter in the U.S. for personal (and illegal) gain. In her deposition, plaintiff asked Caberta a series of questions about

---

[9/]     Non-movant may rely on news articles in opposition to summary judgment, regardless whether admissible at trial. See *Church of Scientology v. City of Clearwater*, 2 F.3d 1514, 1530-31 & n.11 (11th Cir. 1993). This is particularly appropriate here, where the movant has refused to appear for examination on the information in the article.

Minton's payment, including: "Did the money that Mr. Minton gave you assist you to do any of your jobs in Germany, any of your official work?"; "Did the money you received from Mr. Minton enable you to carry out any of your activities with respect to the sect filter?"; and "Did Mr. Minton give you any money to assist you to promulgate the sect filter?" (Ex. 8, at 75, 76, 78). To each of these questions, as well as other questions seeking information regarding Minton's payment and the promulgation of the sect filter, Caberta invoked a privilege against self-incrimination because of the criminal investigation in Germany. (*Id.* at 72-78; 65-66).[10]

Similarly, Minton repeatedly invoked the Fifth Amendment privilege against self-incrimination when questioned about payments to Caberta. He refused to state whether he communicated with Caberta about the sect filter, (Ex. 9, Minton Depo. at 70), including whether Caberta had directed any business towards him and whether, at his request, she had directed any business away from others, *i.e.*, Heller, *id.* at 55-56, what Caberta did in exchange for the money he provided, *id.* at 18, and whether there is an agreement as to what Caberta would do in exchange for the money. *Id.* at 24. In addition, Minton invoked the privilege concerning whether he had provided any money to Beiss, Caberta's boss. (*Id.* at 66).[11]

Where the affirmative answer to a question posed in civil discovery would tend to

---

[10] At the time of her deposition, plaintiff knew only of Caberta's claim of a "loan" in an undisclosed amount, as she had refused to produce documents, including bank records, in violation of prior Court Orders, as set forth *supra*.

[11] Minton's attorney cited generally to the Foreign Corrupt Practices Act ("FCPA") as the basis for the asserted privilege, though he refused to identify the provisions of the FCPA upon which Minton relied. *See* Ex. 9, at 13-14. The relevant section would be the criminal provisions of 15 U.S.C. § 78dd-2(a), which prohibits "any domestic concern" from giving anything of value to a foreign official "to assist such domestic concern in obtaining or retaining business for or with, or directing business to any person."

incriminate the person being questioned and subject them to criminal liability, a court in a civil proceeding may properly draw an inference from a person's assertion of the privilege that the person would have answered in the affirmative. *See Baxter* v. *Palmigiano*, 425 U.S. 308, 318 (1976); *Arango* v. *U.S. Dept. of the Treasury*, 115 F.3d 922, 926 (11th Cir. 1997); *U.S.* v. *Two Parcels of Real Property Located in Russell County, Ala.,* 92 F.3d 1123, 1129 (11th Cir. 1996). Based both on the direct evidence and the adverse inferences to be drawn from Caberta's and Minton's assertions of self-incrimination privileges, Caberta, acting as an individual, and *ultra vires*, and not in her official and lawful capacity, was paid by Minton to employ the religiously-discriminatory sect filter in the U.S, including against Heller, for personal gain.

These facts obviously defeat Caberta's claim of FSIA immunity. First, the receipt of personal payments to propagate the sect filter – in apparent violation of both U.S. and German law, as acknowledged by Caberta's and Minton's invocation of the self-incrimination privilege – shows that Caberta engaged in her religiously discriminatory conspiracy in the United States in her private capacity. Second, as Caberta expressly admitted, the receipt of private funds or benefits to propagate the sect filter would be a violation of German law. *See* Ex. 8, at 43 ("Q. Are government employees permitted to receive payments from private interested persons for the purpose of carrying forth their official duties? A. Of course not.") By definition, an illegal act is outside the scope of her lawful authority. *Jungquist* v. *Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997) (where government official entered "into a corrupt bargain" that "could not have been authorized" by the government, official has no FSIA immunity); *Cabiri* v. *Assasie-Gyimah*, 921 F. Supp. 1189,1198 (S.D.N.Y. 1996).

The Declaration of Alexander Petz, submitted in support of plaintiff's opposition to

defendant's second motion to dismiss (Dkt. 45), further establishes that, even putting aside the payments from Minton, Caberta's acts are unauthorized and illegal under German law and hence beyond the scope of her lawful authority. As the Petz Declaration explains, for a German official to act within her scope of lawful authority, she must establish both that her acts are legal under German law (including German federal law, the German Constitution, and international law) and that there is a specific grant of legal authority which authorizes her activity.[12] (Ex. 10, Petz Decl. ¶¶ 2-6; Dkt. 45). Caberta's acts in propagating the sect filter in the United States are not authorized by German law, and are in fact contrary to German law, including the German Constitution and international law which prohibit discrimination against individuals on the basis of their religion. *Id.* ¶¶ 7-12; *see Bigio* v. *Coca-Cola Co.*, 239 F.3d 440, 448 (2nd Cir. 2000) (recognizing that "racial or religious discrimination" is "conduct that violates international law when undertaken by a state actor," citing *Restatement (Third) of Foreign Relations Law of the United States* § 702 & cmts j & m).[13] The official legal opinion from the government of Berlin,

_____

[12]     In its February 15, 2001 Order denying defendant's motion to dismiss, this Court believed the Petz Declaration inapposite because it did not relate to Caberta's employment, her responsibilities within her employment, or whether her acts were public acts of the Hamburg government. *See* Dkt. 46 at 4. Plaintiff offered the Petz Declaration, however, not as a description of Caberta's responsibilities within her employment or whether they were a public act of Hamburg, but to show that her acts in propagating the sect filter are outside the scope of her *lawful* authority as a matter of fundamental principles of German law, because Caberta has not identified an *express* authority for her acts *and*, separately, that even if such express authority existed in Hamburg, this would run afoul of federal law and constitutional authority. Caberta, who has the burden of proof, has submitted *no* evidence refuting the accuracy of Petz's analysis in any of her three motions to dismiss, and which is further confirmed by the opinion of the Berlin government.

[13]     Rather than *evidence* of her lawful authority to carry out her economic boycott against Scientologists in the U.S., Caberta has submitted only mere conclusory assertions that her activities in propagating the sect filter in the U.S. were within the scope of her lawful authority,

(continued...)

Germany confirms that the sect filter is illegal under German and European law, and hence beyond the scope of Caberta's lawful authority. (Ex. 12, Lehmann Declaration).

Caberta has failed to meet her burden of producing *evidence* of specific legal authority to propagate the sect filter against entities or individuals in the United States, and has not even attempted to show that her acts were either authorized by Hamburg or German federal law, or not prohibited by the German Constitution or international human rights law binding on the German State. Therefore, Caberta's propagation of the sect filter is outside her lawful authority. *See, e.g., Chuidian,* 912 F.2d at 1105; *Jungquist,* 115 F.3d at 1028.

### C. Even If a "Foreign State," Caberta Is Not Immune from Suit Under the FSIA's "Commercial Activity" Exception for Her Economic Boycott

In plaintiff's prior briefs in opposition to Caberta's motions to dismiss, plaintiff explained that, *even if* Caberta could be characterized as a foreign sovereign under the FSIA (equivalent to the government of Hamburg), the "commercial activity" exception to sovereign immunity would apply and this suit would proceed, because Heller's claims here are "based upon" and are "in connection with a commercial activity of the foreign state," 28 U.S.C. § 1605(a)(2), *i.e.*, the coercive economic boycott carried out by Caberta purportedly in the name of the Hamburg

_____

(...continued)
*e.g.*, her anti-Scientology activities are within the "course, scope and authority of her employment by the government of Hamburg, Germany," and her "duties" include the development and distribution of the sect filter, (Ex. 11, Second Caberta Aff. ¶¶ 3-5), as well as irrelevant, false, and scurrilous attacks on counsel and the Scientology religion. Nowhere does Caberta even claim that she has been authorized to carry out her religiously discriminatory economic boycott *in the United States*. The Beiss affidavit (as to which he has refused to be cross-examined) essentially parrots Caberta's and, like hers, is silent on the lawful authorization for her discriminatory activities in the U.S., how her conduct is authorized by the Hamburg or federal government, and how it is consistent with the German federal Constitution.

government.  *See also* November 16, 2001 Order at 9 (Dkt. 133) (recognizing relevance of discovery into commercial activity exception).  Although plaintiff has repeatedly raised the issue, Caberta has still not made any argument and has not submitted any evidence refuting that the use of the sect filter constitutes a "commercial activity" within the meaning of section 1605(a)(2) of the FSIA.  The Court had no need to reach that question previously, and for all the reasons stated above, will have no need to reach this issue here.  Therefore, in the interests of brevity, plaintiff incorporates by reference the arguments made in its prior briefs concerning the applicability of the FSIA's commercial activity exception (Dkt. 35 at 8-12; Dkt. 45 at 11-12).  Furthermore, even assuming within the scope of Caberta's lawful authority, all the available *evidence* demonstrates that the use of the sect filter is a "commercial activity"– a coercive economic boycott of Scientologists and those doing business with Scientologists – and not a mandatory sovereign regulatory regime that excludes Scientologists from the German polity, as for example, the infamous 1935 Nuremburg law that stripped German Jews of their citizenship rights.  This evidence includes not only the Declarations of Hubert Heller, Alexander Petz, Ingo Lehmann, and Carl Rohrig, and the exhibits annexed thereto, but the failure of Caberta to meet her burden of identifying a law or rule mandating exclusion of Scientologists, including those in the U.S., from the German economy.

## IV.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

### A.     This Court Should Refuse to Consider the Motion

Caberta's disobedience of this Court's discovery Orders, and her announced intention not to cooperate in this litigation, requires the entry of a default judgment.  *See* Point II, *supra*.  Caberta cannot, therefore, seek summary judgment on the merits of this case.  Further, in order

to vindicate the Court's authority and as a matter of basic equity, the Court should refuse to entertain her motion until she brings herself into compliance with all extant Court Orders.

## B. Rule 56(f) Mandates Denial of the Motion

Even assuming this case goes forward, Caberta's motion for summary judgment is clearly premature and must be denied pursuant to Rule 56(f). *See WSB-TV* v. *Lee,* 842 F.2d 1266, 1269 (11th Cir. 1988); *Snook* v. *Trust Co.,* 859 F.2d 865, 870 (11th Cir. 1988). This Court's February 15, 2001 Order specifically ordered that "discovery *shall* be limited to the FSIA issue." (Dkt. 46 at 4) (emphasis added). Given this specific Order, plaintiff has not sought discovery with respect to the merits of this action. As described in detail in the Moxon Declaration, if discovery goes forward, plaintiff will seek deposition and document discovery, at a minimum, from Caberta, Beiss, Hintze, Minton, Stacy Brooks, and POSPartners, including its principal, Peter Reich. Clearly, with these, and potentially other, areas yet to be explored through discovery, and given this Court's explicit Order prohibiting discovery on the merits of this action, Caberta's motion for summary judgment on the merits is premature and must be denied pursuant to Rule 56(f).

## C. There is No Evidentiary Basis for Caberta's Motion for Summary Judgment

Even assuming this Court considers Caberta's motion for summary judgment, the motion should be denied. Caberta's only argument is that she cannot be found liable because of the untested assertion by her *direct subordinate*, who falsely represented to the Court that he is an attorney (Dkt 102 at 3; Dkt. 133 at 5), that he, not Caberta, supplied the sect filter to POSPartners specifically to be used against Heller and RTI in the United States, and Caberta's assertion that she was not personally involved. *See* Caberta Br. at 9, 12; Ex. 4, ¶¶ 3-7; Ex. 8, at 176-177. The assertion that a direct subordinate supplied POS with a copy of the sect filter (which was created,

promoted, and distributed by Caberta), far from establishing Caberta's non-liability, in fact establishes, at a minimum, plaintiff's claim under fundamental *respondeat superior* and agency principles. *See* Dkt. 133 at 5 (finding that Hintze is Caberta's subordinate); Caberta Depo. at 175, 178 (confirming that Hintze works under her direction); *Scott* v. *Ross,* 140 F.3d 1275, 1284 (9th Cir. 1998) (finding vicarious liability under 42 U.S.C. § 1985(3)); *Kadic v. Karadzic,* 70 F.3d 232, 242 (2nd Cir. 1995) (finding vicarious liability under Alien Tort Claims Act).[14]

Further, the evidence, including the adverse inferences from her and Minton's assertions of the self-incrimination privilege, show Caberta's clear involvement in propagating the sect filter against plaintiff. As detailed in Point III.B., *supra,* Caberta met with Minton in Germany in early or mid-April 2000, at the exact same time that Hintze furnished POS with the sect filter to be used against Heller in the U.S. (Ex. 3, at 52-53; Ex. 4, ¶¶ 3-6; Dkt. 133 at 5 n.8). Minton then paid Caberta $75,000. Both Minton and Caberta refused to testify whether these payments were for promulgation of the sect filter against U.S. Scientologists, including Heller. The only reasonable inference on summary judgment based on this evidence is that Caberta conspired to use the sect filter against U.S. Scientologists, including against Heller. Defendant's motion for summary judgment should be denied.

## CONCLUSION

For the reasons stated herein, this Court should deny defendant's motion to dismiss and for summary judgment, and grant plaintiff's cross-motion for sanctions for violation of the Court's Orders, including denial of the FSIA defense and entry of default judgment.

---

[14] The Second Amended Complaint, *inter alia,* states claims under 42 U.S.C. § 1985(3) and Alien Tort Claims Act, 28 U.S.C. § 1350.

Dated:  April 5, 2002

Respectfully submitted,

_____
Kendrick Moxon
MOXON & KOBRIN
Helena Kobrin (FBN #0259713)
1100 Cleveland Street, Suite 900
Clearwater, FL  33755
(727) 443-5620

F. Wallace Pope, Jr.
FBN #: 124449
JOHNSON, BLAKELY, POPE, BOKOR,
RUPPEL & BURNS, P.A.
P.O. Box 1368
Clearwater, Fla. 33757
(727) 461-1818

*Attorneys for Plaintiff*
*Hubert Heller*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SANCTIONS FOR VIOLATION OF COURT ORDERS AND MEMORANDUM OF LAW** to be served on this 5th day of April 2002, by U.S. Mail, to Ward Meythaler of Merkle & Magri, P.A., 5510 West LaSalle St., Tampa, FL 33607.

_____
Attorney

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |  |
|---|---|---|
| _____ x |  |  |
| HUBERT HELLER, | : |  |
|  | : |  |
| Plaintiff, | : | Case No. 8:00-CV-1528-T-27C |
|  | : |  |
| vs. | : |  |
|  | : |  |
| URSULA CABERTA, | : |  |
|  | : |  |
| Defendant. | : |  |
| _____ x |  |  |

## DECLARATION OF KENDRICK MOXON

Kendrick Moxon, an attorney duly admitted to the practice of law, declares and states:

1.     I am counsel to the plaintiff in the above-captioned action and make this Declaration in support of plaintiff's Opposition to Defendant's Motion to Dismiss and for Summary Judgment, and pursuant to Fed. R. Civ. P. 56(f). I also authenticate certain exhibits referenced in plaintiff's Opposition.

2.     This Court's February 15, 2001 Order specifically limited discovery solely to defendant Ursula Caberta's FSIA defense. Based on this Court's Order, plaintiff has not sought discovery with respect to the merits of this action.

3.     If this action proceeds, plaintiff will seek discovery with respect to the merits of this action in at least the following areas:

4.     Plaintiff will depose and seek documents from Rüdiger Hintze, defendant Ursula Caberta's subordinate in the Scientology Working Group, who submitted an affidavit in support of Caberta's motion for summary judgment, and expressly relied upon documents

that Caberta has refused to produce. Plaintiff will seek information, *inter alia*, regarding the communications between Hintze and POSPartners ("POS") to which Hintze testified in his affidavit, and the use, operation, scope, and purpose of the sect filter in Germany and the United States, including Caberta's activities with respect to the sect filter in Germany and the United States. Further, plaintiff will seek information regarding the relationship between Caberta and Hintze, including that Hintze acts under Caberta's direction, supervision, or pursuant to policies set by Caberta, and will further seek information regarding Caberta's relationship with Robert Minton.

5.     Plaintiff will depose and seek documents from Caberta on a range of topics related to the merits of this action, including, but not limited to, information regarding Caberta's relationship with Minton, including her receipt of $75,000 from Minton (which Caberta and Minton had failed to disclose at the time of their depositions); her relationship with and direction to Hintze in his dealings with POS and the sect filter generally; her advocacy, promotion and distribution of the sect filter to companies and individuals in Germany and the United States; and the intent and effect of the sect filter, including its operation as an economic boycott of adherents of the Scientology religion in the United States.

6.     Plaintiff will depose and seek documents from Willi Beiss, Caberta's supervisor in the Scientology Working Group, who submitted an affidavit in support of Caberta's motion to dismiss, but has so far refused to be deposed. Plaintiff will seek, *inter alia*, information regarding Caberta's role in propagating the sect filter, to which he testified

in his affidavit, and the use, operation, scope, and purpose of the sect filter in Germany and the United States, including Caberta's activities with respect to the sect filter. Plaintiff will further seek information regarding payments from Minton to Beiss, as to which Minton asserted a Fifth Amendment privilege in his deposition.

7.     Plaintiff will depose and seek documents from POS regarding its dealings with RTI, Heller, Caberta, Hintze, Beiss, the Scientology Working Group in Hamburg and German businesses, including the nature of the economic pressure POS experienced from Caberta, Hintze, and the  Working Group, and other German businesses, with respect to the sect filter and adherents of the Scientology religion, including Heller.

8.     Plaintiff will depose and seek documents from other businesses in Germany with dealings in the United States that have had contact with Caberta and the Scientology Working Group to show that Caberta coercively uses the sect filter to discriminate against the Scientology religion in the United States, including the nature of the coercion placed upon German businesses to implement the sect filter, and the veracity of Caberta's and Hintze's assertions about the nature of the sect filter, including Caberta's and Minton's role in its propagation in the United States, including against Heller.

9.     Plaintiff will depose and seek documents from Minton with respect to the merits of this action, including, but not limited to, his furnishing of $75,000 to Caberta to engage in religious discrimination in the United States as part of the conspiracy between Caberta and Minton to propagate the sect filter in the United States and against Heller.

10.     Plaintiff will depose and seek documents from Stacy Brooks with respect to

the merits of this action, including, but not limited to, her role, and the role of the Lisa McPherson Trust, Inc., in furnishing $75,000 to Caberta and their respective roles in furtherance of the conspiracy between Minton and Caberta to propagate the sect filter in the United States and against Heller.

11.    Plaintiff will also seek additional discovery with respect to the merits of this action as further facts become known.

12.    Attached to this Affidavit are Exhibits 1 through 12 in support of Plaintiff's Opposition to Defendant's Motion to Dismiss and for Summary Judgment and Cross-Motion for Sanctions for Violation of Court Orders and Memorandum of Law.  I have participated in the compilation of these exhibits and can describe them as follows:

EXHIBIT 1 - Check dated June 26, 2000 to Ursula Caberta from Robert Minton for $75,000, produced by FleetBoston bank on March 4, 2002;

EXHIBIT 2 - Newspaper article from *BILD Zuitung* dated September 21, 2001 and certified English translation;

EXHIBIT 3 - Excerpts from the April 10, 2001 deposition of Stacy Brooks taken by me in this case, and the Court Reporter's certificate thereto;

EXHIBIT 4 - Affidavit of Rüdiger Hintze, dated April 25, 2001;

EXHIBIT 5 - Declaration of Hubert Heller, dated March 30, 2002;

EXHIBIT 6 - Declaration of Carl Rörhig, dated March 29, 2002;

EXHIBIT 7 - Affidavit of Ursula Caberta, dated October 9, 2000;

EXHIBIT 8 - Excerpts from the July 26, 2001 deposition of Ursula Caberta

taken by me in this case, and the Court Reporter's certificate thereto;

EXHIBIT 9 - Excerpts from the April 10, 2001 deposition of Robert Minton taken by me in this action, and Court Reporter's certificate thereto;

EXHIBIT 10 - Declaration of Alexander Petz, dated February 8, 2001;

EXHIBIT 11 - Second Affidavit of Ursula Caberta, undated;

EXHIBIT 12 - Declaration of Ingo Lehmann, dated April 4, 2002.

I declare under the penalties of perjury of the laws of the Unites States of America, that the following is true and correct. Executed this 4th day of April, 2001, in Clearwater, Florida.

Kendrick Moxon

# Exhibit
# 1



ROBERT S MINTON

SUBPOENA ZCURRI

REF NUMBER
ACCOUNT NUMBER
TYPE                          10302-10
REELAY NUMBER                 31748591
41221237   05-JUL-00          SISUB
                              01658-11JAN02

Bates# FBF0011

# Exhibit
# 2

City of New York, State of New York, County of New York

ATLANTA
BOSTON
BRUSSELS
CHICAGO
DALLAS
DETROIT
FRANKFURT
HOUSTON
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
NEW YORK
PARIS
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
SEATTLE
WASHINGTON DC

I, Warren Merkel, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the attached document, from German to English.

_Warren Merkel_

Warren Merkel

Sworn to before me this

1st day of April, 2002

_signature_

Signature, Notary Public

PAUL D. RALSTON
Notary Public, State of New York
TRA6023867
Queens County
May 1, 2003

Stamp, Notary Public

By Christian Kersting

Severe accusations against the SPD
Ursula Caberta: Leaving the party after 24 years

Things are getting tougher and tougher for the Hamburg SPD. Three days before the election, nationally known anti-Scientology fighter Ursula Caberta [illegible number] has left the party where she had been a member for 24 years.

The former member of the City Parliament (1986-1992) and head of the Scientology work group in the Ministry of the Interior gave two main reasons:

1. The SPD had disintegrated into a cadre organization. The final proof had been the unanimous election of mayor Ortwin Runde as top candidate. Caberta: "such a gossipy party rally could have not even been organized by Gregor Gysi in the PDS party."

2. Disregard for the dangers coming from fundamentalist Muslim extremists. Even back when she was a member of parliament there had been information from Muslim party members concerning the dangers of fundamentalist religious Muslim groups. However, this not been taken seriously.

3. Schill: "It was you, not the press, who caused Schill to become an important person," Caberta writes in her departure declaration. "When the concerns of the citizens are no longer accepted, populistic slogans find fertile ground. "It was not an easy step to leave the party," Caberta said to Bild Hamburg. Former party friends say, however, that she had had the feeling of being left in the lurch because the party had not publicly defended her against the office of the state attorney.

The state attorney has been investigating her for suspected corruption, senior state attorney Mr. Ruediger Baggel confirmed. Caberta admitted before a U.S. Court that she had accepted a personal loan of DM 150.000 from millionaire and avowed anti-Scientologist Robert Minton. And also confessed that she might not have sufficiently separated her official and private spheres.

Caberta already is the second prominent SPD member to leave before the election, longtime head of the group of SPD deputies in the Hamburg Ministry of science agency, Mr. Wolfgang Hornfeld (48), turned in his party book last month.

21 September 2001 • BILD

## Schwe.e ...
## gegen die ?

# Ursula Caberta — ①
# Partei-Austritt
# nach 24 Jahren

Von CHRISTIAN KERSTING

Für Hamburgs SPD kommt es immer dicker. Drei Tage vor der Wahl erklärte die bundesweit bekannte Scientology-Gegnerin gegen die Scientology-Sekte, Ursula Caberta (51), nach 24 Jahren ihren Austritt.

Die Ex-Bürgerschaftsabgeordnete (1986 bis 1992) und Chefin der Arbeitsgruppe Scientology in der Innenbehörde nennt vor allem drei Gründe.

1. Die SPD habe zu einer Koalition verkommen, letzter Beweis sei die einstimmige Bewerbung von Weddel Innensenator Ortwin Runde zum Spitzenkandidaten gewesen. Caberta: „Eine derartige Klatschpartei kriegt heute nicht mal mehr Gregor Gysi in der PDS hin."

2. Missachtung der von islamischen Extremisten ausgehenden Gefahr. Schon zu ihren Zeiten als Abgeordnete habe es Hinweise von Genossen islamischen Glaubens auf radikalfundamentalistische Personen gegeben. Die Warnungen seien nicht ernst genommen worden.

3. Schill. „Ihr habt Schill groß gemacht, nicht die Presse", schreibt Caberta in ihrem Austrittsbrief. Wenn Sorgen und Ängste von der Politik nicht mehr aufgenommen werden, fielen populistische Parteien leider auf fruchtbaren Boden.

„Der Parteiaustritt war kein leichter Schritt", sagte Ursula Caberta zu BILD Hamburg. Ehemalige Parteifreunde dagegen sagen: „Sie fühlt sich im Stich gelassen, weil die Partei sie nicht gegen die Staatsanwaltschaft unterstützt."

Sie ermittelt bereits seit Oktober letzten Jahres gegen Caberta wegen des Verdachts der Vorteilsannahme, bestätigte Oberstaatsanwalt Rüdiger Bagger. Caberta hat von dem Geschäftsmann und ebenfalls erklärten Scientology-Gegner Robert Minton rund 150 000 Mark als persönliches Darlehen entgegengenommen, gab sie vor einem US-Gericht zu. Dabei hat sie möglicherweise Dienst und Privates nicht genügend voneinander getrennt.

Caberta ist bereits das zweite prominente SPD-Mitglied, das vor der Wahl austritt. Schon letzten Monat hatte der langjährige Vorsitzende der SPD-Bürgerschaftsfraktion in der Wilhelmsburg, Wolfgang Homfeld (41), sein Parteibuch zurückgegeben.

# Exhibit
# 3

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


------------------------------X
HUBERT HELLER, an Individual,
                  Plaintiff,        Case No.
    Vs.                        8:00 CV-1528-T-27C

URSULA CABERTA,
                  Defendant.
------------------------------X


        DEPOSITION of STACY BROOKS, a witness

called by and on behalf of the Plaintiff, pursuant to

the Massachusetts Rules of Civil Procedure, before

Evelyn M. Slicius, Registered Professional Reporter,

CSR No. 127193, and Notary Public in and for the

Commonwealth of Massachusetts, at the offices of

Cooley Manion Jones, LLP, 21 Custom House Street,

Boston, Massachusetts, on Tuesday, April 10, 2001,

commencing at 1:15 p.m.

**K.L. GOOD & ASSOCIATES**
**Registered Professional Reporters**
**P.O. Box 6094**
**Boston, Massachusetts 02209**
**Tel (781) 598-6405  *  Fax (781) 598-0815**

1   Q.   Is there any other number in your office to which

2         phone calls come?

3   A.   Well, there's four lines on that number, so I

4         guess it just rotates.

5   Q.   Are they all billed to the same number?

6   A.   Yes.

7   Q.   Do you get four phone bills or just one?

8   A.   One.

9   Q.   Does that include all your computer lines, too,

10       all go to that one phone number?

11  A.   No, I don't think so.

12  Q.   But you only have one phone line and they all

13       come to that number?

14  A.   Yes.

15  Q.   You first met Caberta in April of 2000, correct?

16  A.   That's possible.

17  Q.   And you made a posting to the internet on April

18       22nd about your trip that you just went -- you

19       spent in Europe, it's dated April 22nd, it says,

20       "Bob Minton and I just spent ten days in Europe.

21       We went to Cologne, Hamburg and Paris.  This was

22       the first time representatives of the Lisa

23       Mcpherson Trust had a chance to meet our

24       counterparts in other countries."

```
 1                    I think in your posting you talk about
 2          meeting Caberta, do you remember that?
 3     A.   Yes.  How come you ask me questions when you
 4          already know the answers?  I mean, you know
 5          better than I do.  I don't remember this as well
 6          as you do.
 7     Q.   So does that refresh your recollection that that
 8          was the first time you met Caberta in April of
 9          2000?
10     A.   Well, honestly, I would still have to say I'm
11          pretty sure that's when I first met her.
12     Q.   Okay.  Was your phone conversation with her about
13          her debt problem before or after you met her in
14          person?
15     A.   Well, it must have been after.
16     Q.   After then, okay.  So it was definitely sometime
17          after --
18     A.   I mean, I know I saw her in April and I had this
19          conversation later than that.  All I'm saying is,
20          I guess April was the first time I ever saw her
21          in person.
22     Q.   When you talked to her on the phone about coming
23          to Florida, did you talk to her about the press
24          conference?
```

1          <u>CERTIFICATE</u>

2     COMMONWEALTH OF MASSACHUSETTS
      SUFFOLK, SS
3

4          I, Evelyn M. Slicius, Registered

5     Professional Reporter, CSR No. 127193 and

6     Notary Public in and for the Commonwealth of

7     Massachusetts, do hereby certify:

8          That STACY BROOKS, the witness whose

9     deposition is hereinbefore set forth, was duly

10    sworn by me, and that the foregoing transcript is

11    a true record of the testimony given by the

12    witness.

13          I further certify that I am not related

14    to any of the parties in this matter by blood or

15    marriage, and that I am in no way interested in

16    the outcome of this matter.

17          IN WITNESS WHEREOF, I have hereunto

18    set my hand and affixed my notarial seal this

19    17th day of April, 2001.

20

21                    Evelyn M. Slicius
                      Notary Public
22

23
      My commission expires:
24    May 15, 2003

Exhibit
4

## AFFIDAVIT

Before me, the undersigned authority, personally appeared

HERR Rüdiger Hintze, who presented Identity Card N° 13074 50 769

as identification and who did take an oath and said that the following statements

are true and correct:

1. I am an employee of the Scientology Working Group of the State of

Hamburg, Germany.

2. I have access to and have reviewed the records of the said Working

Group concerning POSpartner G.M.B.H. and Hubert Heller. The following

statements are made of my own personal knowledge.

3. In April, 2000, in my capacity as an employee of the said Working

Group, I was contacted by a representative of POSpartner G.M.B.H. who advised

that

a) POSpartner G.M.B.H. was involved in negotiations with RTI,

Inc., which was represented in the negotiations by Hubert Heller;



DEFENDANT'S
EXHIBIT
5.
ALL-STATE LEGAL SUPPLY CO.

b) In researching Heller and his firm, a representative of POSpartner G.M.B.H. had searched the internet and found Heller's web page in which he identified himself as a Scientologist;

c) POSpartner G.M.B.H. was concerned that Heller would, if given the opportunity, insinuate the doctrine and practices of L. Ron Hubbard into POSpartner G.M.B.H., to the detriment of POSpartner G.M.B.H.

d) POSpartner G.M.B.H. wanted the assistance of the aforesaid Working Group to prevent the insinuation of the doctrine and practices of L. Ron Hubbard into POSpartner G.M.B.H.

4. In response to the request of POSpartner G.M.B.H., I furnished to that firm a copy of the Hubbard Technology Declaration, which is the subject of the lawsuit Heller has filed against Ursula Caberta.

5. Communication between the aforesaid Working Group and POSpartner G.M.B.H. concerning Scientology, the doctrine and practices of L. Ron Hubbard, Hubert Heller, and/or the Hubbard Technology Declaration was initiated by POSpartner G.M.B.H.

6. No person employed by the aforesaid Working Group, other than myself, was involved in any substantive communication with POSpartner G.M.B.H. concerning Scientology, the doctrine and practices of L. Ron Hubbard, Hubert Heller, or the Hubbard Technology Declaration.

7. Ursula Caberta was in no way involved in any communication or activity involving POSpartner G.M.B.H., which concerned Scientology, the doctrine and

practices of L. Ron Hubbard, Hubert Heller, or the Hubbard Technology

Declaration.

_____

AFFIANT


_____ Willi Leif, Leitender Regierungsdirektor

OFFICER ADMINISTERING OATH

**Freie und Hansestadt Hamburg**
**Behörde für Inneres**
**Amt für Innere Verwaltung und Planung**
**Grundsatz- und Rechtsangelegenheiten**
**Johanniswall 4, 20095 Hamburg**

Dated this _25_ day of April, 2001.

Exhibit
5

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

```
_____ x
HUBERT HELLER,                     :
                                   :
                                   :
                 Plaintiff,        :        Case No. 8:00-CV-1528-T-27C
                                   :
                                   :
        vs.                        :
                                   :
URSULA CABERTA,                    :
                                   :
                                   :
                 Defendant.        :
_____ x
```

## DECLARATION OF HUBERT HELLER

HUBERT HELLER, declares under penalty of perjury, that the following is true and correct.

1.     I am the plaintiff in the above-captioned case and am a citizen of Germany, admitted to the United States for permanent residence, and domiciled in Clearwater, in the State of Florida.   I make this declaration upon personal information.

2.     I am Vice-President, International, of RTI, a computer software company based in Sacramento, California.  RTI's clients are large and small retail companies and manufacturers of retail products in the United States and abroad.  RTI has customers in 58 countries with over 18,000 installations of its point-of-sale inventory control software, known as Retail Pro.  The software controls ordering, receiving and distribution of products in stores, it monitors how well individual merchandise and products are selling, and it controls inventory of products essentially monitoring and controlling the flow of

merchandise through a retail system. RTI is the market leader in this type of inventory control software, with installations in clothing stores, specialty shops, gift shops, sporting goods stores and many other types of businesses. A large market exists for RTI's products in Europe, and particularly in Germany.

3.      On behalf of RTI, during February to April 2000, I negotiated with the German firm, POSPartner G.M.B.H. "(POS)", through its President, Peter Reich, to establish a distribution agreement whereby POS would distribute RTI's software product Retail Pro in Germany. The distribution agreement that I negotiated with POS would have resulted in substantial commissions, which I estimate would have been in excess of $100,000.

4.      On behalf of RTI, I negotiated with POS to the point that POS offered to enter into a distribution agreement for Retail Pro in Germany with RTI on terms that were acceptable to RTI. As part of the proposed agreement, POS made a reservation for training by RTI on Retail Pro. During the negotiations, POS learned that I am a member of the Scientology religion.

5.      On April 13, 2000, Reich of POS informed me by email (a true copy of which is annexed hereto as Exhibit A) that he had met with a Retail Pro user, that the visit was "very impressive," that the user was "convinced about the product and made a real good demo," that "the product is rich of functions, easy to tailor and robust," that the user has "very good experiences working with RTI" and "the product is very convincing." Nevertheless, Reich stated POS would not enter into the distribution

2

agreement. "The reason for this is *not the product or any of its features, which seam [sic] to be great*, but it is a *more business-strategic decision*." (emphasis added). He also canceled POS's training reservation.

6.    When I tried to find out the reason, Reich asked me to send an organizational chart to POS, which I did.

7.    On April 17, 2000, Reich faxed a copy of the sect filter to RTI and asked that it be signed by Heller and RTI as soon as possible, thus indicating that POS would enter into the distribution agreement if the sect filter was signed.

8.    The sect filter, annexed hereto as Exhibit B, in German with a translation in English, provides as follows:

> I, the signer, declare,
>
> 1)    that I, i.e., my company, do not work with the technologies of L. Ron Hubbard,
>
> 2)    that neither I or my fellow workers are trained in the technologies of L. Ron Hubbard, i.e. I do not attend any course and/or seminars on the technologies of L. Ron Hubbard, and
>
> 3)    that I reject the technologies of L. Ron Hubbard for the running of my company (and the conduct of my seminars.)

9.    An adherent of the Scientology religion could not sign the sect filter in good conscience and consistent with his religious beliefs.

10.    I have been a member of the Scientology religion since 1971. RTI and I refused to sign the "sect filter," and POS refused to enter into the agreement with RTI or

3

do business with me or RTI unless we signed the "sect filter."

11.     I am aware that defendant Ursula Caberta developed the sect filter and that she distributes and promotes the sect filter to German businesses and German Chambers of Commerce as part of an economic boycott of persons who are adherents of the Scientology religion.  In Germany, membership in a Chamber of Commerce is mandatory for many professions in order to have a license to do business.  I am aware that German companies that refuse to sign the sect filter, or that do business with other companies that refuse to sign the sect filter, are boycotted both by other German businesses and by the Hamburg government.

12.     When I tried to discuss the use of the sect filter with Reich of POS, he refused to discuss the matter with me directly, but sent RTI an email on May 3, 2000, acknowledging that he was forced to use the sect filter to avoid being subject to an economic boycott in Germany, but that he was still trying to get RTI to sign the sect filter so that POS could enter into the distribution agreement.  The email from Reich, annexed hereto as Exhibit C, admitted the coercive impact of Caberta's sect filter:

> As a germany-based [sic] company, acting mostly in germany, [sic] it is vital for us to be able to sign these declarations also in future, whenever required.  Companies, that do not, or are not able to sign the declaration mentioned, may face different problems in their marketing success.

Executed this 30th day of March, 2002.

HUBERT HELLER

4

Exhibit A

| | |
|---|---|
| **From:** | <prreich@attglobal.net> |
| **To:** | <hubert@compuserve.com> |
| **Sent:** | Thursday, 13 April, 2000 7:37 AM |
| **Subject:** | Re: FW: Meeting with Svarowski |

Hallo Hubert,

the cellular-number was correct, I don`t know why the connection missfunctioned.

My visit to Swarovski on last friday was very impressive.

Bernt Müller was polite, competent, convinced about the product and made
a real good demo to me. He assured me, that the product is rich of functions,
easy to tailor and robust.

He also told me about his very good experiences in working with RTI, including
the knowledge database and so on.

So for our decision it was a good idea to visit him. The product is really convincing.

In spite of this, I am sorry to write you, that we decided not to remarket Retail Pro.
The reason for this is not the product or any of its features, which seam to be great,
but it is a more business-strategic decision. Please cancel the training-reservation.

Thank you very much for your cooperation so far.
We asure you to keep all informations about the product, pricing, contracts and so on
as confidential between RTI and POSPartner GmbH.


POSPartner GmbH
Peter Reich



Hubert Heller schrieb:

> Dear Peter,I tried to call you on your cellular phone: +49 (172) 897 4166 but keep
> getting a busy signal.Is it the correct number?Hubert
> -----Original Message-----
> **From:** Hubert Heller [mailto:huberth@gte.net]
> **Sent:** Wednesday, April 12, 2000 12:34 AM
> **To:** Peter Reich (E-mail)
> **Subject:** Meeting with Svarowski
>
> Hallo Peter,How did the meeting with Svarowski go?

Best regards,

Hubert Heller
VP International
RTI
http://www.retailpro.com

3/27/2002 6:03 PM  FROM: Fax +1 (208) 249-1625  TO: +1 (727) 467 6875  PAGE: 004 OF 004

Received: 17 Apr.00 09 35 AM  From: +492244880118  To: 6032979225     **Get faxes by email. Free.** eFax.com     Page: 3 of 3

17/04 '00 MO  16:34 FAX +49 2244 8801 18     PosPartner GmbH                          ☑003

Partnership in germany

**Betreff: Partnership in germany**
**Datum:** Mon, 17 Apr 2000 16:26:07 +0100
   **Von:** prreich@attglobal.net
     **An:** huberth@gte.net

Hi Hubert,

I sent a fax to 001-603 297 9225 with an (for us) important content
and enclosure.

Please make sure, that you receive my fax ASAP.

Regards

POSPartner GmbH
Peter Reich

## Telefax-Deckblatt

| An | Mr. Hubert Heller | Von | Peter Reich |
|---|---|---|---|
| Firma | Retail Technologies International | Firma | POSPartner GmbH Gesellschaft für Kassensysteme |
| Ort | 33755 Clearwater FL | Ort | 53639 Königswinter-Thomasberg |
| Straße | 300 N. Osceola Ave. # C2 | Straße | Wiesenstrasse 9 a |
| Telefon | 001-727 461 1329 | Telefon | 02244-8801 29 |
| Fax-Nr. | 001-603 297 9225 | Fax-Nr. | 02244-8801 18 |
| Datum | 17.04.2000 16:00 | Seiten | (incl. Deckblatt) |

RTI: Partnership for Germany

Sehr geehrte Mr. Heller,

by chance I started a query at yahoo.com with your name, I received as
a result your personal web-page.

You declare that Scientology is important for your personal life.

As you will know, german public and federal organizations observe
scientologies activities in germany.

It is not our right or intention to make any comments to anybodys personal
religious or philosophical interests or preferences.

But it is vital for POSPartner as a company and for me as the director
to make sure, that any business-contact is free of any intentions mentioned.
This covers both products and personal contacts to our staff, prospects
and customers.

We have been advised to ask you to sign the declaration enclosed,
to ensure that RTI´s intention as a company is not influenced by
Ron Hubbards technology.

Please be so kind to return the declaration (I am sure that you
can easily transiate it) signed legaly for RTI.

Mit freundlichen Grüßen
POSPartner GmbH

Peter - R. Reich

3/17/2000 6:13 PM FROM: Fax +1 (208) 248-1625 TO: +1 (727) 467 6875 PAGE: 003 OF 004

Received 17 Apr 00 09:35 AM From +492244880118 To: 6032979225          Get faxes by email. Free. eFax.com          Page 2 of 3

17/04 '00 MO 16:34 FAX -49 2244 8801 18          PosPartner GmbH                                    002

# ERKLÄRUNG

Ich, die/der Unterzeichnende

erkläre,

1)  daß ich bzw. mein Unternehmen nicht nach der Technologie von
    L. Ron Hubbard arbeite/arbeitet,

2)  daß weder ich noch meine Mitarbeiter nach der Technologie von L.
    Ron Hubbard geschult werde/werden bzw. keine Kurse und/oder
    Seminare nach der Technologie von L. Ron Hubbard besu-
    che/besuchen und

3)  daß ich die Technologie von L. Ron Hubbard zur Führung meines
    Unternehmens (zur Durchführung meiner Seminare) ablehne.

---------------------------          ---------------------------
     Datum                                Unterschrift

21.08.1996

**Exhibit C**

| From: | RTI- Nate Jessup <natej@retailpro.com> |
|---|---|
| To: | <prreich@attglobal.net> |
| Cc: | Hubert Heller <huberth@gte.net> |
| Sent: | Friday, 19 May, 2000 1:40 PM |
| Subject: | RE: Partnership in Germany |

Dear Peter,

Sorry for the delay in getting back to you - I have been traveling. Thanks for your explanation.

Due to the unusual nature of your request I have been instructed to pass this matter over to our attorneys as it may have legal implications. They will probably get back to you directly for any clarification you require.

Best regards,

Nate Jessup

-----Original Message-----
From: prreich@attglobal.net [mailto:prreich@attglobal.net]
Sent: Wednesday, May 03, 2000 5:03 AM
To: natej@retailpro.com
Cc: huberth@gte.net
Subject: Partnership in Germany

Dear Nate,

returning from my easter-vacation, I received your mail.

Thank you for your explanations.

I think, that I have to explain some things, which might be country-specific.

The scientology-organisation is observed in germany by the federal agency for internal security.
The results of this observations are available in public reports, thus available to everybody
businesses, press, just everyone who is interested in it.

The reason and justification for the federal observation is beside others, that SO is suspected to follow
objectives which are not consistant with or even against the german constitution or rights which are
granted by german constitution.

The observation is well known in public and business, and lead to the fact that some of our customers
asked us to sign the declaration, I sent by fax to Hubert. As POSPartner or one of our employees
do not follow SO technology, we signed the declaration on demand.

As a germany-based company, acting mostly in germany, it is vital for us to be able to sign these
declarations also in future, whenever required. Companies, that do not, or are not able to sign the
declaration mentioned, may face different problems in their marketing success.

As you might know, even Microsoft is forced to give declarations about and even show WIN2000 sourcecode to german federal authorities in order to sell WIN2000 to federal and public organisations.

There is absolut no question, that POSPartner, our employees and myself will respect US laws
and RTI´s company policy.

But we are embedded in german business practices and have to protect our employees and the
company against potential discrimination.

So, how can we proceed?

I understand that you are not able to give declarations about your employees beliefs or practices.
But it could be possibly a compromise, when we receive a declaration of RTI, that RTI as a company

  does not follow SO´s technology,
  did not make LRH policy to RTI´s policy,
  is not a member of WISE.

I hope, that you are able to send us a document requested.

Best regards

POSPartner GmbH
Peter Reich

**From:** Hubert Heller <huberth@gte.net>
**To:** Peter Reich POSPartner (E-mail) <prreich@attglobal.net>
**Sent:** Friday, 28 July, 2000 5:48 PM
**Subject:** Update

Dear Peter,

How are you? I'm sorry I have been out of touch.

The company has not responded on that document other than to say that the attorneys are looking it over. I assume the attorneys are busy and are not used to such a document, as it would be illegal here.

Personally, Peter, my compensation is based on bonuses for successful new software dealers. This is my livelihood, and I was disturbed that my revenue (and possibly yours too) was affected by the pressure placed on you to follow this "sect filter".

I knew you did not write it yourself. I found it was written by a woman in Hamburg, Ursula Camberta, employed as a government official, who dislikes newer religions.

I have therefore filed a personal lawsuit against her in the United States for interfering with normal and legal business activity.

I want you to know that this action is not against you. On the contrary, I would defend any German's right to run your own business without discriminatory interference from a hostile petty bureaucrat.

Sincerely,

Hubert Heller

26/03/02

# Exhibit
# 6

————————————————————x
HUBERT HELLER,             :
                     :
          Plaintiff,    :     Case No. 8:00-CV-1528-T-27C
                     :
       vs.             :
                     :
URSULA CABERTA,     :
                     :
         Defendant.  :
————————————————————x

## DECLARATION OF CARL RÖHRIG

I, Carl Röhrig, hereby declare and state:

1.   I make the fallowing statements of my own personal knowledge, and if called to testify thereto, I could do so competently.

2.   I am a citizen if the Federal Republic of Germany. For 30 years, I have been a professional artist and illustrator. Several of my paintings were created as magazine cover paintings, including for *Stern* and *Spiegel* magazines. I have also made many exhibits in cities all over Europe, including Vienna, Copenhagen, Berlin, Zurich, Munich, Hamburg, Bonn, Frankfurt, Bremen, Cologne, Lucern, as well as in New York, Palm Springs, Los Angeles and Tokyo. A permanent exhibit of my works exists at NASA in Los Angeles. I have also created many scientific illustrations as

well as sculptures. Reduced copies of some of my paintings are attached hereto as examples of my work.

3. I have received several awards, including ones from the Museum of American Illustration in New York for my scientific artwork, the National Geographic Society and the Art Directors Club in Frankfurt. I have been declared a lifetime "Member of the National Geographic Society" by their Board of Trustees due to my works for that Society.

4. I am also a Scientologist and have been for more than 20 years.

5. My religious affiliation has caused me substantial problems in my work because of attacks against me by Ursula Caberta, solely by virtue of my religion. For example, in 2000, I had a large exhibition arranged to be displayed in the City Hall of the town of Schortens, Germany. Invitations were printed and distributed and the paintings were being prepared for display at substantial cost and after a substantial expenditure of time and effort. Two days before the exhibit was to open, a communication was made to officials in Schortens from Hamburg, which I believe was from Ms. Caberta (the officials refused to identify the source), pressuring them to cancel my exhibit simply because I was a Scientologist, and because Schortens would be seen to be assisting and patronizing a Scientologist.

6. I similarly had a large exhibit planned and approved for the regional airport at Hamburg. Again, the exhibit was canceled at the last minute, I am also informed,

2

informed, based on pressure from Ms. Caberta to ensure the airport was not seen to be approving or associating with a Scientologist.

7. One of my biggest customers was the Hamburg Mannheimer Insurance Co., which purchased and displayed a number of my paintings. I was informed by executives in the company that Ms. Caberta's office pressured them to sever their relationship with me because I am Scientologist, and again, told them that it would be bad for their business to be associated with a Scientologist. I understand she made it clear that she would disseminate the relationship if the company did not break off its business with me. As a result, I lost a great deal of business already planned.

8. I also had scheduled an exhibition at the Deutscher Ring company, a large insurance company in Germany, which was disrupted by Ms. Caberta. I had an agreement with the company to exhibit eighty of my paintings in August 2001. However, two weeks before the exhibition was scheduled to open, it was cancelled by Deutscher Ring for the expressed reason that I was a Scientologist. Upon investigation, I learned that Ms. Caberta had given information to employees of Deutscher Ring that I was a Scientologist, and pressured them to boycott a business relationship with me and cancel the exhibition.

9. Ms. Caberta has sent information regarding me to many businesses, dealers and individuals with whom I was doing business or with whom I was

work, always in an effort to effect a boycott of my work solely because I am a Scientologist. As one can readily see from the attached examples of my work, it is neither controversial nor religious in nature, but was suppressed by Ms. Caberta based upon her boycott activities of anyone who is a Scientologist.

I declare under the penalties of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Signed this 29th day of March, 2002, in Clearwater, Florida.

_____
Carl Röhrig



The Herbal Woman • La femme aux herbes • Die Kräuterfrau. 1986





Water and Forest • La forêt et L'eau • Wasser und Wald, 1987



**Love to the Mountains • L'amour de la montagne • Liebe zu den Bergen, 1989**







The Fool • le Fou • Dec N-??, 1991





The World as a Tree • Le monde en forme d'arbre • Die Welt als Baum · 1992

„Tatsächlich suche ich stets nach Symbolen, die meine „künstlerischen Erörterungen" am besten zum Ausdruck bringen".



The Mhulla • Le Mollah • Der Mullah  1992



Waiting for Freedom • En attendant la liberté • Warten auf die Freiheit, 1992



u • Je te regarde • Ich sehe Dich an. 1993



Tiger. 1993





**Yellow Macaw** • Macaw jaune et bleu
**Gelbbrust-Ara**, 1994

Jaguar, 1993



**Keel-billed Toucan** • Toucan pêcheur • **Fischertukan**, 1993





Red Macaw • Ara macao • Robert Ara [?] II. 1996



Lion • Edition of 1997

# Exhibit
# 7

# UNITED STATES DISTRICT COURT
## Middle District of Florida

HUBERT HELLER,

             Plaintiff,

Case No.: 8:00CV-1528-T-27C

vs

URSULA CABERTA,

             Defendant.

---

## AFFIDAVIT OF URSULA CABERTA

COMES NOW Ursula Caberta, appearing for the purpose of contesting jurisdiction and seeking dismissal of this action and no other, and says:

1. She is the named defendant in the above-styled action.

2. She is a citizen and resident of Germany.

3. She has visited the United States of America on only three occasions, to-wit: Spring 1998, Fall 1998, and July 2000. Her visit in the Spring of 1998 was on official government business. The other two visits were personal in nature, for the purpose of visiting friends.

4. She has entered the State of Florida on only one occasion, to-wit: July, 2000.

5. She has never engaged in any business activity in the United States, and has not engaged in any activity in the United States for the purpose of gaining profit, and has never had any employment or business or property interests in the United States.

6. She is, as an individual, indebted to Robert S. Minton, as an individual, for a sum of money loaned to her by Mr. Minton. The loan proceeds were received by her in



DEFENDANT'S
EXHIBIT
_1_
ALL-STATE LEGAL SUPPLY CO.

Germany, and were obtained in connection with the retirement of an earlier debt which was incurred and satisfied in Germany.

7. She has never promoted the use of the Hubbard Declaration[1] in the United States. During her July, 2000 visit to the United States she discussed the services the government of Hamburg provides to German firms seeking to avoid infiltration by Scientologists, including the availability in Germany of the Hubbard Declaration, and the fact that the Declaration is distributed on request to companies which fear infiltration by Scientology.

8. In July, 2000, she traveled at her own expense to Clearwater, Florida to publically discuss her activities in Germany.

9. All her activity concerning the Hubbard Declaration, including distribution of the Declaration, has been in her capacity as an employee of the government of Hamburg, Germany.

10. The Hubbard Declaration was developed in response to requests from businesses concerned about infiltration and subversion by Scientologists.

11. No business is required or urged by Defendant or her employer to make use of the Hubbard Declaration. The Hubbard Declaration is made available to individuals and businesses who request some means to avoid infiltration and subversion by Scientologists.

---

[1] This is the document described by Plaintiff as a "sect filter."

12. She has never, to her knowledge, had any dealings with the entity identified in the amended complaint as "POSPartner G.M.B.H.."

13. To a certainty she has never had any dealings with the entity identified in the amended complaint as "POSPartner G.M.B.H" outside her function as an official of the government of Hamburg, Germany.

14. The Lisa McPherson Trust, Inc. paid her hotel expense while she was in Clearwater in July 2000, but she received no other thing of value in connection with her trip.

15. She has no financial, employment or business arrangements with the Lisa McPherson Trust, Inc. except as set forth in Paragraph 14 above.

16. She owns no interest in the Lisa McPherson Trust, Inc.

17. Although she has in the past discussed with persons affiliated with the Lisa McPherson Trust, Inc. the possibility of opening a German office of the Lisa McPherson Trust, Inc., she was never offered remuneration or any position with such an organization.

18. To the best of her knowledge and belief, there are presently no plans to open such an office. To a certainty, she is not involved in and has no knowledge of any such plans.

URSULA CABERTA

BEFORE ME, the undersigned authority, personally appeared URSULA

CABERTA, who presented *PASSPORT 1320284 US* as identification, and who did

take an oath and said that the foregoing statements true and correct.

_____
OFFICER ADMINISTERING OATH

Freie und Hansestadt Hamburg
Behörde für Inneres
Amt für Innere Verwaltung und Planung
Johanniswall 4, 20095 Hamburg

9. Okt. 00

-4-

Exhibit
8

1

2             IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
3                     TAMPA DIVISION

   HUBERT HELLER, an individual, )
4                                 )
                  Plaintiff,      )
5                                 )
             v.                   ) Case No. 8:00
6                                 ) CV-1528-T-27C
   URSULA CABERTA, an individual,)
7                                 )
                  Defendant.      )
8                                 )
   _____)
9
               DEPOSITION UPON ORAL EXAMINATION
10                          OF
                      URSULA CABERTA
11
                On Thursday, July 26, 2001
12              Commencing at 9:09 A.M.

13                    Taken at:

14     American Consulate General Hamburg
                 Alsterufer 27/28
15          20354 Hamburg, Germany

16

17

18

19

20

21

22

23

24

25       REPORTED BY:  RICK C. WEISS, CSR, CM, RPR

1

2   BY MR. MOXON:                                          10:19:20

3          Q.      Government employees are not           10:19:20

4   permitted by law to receive payments from             10:19:22

5   interested persons to do some aspect of their job.    10:19:24

6                  Is that correct?                        10:19:28

7          A.      There are laws governing that.          10:19:40

8          Q.      Can she answer my question, please?     10:19:44

9          A.      That is my answer to your question.     10:19:48

10         Q.      Are government employees permitted      10:19:54

11  to receive payments from private interested           10:19:56

12  persons for the purpose of carrying forth their       10:19:58

13  official duties?                                       10:20:04

14         A.      Of course not.                          10:20:10

15         Q.      Do you receive orders from some         10:20:20

16  other government entity telling you how to do your     10:20:24

17  job?                                                   10:20:30

18         A.      Other government agencies?  What do     10:20:36

19  you mean by that?                                      10:20:40

20         Q.      Does someone instruct you, tell you     10:20:40

21  exactly how to do your job?                            10:20:42

22         A.      So as for any government agency in      10:21:14

23  the administration, certain rules apply, and in my    10:21:18

24  case, the Senator for the interior or the minister    10:21:20

25  for the interior, called the Senator here in          10:21:26

1
2    law.                                                    11:32:44

3          Q.    I am just going to move on and I am    11:32:44

4    going to move to compel an answer.                 11:32:46

5            MR. MERRETT: Hang on just a second.       11:32:50

6      (DISCUSSION BETWEEN ATTORNEY AND WITNESS)       11:32:56

7    BY MR. MOXON:                                      11:32:56

8          Q.    Have you received any money from       11:33:06

9    Robert Minton?                                     11:33:08

10         A.    I will not answer those questions.     11:33:18

11         Q.    I will ask again:  Have you            11:33:20

12   received any money from Robert Minton?             11:33:20

13           MS. LOVERDE: Excuse me.  She               11:33:28

14   answered the question.  As I explained at the      11:33:28

15   beginning, if she refuses to answer a question,    11:33:30

16   that is her right here.  We have no way to make    11:33:34

17   her answer that question.                          11:33:38

18           THE WITNESS: Let me add to that.          11:33:50

19   There is a court case pending here in Hamburg.     11:33:52

20   And that's why I am not going to say anything      11:33:54

21   further.                                           11:33:58

22   BY MR. MOXON:                                      11:33:58

23         Q.    What court case?                        11:34:00

24         A.    I don't have to explain that.          11:34:06

25           MR. BLUEMEL: An investigation             11:34:14

1
2  procedure.                                          11:34:16
3  BY MR. MOXON:                                       11:34:16
4        Q.      You said in an affidavit that you     11:34:24
5  filed in this case --                               11:34:26
6        A.      If I answered that question, I        11:34:40
7  might be prosecuted, and that's why I will not      11:34:42
8  answer this question any further.                   11:34:46
9        Q.      You said in an affidavit you filed    11:34:50
10 earlier in this case, quote,                        11:34:52
11              "That you are indebted to Robert S.    11:34:56
12              Minton as an individual for a sum of   11:35:02
13              money loaned to her by Mr. Minton.     11:35:04
14              The loan proceeds were received by     11:35:08
15              her in Germany and were obtained in    11:35:10
16              connection with retirement of an       11:35:14
17              earlier debt which was incurred and    11:35:14
18              satisfied in Germany."                 11:35:18
19       A.      I would like to repeat what I just    11:35:28
20 said.                                               11:35:30
21 (MR. HINTZE SPEAKING IN GERMAN WITH THE WITNESS)    11:35:44
22              (Whereupon, four-page document         11:36:14
23 entitled "Affidavit of Ursula Caberta" was marked   11:36:14
24 as Caberta Deposition Exhibit No. 4)                11:36:14
25              MR. MOXON:  I have marked as           11:36:14

1

2          THE WITNESS:  Yes.  I think so, in          11:41:42

3   principle.                                        11:41:44

4   BY MR. MOXON:                                     11:41:44

5          Q.     Is there a penal investigation      11:41:52

6   against you arising out of funds given to you by  11:41:54

7   Mr. Minton?                                       11:41:58

8          A.     As I said, there is an              11:42:10

9   investigation procedure.  And other than that, my 11:42:10

10  answer is the same as before.                     11:42:14

11         Q.     I don't know what you mean, because 11:42:16

12  we have had hundreds of answers today.  Is there a 11:42:16

13  penal investigation against you arising out of    11:42:20

14  funds allegedly given to you by Mr. Minton?       11:42:22

15         MR. MERRETT: The same answer for           11:42:26

16  the same reason.  Don't pretend you don't know    11:42:26

17  what's going on.                                  11:42:28

18         Ask another question.                      11:42:30

19         MR. MOXON:  Mr. Merrett, you know          11:42:32

20  and I know that we have to have a clean record    11:42:34

21  here.  When you say, "same answer," it doesn't    11:42:36

22  communicate on the record, the transcript.        11:42:38

23         We have come 8,000 miles to take           11:42:42

24  this deposition.  I would like a clean record, if 11:42:46

25  we could.                                         11:42:46

1

2          (MR. HINTZE SPEAKING IN GERMAN)          11:42:48

3              MR. MERRETT: She has declined to      11:42:50

4   answer on the advice of German counsel for the   11:42:52

5   reason that it may tend to subject her to        11:42:56

6   prosecution.  That is her answer.                11:42:58

7   BY MR. MOXON:                                     11:42:58

8          Q.      Is that correct, Ms. Caberta?    11:43:04

9   That's your answer?                               11:43:08

10         A.      Yes.  Once again.                 11:43:10

11         Q.      Have you been indicted for receipt 11:43:14

12  of money or bribes from Mr. Minton?              11:43:16

13          (MR. HINTZE SPEAKING IN GERMAN)          11:43:24

14         A.      Once again, same answer as before. 11:43:52

15  And I object to the plaintiff in the other case  11:43:56

16  whispering with you, obviously trying to get     11:44:02

17  information for his case from this deposition.   11:44:06

18         Q.      I don't know what the same answer 11:44:10

19  as before means.  Let me ask the question again. 11:44:12

20              MR. MERRETT: Let me make it real     11:44:14

21  clear to you, okay?  Try to catch up.  Every time 11:44:16

22  that you have received the statement:  The same  11:44:18

23  answer as before --                              11:44:20

24              MR. MOXON:  Yes.                      11:44:22

25              MR. MERRETT: -- it means the last    11:44:22

1

2    answer that I gave you, that she declines to          11:44:22

3    answer on the grounds that the answer may tend to    11:44:26

4    subject her to prosecution.                          11:44:28

5                 MR. MOXON:  Okay.                        11:44:28

6                 MR. MERRETT:  Every time that            11:44:28

7    phrase is used, that's what that means.              11:44:30

8          .           Do you understand now?             11:44:32

9                 MR. MOXON:  Thank you.  Now it's         11:44:34

10    clear now.  Thank you.                               11:44:34

11                 MR. MERRETT: Okay.                       11:44:36

12    BY MR. MOXON:                                        11:44:36

13          Q.      Did -- are you aware of whether or     11:44:40

14    not there is a penal investigation against Mr.      11:44:42

15    Minton for providing bribes to you?                 11:44:44

16          A.      The same answer.                       11:44:54

17          Q.      Did you --                              11:45:04

18          A.      I will not provide information to      11:45:10

19    the lawyer and the plaintiff of the other case,     11:45:16

20    who are present here.                               11:45:20

21          Q.      If they leave the room, will you      11:45:26

22    answer the question?  They can --                   11:45:26

23          A.      As I said, I will not answer those    11:45:38

24    questions.  Please ask the right questions now.     11:45:40

25          Q.      Do you have a loan agreement with     11:45:56

1

2    Mr. Minton?                                      11:45:58

3              MR. MERRETT: Same answer.             11:46:02

4    BY MR. MOXON:                                    11:46:02

5         Q.    Have you paid any money to Mr.       11:46:12

6    Minton on any loan agreement?                    11:46:14

7              MR. MERRETT: Same answer.             11:46:16

8    BY MR. MOXON:                                    11:46:16

9         Q.    What form of payment did Mr. Minton  11:46:20

10   use to provide money to you?                     11:46:22

11             MR. MERRETT: Same answer.             11:46:24

12   BY MR. MOXON:                                    11:46:30

13        Q.    Did the money that Mr. Minton gave   11:46:32

14   you assist you to do any of your jobs in Germany, 11:46:34

15   any of your official work?                       11:46:42

16             MR. MERRETT: Same answer.             11:46:44

17   BY MR. MOXON:                                    11:46:44

18        Q.    Have you provided any information    11:46:50

19   to Mr. Minton with respect to your work in       11:46:54

20   Germany?                                         11:46:56

21   (DISCUSSION BETWEEN MR. MERRETT AND THE WITNESS) 11:47:10

22   (DISCUSSION BETWEEN MR. MOXON  AND MR. BLOEBAUM) 11:47:24

23             MR. MERRETT: Same answer.             11:47:32

24   BY MR. MOXON:                                    11:47:32

25        Q.    Did Stacy Brooks, the President of   11:47:48

1

2     the Lisa McPherson Trust, Incorporated tell you          11:47:52

3     that Mr. Minton would provide you money if you          11:47:56

4     needed it?          11:47:58

5               MR. MERRETT: Same answer.          11:48:00

6     BY MR. MOXON:          11:48:00

7          Q.     If you had not received the money          11:48:06

8     from Mr. Minton, would you have had to quit your          11:48:08

9     job?          11:48:12

10              MR. MERRETT: Same answer.          11:48:12

11    BY MR. MOXON:          11:48:12

12         Q.     Did the money you received from Mr.          11:48:14

13    Minton enable you to carry out any of your          11:48:18

14    activities with respect to the sect filter?          11:48:20

15              MR. MERRETT: Same answer.          11:48:26

16    BY MR. MOXON:          11:48:26

17         Q.     What's the total amount of money          11:48:32

18    that Mr. Minton gave you?          11:48:34

19              MR. MERRETT: Same answer.          11:48:36

20    BY MR. MOXON:          11:48:36

21         Q.     Did you provide any assistance to          11:48:44

22    Mr. Minton in Germany to have any meetings with          11:48:46

23    the German press?          11:48:50

24              MR. MERRETT: Same answer.          11:48:52

25    BY MR. MOXON:          11:48:52

1

2        Q.      Did your office provide any          11:49:00

3   assistance to Mr. Minton with respect to his      11:49:02

4   business activities in Germany?                    11:49:06

5               MR. MERRETT: Same answer.  And        11:49:10

6   additionally object that it assumes facts not in   11:49:10

7   evidence.                                          11:49:14

8   BY MR. MOXON:                                      11:49:14

9        Q.      And may I properly assume, Mr.       11:49:18

10  Merrett, that every time you say the "same         11:49:20

11  answer," that she is following that advice, so     11:49:22

12  that that can be clear on the record?              11:49:28

13              MR. MERRETT: Well, let me ask you     11:49:30

14  if you hear an answer coming from her?             11:49:30

15              MR. MOXON:  No.  I don't want to      11:49:34

16  have to ask her each one of these.  If you were    11:49:34

17  indicating that it's the same answer, then I just  11:49:36

18  want to make sure that that's her answer.          11:49:38

19              MR. MERRETT: Let's move along.        11:49:42

20              MR. MOXON:  Do you want me to ask     11:49:44

21  her each time?                                     11:49:46

22              MR. MERRETT: Are you confused?  Do    11:49:46

23  you not know?  Is that what you are saying?        11:49:48

24              MR. MOXON:  Do you refuse to tell     11:49:50

25  me whether or not you are stipulating that every   11:49:52

1

2　time you say "same answer," that she is asserting　11:49:54

3　a right to not testify?　11:49:56

4　　　　　　MR. MERRETT: Every time she doesn't　11:49:58

5　answer and I say "same answer," it means the same　11:50:00

6　thing that I said the last time I explained it to　11:50:02

7　you.　11:50:06

8　　　　　　MR. MOXON:　That's the best that　11:50:06

9　you will tell me?　11:50:08

10　　　　　　MR. MERRETT: Yes.　11:50:08

11　　　　　　MR. MOXON:　Okay.　If anything is　11:50:08

12　vague on that, then we may have to come back here.　11:50:10

13　　　　　　MR. MERRETT: Do you have more　11:50:16

14　questions?　11:50:18

15　BY MR. MOXON:　11:50:18

16　　　　Q.　　Did Mr. Minton give you any money　11:50:22

17　to assist the Lisa McPherson Trust Incorporated to　11:50:24

18　establish itself in Germany?　11:50:30

19　　　　　　MR. MERRETT: Same answer.　11:50:32

20　BY MR. MOXON:　11:50:32

21　　　　Q.　　Did Mr. Minton give you any money　11:50:38

22　to assist you to promulgate the sect filter?　11:50:40

23　　　　　　MR. MERRETT: Same answer.　11:50:46

24　BY MR. MOXON:　11:50:46

25　　　　Q.　　Have you paid back any money to Mr.　11:50:56

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | A. | No. | 15:56:02 |
| 3 | Q. | And he has never been your lawyer. | 15:56:02 |
| 4 | | Correct? | 15:56:06 |
| 5 | A. | He is not a lawyer. | 15:56:06 |
| 6 | Q. | Okay.  You told the court he was a | 15:56:10 |
| 7 | lawyer last week.  But -- | | 15:56:14 |
| 8 | A. | No, I didn't. | 15:56:20 |
| 9 | Q. | So it's your understanding that | 15:56:36 |
| 10 | your deputy -- | | 15:56:38 |
| 11 | A. | Plus I need to explain that in | 15:56:40 |
| 12 | Germany we have legal experts who work in the | | 15:56:42 |
| 13 | administration, that they are not lawyers who | | 15:56:44 |
| 14 | represent people in court. | | 15:56:46 |
| 15 | Q. | Okay.  It's your understanding from | 15:56:48 |
| 16 | your discussions with Mr. Hintze that while he was | | 15:56:52 |
| 17 | your deputy, he had communications with POS | | 15:56:56 |
| 18 | Partners? | | 15:57:00 |
| 19 | A. | Yes.  That is the case. | 15:57:06 |
| 20 | Q. | And you learned this after you were | 15:57:08 |
| 21 | sued? | | 15:57:10 |
| 22 | A. | Yes.  And I asked who is Mr. | 15:57:14 |
| 23 | Heller. | | 15:57:16 |
| 24 | Q. | What did he tell you?  What did Mr. | 15:57:18 |
| 25 | Hintze tell you? | | 15:57:24 |

1

2          A.      At first, nothing.  And then we          15:57:58

3     looked it up in our files and found what had          15:58:00

4     happened.  And that is that POS Partner had          15:58:04

5     approached the Working Group like many other          15:58:06

6     companies before and asked for the protective          15:58:10

7     clause.          15:58:14

8                     And that's what Mr. Hintze          15:58:14

9     supplied, and that was all.          15:58:18

10          Q.      Do you still possess any          15:58:20

11     correspondence with POS Partners?          15:58:22

12          A.      In our files or all we have is          15:58:54

13     usually a note saying there was a call, and then          15:58:56

14     we sent out this protective clause.  And that's          15:58:58

15     all I can remember.          15:59:02

16                     Usually we don't have lots of          15:59:04

17     correspondence with these companies.          15:59:06

18          Q.      Is there any correspondence with          15:59:08

19     POS Partners, or not?          15:59:14

20          A.      I don't know.  I don't think that          15:59:16

21     we exchanged any letters.          15:59:22

22          Q.      You didn't look?          15:59:24

23          A.      No.          15:59:26

24          Q.      Where did you find this note?          15:59:30

25          A.      Which one?          15:59:38

```
 1
 2              CERTIFICATE OF COURT REPORTER
 3                   I, Frederick C. Weiss, California
 4    CSR # 3606, Registered Professional Reporter, do
 5    hereby certify that I took the stenotype notes of
 6    the foregoing deposition, and that the transcript
 7    thereof is a true and accurate record transcribed
 8    to the best of my skill and ability.
 9                   I further certify that I am neither
10    counsel for, related to, nor employed by any of
11    the parties to the action in which this deposition
12    was taken, and that I am not a relative or
13    employee of any attorney or counsel employed by
14    the parties hereto, nor financially or otherwise
15    interested in the outcome of the action.
16
17
18
19
20
21    _____
22    Frederick (Rick) C. Weiss
23
24    _____
25    DATE
```

# Exhibit
# 9

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


------------------------------X
HUBERT HELLER, an Individual,
                    Plaintiff,              Case No.
   Vs.                              8:00 CV-1528-T-27C

URSULA CABERTA,
                    Defendant.
------------------------------X


        DEPOSITION of ROBERT MINTON, a witness

called by and on behalf of the Plaintiff, pursuant to

the Massachusetts Rules of Civil Procedure, before

Evelyn M. Slicius, Registered Professional Reporter,

CSR No. 127193, and Notary Public in and for the

Commonwealth of Massachusetts, at the offices of

Cooley Manion Jones, LLP, 21 Custom House Street,

Boston, Massachusetts, on Tuesday, April 10, 2001,

commencing at 10:25 a.m.

        **K.L. GOOD & ASSOCIATES**
      **Registered Professional Reporters**
               **P.O. Box 6094**
        **Boston, Massachusetts 02209**
   **Tel (781) 598-6405  *  Fax (781) 598-0815**

```
 1            prosecution; and the fact that your offices had

 2            used deposition testimony already of Ursula

 3            Caberta to initiate a criminal prosecution in

 4            Germany.

 5                   However, I'm not relying on that

 6            criminal prosecution in Germany.  The allegations

 7            in your complaint are so vastly broad that they

 8            come within the potential for criminal

 9            prosecution of my client in this country, and so

10            I'm going to instruct him not to answer based on

11            the Fifth Amendment.

12      Q.    Are you following that instruction, Mr. Minton?

13      A.    I am.

14                   MR. MOXON:  Mr. Leipold, I'd like to

15            get some clarification of what you're asserting

16            with respect to the Fifth Amendment here.

17                   MR. LEIPOLD:  I bet you would.  You

18            know what the Fifth Amendment is?  I'm asserting

19            it.  That is the clarification.

20                   What else would you like?

21                   MR. MOXON:  What alleged law is it --

22            well, let me ask the witness.

23      Q.    What alleged law is it, Mr. Minton, for which you

24            are -- in violation of what alleged law are you
```

1      asserting the Fifth Amendment for?

2            MR. LEIPOLD:  I'm instructing my client

3      not to answer.  But I will respond to you that

4      that is the Foreign Corrupt Practices Act.

5            The breadth of your complaint, and the

6      fact that I had been advised that there is a

7      criminal prosecution in Germany, which the real

8      parties in interest, the Church of Scientology,

9      has initiated against my client, leaves me no

10     choice but to make sure that there is a blanket

11     Fifth Amendment assertion here so that there is

12     no waiver.

13           Your co-counsel -- excuse me -- handed

14     you a note.  Would you like to read that into the

15     record?

16           MR. MOXON:  Do you have any other

17     comments with respect to the Fifth Amendment

18     issue?

19           MR. LEIPOLD:  Pardon?

20           MR. MOXON:  I'm going to ask Mr. Minton

21     some specific questions on these Fifth Amendment

22     issues, and if he is going to assert the claim,

23     fine.  I don't know what you mean by a blanket

24     claim as to everything.  I don't think we can

1    He has already answered questions in this

2    deposition, sir.  We are just not going to answer

3    questions that substantive to the allegations in

4    the complaint.

5  Q. Have you provided any money to Ursula Caberta?

6      MR. LEIPOLD:  I'm going to instruct him

7    not to answer based on the Fifth Amendment.

8  A. I'm following my attorney's advice in not

9    answering questions on the basis of the Fifth

10    Amendment.

11  Q. What has Ursula Caberta done for you in exchange

12    for the money that you've given to her?

13      MR. LEIPOLD:  I'm going to instruct my

14    client not to answer based on the Fifth

15    Amendment.

16  A. I'm following my attorney's advice in not

17    answering based on the Fifth Amendment.

18  Q. You are concerned that a response to that

19    question could incriminate you?

20      MR. LEIPOLD:  Counsel, that is an

21    improper question.  I'm going to instruct my

22    client not to answer based on the Fifth

23    Amendment.

24      MR. MOXON:  I want to make sure I know

1            MR. LEIPOLD:  I'm instructing my client

2        not to respond based on the Fifth Amendment.

3    A.   I'm following my attorney's advice.

4    Q.   Did you give Ms. Caberta bills, United States

5        treasury bills, that could not be traced?

6            MR. LEIPOLD:  I'm instructing my

7        client -- that is an old Scientology trick, isn't

8        it?  I'm instructing my client not to respond

9        based on the Fifth Amendment.

10   A.   I'm following my attorney's advice.

11   Q.   Did you wire any money into Ms. Caberta's

12       account?

13           MR. LEIPOLD:  I'm instructing my client

14       not to response based on the Fifth Amendment.

15   A.   I'm following my attorney's advice.

16   Q.   Do you have a written agreement with Ms. Caberta

17       as to what she will give you in exchange for the

18       money provided?

19           MR. LEIPOLD:  I'm instructing my client

20       not to response based on the Fifth Amendment.

21   A.   I'm following my attorney's advice.

22   Q.   Did you give any money to Ms. Caberta that you

23       would not consider a loan?

24           MR. LEIPOLD:  I'm going to instruct my

1   Q.   Are you following that instruction?

2   A.   I am following that instruction.

3   Q.   Have you called Ms. Caberta at her home?

4          MR. LEIPOLD:  You can respond to that,

5      if you know.

6   A.   I don't know.

7   Q.   You may have?

8   A.   I don't think so.

9   Q.   Do you have her home number?

10   A.   I don't know.

11   Q.   Does Ms. Brooks have her home number?

12          MR. LEIPOLD:  Calls for speculation.

13   A.   She probably does but I don't know.

14   Q.   Has Ms. Caberta assisted your business endeavors

15      in any fashion?

16          MR. LEIPOLD:  I'm going to instruct my

17      client not to respond based on the Fifth

18      Amendment.

19   A.   I'm following my attorney's advice.

20   Q.   Has Ms. Caberta directed any business towards

21      you?

22          MR. LEIPOLD:  I'm going to instruct my

23      client not to respond based on the Fifth

24      Amendment.

1   A.   I'm following my attorney's advice.

2   Q.   At your request, has Ms. Caberta directed

3       business away from anyone else?

4           MR. LEIPOLD:  I'm going to instruct my

5       client not to respond based on the Fifth

6       Amendment.

7   A.   I'm following my attorney's advice.

8   Q.   Do you have any business?

9           MR. LEIPOLD:  I'm going to instruct --

10       no.  I'm sorry, Counsel, that is so broad.  I'm

11       going to object as vague and ambiguous as to the

12       meaning of that question.

13           MR. MOXON:  That's one of the elements

14       of your Fifth Amendment assertion.

15   Q.   Do you have any business, Mr. Minton?

16           MR. LEIPOLD:  I'm going instruct my

17       client not to respond based on the Fifth

18       Amendment.

19           MR. MOXON:  Whether or not he has a

20       business?  Okay.

21   Q.   Are you going to follow that instruction?

22   A.   I'm going to follow that instruction.

23   Q.   Do you own any interest in LMT, Inc.?

24           MR. LEIPOLD:  I'm going to instruct my

1   A.   I'm following that advice.

2   Q.   Did you give any money to Willi Beiss?

3            MR. LEIPOLD:  I'm going to instruct my

4        client not to respond based on the Fifth

5        Amendment.

6   A.   I'm following that advice.

7   Q.   Did you give any value of any kind to Willi

8        Beiss, Ms. Caberta's superior?

9            MR. LEIPOLD:  I'm going to instruct my

10       client not to respond based on the Fifth

11       Amendment

12  A.   I'm following my attorney's advice.

13  Q.   Any time you were in Germany, did you contact any

14       realtors or, in any fashion, attempt to locate an

15       office, to set up an office of the Lisa McPherson

16       Trust in Germany?

17           MR. LEIPOLD:  I'm going to instruct my

18       client not to respond based on the Fifth

19       Amendment.

20  A.   I'm following my attorney's advice.

21           MR. MOXON:  Ms. Brooks just wrote a

22       note and left it in front of the witness.

23           MS. BROOKS:  Well, I'm sorry --

24           MR. HERTZBERG:  That was very clear

1    Q.    Have you had any communication with Ms. Caberta

2          about the use of the sect filter?  S-e-c-t.

3                MR. LEIPOLD:  I'm going to instruct my

4          client not to respond based on the Fifth

5          Amendment, based on the allegations that you have

6          made in the complaint.

7    A.    I'm following my attorney's advice.

8                MR. MOXON:  We are going to suspend the

9          deposition at this point to make a motion to

10         compel and, of course, we'll our costs and

11         sanctions.

12               MR. LEIPOLD:  Thank you, Counsel.

13               MR. MOXON:  So we have a second

14         deposition of LMT, it's scheduled for tomorrow

15         morning.  If either Ms. Brooks or Mr. Minton is

16         the witness for that, we could do that one today

17         also.

18               MR. LEIPOLD:  Okay.  Why don't we break

19         for lunch and we'll come back after lunch and

20         we'll do that deposition.

21               THE VIDEOGRAPHER:  12:00.  Going Off

22         the record.

23               (Whereupon, the deposition was

24         suspended at 12:00 p.m.)

1                          <u>CERTIFICATE</u>

2     COMMONWEALTH OF MASSACHUSETTS
      SUFFOLK, SS
3

4            I, Evelyn M. Slicius, Registered

5     Professional Reporter, CSR No. 127193 and

6     Notary Public in and for the Commonwealth of

7     Massachusetts, do hereby certify:

8            That ROBERT MINTON, the witness whose

9     deposition is hereinbefore set forth, was duly

10    sworn by me, and that the foregoing transcript is

11    a true record of the testimony given by the

12    witness.

13           I further certify that I am not related

14    to any of the parties in this matter by blood or

15    marriage, and that I am in no way interested in

16    the outcome of this matter.

17           IN WITNESS WHEREOF, I have hereunto

18    set my hand and affixed my notarial seal this

19    11th day of April, 2001.

20                          _Evelyn M. Slicius_

21                          Evelyn M. Slicius
                            Notary Public
22

23
      My commission expires:
24    May 15, 2003

# Exhibit
# 10

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

```
---------------------------------  x
                                   :
HUBERT HELLER,                     :
                                   :
                  Plaintiff,       :    Case No. 8:00-CV-1528-T-27C
                                   :
       vs.                         :
                                   :
URSULA CABERTA,                    :
                                   :
                  Defendant.       :
---------------------------------  x
```

## DECLARATION OF ALEXANDER PETZ

ALEXANDER PETZ, an attorney duly admitted to the practice of law in the

Federal Republic of Germany, declares that the following is true and correct:

1.     I am an attorney licensed to practice law in the Federal Republic of

Germany since 1995. I am a partner in the law firm of Bluemel and colleagues. For

the past 5 years I have been retained by the Church of Scientology of Germany and

local Churches and Missions to help protect the rights of Scientologists in Germany.

In that capacity, I have become extremely familiar with legal issues concerning the

rights of Scientologists in Germany, including judicial decisions, activities of the

German Federal government, the government of the Free Hanseatic State of Hamburg,

the Hamburg Working Group Scientology ("Working Group"), as well as activities of

certain Hamburg officials, including Ursula Caberta and her activities concerning the

anti-Scientology sect filter.

2.    The Working Group, which Caberta heads, was created in 1992.
According to the Hamburg government, the Working Group is authorized especially to
engage in public relations work and "information events." See Exhibit A, annexed
hereto. The distribution and promotion of the sect filter is not covered by the
description of the tasks/functions of the Working Group. Thus, the distribution and
promotion of sect filters for the purpose of excluding individual Scientologists or their
enterprises from the commercial life of Hamburg and Germany exceeds the lawful
authority granted the Working Group. To my knowledge and research, there is no
official authorization by the Hamburg government to the Working Group, Caberta, or
any other official or department of the Hamburg government to distribute, promote, or
mandate the use of the sect filter.

3.    According to the general principle of legal proviso, in Germany the
administration is allowed to act only if authorized by law. Even if an administrative
act of the executive administration would be within the scope of the functions or duties
of the administrative body, nevertheless, a definite and clear legal authorization
describing the content, the subject, the purpose and the extent of its possible acts is
required nonetheless. The stronger the lasting effect on the constitutional rights might
be, the more precise and narrow the law has to be (See e.g., Federal Supreme
Administrative Court No. 7 C 21/90, March 27, 1992, *Osho-Rajneesh vs. Federal
Republic of Germany*). The term "law" means either a formal parliamentary law or at
least a statutory order based on such a formal law. To my knowledge, no such

2

authorization for the promotion and distribution of the sect filter by the Working
Group Scientology exits. Thus, Caberta – in the distribution and promotion of the sect
filter to encourage boycotts of businesses and to attack Scientologists – necessarily
must be acting outside the scope of her legal authority under both, German and
Hamburg law.

4.     In Germany, a government official or employee in the public service is
legally obliged to follow the Constitution of the Federal Republic of Germany (known
as the "Basic Law") and the General Laws regarding the rights of its citizens. In
addition, government officials and employees, in relation to their employer, also are
charged with the official duty of conducting their tasks/functions in compliance with
the legal obligations that are imposed on the government/state. Thus, a violation of the
state legal order by the official/employee also violates his official duties at the same
time.

5.     Caberta, as an employee in the public service, is subject to the
regulations of the Federal Tariff Treaty for Employees ("Tariff"). According to Art. 6
of the Tariff, she must vow as follows:

> "I vow: I will fulfill my service obligations conscientiously and will
> safeguard the Constitution as well as the Laws of the Federal Republic of
> Germany."

Caberta presumably gave this vow, as otherwise she would not be employed as an
employee in the public service.

6.     Caberta is thereby bound to follow the Basic Law. In particular, Art. 1,

3

sect. 3 of the Basic Law provides, "The following basic rights bind the legislature, the

executive and the judiciary as directly enforceable law," and Art. 20, sect. 3 provides,

"Legislation is subject to the constitutional order; the executive and the judiciary are

bound by the law."

    7.    Through her conduct with respect to the distribution and promotion of

the anti-Scientology sect filters, Caberta's conduct appears to violate several

provisions of the Basic Law, including:

> Art. 1, sect. 1:
> "The dignity of man is inviolable. To respect and protect it is the duty of all
> state authority."
>
> Art. 2, sect. 1:
> "Everyone has the right to the free development of his personality insofar as he
> does not violate the rights of others or offend against the constitutional order or
> the moral code."
>
> Art. 3, sect. 1:
> "All persons are equal before the law."
>
> Art. 3, sect.3:
> "No one may be prejudiced or favored because of his sex, his parentage, his
> race, his language, his homeland and origin, his faith or his religious or political
> opinions."
>
> Art. 4, sect. 1:
> "Freedom of faith and of conscience, and freedom of creed, religious or
> ideological, are inviolable."
>
> Art. 4, sect. 2:
> "The undisturbed practice of religion is guaranteed."
>
> Art. 12, sect 1:
> "All Germans have the right freely to choose their trade or profession, their
> place of work and their place of training. The practice of trades and professions

may be regulated by law."

8.     To the extent that Caberta's promoting and distributing the sect filter has violated the Basic Law, she has thereby violated her vow under Art. 6 of the Tariff in relation to her employer, namely to safeguard the Basic Law and the Laws of the Federal Republic of Germany.  Such a violation of her vowed obligations towards her employer, therefore, cannot at the same time have been committed in the accomplishment of her legal authority.

9.     Contrary to Caberta's assertion that Scientology is not recognized as a religion in Germany, over the last two decades, numerous court decisions in Germany have held that Scientology is a religion and/or that its members hold sincere religious convictions.  A sampling follows:

10.    In a decision of the Federal Supreme Administrative Court in *Mission Neue Brueke Stuttgart vs State of Baden-Wuerrtemberg,* (November 6, 1997), the Court recognized the religious nature of Scientology beliefs, and that the Church's purpose is the practice and dissemination of the Scientology religion and its teachings. The practice of the religion is accomplished through spiritual counseling, known as "auditing" in Scientology, and the study of the Scientology scriptures through courses and seminars ordinarily offered for monetary remuneration to members.  Based upon the lower court's findings that the Mission's services reflect the philosophy and ideals of the Church of Scientology, that such services are only made available to members by Scientology organizations, and that members recognize the religious nature of these

5

services, the Supreme Administrative Court determined that the value of the services
and courses offered by the Mission for the attainment of a "higher level of existence"
are based upon a common conviction of the members. These services and courses
cannot be separated from the underlying beliefs of Scientology without losing their
value for the recipient. Under these circumstances, the Court determined that the
services offered by the Mission are not commercial in nature.

11.    A three-judge court in Hamburg, where Caberta is employed, has also
recognized the religious nature of Scientology. In *Hoppe vs. Church of Scientology of
Hamburg* (Regional Court of Hamburg, No. 330 O 169/97, January 5, 1998), the court
stated: "[The Church of Scientology] is recognized as a religious community, and its
financing through contributions in the form of donations does not constitute
commercial activity according to the general view (see Federal Supreme
Administrative Court press release of November 6, 1997). In evaluating the religious
services offered to members – in light of the guarantee of religious freedom pursuant
to Article 4 of the Constitution – one must consider that [the Church] must fund itself
exclusively through donations from members, contrary to church communities that
fund themselves, inter alia, through tax revenue. The services offered by [the Church]
therefore cannot be viewed from the position of a normal price-service relationship."

12.    Other recent decisions include:

• "One cannot leave unconsidered that the practice of [Scientology] services is
part of the religious and philosophical denomination, which thereby is excluded from

6

any scientific evaluation based on the principal of free practice of religion and the principal of state neutrality." (Regional Court of Frankfurt/Main, No. 2/4 0 234/92, February 24, 1993, *Koch* v. *Church of Scientology of Frankfurt*.)

- There is no evidence of profiteering by the Church and the value of the services cannot be measured by market value as they are spiritual services intended by the plaintiffs to fulfill their own personal spiritual needs. (Regional Court of Frankfurt, No. 2/4 076/92, 27 May 1992, *Gebauer* v. *Church of Scientology of Frankfurt*).

- The Church of Scientology fulfills the requirements of a religious and ideological association; thus, the promotion, dissemination and propagation of the Scientology religion is protected by the Constitution. (Administrative Court of Frankfurt/Main, No. IV/2 E 2234/86, September 4, 1990, *Scientology Mission of Frankfurt v. City of Frankfurt*.)

- "If gifts of voluntary contributions are paid by the members, on the occasion of the concrete use of ecclesiastical services [as is the case with Scientology] this is only one imaginable form of financing of a religious community, which can possibly be regarded as fairer than the demand of a flat-rate percentage of the member's income [as is practiced by the Catholic and Lutheran Churches]. It is quite obvious that the aims of the defendant can only be achieved by a financially strong organization, the way and manner of financing of a religious community being again part of the self-administration of a church. Small religious/philosophical communities, such as the

7

defendant, which, contrary to the great established churches, do not have considerable
tax receipts, have to arrange for a different financing." (Regional Court of Frankfurt,
No. 2/4 0 471/88, June 7, 1989, *Emiliano Padin* v. *[Scientology] Mission of
Frankfurt.*)

• "According to its own understanding, this Church is a salvation religion
which deals with the human soul and the riddles of life and which sees its roots and
historical tradition in Buddhism, Hinduism and other religions. Its purpose in this
world is considered to help man in his strive for spiritual freedom and to completely
free him from problems and burdens to reach total freedom in order to recognize
himself as a spiritual being and experience the existence of a Supreme Being to be able
to be more aware and to reach satisfaction and happiness. In the course of this one
also reaches an understanding of God as the Supreme Being and the spiritual goals as
per the understanding of this religious community." (Stuttgart District Court, No. B33
Owi 9306/84, January 30, 1985, *The People v. Karl Friedrich Munz*).

• "The offered courses and aims of the [Church of Scientology of Germany] are
evidently not governed by general scientific knowledge but are 'heightened' by the
belief in the supernatural. Thus, the remark 'Scientology is an applied religious
philosophy' is contained in the enrollment forms." The Court also found that the
Church beliefs in the spirit and the achievement of its spiritual goals are based wholly
upon and can only be achieved through a system of belief. (Regional Court of Munich
I, 6th Chamber for Civil Matters, No. 6 0 5709/82, 6 0 6 6895/82, January 7, 1983,

8

*Kager* v. *Church of Scientology of Germany, Ertl* v. *Church of Scientology of Germany).*

- The Church of Scientology is a religious community which offers teachings based on religious tenets. (Stuttgart District Court, No. 13 C 3687/76, December 8, 1976, *Hans Peter Fuger* v. *Stuttgart Church.*)

13.    Further, in the case of *Christian Winkler* (Munich Labor Court, No. 21 Ca 13754/99, October 24, 2000), the court found the requirement that a government employee answer a questionnaire concerning his involvement with Scientology to be unlawful, as a violation of plaintiff's right not "to answer questions about his private sphere," in the absence of facts showing that the employee – an adherent of the Scientology religion, and a former employee of a local Scientology Church -- was engaged in "anti-constitutional activities."

Executed this 8th day of February, 2001, in Munich, Germany.

_____
ALEXANDER PETZ

9

Exhibit
11

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

HUBERT HELLER,

                    Plaintiff,        Case No.: 8:00-CV-1528-T-27C

VS

URSULA CABERTA,

                    Defendant.

## SECOND AFFIDAVIT OF URSULA CABERTA

COMES NOW Ursula Caberta, appearing for the purpose of contesting

jurisdiction and seeking dismissal of this action and no other, and says:

. 1. She is the named defendant in the above-styled action.

2. She is a citizen and resident of Germany, and an employee of the government of

Hamburg, Germany.

3. Her duties as an employee of the government of Hamburg, Germany are

focused on the protection of legitimate businesses and other lawful entities from

infiltration or other attack by Scientology and Scientologists, and her duties include

A) the development and distribution of the Hubbard Declaration[1]; and

B) the distribution of information concerning the character, nature, and

activities of Scientology, which is not recognized as a religion in Germany, but is

characterized as a totalitarian political and/or profitmaking enterprise.

4. All her activity concerning the Hubbard Declaration, including development

and distribution of the Declaration, has been in her capacity as an employee of the

_____

[1] This is the document described by Plaintiff as a "sect filter."



DEFENDANT'S
EXHIBIT
2.
ALL-STATE LEGAL SUPPLY CO.

government of Hamburg, Germany, and has been within the course, scope and authority

of her employment by the government of Hamburg, Germany.

5. All her activity, communication and pronouncements concerning Scientology

and Scientologists, directed to businesses and other entities headquartered in or doing

business in Germany, including the dissemination of the Hubbard Declaration, has been

within the course, scope and authority of her employment of the government of

Hamburg, Germany.


_Ursula Caberta_ (signature)

URSULA CABERTA


BEFORE ME, the undersigned authority, personally appeared URSULA
CABERTA, who presented _Personalausweis and Dienstausweis Nr. 701_
_Nr. 13205787_ as identification, and who did

take an oath and said that the foregoing statements true and correct.

_Volker Wiehl, Senatsdirektor_ (signature)

OFFICER ADMINISTERING OATH

**Freie und Hansestadt Hamburg**
**Behörde für Inneres**
Amt für Innere Verwaltung und Planung
Johanniswall 4, 20099 Hamburg



Exhibit
12

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

———————————————— x

HUBERT HELLER,        :

                 :

           Plaintiff,    :     Case No. 8:00-CV-1528-T-27C

                 :

    vs.                :

                 :

URSULA CABERTA,     :

                 :

          Defendant.   :

———————————————— x

## DECLARATION OF INGO LEHMANN

INGO LEHMANN, declares that the following is true and correct:

1. I make the following statements of my own personal knowledge and if called to testify to the matters set forth herein, I could and would do so competently.

2. I am staff of the Church of Scientology of Germany, Human Rights Office. The purpose of our office is to document abuses of human rights in Germany, and to communicate such violations to appropriate authorities within and without Germany.

3. As part of my duties, in January and March 2000 I made requests to the Berlin government for all documents that mention "Scientology" under Berlin's

Freedom of Information Act, including a request to Senate Administration of Economy and Technology. After an administrative proceeding due to them not wanting me to look at all of their files on Scientology, I was given permission to review files from two departments, which I did on August 13, 2001.

4. Some of the files I reviewed were from the Senate Administration of Economy and Technology's trade department. One file was entitled "IIIB2 30.14 Scientology". In that file, I found two letters regarding the sect filter. One letter was from a Dr. Kleiner of the Union of Company Associations in Berlin and Brandenburg to Mr. Elmar Pieroth, the Senator for the Administration of Economy and Technology dated July 16, 1997. The second letter was a respons from Mr. Pieroth to Dr. Kleiner dated August 4, 1997. Copies of these letters and Englis translations are attached hereto as Exhibits A and B.

5. It is my understanding that the Union of Company Associations in Berlin and Brandenburg is a private organization consisting of business people in the are who advise the government on organizational matters and large companies o organizational and structural matters. It is a large lobby group that protects the interests of its members.

6. The Senate Administration of Economy and Technology is part of th Berlin government. It is responsible for implementing trade law, the registration of

new businesses, investing in scientific research and development of infrastructure. It is responsible for an environment in Berlin where businesses can grow.

7. I copied these two letters as they dealt with the sect filter. The sect filte is of interest to me as it is used to abuse the rights of Scientologists in Germany.

I declare under the penalties of perjury of the law of Germany that th foregoing is true and correct. Executed this 2nd day of April, 2002, in Munich, Germany.

INGO LEHMANN

3

Exhibit A

*5*

**Union of Company associations
In Berlin and Brandenburg**
The Main Managing Director

uvb
in Haus der Wirtschaft
Am Schillertheater 2
10625 Berlin
(Charlottenburg)
Phone (030) 31005-0

Personal/Confidential
Mr.
Elmar Pieroth
Senator for Economy
and Companies
Martin-Luther-Str. 105

10825 Berlin

Berlin, 16ᵗʰ July 1997

**Public offers to Companies**
- Relation of companies to Scientology –

Dear Mr. Roth,

we have been informed by member companies that the Police President wants to make it obligatory for companies to declare that they have no relations to Scientology to be viable to get public contracts.

As per my opinion this procedure is not legal as the letter sent to companies does not include any hint for a legal basis which would be a prerequisite for such a request.

I thus would welcome if you could care for a uniform legal viewpoint inside the administration.

Sincerely,

Dr. Kleiner

Vereinigung der Unternehmensverbände
in Berlin und Brandenburg e.V.

Der Hauptgeschäftsführer

**uvb**

im
HAUS DER WIRTSCHAFT
Am Schillertheater 2
10625 Berlin
(Charlottenburg)
Telefon (0 30) 310 05-0

Persönlich/Vertraulich
Herrn
Elmar Pieroth
Senator für Wirtschaft
und Betriebe
Martin-Luther-Str. 105

·10825 Berlin

Senatsverwaltung für Wirtschaft
Nr. 1036
1 7. JULI 1997
SEN

Berlin, 16. Juli 1997

**Auftragsvergabe an Unternehmen
- Verbindung von Unternehmen zu Scientology -**

Sehr geehrter Herr Pieroth,

von Mitgliedsunternehmen wurden wir darüber informiert, daß der Polizeipräsi-
dent die Vergabe öffentlicher Aufträge davon abhängig machen will, daß die
Unternehmen erklären, keine Beziehungen zu Scientology zu unterhalten.

M.E. ist dieses Vorgehen rechtlich zu beanstanden, da das an die Unternehmen
gerichtete Schreiben keinen Hinweis auf eine Rechtsgrundlage enthält, die ja
Voraussetzung für ein solches Verlangen wäre.

Ich wäre Ihnen daher dankbar, wenn Sie sich innerhalb des Senats um eine ein-
heitliche Rechtsauffassung bemühen könnten.

Mit freundlichen Grüßen

(Dr. Kleiner)

**Exhibit B**

**Senate Administration for Economy and Companies**　　　　　　Berlin

Union of Company associations
In Berlin and Brandenburg
The Main Managing Director
Dr. Kleiner
Am Schillertheater 2

10625 Berlin

Procedure Nr.
**III D 1**
Please note in you response
Treated by
**Mr. Schoening**
Office building Berlin-Schöneberg
Martin-Luther-Str 105
10825 Berlin
Room
**147**
Phone (030)
**78 76 - 3456**
(internal 90)
Fax (030)
**78 76 – 3570**
Date
**4th August 1997**

Re: Public offers to Companies
　　Here: Relation of companies to Scientology

Proc.: Your letter of 16th July 1997

Dear Mr. Dr. Kleiner,

During the last time the evaluation of the Scientology-Organization has been subject of lively discussions. The Ministers of Interior of some States and also the Berlin Senator of Interior saw some necessity to demand from junior authorities – such as the Police Presidency you mentioned – to use a so-called safety declaration in the realm of public offers.

Contrary to that we and the Federal Ministry of Economy see the obligation to sign a safety declaration as generally inadmissible due to the fact that national as well as european law on public offers solely requires to take into account economic aspects of the bidding as well as the efficiency, skill and reliability of the applicant. So-called aspects alien to the public offer can not play a role in public offers.

-2-

In the meantime the topic has been further discussed in various Minister Conferences. Also the Senate has built a working group for questions relating to Scientology. Amongst others also the problem of public offers was discussed.

5

Per the recently published final report of the Conference of Ministers-Presidents [Heads of the States] our viewpoint is broadly shared (see enclosed relevant excerpts). Only in the frame of sensible contracts – which require a special trust relation such as training and counselling contract – the safety declaration can become an issue as such cases have special requirements for the reliability. A legal basis for the demand to sign the declaration or exclusion from the bidding in this case would be §25 Nr. 2 VOL/A or VOL/B [Regulations on public offers]

We agree to this concept of treating each case individually and think that an agreement for a related practice in the Berlin offices for public offers is possible with the Senate working group and the Senate [Government council].

Sincerely

Elmar Pieroth


D/III B2

**Senatsverwaltung für Wirtschaft und Betriebe**

~~Senator~~ *Senatorin* [handwritten]

**Berlin**

Senatsverwaltung für Wirtschaft und Betriebe · 10820 Berlin (Postanschrift)

Vereinigung der Unternehmensverbände
in Berlin und Brandenburg e.V.
Herrn Hauptgeschäftsführer
Dr. Kleiner
Am Schillertheater 2

10625 Berlin

Geschäftszeichen
**III D 1**
Bei Antwort bitte angeben
Bearbeiter/in
**Herr Schoening**
Dienstgebäude Berlin-Schöneberg
Martin-Luther-Str. 105
10825 Berlin
Zimmer
**147**
Telefon (0 30)
**78 76 - 3456**
(intern 90)
Telefax (0 30)
**78 76 - 3570**
Datum
**4 . August 1997**

Betr.: Auftragsvergabe an Unternehmen
    hier: Verbindung von Unternehmen zu Scientology

Vorg.: Ihr Schreiben vom 16.07.1997

Sehr geehrter Herr Dr. Kleiner,

die Einschätzung der Scientology-Organisation ist in der Bundesrepublik in letzter Zeit Gegenstand lebhafter Erörterungen gewesen. Die Innenminister einiger Bundesländer und auch der Berliner Innensenator sahen die Notwendigkeit, ihren Dienststellen und nachgeordneten Einrichtungen, hierzu gehört in Berlin der von Ihnen angesprochene Polizeipräsident, vorzugeben, bei der Vergabe öffentlicher Aufträge sog. Schutzerklärungen zur Scientology abzuverlangen.

Demgegenüber halten wir und das Bundeswirtschaftsministerium das Abhängigmachen einer Auftragsvergabe von der Abgabe einer Schutzerklärung grundsätzlich nicht für zulässig, da sich nach den nationalen und europarechtlichen Vergabevorschriften die Auftragsvergabe ausschließlich nach der Wirtschaftlichkeit der Angebote sowie der Leistungsfähigkeit, Fachkunde und Zuverlässigkeit der Bewerber zu richten hat. Sogenannte vergabefremde Aspekte dürfen bei der Auftragsvergabe keine Rolle spielen.

· · ·

Verkehrsverbindungen:
🚇 Rathaus Schöneberg, Innsbrucker Platz
🚇 Schöneberg, Innsbrucker Platz
🚌 104, 146, 148, 185, 204, 348

Zahlungen bitte bargeldlos
an die Landeshauptkasse
Nürnberger Straße 53
10789 Berlin

| Geldinstitut | Kontonummer | Bankleitzahl |
|---|---|---|
| Postbank Berlin | 56-100 | 100 100 10 |
| Berliner Bank | 9 919 260 800 | 100 200 00 |
| Berliner Sparkasse | 0 990 007 600 | 100 500 00 |
| Landeszentralbank | 10 001 520 | 100 000 00 |

Das Thema ist inzwischen bundesweit in zahlreichen Fachministerkonferenzen weiter diskutiert worden. Auch der Senat hat bereits eine Arbeitsgruppe zu Fragen der Behandlung der Scientology eingerichtet. Hier wird u. a. auch das Problem der öffentlichen Auftragsvergabe besprochen.

Dem kürzlich vorgelegten Abschlußbericht an die Ministerpräsidentenkonferenz (s. die maßgeblichen Passagen anbei) ist zu entnehmen, daß unsere Auffassung inzwischen weitgehend geteilt wird. Lediglich bei sensiblen Aufträgen, die ein besonderes Vertrauensverhältnis voraussetzen - z. B. Schulungs- und Beratungsaufträge - kommt die Verwendung von Schutzerklärungen in Betracht, da hier besondere Anforderungen an die Zuverlässigkeit gegeben sind. Rechtsgrundlage für das Verlangen der Erklärung bzw. des Ausschlusses von der Vergabe wäre in diesen Fällen § 25 Nr. 2 VOL/A bzw. VOB/A.

Wir halten diesen auf einzelne Fallkonstellationen abstellenden Ansatz für richtig und denken, daß eine Verständigung in der Senatsarbeitsgruppe und im Senat auf eine entsprechende Praxis der Berliner Vergabestellen möglich sein wird.

Mit freundlichen Grüßen

Elmar Pieroth

D/ III B 2