# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**HUBERT HELLER,**

    Plaintiff,

vs.                                             **Case No.: 8:00-CV-1528-T-27C**

**URSULA CABERTA,**

    Defendant.

_____/

## DEFENDANT'S RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR SANCTIONS REGARDING SUBJECT MATTER JURISDICTION AND JUDGMENT

On or about August 31, 2001, Defendant Ursula Caberta filed Defendant's Renewed Motion To Dismiss For Lack Of Subject Matter Jurisdiction (FSIA) And Motion For Summary Judgment As To Liability ("Renewed Motion to Dismiss"). On or about April 5, 2002, Plaintiff responded with Plaintiff's Opposition To Defendant's Motion To Dismiss And For Summary Judgment And Cross-Motion For Sanctions For Violation Of Court Orders ("Cross-Motion"). Essentially, Plaintiff's Cross-Motion seeks a finding of subject matter jurisdiction and a default judgment as discovery sanctions. This is the Defendant's response in opposition to the Plaintiff's Cross-Motion.

## PROCEDURAL BACKGROUND

On or about January 8, 2001, Plaintiff filed a Second Amended Complaint which alleges that Defendant is an employee of the State of Hamburg, Germany and is the head of a Hamburg State task force, the Scientology Working Group ("SWG"), which is purportedly designed to disrupt the business activities of the Scientology organization. Plaintiff alleges that the Defendant

created a document known as the "Hubbard Declaration" or "sect filter" in which individuals or companies declare in writing that they reject and do not use the technology of L. Ron Hubbard. Plaintiff asserts that Defendant distributed the Hubbard Declaration to a German business by the name of POS partner G.M.B.H. ("POS"). Plaintiff further alleges that he was an employee of RTI who was attempting to make a sale to POS and that POS requested him to sign the Hubbard Declaration. Plaintiff alleges that he is a Scientologist, that he refused to sign the Hubbard Declaration and that POS consequently refused to enter into an agreement or do business with the company for which he worked which purportedly caused him damage.

Defendant filed a second motion to dismiss the Second Amended Complaint on the grounds that since Defendant's activities with respect to the Hubbard Declaration were undertaken in her official capacity as an employee of the State of Hamburg, she is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1604. On February 15, 2001, this Court entered an Order (attached as Exhibit 11)[1] denying Defendant's second motion to dismiss "[g]iven Plaintiff's arguments that by conducting additional discovery he will be able to establish that FSIA immunity does not apply to Defendant and that this Court has jurisdiction." The Court further ordered that the Plaintiff may conduct limited discovery "to discover evidence supporting this Court's exercise of jurisdiction over Defendant" and that Defendant may thereafter renew her motion to dismiss. In putting the burden on Plaintiff to establish that FSIA immunity does not apply to Defendant, this Court noted that "Defendant alleges in her affidavit that she acted in her official capacity as an employee of the government of Hamburg, Germany when she

---

[1]    Exhibits 11-19 are attached hereto. Exhibits 1-10 were previously submitted under the title Exhibits In Support Of Defendant's Renewed Motion To Dismiss For Lack Of Subject Matter Jurisdiction (FSIA) And Motion For Summary Judgment As To Liability.

disseminated the 'Hubbard declaration'" and that her employer also "submitted an affidavit stating that Defendant's actions in developing and distributing the 'Hubbard Declaration' were performed as part of her job responsibilities in her capacity as an employee of the government of Hamburg, Germany."[2] Ex. 11, p. 3. Moreover, this Court specifically pointed out that issues such as whether Defendant's conduct violated German law or whether Scientology is a recognized religion are not relevant to the limited FSIA inquiry. *Id.* Consequently, the FSIA issue framed by the Court's Order is whether the creation and alleged dissemination of the Hubbard Declaration by Defendant to POS, if at all, were part of the Defendant's job responsibilities in her capacity as an employee of the government of Hamburg, Germany.[3]

Plaintiff subsequently took the Defendant's deposition in Germany. Following her deposition, Defendant filed her Renewed Motion to Dismiss.[4] As a result of issues concerning the Defendant's deposition in Germany, Plaintiff filed a motion to compel the further deposition of the Defendant. On November 6, 2001, the Magistrate entered an order granting the motion to compel and ordered the Defendant to come to the United States for another day of deposition. Defendant appealed this order, and this Court entered an order on January 30, 2002, directing

---

2   Actually, in her affidavit and deposition Defendant denied that she disseminated the Hubbard Declaration to POS. Ex. 3, ¶'s 2, 3; Ex. 6, p. 175. Mr. Hintze, an employee of Hamburg's SWG, confirmed that he disseminated the Hubbard Declaration to POS and that he was the only employee at the SWG to have any substantive communication with the POS. Ex.5, ¶'s 3, 4, 6.

3   This Court's identification of the precise relevant activity was necessary under applicable law. *See De Sanchez v. Banco Central*, 770 F.3d 1385, 1391 (5th Cir. 1985) (application of the FSIA's commercial activity exception requires defining with precision the relevant activity which requires focusing on the acts of the named defendant, not on other acts that may have had a casual connection with the suit).

4   Defendant's present counsel, Merkle & Magri, was retained by Defendant shortly before her deposition in Germany following miscommunications between her former attorney, John Merrett, and Defendant which resulted in Defendant being scheduled for a 2-day deposition in Germany when she was not available because of her government responsibilities. This caused the Defendant to miss one of the days of the deposition which led to this Court's order requiring her to appear in the United States for another day of deposition. Present counsel, Merkle & Magri, filed an emergency motion to change the deposition date which the Defendant, as confirmed by her failure to appear for the first day of deposition, simply could not attend. This motion was denied. Merkle & Magri did not attend and had no involvement in the deposition in Germany and did not become substantively involved in this case until after the deposition in Germany was completed. This explanation is added to avoid any intimation that Merkle & Magri was involved in any conduct of Defendant's former counsel which Plaintiff or the Magistrate has criticized.

that the "deposition shall be resumed as ordered by Judge Jenkins and [that]sanctions were correctly imposed in light of Defendant's failure to appear."

In the meanwhile, Defendant and her new counsel (the undersigned) made arrangements for Defendant to appear at the ordered deposition in the United States, which had been set for December 13, 2001. *See* Motion To Continue Deposition Of Ursula Caberta filed December 11, 2001. However, on Friday, December 7, 2001, Defendant's counsel was advised that the Federal Republic of Germany intended to file a Note Verbale with the United States Department of State officially protesting this lawsuit as an infringement on its sovereignty and that the Defendant may be ordered by German authorities not to attend the scheduled deposition. *Id.* On Monday, December 10, 2001, Defendant's counsel was advised that the Note Verbale (Exhibit 12) had been filed with the United States Department of State on December 10, 2001, and that Defendant had in fact been ordered by authorities in Hamburg, Germany not to attend the deposition. *Id.* The Note Verbale officially protested this lawsuit as an intrusion on the sovereignty of the Federal Republic of Germany, asserted state immunity and advised that Defendant had been ordered by state officials in Hamburg not to appear for her deposition. As a result of this, Defendant filed a Motion To Continue Deposition Of Ursula Caberta, which was denied by the Magistrate on January 25, 2002.

In a letter dated February 22, 2002, the Consul General of the Federal Republic of Germany provided this Court a copy of an Aide-Memoire and a Statement by the Senior Government Official for the Department of Internal Affairs of the State of Hamburg (all attached as Exhibit 13). The Aide-Memoire, like the Note Verbale, officially reiterated the Federal Republic of Germany's claim to sovereign immunity in this case. The Federal Republic of

4

Germany also pointed out in the Aide-Memoire that the Defendant's actions were "in the exercise of her official duties" and were "an extension of Germany's sovereign authority." The Statement of the State of Hamburg reconfirmed that the Defendant was not engaged in the dissemination of the Hubbard Declaration to POS; that the Hubbard Declaration was sent to POS by the Hamburg Department of Internal Affairs; that the development and dissemination of the Hubbard Declaration to POS were acts of the Hamburg Department for Internal Affairs; that Defendant acted fully within the scope of her service-related tasks; that Defendant did not pursue any private interest in exercising her activity, did not violate the law in any way and did not exceed her official duties. Both the Aide-Memoire and the Statement of the State of Hamburg confirmed that the Plaintiff, who is German, may bring a suit before a German court of law. The Consul General and the State of Hamburg further advised this Court that the Defendant, as a government official, was prohibited by order from her employer, the Hamburg Department for Internal Affairs, from traveling to the United States to give a deposition and that if she were to do so, she would face legal consequences including, but not limited to termination of her employment. As a result of the direct order by her employer and government not to appear for deposition in the United States, the Defendant respectfully advised the Court in her February 22, 2002 Notice of Inability To Appear For Court Ordered Deposition that she was unable to appear for a deposition in the United States. On or about April 5, 2002, Plaintiff filed his Cross-Motion as part of his response to Defendant's Renewed Motion to Dismiss.

## ADDITIONAL FACTUAL BACKGROUND

Many relevant facts are set forth in Defendant's Renewed Motion to Dismiss. As set forth in the Renewed Motion to Dismiss at page 13 n.3, Mr. Moxon and the Scientology organization

have a recognized record of involvement in sham lawsuits in the names of members of Scientology when in fact the real party interest prosecuting the suit is the Scientology organization and the purpose of the lawsuits is to beat other parties into submission. Defendant, as the head of the SWG in Germany, has also become a target of Scientology attack. For example, when she came to Florida for the first and only time in July, 2000, for a vacation and to see Ms. Brooks and Mr. Minton,[5] she was greeted at the Tampa Airport by an organized group of Scientologists who yelled epitaphs at her, including that she was a "Nazi Criminal." Ex. 7. During that trip to Florida she was also served with the instant lawsuit as well as a subpoena to give a deposition in the state wrongful death lawsuit brought by the Estate of Lisa McPherson against the Scientology organization. Defendant had no involvement in and no knowledge of the facts of that lawsuit, and Mr. Moxon spent virtually the entire deposition insulting her and asking irrelevant, harassing questions; accused her of engaging in "genocide" for the German government; and asked her whether she considered herself to be a Nazi. As she was leaving the deposition, he not once, but twice saluted her with a "Hitler salute" and said "Heil Hitler!" See Defendant's Objection to Magistrate's Order on Plaintiff's Motion to Compel, pp. 5-7.

### The $75,000 Payment

Plaintiff makes reference in his Cross-Motion to a June 26, 2000 check for $75,000 from Mr. Minton to Defendant as though this was new information. In fact, these funds are totally irrelevant to this case and the issue is simply another part of the Scientology organization's efforts

---

5    Mr. Minton incorporated the Lisa McPherson Trust ("LMT") and was its sole shareholder and chairman of the board and was believed by Mr. Moxon to be funding the Lisa McPherson lawsuit. See p. 28, Ex. 16 or 17 to Plaintiff's Motion to Compel Production of Documents filed on or about April 17, 2001; p. 67, Ex. B to Defendant's Response to Plaintiff's Motion to Compel Further Deposition filed on or about October 3, 2001. The purpose of the LMT was to expose abusive and deceptive practices of the Scientology organization and to help those who have been victimized by it. Ex. 10, ¶1. Lisa McPherson was a Scientologist who died in 1995 while purportedly under Scientology care in Clearwater, Florida. Her estate brought a wrongful death lawsuit against a Scientology organization. Ms. Brooks was formerly a Scientologist who worked in high-level Scientology offices. She left the Scientology organization and later became President of LMT.

to harass and to ruin the Defendant. Plaintiff theorizes that since Mr. Minton met with the Defendant in Germany in middle April, 2000 (at about the time that POS requested the Hubbard Declaration which Mr. Hintze forwarded to it) and since Mr. Minton's check to Defendant is dated June 26, 2000, two months later, the $75,000 must be an illegal bribe to Defendant to disseminate or "propagate" the Hubbard Declaration in the United States.  This theory is complete fantasy supported by absolutely no evidence.  In fact, Plaintiff totally ignores evidence he developed during jurisdictional discovery concerning the loan from Mr. Minton to the Defendant.

First, Defendant acknowledged early in this case in an affidavit submitted in support of her objection to personal jurisdiction that she was indebted to Mr. Minton for money he loaned to her in connection with her effort to pay off an earlier debt.  Ex. 1, ¶ 6.  Moreover, in the state court deposition taken by Mr. Moxon during the Defendant's trip to Florida in July, 2000, the Defendant testified that she had received an unwritten private loan from Mr. Minton. *See* pp. 19, 30, 113-114, Ex. B to Defendant's Response To Plaintiff's Motion To Compel Further Deposition of Defendant.   In addition, as part of its campaign against the Defendant, the Scientology organization in Germany (through its President, Helmuth Bloebaum, and represented by its German attorney, Wilhelm Blumel) has made a penal charge against the Defendant to authorities in Germany that she allegedly accepted a benefit (a loan from Mr. Minton) to carry out an official act ("vorteilsnahne").  Since the Scientology charge is presently under investigation and in light of the Scientology organization's history of bludgeoning its targets with legal claims, the Defendant has quite rightly and understandably refused to answer questions in this case under the fifth amendment concerning her relationship with Mr. Minton.    In fact, it is clear from the

transcript of the Defendant's deposition in Germany that Mr. Moxon was primarily attempting to obtain irrelevant information which he, Mr. Bloebaum and Mr. Blumel[6] felt could be used concerning the charge which the Scientology organization has made against the Defendant in Germany. Indeed, Mr. Moxon spent only about 25 minutes in the Defendant's deposition asking questions about the POS and Heller matter upon which the instant lawsuit is based. Ex. 6, pp. 174-187. Similarly, Mr. Minton also asserted the fifth amendment in his deposition "on a blanket basis" for much the same reason. Mr. Minton's attorney commented as follows to Mr. Moxon (Minton deposition pp. 14, 19, which appears as Exhibit 16 or 17 to Plaintiff's Motion to Compel Production of Documents filed on or about April 17, 2001):

> The breadth of your complaint, and the fact that I had been advised that there is criminal prosecution in Germany, which the real parties in interest, the Church of Scientology, has initiated against my client, leaves me no choice but to make sure that there is a blanket Fifth amendment assertion here so that there is no waiver.
>
> *          *          *
>
> Counsel, I'm responding to you and I am telling you, that, given the history of your misuse of lawsuits, given the history of your clients, the real party in interest, outrageous misuse of lawsuits, given the history of false allegations you have made both here and in Germany, and given the exact pleadings which you put in the complaint, I am instructing my client that I am – not to answer based on the Fifth amendment, as I am not going to expose him to real or phony allegations that you may make based on his testimony here to initiate a criminal prosecution in this country.

Mr. Minton declined to answer most of the questions asked of him during the deposition, including even whether he had a business. *Id.* pp. 56.

---

6    Both Mr. Bloebaum and Mr. Blumel attended the Defendant's deposition as, respectively, a purported "consultant" and local German counsel. Ex. 6, p. 4. At times, both interjected themselves in the deposition and the Vice Consul overseeing the deposition had to admonish both Mr. Moxon and Mr. Bloebaum when their conversations were disruptive. Ex. 6, pp. 56, 86, 102, 104, 105, 126-127, 128, 144-145, 158. Mr. Blumel also attended the Defendant's deposition in Florida.

As part of his purported jurisdictional discovery, Plaintiff also took the deposition of Stacy Brooks. In fact, Plaintiff relies on part of her deposition for the proposition that Mr. Minton visited with the Defendant in Germany in April, 2000. What Ms. Brooks also testified to and is not mentioned by the Plaintiff, is that Defendant had co-signed on a loan with a friend many years ago and someone else had taken over the loan, possibly at the instigation of Scientology, and was demanding immediate payment. Since the Defendant's former friend was nowhere to be found, Defendant had to pay off the loan. Ex. 18, pp. 44-46. According to Ms. Brooks, she (Ms. Brooks) reported this to Mr. Minton, who was a close personal friend of Ms. Brooks, and he told her to tell the Defendant not to worry about it and to call him. According to Ms. Brooks, she advised the Defendant to call Mr. Minton, and Mr. Minton subsequently loaned the Defendant the money to pay the debt. Ex. 18, pp. 47-48. According to Ms. Brooks, the whole issue of the Defendant's problem with the antecedent debt and Mr. Minton's loan to the Defendant all arose some time after her trip to Germany during which she met the Defendant in person for the first time. That trip ended on approximately April 22, 2000, which was after POS contacted Mr. Hintze and Mr. Hintze sent the Hubbard Declaration to POS. Ex. 18, pp. 52-53. This is confirmed by the date on the check, June 26, 2000.

Consequently, there is no evidence that there was anything other than a loan from Mr. Minton to the Defendant.[7] Moreover, it is crystal clear that this loan had absolutely nothing to do with the dissemination of the Hubbard Declaration to POS. The Defendant was not involved in the dissemination of the Hubbard Declaration to POS; the Defendant never even heard of POS

---

[7]    In his Cross-Motion the Plaintiff asserts that Defendant falsely swore in her affidavit that she received a loan and that there was no evidence that it was a loan. To contrary, there is no evidence at all that her testimony that she received a loan was false. Evidence that she received a loan includes her and Ms. Brook's sworn testimony.

until this lawsuit was filed; and the subject of the loan did not even arise for the first time until after Mr. Hintze on his own had sent the Hubbard Declaration to POS in the normal course of the SWG's business following POS's request for the Hubbard Declaration because POS itself discovered that that Plaintiff was a Scientologist and was itself concerned that Plaintiff would insinuate Scientology doctrine and practices into POS to its detriment. Ex. 3, ¶'s 2,3, 4; Ex. 5, ¶3, 7; Ex. 6, p. 175. In fact, Plaintiff 's Exhibit 5 (attachment B) confirms in a letter from POS to Plaintiff that it was POS that discovered and was concerned that the Plaintiff was a Scientologist.

There is absolutely no evidence contrary to the affidavits of the Defendant, Mr. Hintze[8] and Mr. Beiss; the Defendant's deposition; the Note Verbale and the Aide-Memoire from the Federal Republic of Germany (Ex's. 12, 13); and the formal Statement from the State of Hamburg (Ex. 13) pointing out that the Defendant was not involved in the dissemination of the Hubbard Declaration to POS and that she did not act outside of her official duties and that the dissemination of the Hubbard Declaration was part of the official function of the Hamburg SWG, and that the Defendant did not violate the law. In fact, the only new evidence offered by the Plaintiff in support of his FSIA argument since jurisdictional discovery began is the loan to the Defendant which is totally irrelevant to the dissemination of the Hubbard Declaration to POS.[9]

---

8    The Plaintiff attempts to discredit the affidavit of Mr. Hintze because he (Mr. Hintze) purportedly represented to Judge Jenkins that he was an "attorney." Actually the Defendant's prior counsel, John Merrett, told Judge Jenkins in a telephone hearing from Germany (to which Mr. Hintze was a party) that Mr. Hintze was a "staff attorney in the Defendant's office with the Hamburg government." Ex. 17. At worse, this was merely a misunderstanding of the different types of attorneys or legal advisors in Germany. As it has been recently explained to us, University students in Germany must take an examination. A second examination is offered to individuals who seek to become judges, attorneys, or legal advisors to the state. The examination for each of these positions is the same. Upon successfully passing the examination, these individuals then go on to work as either a judge, an attorney or a legal advisor for the state. Legal advisors for the state, which Mr. Hintze became after taking the second examination, are not like "attorneys-at-law" in the United States because they cannot represent private individuals. However, they do represent and advise the state, as opposed to individuals, on legal matters. Thus, the only issue here is one of semantics, which was not fully understood by Mr. Merrett, Judge Jenkins or the undersigned when Judge Jenkins asked him about it. Indeed, the argument could easily be made that Mr. Merrett was absolutely correct in his assertion since an attorney is defined in Black's (Revised Fourth Edition) as an "agent or substitute or one who is appointed and authorized to act in the place or stead of another" or "one who is put in place, stead and turn of another to manage his matters of law."

9    Plaintiff implicitly acknowledges that he has no evidence that Defendant was involved in the dissemination of the Hubbard Declaration to POS by his repeated, vague and unsupported references to Defendant's purported dissemination or propagation of the Hubbard Declaration in the United States, rather than to POS. See

## The Plaintiff Has Submitted a False Translation

Finally, a serious matter has arisen in connection with the foregoing. Plaintiff has referred to a hearsay German newspaper article (Exhibit 2 to the Cross-Motion), which is obviously inadmissible at least with respect to the issue of subject matter jurisdiction,[10] for the proposition that Defendant acknowledged being paid a bribe because the article purportedly states that "she [Defendant] confessed that she might not have sufficiently separated her official and private spheres." This is a highly inaccurate translation. The correct translation, according to the official interpreter for the State of Hamburg, contains no reference to any purported confession. Rather, the pertinent sentence in the newspaper actually sets forth the newspaper author's comment and says, "By accepting the loan, she might not have sufficiently separated her official and private spheres." *See* attached Exhibit 14. Further, the undersigned submitted the critical German sentence for further translation to the Miami office (as opposed to the New York office used by Defendant) of the exact same translation company used by the Plaintiff. That office's translation also confirms that the sentence does not contain anything remotely close to a purported confession by the Defendant, but, as described above, contains only the reporter's comment. *See* Exhibit 19. Moreover, accepting a loan in no way means that there was an illegal *qui pro quo* or bribe.

## DEFENDANT HAS NOT SOUGHT RELEVANT DISCOVERY

Throughout his Cross-Motion, Plaintiff asserts or intimates that he has been unable and

---

Cross-Motion, pp. 12, 13, 15, 16, 17, 18. There is no evidence that Defendant or anyone else at the SWG ever disseminated or propagated the Hubbard Declaration to the United States. More importantly, the issue in this case is the involvement, if any, of the Defendant in the dissemination of the Hubbard Declaration to POS in Germany and whether it was within the scope of her authority. See n.3 supra. Plaintiff also makes a respondeat superior argument that Defendant is liable for dissemination of the Hubbard Declaration because Mr. Hintze was her subordinate. However, Mr. Hintze was employed by the SWG, not the Defendant, and in any event he was also working within his scope of his authority as a government employee and his conduct would be immune under the FSIA.

10    Plaintiff asserts at p.13n.2 of his Cross-Motion that he may rely on an otherwise inadmissible news article in opposition to summary judgment. However, he is relying on it in support of subject matter jurisdiction .

will be unable to obtain relevant evidence and discovery from Defendant's "co-worker's, " "affiants, " Mr. Beiss and "other core participants." *See* Cross-Motion, pp. 2, 10, 11, 12, 17 n.13. Plaintiff even suggests that Defendant has refused to submit to Court-ordered "examination of the affiants" whose affidavits have been filed in support of the Defendant's Renewed Motion to Dismiss. Cross-Motion, p.12. First, these later assertions constitute an implicit acknowledgment that Plaintiff should have conducted jurisdictional discovery of these individuals. Next, these assertions are totally misleading and false. While Mr. Beiss may have declined an informal request for a deposition, Mr. Moxon has made no attempt whatsoever to conduct any third-party discovery of any of these individuals or the POS with respect to FSIA subject matter jurisdiction.[11] If this were anything other than a sham lawsuit to harass the Defendant, the Plaintiff would have invoked applicable discovery provisions under international law to take the depositions of Mr. Beiss, Mr. Hintze and the POS while he and Mr. Merrett were in Germany for Defendant's deposition. Moreover, although inaccurately complaining that Plaintiff has not produced documents, Plaintiff has made no attempt to obtain documents from any third parties in Germany, including the State of Hamburg and its SWG who actually have the documents. Notably, attached to the Cross-Motion is a Declaration of Kendrick Moxon which is apparently a Rule 56(f) affidavit purporting to set forth reasons why he cannot present by affidavit facts essential to justify his opposition to the summary judgment portion of the Renewed Motion to Dismiss.[12] Mr. Moxon's Declaration is also relevant to the Cross-Motion. Mr. Moxon points out

---

11    Any intimation that present counsel has somehow not permitted discovery is false. The undersigned has never not permitted or attempted to thwart proper discovery. Even though this Court does not have subject matter jurisdiction in this case and counsel considered the Magistrate's Order with respect to sanctions and a deposition in the United States to be flawed, he still made arrangements for Defendant's deposition in the United States and did not and would not attempt to cause the state or federal government in Germany to direct the Defendant not to come to the United States.

12    The affidavit fails to comply with the requirements set forth in the authorities cited in Defendant's Renewed Motion to Dismiss because it fails to show what facts he hopes to discover to raise a material issue of fact and fails to show that any relevant evidence exists. See authorities cited in the Renewed Motion to Dismiss, pp.10-11.

in his Declaration that he intends to depose and seek documents from Mr. Hintze, Mr. Willi Beiss (the Senior Government Official for Hamburg's Department of Internal Affairs) and POS about the very matters critical to subject matter jurisdiction. It is these people he should have already deposed rather than spend all his time trying to find evidence irrelevant to this case, but which the Scientology organization thinks it can use to embarrass Defendant in Germany. In fact, Plaintiff has made no effort whatsoever to describe what further information he thinks he could even get from Defendant which has any bearing on the subject matter jurisdiction.

## <u>DEFENDANT HAS NOT FAILED TO PRODUCE DOCUMENTS</u>

Plaintiff repeatedly asserts that Defendant has failed to produce documents. In fact, the Defendant has produced all the non-privileged documents in her control. For the most part, the documents which Plaintiff has in the past complained were not produced included documents not under her control, but under the control of the Government of Hamburg or her bank. *See e.g.* Ex. 6, pp. 45-46. However, as noted above, the Plaintiff has failed to undertake any third-party discovery to obtain these documents. After the Magistrate raised the possibility that Defendant's bank documents at the bank might actually be constructively under her control, Plaintiff asserted her privilege under German law not to ask the bank to produce these documents and confirmed that she had no other responsive documents.[13] *See* attached Exhibits 15, 16. Although Plaintiff stated at page 23 n.3 of his September 4, 2001, motion to compel the further deposition of Defendant that a separate motion to compel "will" be filed to address Defendant's purported failure to produce documents, Plaintiff has never filed any such motion. Consequently, there is no failure to produce documents and no Order that she has failed to produce documents.

---

13    The Plaintiff seeks Defendant's banking records only because of the Minton loan issue which is not relevant here.

## SANCTIONS CANNOT BE USED TO ESTABLISH
## SUBJECT MATTER JURISDICTION

As the Court noted in its February 15, 2001 Order On Defendant's Second Motion To Dismiss, the FSIA "is the exclusive source of subject matter jurisdiction over all civil suits against foreign states." *Alejandro v. Telefonica Larga Sistancia de Puerto Rico, Inc.*, 183 F.3rd 1277, 1282 (11th Cir. 1999).

Plaintiff has no evidence and has made no serious attempt to obtain evidence concerning FSIA subject matter jurisdiction. Rather, he seeks to establish subject matter jurisdiction and obtain a default judgment as a sanction for the Defendant having failed to appear in the United States for another day of deposition. However, the Court is clearly prohibited from doing either of these things. The critical case on this issue is cited by, but completely misrepresented by the Plaintiff. Plaintiff cites *Ins. Corp. of Ireland vs. Compagnie des Bauxities de Guinee,* 456 U.S. 694, 102 S. Ct. 2099 (1982) (referred to as *"CBG"*) for the proposition that "the Supreme Court held that a district court properly presumes jurisdiction under Rule 37 (b)(2)(A) when a party asserts a <u>jurisdictional defense</u> and then refuses to comply with the district court's orders that it provide jurisdictional discovery" (emphasis added). Cross-Motion, p. 7. While the Supreme Court made such a determination with respect to <u>personal jurisdiction</u>, the Supreme Court held precisely the opposite with respect to <u>subject matter jurisdiction</u>, which is the issue here. Indeed, the Supreme Court even specifically pointed out the problem in using the general term "jurisdiction" without distinguishing between the two different concepts of subject matter jurisdiction and personal jurisdiction. *Id* at 701, 102 S.Ct. at 2103

In *CBG*, the defendants refused to comply with a discovery order directed at facts which would reveal whether the defendants were subject to the personal jurisdiction of the district court.

14

*Id.* at 699, 102 S.Ct. at 2102.  As a sanction, the district court there essentially struck defendants' affirmative defense of lack of personal jurisdiction.  *Id.*  In analyzing the issue, the Supreme Court distinguished between subject matter and personal jurisdiction.  Both concepts "serve different purposes, and these different purposes affect the legal character of the two requirements." *Id.* at 701, 102 S.Ct. at 2103.  The requirement of personal jurisdiction serves to protect an individual's rights to due process and "traditional  notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154 (1945); *CBG,* 456 U.S. at 702-703, 102 S.Ct. at 2104.  The requirement of personal jurisdiction "recognizes and protects an individual liberty interest.  It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty*" CBG* at 702, 102 S.Ct. at 2104.  Like any other individual right, it can be waived, either intentionally, as when a party voluntarily submits to the jurisdiction of the court, *id.* at 706, 102 S.Ct. at 2104 (citation omitted), or inadvertently, as when a party fails to timely raise lack of personal jurisdiction as an affirmative defense pursuant to Fed.R.Civ.P. 12(h)(l).  *Id.* at 704, 102 S.Ct. at 2105.  A sanction "consisting of a finding of personal jurisdiction has precisely the same effect" as failure to enter a timely objection to personal jurisdiction. *Id.* at 705, 102 S.Ct. at 2105.  Accordingly, a sanction designating the existence of personal jurisdiction "is nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver." *Id* at 706, 102 S.Ct at 2106.

However, the Supreme Court in *CBG*  noted that subject matter jurisdiction is totally different. Subject matter jurisdiction is a requirement of Article III of the United States Constitution  and acts of Congress, and defines the power of federal courts to hear cases or

controversies. *Id.* 701-702, 102 S.Ct. at 2104. Subject matter jurisdiction "functions as a restriction on federal power, and contributes to the characterization of the federal sovereign." *Id* at 702, 102 S.Ct. 2104. "Certain legal consequences directly follow from this. "For example, no action of the parties can confer subject – matter jurisdiction upon a federal court. "Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings." *Id.* at 702, 102 S.Ct. 2104 (emphasis added, citations omitted). "[T]he rule springing from the nature and limits of the judicial power of the United States is inflexible and without exception, which requires this court, of its own motion, to deny its jurisdiction, and in the exercise of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record." *Id.* at 702, 102 S.Ct at 2104 (citation omitted).

Consequently, according to the Supreme Court in *CBG*, while discovery sanctions or legal presumptions or constructive waiver can be employed to designate the existence of personal jurisdiction, they may not be used to create subject matter jurisdiction. The use of sanctions to designate subject matter jurisdiction would impermissibly and unconstitutionally result in the use of a fiction to establish judicial power where, as a matter of fact, it does not exist.

Similarly, the court in *L.D. Williams v. Texaco, Inc.* 165 B.R. 662, 669 (D. N.Mex. 1994) stated the following:

> Texaco is correct in contending that a discovery **sanction** under **Rule 37**(b)(2)(B) cannot be used to confer **subject matter jurisdiction** that a court might not otherwise possess. "When the court lacks jurisdiction over the subject matter of action, ...it cannot employ Rule 37(b)(2)(B) to preclude proof of facts demonstrating want of jurisdiction." 4A James W. Moore *et.. al.*, Moore's Federal Practice ¶ 37.03[2] at 37-80 (1988)[emphasis in the original].

*See also Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 493n.20, 103 S.Ct. 1962, 1971 n. 20 (1983) ([E]ven if the foreign state does not enter an appearance to assert an immunity defense, a district court still must determine that [FSIA] immunity is unavailable under the Act."); *Frolova v. Union of Soviet Socialist Republics,* 761 F.2nd 370, 373 (7th Cir. 1985) ("Because the absence of sovereign immunity is a prerequisite to subject matter jurisdiction [under the FSIA], the question of immunity must be considered by a district court even though the foreign country whose immunity is at issue, has not entered an appearance."); *MCI Telecommunications Corp. v. Alhadhood,* 82 F.3rd 658, 662 (5th Cir. 1996); *Meadows v. Dominican Republic,* 628 F.Supp. 599, 603 (N.D. Cal. 1986).

Although obfuscating the difference between personal jurisdiction and subject matter jurisdiction by the use of the general term "jurisdictional defense," the Plaintiff anticipates the argument made above with the suggestion in his Cross-Motion that since the FSIA has a waiver provision, the aforementioned principles concerning subject matter jurisdiction somehow do not apply.   However, as noted above, the FSIA provides the exclusive source of subject matter jurisdiction,  and the FSIA cases cited above, including the Supreme Court  in *Verlinden,* have applied the aforesaid subject matter jurisdiction principles.  For example, as stated in the cases above, sovereign immunity is not waived if the foreign sovereignty fails to enter an appearance. The fact that the FSIA contains a narrow waiver provision does not magically expand the subject matter jurisdiction of the courts such that sanctions, legal presumptions and constructive waiver may result in a designation of subject matter jurisdiction. Unless the specific statutory waiver provision of the FSIA applies, there can be no waiver of subject matter jurisdiction.  The FSIA waiver provision, 28 U.S.C. §1605(a)(1), provides that a foreign state is not immune from

jurisdiction where it has "waived its immunity either explicitly or by implication." The FSIA's implied waiver exception must be "construed narrowly," and an express waiver must be "clear, complete, unambiguous and unmistakable ." *Aquamar v. Del Monte Fresh Produce,* 179 3d 1279, 1292 (11th Cir. 1999); *see also Frolova v. Union of Soviet Socialist Republic, supra,* at 378 ("The case law evidences a reticence to find a waiver from the nature of a foreign state's participation in litigation.").

"The legislative history of the FSIA gives three examples of cases in which courts have found implied waivers: (1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that a contract is governed by the law of a particular country; and (3) a foreign state has filed a responsive pleading in a case without raising the defense of sovereign immunity. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6617; S.Rep No. 1310, 94th Cong. 2d Sess. 18. "Since the FSIA became law, courts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity." *Frolova v. Union of Soviet Socialist Republic's, supra,* at 377. Obviously, none of these examples apply here. Moreover, the Federal Republic of Germany and the State of Hamburg have reiterated sovereign immunity in the Note Verbale, the Aide-Memoire and the statements to the Court discussed above. Indeed, Plaintiff here has never asserted that the waiver provisions of §1605(a)(1) apply here, but rather that the commercial activity exception of §1605(a)(2) purportedly supplies subject matter jurisdiction.

In light of the above, the argument that subject matter jurisdiction under the FSIA may be established as a sanction for a purported discovery violation is frivolous. Such a result would violate the Constitution, the FSIA and clear Supreme Court authority.

## THE COURT MAY NOT ENTER A DEFAULT JUDGMENT

For the reasons set forth above, the Court may also not enter a default judgment. In fact, §1608(e) of the FSIA itself specifically provides that "[n]o judgment by default shall be entered by a court of the United States against a foreign state, a political subdivision thereof or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." Plaintiff here has established neither subject matter jurisdiction nor any right to relief.

In addition to the above, the Plaintiff's inability to appear for a deposition in the United States pursuant to the Court's order was not willful. She intended and had made arrangements to appear for a deposition before she was prohibited from attending a deposition in the United States by both her employer and the government. Before any default judgment can be entered, a discovery violation must be willful. *Bankatlantic v. Blythe Eastman Paine Webber, Inc.* 12 F.3d 1045, 1049 (11th Cir. 1994). Further, the discovery violation must be related to the sanction sought. Here the purported discovery violation related to the failure to give a deposition in the United States with respect to FSIA sovereign immunity, not the merits of the case.

## PLAINTIFF MAY NOT RELY ON THE INVOCATION OF THE FIFTH AMENDMENT TO FIND SUBJECT MATTER JURISDICTION

Plaintiff argues that the Defendant's refusal to answer questions based on the fifth amendment creates a presumptions that Defendant violated the law and therefore acted outside of the scope of her authority, which purportedly gives rise to subject matter jurisdiction. However, as demonstrated above, such presumptions may not be used to establish subject matter jurisdiction. Moreover, there is nothing probative to presume from the invocation of the fifth amendment by either Mr. Minton or Defendant in this case. First, the fifth amendment was

19

invoked, not because Defendant did anything wrong, but because of the abusive harassment of them and of other targets by the Scientology organization. Further, the subject matter concerning which they invoked the fifth amendment is not probative to this case and the presumptions which the Plaintiff wishes to make are simply inconsistent with known, undisputed facts. Basically, Plaintiff wishes to presume that the purported $75,000 payment from Mr. Minton to the Defendant was a bribe to Defendant to distribute the Hubbard Declaration in the United States. First, the issue in this case is not the distribution of the Hubbard Declaration in the United States, but the dissemination of the Hubbard Declaration in Germany to POS. There is not now and has never been any evidence, and the Plaintiff still points to none, showing that the Defendant disseminated the Hubbard Declaration to POS. All the evidence demonstrates that Mr. Hintze disseminated the Hubbard Declaration to POS. In addition, the State of Hamburg has made several submissions showing that this was done in the course and scope of the authority of a governmental agency, the SWG. Moreover, the evidence shows that the payment to Defendant was in fact a loan to the Defendant so that she could retire a prior debt. There is simply no evidence whatsoever that the loan to the Defendant had anything to do with the dissemination of the Hubbard Declaration to POS or to anyone else.

## CONCLUSION

For the reasons stated above, Plaintiff's Cross-Motion must be denied.

Respectfully submitted,

ROBERT W. MERKLE
Florida Bar No.: 0138183
WARD A. MEYTHALER
Florida Bar No.: 0832723

MERKLE & MAGRI, P.A.
5510 West LaSalle Street
Tampa, Florida 33607
TEL: (813) 281-9000
FAX: (813) 281-2223

## CERTIFICATE OF SERVICE

**I HEREBY** certify that a true and correct copy of the foregoing instrument has been

furnished via U.S. Mail this 22nd day of April, 2002 to K. Moxon, 1100 Cleveland Street, Suite

900 Clearwater, Florida 33755.

WARD A. MEYTHALER

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

01 FEB 16 A 10: 01

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

HUBERT HELLER,

              Plaintiff,

vs.                                          Case No. 8:00-CV-1528-T-27EAJ

URSULA CABERTA,

              Defendant.

_____/

## ORDER ON DEFENDANT'S SECOND MOTION TO DISMISS

THIS CAUSE came on to be considered on Defendant's Second Motion to Dismiss for Lack

of Jurisdiction Under the Federal Sovereign Immunities Act (Dkt. 42). The Court having reviewed

said motion and being otherwise fully advised in the premises, finds as follows:

Plaintiff has filed a Second Amended Complaint ("Complaint") (Dkt. 40) asserting causes

of action for tortious interference with advantageous business relationships (Count I), unfair and

deceptive trade practices (Count II), conspiracy to deprive Plaintiff of civil rights in violation of 42

U.S.C. § 1985(3) (Count III), and violation of the alien tort claims act, 28 U.S.C. § 1350 (Count IV).

Factually, Plaintiff alleges that Defendant is an employee of the City of Hamburg, Germany and is

the head of the Hamburg, Germany task force designed to disrupt the business activities, civil rights

and human rights of the members of the Scientology religion. (Dkt. 40, ¶¶ 2, 7). Plaintiff alleges

that Defendant created, advocates, promotes and disseminates "sect filters" or "Hubbard

Declarations" that require individuals and companies to declare in writing:

(1) That they do not use the technology of L. Ron Hubbard;
(2) That they are not trained and do not participate in the technology of L. Ron
Hubbard; and



(3) That they reject the technology of L. Ron Hubbard.

(Dkt. 40, ¶ 9). Plaintiff further alleges that in creating and disseminating the "sect filters," Defendant acted outside the scope of her lawful authority as an employee of the City of Hamburg, Germany and "persecuted members of the Scientology religion" interfered with Defendant's established advantageous business relationships and utilized unfair trade practices. (Dkt. 40, ¶¶ 23-26, 35).

Defendant moved to dismiss the Complaint on the grounds that since she acted in her official capacity when creating and disseminating the "sect filters" or "Hubbard Declaration," she is immune from suit under the Federal Sovereign Immunities Act, 28 U.S.C. § 1603, *et seq.* and that no exception to sovereign immunity applies. (Dkt. 42).

The Federal Sovereign Immunities Act ("FSIA") is the exclusive source of subject matter jurisdiction over all civil actions against foreign states. <u>Alejandre v. Telefonica Larga Sistancia De Puerto Rico, Inc.</u>, 183 F.3d 1277, 1282 (11th Cir. 1999). Pursuant to the FSIA, an employee of a foreign state who is acting in her official capacity may be immune from suit unless an exception in 28 U.S.C. § 1605 applies. <u>Chuidian v. Philippine National Bank</u>, 912 F.2d 1095 (9th Cir. 1990).

When a Plaintiff asserts facts suggesting that an exception to the FSIA applies, the Defendant bears the burden of proving by a preponderance of the evidence that no exception applies. <u>Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.</u>, 179 F.3d 1279 (11th Cir. 1999); <u>Meadows v. Dominican Republic</u>, 817 F. 2d 517 (9th Cir. 1987). The Defendant must first produce evidence to establish that a foreign state is named in the lawsuit and that the Plaintiff's claims relate to public acts of the foreign state. <u>Meadows</u>, 817 F.2d at 522; <u>Kline v. Kaneko</u>, 685 F.Supp. 386 (S.D.N.Y. 1988). Once Defendant produces prima facie evidence of immunity, the burden of going forward shifts to the Plaintiff to produce evidence establishing that the foreign state is not entitled to immunity.

2



Meadows, 817 F.2d at 522.

Courts considering motions to dismiss are usually confined to reviewing the four corners of the complaint. Milburn v. United States, 734 F.2d 762, 765 (11th Cir. 1984). However, when a movant factually attacks the complaint and challenges the existence of subject matter jurisdiction, the district judge may rely on affidavits as well as the pleadings. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990); Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 855 (11th Cir. 1990); Kline, 685 F.Supp. at 389. The district court must accept the facts alleged in the complaint as true to the extent that they are uncontroverted by the defendant's affidavits. Cable/Home Communication Corp., 902 F.2d at 855. When the evidence conflicts, the district court must itself evaluate the merits of the jurisdictional claims. Lawrence, 919 F.2d at 1529.

Here, Defendant alleges in her affidavit that she acted in her official capacity as an employee of the government of Hamburg, Germany when she disseminated the "Hubbard Declaration." (Dkt. 43, pgs. 3-4). Defendant's employer has also submitted an affidavit stating that Defendant's actions in developing and distributing the "Hubbard Declaration" were performed as part of her job responsibilities in her capacity as an employee of the government of Hamburg, Germany. (Dkt. 43, pgs. 5-6).

Plaintiff alleges in response that Defendant was acting outside the scope of her employment with the government of Hamburg, Germany. (Dkt. 40, ¶ 2). Plaintiff has submitted an affidavit from Alexander Petz, an attorney practicing in the Federal Republic of Germany, to support his arguments. (Dkt. 45, Ex. A). According to Mr. Petz, "Caberta's conduct appears to violate several provisions of the [German] Basic Law," (Dkt. 45, Ex. A, ¶ 7), and that "she has thereby violated . . . her vowed obligation towards her employer," (Dkt. 45, Ex. A, ¶ 8). According to Mr. Petz, Scientology is a

3

recognized religion, (Dkt. 45, Ex. A, ¶¶ 11, 12), that is protected from persecution, (Dkt. 45, Ex. A, ¶ 7). These averments do not relate to Defendant's employment, her responsibilities in that employment, or whether her dissemination of the "sect filters" or "Hubbard Declaration" constituted a public act on behalf of the government of Hamburg, Germany.

Plaintiff asserts in his pleadings that additional discovery on the FSIA issue is required before he can introduce evidence supporting his contentions that Defendant acted outside the scope of her employment. (Dkt. 45, pgs. 5-7). The Eleventh Circuit has held that a case should not be dismissed for lack of jurisdiction when a plaintiff contends that through discovery he could obtain facts establishing jurisdiction. Colonial Pipeline Co. v. Collins, 921 F.2d 1237 (11th Cir. 1991); Majd-Pour v. Georgiana Community Hospital, Inc., 724 F.2d 901 (11th Cir. 1984); see also Coca-Cola Foods v. Empresa Comercial Internacional de Frutas S.A., 1997 WL 370121 (M.D. Fla. 1997). Given Plaintiff's arguments that by conducting additional discovery he will be able to establish that FSIA immunity does not apply to Defendant and that this Court has jurisdiction, this Court will deny Defendant's Motion to Dismiss. However, Defendant need not respond to the Complaint at this time.

Plaintiff may conduct limited discovery for a period of 90 days from the date of this Order to discover evidence supporting this Court's exercise of jurisdiction over Defendant. This discovery shall be limited to the FSIA issue. Not later than 115 days from the date of this Order, unless that period is extended for good cause, Defendant shall renew its motion to dismiss or respond to the Complaint. Both parties are advised to be cognizant of the provisions of Fed. R. Civ. P. 11 and to refrain from filing any pleadings that are unmeritorious and unsupported by law or fact. See Majd-Pour, 724 F.2d at 903.

4

Accordingly, it is

**ORDERED AND ADJUDGED** that:

1.    Defendant's Second Motion to Dismiss for Lack of Jurisdiction Under the Federal

Sovereign Immunities Act (Dkt. 42) is DENIED without prejudice.

2.    Defendant's Motion to Suspend Discovery (Dkt. 43) is DENIED.

3.    Plaintiff is permitted to conduct discovery, limited to the FSIA issue and this Court's

exercise of jurisdiction over Defendant for a period of 90 days from the date of this

Order.  Not later than 115 days from the date of this Order, unless the time period is

extended for good cause shown, Defendant may renew her motion to dismiss or

answer the Complaint, in accordance with the terms of this Order.

**DONE AND ORDERED** in chambers this _15th_ day of February, 2001.


                                                    **JAMES D. WHITTEMORE**
                                                    **United States District Judge**


Copies to:
Counsel of Record
Courtroom Deputy
Law Clerk


5



**Botschaft
der Bundesrepublik Deutschland
Washington**
Embassy
of the Federal Republic of Germany

### N O T E   V E R B A L E   No. 225/2001

The Embassy of the Federal Republic of Germany presents its compliments to the State Department and has the honor to refer to the statement of claim which Mr. Hubert Heller, plaintiff, has filed against Mrs. Ursula Caberta, defendant, at the United States District Court, Middle District of Florida, Tampa Division, case no.: 8:00-CV-1528-T-27C. The Embassy would like to draw attention to the fact that the German citizen Caberta is an employee of the Free and Hanseatic City of Hamburg, a state of the Federal Republic of Germany.

The claim exclusively concerns activities of Mrs. Caberta and her coworkers in Germany in their official capacities as employees of the Government of the Free and Hanseatic City of Hamburg.

Mrs. Caberta has always stated that she is not the proper subject of the claim, indicating that she is a government official and — if at all — the Government of Hamburg (Senator for the Interior) is to be sued. The case would be under the jurisdiction of the regional court in Hamburg (Landgericht).

Due to the fact that the proper subject of the claim can only be the Free and Hanseatic City of Hamburg, the Federal Republic of Germany, representing the City of Hamburg in accordance with international public law, claims state immunity and asks for the immediate dismissal of the case. A United States Court has no jurisdiction over the Free and Hanseatic City of Hamburg of the Federal Republic of Germany and is not in a position to allow the commencement of a court action.

The Federal Republic of Germany does not intend to waive its immunity and, in compliance with international public law in general, will not appear as a respondent or defendant in any court of a foreign state.



DEFENDANT'S
EXHIBIT

_12._

ALL-STATE LEGAL

The Federal Republic of Germany consequently asks the esteemed State Department to intervene to have the claim dismissed in accordance with the principles of international public law as outlined above.

A copy of this note verbale will be provided to the court by the legal representative of Mrs. Caberta, while she has been ordered by her Hamburg authorities not to appear before the Court in Tampa.

The Embassy of the Federal Republic of Germany avails itself of this opportunity to renew to the State Department the assurance of its highest consideration.

Washington, DC, December 7, 2001



United States
      Department of State
          Washington, DC

Doppel

DER GENERALKONSUL
DER BUNDESREPUBLIK DEUTSCHLAND
THE CONSUL GENERAL
OF THE FEDERAL REPUBLIC OF GERMANY
Dr. Volker Anding

Miami, February 22, 2002

The Honorable James D. Whittemore
U.S. District Judge
U.S. District Court Middle District of Florida
Tampa Division
801 N. Florida Ave.
Tampa, FL 33602

RE:     Heller v. Caberta

        Case No.: 8:00CV-1528-T-27EAJ

Honorable Judge Whittemore:

I have the honor to send to you a copy of the aide-memoire which the Deputy Chief of
Mission of the German Embassy in Washington discussed with the U.S. State Department
on February 20, 2002.  At the same time, the Director of Legal Affairs in the German
Ministry of Foreign Affairs, discussed this aide-memoire with the Deputy Chief of Mission
of the U.S. Embassy in Berlin.

As already pointed out in the Note Verbale No. 225/2001, dated December 7, 2001, which
has been submitted to the court on December 12, 2001, it reiterates once more the position
of the Federal Republic of Germany to claim sovereign immunity in the a.m. case.

The aide-memoire also points out that the plaintiff may raise the issue within the German
legal system.

100 N. Biscayne Blvd., Ste. 2200          Telefon (305) 358 0290          E-Mail  gc@g...
Miami, FL  33132-2381                     Telefax (305) 358 0307          Internet www.g...

DEFENDANT'S
EXHIBIT

*13.*

In addition, I have the honor to send to you a copy of a letter of the State of Hamburg.  In this letter, the State of Hamburg once more reconfirms that actions carried out by the defendant have been completely of official nature and within the boundaries of her official responsibilities.  The State of Hamburg also reaffirms that the plaintiff may raise legal actions against the State of Hamburg if he wishes to do so.  Furthermore the State of Hamburg confirms that the defendant as a government official is barred by order from her employer from appearing in front of the U.S. District Court in Tampa.  In case of contravening against her employer's order, the defendant faces legal consequences including, but not limited to termination of her employment.

I should like to add that the Ministries of Foreign Affairs (the U.S. Department of State and the German Federal Foreign Office) provide the official conduits of communication between our two countries.  Their authority to effect such communication with a view to making the official position of one country known to the other country does of course not mean that the courts of our countries are subject to the executive authority of either government.  Both Germany and the United States respect the separation of powers and the independence of the judiciary.  However, the principles of public international law, superseding the national legal system, as pointed out in the communication between the German and the American Government, and made known to the courts in an official manner, should be seriously considered by the courts.

Copies of this letter with attachment are being sent to Magistrate Judge Elizabeth A. Jenkins, Moxon & Kobrin and Johnson *et al.* as attorneys for plaintiff and Merkle & Magri as attorneys for defendant.

Sincerely yours,

Die Richtigkeit vorstehender/umseitiger Abschrift/Ablichtung wird bestätigt.

Miami, den 2 2. Feb. 2002

cc:
Magistrate Judge Elizabeth A. Jenkins
U.S. District Judge
U.S. District Court Middle District of Florida
Tampa Division
801 N. Florida Ave.
Tampa, FL 33602

Moxon & Kobrin, P.A.
Attn.: Mr. Kendrick Moxon and
Ms. Helena Kobrin
1100 Cleveland Street, Ste. 900
Clearwater, FL 33755

Johnson, Blakely, Pope, Bokor,
Ruppel & Burns, P.A.
Attn.: Mr. F. Wallace Pope, Jr.
P.O. Box 1368
Clearwater, FL 33757

Merkle & Magri, P.A.
Attn.: Mr. Ward Meythaler
5510 West LaSalle Street
Tampa, FL 33607

# Freie und Hansestadt Hamburg
## Behörde für Inneres

Behörde für Inneres, Johanniswall 4, D-20095 Hamburg

United States District Court
Middle District of Florida

Tampa Division

Amt für Innere Verwaltung und Planung
Allgemeine Grundsatz- und Rechtsangelegen-
heiten

Johanniswall 4
D - 20095 Hamburg
Telefon   040 - 4 28 39 - 4820
Telefax   040 - 4 28 39 - 3735
Ansprechpartner: Willi Beiß
Zimmer: 428

eMail: willi.beiss@bfi-a.hamburg.de

Geschäftszeichen (bei Antworten bitte angeben)
A 20/

Hamburg, 22. Februar 2002

**Legal action brought by Mr. Hubert Heller against Ms. Ursula Caberta – court ref. no.:
8:00-CV-1528-T-27EAJ**

In order to clarify the situation, the Department for Internal Affairs of the Free and Hanseatic City
of Hamburg would officially like to issue the following statement:

1.  A claim has been brought against Ms. Caberta to the effect that she personally caused
    loss or damage in connection with the initiation of business relations between plaintiff
    and the company POS headquartered in Germany by having made a form available to
    POS, in which a potential contracting party has to state whether he or she operates ac-
    cording to the technology of L. Ron Hubbard.

2.  This is not the case.

    As stated in an affidavit from Mr. Hintze, Department for Internal Affairs of the Free and
    Hanseatic City of Hamburg, which has already been submitted to the court, Ms. Caberta
    herself was not engaged with the matter giving rise to the action in question.

3.  The form was sent to the company POS by the Department for Internal Affairs. While it
    may have been developed by Ms. Caberta, this was in her capacity as Head of a de-
    partment of that authority. Accordingly, this relates to an act by the Department for Inter-
    nal Affairs.

4.  In exercising this activity, Ms. Caberta as an employee of the Department for Internal
    Affairs of the Free and Hanseatic City of Hamburg acted fully within the scope of her
    service-related tasks. In particular, Ms. Caberta did not pursue any private interests in
    exercising this activity, nor did she violate the law in any way. Above all, she did not ex-
    ceed her official competences (i.e. the rules relating to *ultra vires*) in terms of her action
    on behalf of the Department for Internal Affairs of the Free and Hanseatic City of Ham-
    burg.

5.  Accordingly, Ms. Caberta cannot be held responsible in any circumstances for the dam-
    ages claimed by plaintiff. Plaintiff may sue before a German court of law if he considers
    himself the victim of any action taken by the Department for Internal Affairs of the Free
    and Hanseatic City of Hamburg.

6.    Against this backdrop, Ms. Caberta has been prohibited by the Department for Internal Affairs, the government department to which she reports, from traveling to the U.S. to make the deposition. If Ms. Caberta were to disregard this prohibition, she would face legal consequences on the part of her superior department.


**Beiß**
*Leitender Regierungsdirektor*
(senior government official)

**AIDE-MEMOIRE**

The Special Representative of the Government of the German State of Hamburg for Scientology Affairs, Ursula Caberta, is being sued in the U.S. District Court in Tampa, FL (*Hubert Heller vs. Ursula Caberta*, case no. 8:00-CV-1528-T-27EAJ). The plaintiff argues that, in the exercise of her official duties, Ms. Caberta prevented him from obtaining a lucrative business contract in Hamburg, Germany, and is now suing for damages.

On December 7, 2001, the German Embassy in Washington submitted Note Verbale No. 225/2001 to the U.S. Department of State stating that U.S. courts have no jurisdiction in the matter, because Ms. Caberta's actions were covered by Germany's sovereign right to self-governance. A copy of the note verbale was also forwarded to the U.S. District Court in Tampa. On February 1, 2002, the Department of State replied that it would not take a position in the *Heller vs. Caberta* case at this time.

Meanwhile, the District Court decided not to accept Germany's claim of sovereign immunity in Ms. Caberta's case and issued orders on January 25 and January 30 for her to appear before the Court within thirty days.

The Foreign Office would therefore like to reiterate Germany's legal position in this matter and urges the Department of State to reconsider its position of nonintervention.

Mr. Heller's claim is based solely on Ms. Caberta's actions in the exercise of her official duties. Ms. Caberta emphasized this point in a deposition taken at the U.S. Consulate General in Hamburg on July 25, 2001, as well as in numerous documents filed with the U.S. District Court. Her conduct was an extension of Germany's sovereign authority. Under international law, sovereign acts are immune from foreign jurisdiction, including the jurisdiction of the U.S. courts. For this reason, the U.S. District Court in Tampa must dismiss the case.

This does not, however, leave the plaintiff without legal redress. Mr. Heller is free to seek legal recourse in Germany. Article 19, para. 4 of the Basic Law (German Constitution) provides for the right of any person to challenge actions by German authorities in a court of law. This includes the right to seek damages for any illegal action.

The German Government is aware that the U.S. District Court in Tampa may come to another conclusion. The Court stressed in its January 25 order that, according to the United States Foreign Sovereign Immunities Act, it is not subject to executive authorities, neither the German Foreign Office, nor the U.S. Department of State. However, Germany reemphasizes that its claim of sovereign immunity, based upon public international law, be respected and asks the Department of State to inform the U.S. District Court in Tampa accordingly.

**WERNER MEYER**
Dolmetscher / Staatl. geprüfter Übersetzer
Interpreter / Certified Translator
Fritz-Tarnow-Straße 7
22869 Schenefeld
Tel. +49 40 8301440 • Fax +49 40 8301183

Schenefeld,
April 19, 2002

Freie und Hansestadt Hamburg
Behörde für Inneres
– Arbeitsgruppe Scientology –
Eiffestraße 464 b

20537 Hamburg

Translation of an article published in the Bild-Zeitung of 21 Sept. 2001, p. 9

The last two sentences in the next to the last paragraph read in German:

Caberta hat von dem US-Millionär und ebenfalls erklärten Scientology-Gegner Robert Minton rund 150.000 Mark als persönliches Darlehen angenommen, gab sie vor einem US-Gericht zu. Dabei hat sie möglicherweise Dienst und Privates nicht genügend voneinander getrennt.

This was translated into English as follows:

Caberta admitted before a US Court that she had accepted a personal loan of DM 150,000 from millionaire and avowed anti-Scientologist Robert Minton. And also confessed that she might not have sufficiently separated her official and private spheres.

Apart from the fact that the loan – according to the German text – should be "*about* DM 150,000*", the first word of the German second sentence, "*Dabei*", is rendered as "*And also confessed...*". The second German sentence does not in the least contain and imply any confession but simply means (and should have been translated accordingly):

By accepting the loan, she might not have sufficiently separated her official and private spheres.

By this translation, it is left open who made this statement – exactly as in the German original.

*Werner Meyer*
Werner Meyer
Interpreter / Certified Translator

DEFENDANT'S
EXHIBIT
14
ALL-STATE LEGAL®

Law Offices
of

# MERKLE & MAGRI, P.A.

5510 W. LaSalle Street
Tampa, Florida 33607
(813) 281-9000
Clearwater (727) 441-2699
Telecopier (813) 281-2223

December 14, 2001

*VIA FACSIMILE (727-443-5640)*

Kendrick L. Moxon
Moxon & Kobrin
Suite 900
1100 Cleveland Street
Clearwater, FL 33755

      Re:   *Heller v. Caberta*

Dear Mr. Moxon:

      You requested a letter indicating the status of the Defendant's compliance with the Court's orders concerning production of documents. With the possible exception set forth in the next paragraph, please be advised that the Defendant does not have custody and control in her individual capacity of any other documents responsive to your document request and the Court's orders. Out of an abundance of caution, a number of documents were produced last week which may be covered by your document request and the Court's orders.

      As I previously explained in a letter, Ms. Caberta has declined to request her bank to provide her with any bank statements from her bank under her rights and privileges in Germany, including her right not to take action that may be used by you or others in an attempt to prosecute or incriminate her.

                         Very truly yours,

                         Ward A. Meythaler

WAM/anb



DEFENDANT'S
EXHIBIT
*15*
ALL-STATE LEGAL

*Law Offices
of*

# MERKLE & MAGRI, P.A.

5510 W. LaSalle Street
Tampa, Florida 33607
(813) 281-9000
Clearwater (727) 441-2699
Telecopier (813) 281-2223

December 6, 2001

Kendrick L. Moxon
Moxon & Kobrin
Suite 900
1100 Cleveland Street
Clearwater, FL 33755

Re:    *Heller v. Caberta*

Dear Mr. Moxon:

Enclosed are several documents, including the following:

1.    October 5, 1992 Staatliche Pressestelle;

2.    A portion of "Staatsfeind Scientology?"

3.    New Religious and Ideological Communities and Psychogroups in the Federal Republic of Germany;

4.    Part of the August, 1988 Das Parlament.

Ms. Caberta declines to request her bank to produce bank statements which she no longer has under her rights and privileges in Germany, including her right not to take action that may be used by you or others in an attempt to prosecute or incriminate her.

Very truly yours,

Ward A. Meythaler

WAM/anb
Enclosures

DEFENDANT'S
EXHIBIT
16
ALL-STATE LEGAL®

<pre>
 1                    P R O C E E D I N G S

 2              (Note - transcriber may not have accurately

 3    determined contents due to poor quality of telephonic

 4    recording and lack of audibility, nor the accurate identity

 5    of voices on audio recording tapes due to absence of speaker

 6    identification information.)

 7              THE COURT:  Okay.  Counsel are ready to proceed.

 8    We're here in the case of Hubert Heller versus Ursula

 9    Caberta, Case No. 00-CR-1528-T-27EAJ (sic).  Would counsel

10    state their appearances, please?

11              MR. MOXON:  Kendrick Moxon for Plaintiff Hubert

12    Heller.

13              THE COURT:  I'm sorry, I cannot hear a thing.

14              MR. MERRETT:  John Merrett for Defendant, Ursula

15    Caberta.

16              THE COURT:  Okay, counsel, you'll have to speak up

17    a little bit.  Judge Jenkins is on the bench and you're not

18    coming in too loudly.

19              MR. MOXON:  Okay.  Kendrick Moxon on behalf of the

20    Plaintiff.

21              MR. MERRETT:  John Merrett on behalf of the

22    Defendant.  And we also have Rudeker Hentz (phonetic) who is

23    a staff attorney in the Defendant's office with the Hamburg

24    government.

25              THE COURT:  All right.  This is Elizabeth Jenkins,
</pre>

DEFENDANT'S
EXHIBIT
17

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
 2                  TAMPA DIVISION

 3

 4    ------------------------------X

 5    HUBERT HELLER, an Individual,
                Plaintiff,      Case No
 6    Vs                        8:00 CV-1528-T-27C

 7    URSULA CABERTA,
                Defendant.
 8    ------------------------------X

 9         DEPOSITION of STACY BROOKS, a witness

10    called by and on behalf of the Plaintiff, pursuant to

11    the Massachusetts Rules of Civil Procedure, before

12    Evelyn M. Sheius, Registered Professional Reporter,

13    CSR No. 127193, and Notary Public in and for the

14    Commonwealth of Massachusetts, at the offices of

15    Cooley Manion Jones, LLP, 21 Custom House Street,

16    Boston, Massachusetts, on Tuesday, April 10, 2001,

17    commencing at 1:15 p.m.

18

19

20

21

22            K.L. GOOD & ASSOCIATES
              Registered Professional Reporters
23                 P.O. Box 6094
                 Boston, Massachusetts 02209
24      Tel (781) 598-6405 * Fax (781) 598-0815
```

**Page 1**

```
                     I N D E X

 Deposition of:        Direct   Cross

 STACY BROOKS

 (By Mr. Moxon)          4

                   E X H I B I T S
 No.          Description            Page

 1   Second Amended Notice of Deposition     15
     Person Most Knowledgeable, Lisa McPherson
     Trust, Inc.

 2   Photocopies of Check Nos. 1204, 1205,   26
     1206 and 1217

 3   Press Release dated 7-17-2000, 11:16 a.m.  54

 4   Press Release entitled "Head of German's  56
     Scientology Task Force to Speak in
     Clearwater, FLA"

 5   Document entitled "Meet Bob Minton.      66
     Charlemagne Award: Acceptance Speech"

 5   Alternative Charlemagne Award           146
     (Exhibit 5-A)

 6   Videotape of Award Ceremony             147

 7   Videotape of Ursula Caberta in Leipzig   147

 8   Internet posting, 22 Apr 2000           151
```

**Page 2**

```
APPEARANCES:

      Kendrick Moxon, Esq.
      MOXON & KOBRIN
      11 Cleveland Street, Suite 900
      Clearwater, Florida 33755
      (727)443-5620
      On behalf of the Plaintiff.
      and
      Michael Lee Hertzberg, Esq
      740 Broadway
      New York, New York 10003
      (212) 982-9670
      On behalf of the Plaintiff.

      Daniel A. Leipold, Esq.
      LEIPOLD, DONOHUE & SHIPE, LLP
      960-A West Seventeenth Street
      Santa Ana, VA 02706
      (714) 796-1555
      On behalf of Robert Minton.

Also Present

      Ms. Sarah Heller

VIDEO SERVICES:

      Mr. Craig Newman
      Valed Video Services
      One Union Street
      Boston, MA 02108
      (617) 282-2482
```

**Page 3**

```
 1              PROCEEDINGS

 2         THE VIDEOGRAPHER: Today's date is

 3    April 10, 2001. The time is approximately 1:23

 4    p.m. and the tape is rolling. In the United

 5    States District Court for the Middle District of

 6    Florida, Tampa Division. This is being taken for

 7    Case No. 8:00, CV-1528-T-27C. Hubert Heller, an

 8    Individual, versus, Ursula Caberta, an

 9    Individual.

10         We are in Boston, Massachusetts, to

11    take the deposition of the corporation

12    representative of the Lisa McPherson Trust, Inc.,

13    Stacy Brooks.

14         Counsel, please introduce yourselves.

15         MR. MOXON: Kendrick Moxon for the

16    Plaintiff; with me is Michael Hertzberg and Sara

17    Heller.

18         MR. LEIPOLD: My name is Daniel Leipold

19    and I represent the deponent.

20              *    *    *

21         STACY BROOKS, having duly affirmed that

22    her testimony would be the truth, the whole

23    truth and nothing but the truth, testified as

24    follows in answer to direct interrogatories:
```

DEFENDANT'S EXHIBIT 18

ALL-STATE LEGAL®

Page 41

1   MR. LEIPOLD: I'm sorry, could I have
2   the question back?
3   Q. Do you know if Minton ever transferred in any
4   fashion any money to Ursula Caberta?
5   A. I have no firsthand knowledge of it.
6   Q. I didn't ask you if you had firsthand knowledge.
7   I asked you if you knew, in any way, do you have
8   any knowledge that Robert Minton transferred any
9   money to Ursula Caberta?
10  A. I think he did.
11  Q How much money?
12  A. I don't know.
13  Q. Why do you think he did?
14  A. Well, Ursula said so in that affidavit that you
15  provided this morning; Ursula said so also in her
16  deposition.
17  Q. You were at that deposition, weren't you?
18  A. I wasn't. I wish I had been, but I wasn't.
19  Q. Why? You would have stopped her from talking
20  about the money she --
21      MR. LEIPOLD: Counsel, that's
22  harassment. That is not a legitimate question.
23      MR. MOXON: I'm following up on her
24  original question.

Page 42

1       MR. LEIPOLD: It may be following up on
2   her original question, but it's clearly
3   harassing. Do you want to withdraw that?
4       MR. MOXON: No.
5       MR. LEIPOLD: Okay. Don't withdraw it.
6   Respond to the question.
7   A. What was the question again?
8       MR. LEIPOLD: Please repeat --
9   Q. The question is: You would have stopped
10  Ms. Caberta from talking about the money that
11  Minton gave her?
12  A. No.
13  Q. So do you have any knowledge from any source
14  other than hearing about her deposition and
15  reading the affidavit of Caberta that you saw
16  this morning, that Minton gave any money to
17  Caberta?
18  A No, I don't believe so.
19  Q. All the tremendous problems you say, the
20  tremendous interest that has been on ARS and the
21  criminal complaint you say is pending against him
22  in Germany in this case, you have never had a
23  single discussion with Minton as to whether or
24  not he gave money to Caberta, right?

Page 43

1   A. Not that I recall.
2   Q. What is your relationship with Robert Minton?
3       THE WITNESS: Is this something I need
4   to answer?
5       MR. LEIPOLD: Just answer it.
6   A. He's very close to me.
7   Q. What is your relationship?
8   A. He is very close to me.
9   Q. Well, you are lovers, right?
10  A. No, I wouldn't characterize our relationship that
11  way.
12  Q. He is your boyfriend?
13  A. I think I answered your question as well as I
14  can.
15  Q. You live together, correct?
16  A. No.
17  Q. Doesn't he live at your home when he comes to
18  Clearwater?
19  A. Sometimes.
20  Q. And don't you live at his home when you go to New
21  Hampshire?
22  A. I stay there when I go to New Hampshire.
23  Q. So you don't have a romantic relationship?
24  A. Yes, we do.

Page 44

1   Q. Yet you've never talked about whether or not he
2   has given money to Caberta?
3   A. There are many things we haven't talked about. .
4   Q. That is not the question I asked you.
5   A. Well, I've answered this one several times
6   already.
7       MR. LEIPOLD: Answer it again. He's
8   not -- answer it again.
9   A. What was the question again?
10  Q. You have never talked to Robert Minton about
11  whether or not he has given money to Ursula
12  Caberta?
13  A. I think what I testified before earlier is that
14  we have discussed the problems that arisen as a
15  result of this.
16  Q. As a result of the allegations?
17  A. As a result of his having made a loan to her.
18  Q. So it was a loan then that he gave to her?
19  A. As far as I understand it.
20  Q. And what is your understanding of it?
21  A. That it was a loan.
22  Q. For what?
23  A. Some personal difficulty that Ursula got into.
24  Q. What was it?

Page 45

1 A. Well, as I understand it, she had co-signed on a
2   loan many years ago and suddenly someone else had
3   taken over that loan and was demanding immediate
4   payment.
5 Q. Do you know who it was?
6 A I can only tell you who she suspected that it
7   was.
8 Q. Who was that?
9 A Scientology.
10 Q Was demanding payment on a loan?
11 A. Was behind putting her into a financial
12   difficulty.
13 Q. What did she tell you?
14 A. What I just told you.
15 Q. So she suspected that someone from Scientology
16   was requiring the person that she owed money to
17   pay?
18 A. No.
19 Q. The loan that Caberta owed to the person?
20 A. No.
21 Q Who did Caberta owe the money to?
22 A. My understanding was that many years before, she
23   had co-signed on a loan with a friend, the friend
24   was nowhere to be found, someone else was now

Page 46

1   demanding payment of the loan. I can't explain
2   it to you any more than that, that's all I know.
3 Q Who was the friend?
4 A. I have no idea.
5 Q Who was the person that was demanding the money?
6 A. I have no idea.
7 Q. And she believed that somehow the Church was
8   behind this?
9 A. She had some reason to suspect that.
10 Q. That the Church was going to the person that she
11   owed the money to?
12   MR. LEIPOLD: Counsel, I'm going --
13 Q Is that what you're saying?
14   MR. LEIPOLD: I'm going to object as
15   vague and ambiguous as to what you mean by
16   "church."
17   MR. MOXON· Can you read back the
18   question for us before i was interrupted.
19   (Whereupon, the question was read back
20   by the stenographer: "That the Church was going
21   to the person that she owed the money to?"
22 Q. The Church of Scientology, I'm talking about.
23   MR. LEIPOLD: I'm still going to object
24   as vague and ambiguous.

Page 47

1 Q. So it's your understanding that from Caberta that
2   she had some alleged evidence or belief that the
3   Church of Scientology was somehow forcing her
4   creditor to make good on this debt?
5 A. No. I don't believe that was -- you know what, I
6   can't explain it any better than I just did
7   because I -- that is really all I know.
8 Q. When did she tell you that? Or if she told
9   you -- did she tell you that?
10 A. She did.
11 Q. And did you talk to Minton about that, too?
12 A. Well, she spoke to me about it, and I told Bob
13   that she was extremely distraught. And, as I
14   recall, he said to tell her not to worry, that --
15   and to call him.
16 Q. Did you tell her that?
17 A. So I told her to call him, I think is what
18   happened.
19 Q. So it is your understanding that you were
20   relaying to her to call Bob so that he could take
21   care of the problem?
22 A. Well, he wanted to talk to her about it.
23 Q. Basically to pay the debt?
24 A. I don't know. He just said he wanted to talk to

Page 48

1   her about it.
2 Q. Did he talk to her about it?
3 A. Apparently so; but I wasn't there.
4 Q. It is your understanding that she subsequently
5   called Minton to talk to him about her debt?
6 A. Yes.
7 Q. And he lent her the money to pay the debt?
8 A. I guess.
9 Q It is your understanding, correct?
10 A. Yes.
11 Q. And how did you get this understanding?
12 A. Well, as I earlier testified, this has now become
13   the subject of a huge amount of attention.
14 Q. Did Minton tell you later that he helped her out,
15   helped out Caberta?
16 A. Only as it became the subject of this criminal
17   investigation and all this stuff.
18 Q. And so he was just trying to help her basically?
19 A. As far as I understand.
20 Q. And he helped her by sending her some money?
21 A. I think I've told you as well as I know.
22 Q. When was this conversation you had with Caberta
23   about her money problems?
24 A. I think it was maybe August, but I don't really

Case 8:00-cv-01215-JSM Document 161 Filed 04/02/02 Page 42 of 49 PageID 1770

Hubert Heller Ursula Berta Condensed? Deposition of Stacy Brooks, 4-10-01

Page 49

1 remember.
2 Q. August of what year?
3 A. Last year.
4 Q. July of last year she was in Florida, correct?
5 A. Yes.
6 Q. July of last year she mentioned in her deposition
7 that she had received this loan?
8 A. Oh, well then it would have been earlier.
9 Q. So does that help your recollection as to when
10 this conversation was?
11 A. Only that it would have had to have been before
12 she came to Clearwater.
13 Q. So if you thought it was in August of last year,
14 does that mean it was close to August, it was
15 soon before she came to Clearwater?
16 A. Sorry?
17 Q. She came -- I'm just trying to help you remember.
18 The press conference was on July 25th of 2000.
19 A. Mm-hmm. It may have been earlier in July, I'm
20 not really sure.
21 Q. You had some phone calls with her about this?
22 A. Just one.
23 Q. Did she call you or did you call her?
24 A. I think she probably called me.

Page 51

1 A. Yes, she was distraught.
2 Q. She was under a lot of pressure? Distraught?
3 A. Distraught.
4 Q. Did she pay the loan off?
5 A. I don't know really.
6 Q. Did she pay the money back to Minton?
7 A. I don't know really.
8 Q. You never asked him?
9 A. No.
10 Q. You never talked to him about whether or not she
11 paid it back?
12 A. No.
13 Q. Where were you when you were talking to Caberta
14 about her loan?
15 A. My office.
16 Q. Your office in Florida?
17 A. Yes.
18 Q. What is the number there?
19 A. The phone number?
20 Q. The telephone number, yes.
21 A. 727-467-9335.
22 Q. Do all the phone calls from outside your office
23 come to that number?
24 A. I assume so.

Page 50

1 Q. And in that call did you discuss the fact of her
2 coming to Florida also?
3 A. I don't remember.
4 Q. Well, it would have been soon before she came to
5 Florida, right?
6 A. But I really don't remember.
7 Q. You did have some phone calls with her about her
8 coming to Florida, didn't you, before she came?
9 A. Oh, I'm sure I had at least one, but I don't --
10 Q. Well, you picked her up at the airport, right?
11 A. Yes.
12 Q. So you knew she was coming?
13 A. Yes, you know that.
14 Q. Yes. So you knew she was coming?
15 A. Yes.
16 Q. And you had had some phone calls with her about
17 her coming to Florida?
18 A. At least one.
19 Q. And do you know what the loan Caberta -- what was
20 the loan that Caberta had co-signed for, what
21 that was about?
22 A. I don't.
23 Q. She was pretty upset about it when she called
24 you, this pressure she was getting on some loan?

Page 52

1 Q. Is there any other number in your office to which
2 phone calls come?
3 A. Well, there's four lines on that number, so I
4 guess it just rotates.
5 Q. Are they all billed to the same number?
6 A. Yes.
7 Q. Do you get four phone bills or just one?
8 A. One.
9 Q. Does that include all your computer lines, too,
10 all go to that one phone number?
11 A. No, I don't think so.
12 Q. But you only have one phone line and they all
13 come to that number?
14 A. Yes.
15 Q. You first met Caberta in April of 2000, correct?
16 A. That's possible.
17 Q. And you made a posting to the internet on April
18 22nd about your trip that you just went -- you
19 spent in Europe, it's dated April 22nd, it says,
20 "Bob Minton and I just spent ten days in Europe.
21 We went to Cologne, Hamburg and Paris. This was
22 the first time representatives of the Lisa
23 Mcpherson Trust had a chance to meet our
24 counterparts in other countries."

Page 53

1    I think in your posting you talk about
2  meeting Caberta, do you remember that?
3  A. Yes. How come you ask me questions when you
4    already know the answers? I mean, you know
5    better than I do. I don't remember this as well
6    as you do.
7  Q So does that refresh your recollection that that
8    was the first time you met Caberta in April of
9    2000?
10 A Well, honestly, I would still have to say I'm
11   pretty sure that's when I first met her.
12 Q Okay. Was your phone conversation with her about
13   her debt problem before or after you met her in
14   person?
15 A. Well, it must have been after.
16 Q. After then, okay. So it was definitely sometime
17   after --
18 A. I mean, I know I saw her in April and I had this
19   conversation later than that. All I'm saying is,
20   I guess April was the first time I ever saw her
21   in person.
22 Q When you talked to her on the phone about coming
23   to Florida, did you talk to her about the press
24   conference?

Page 54

1  A. Possibly.
2  Q. Well, you sent out a press release over a week
3    prior to the conference, the press conference,
4    correct?
5  A I did.
6  Q LMT did?
7  A. Like I said, you're remembering this better than
8    I do. I mean, I do remember that we sent out a
9    release letting media know that she was going to
10   be there. I don't remember how much before she
11   got there that happened. Actually, I thought it
12   happened the day before but, again, you seem to
13   know better than I do.
14      MR MOXON  Mark this.
15      (Exhibit No. 3 was marked for
16   identification.)
17      MR. MOXON. Marked as Exhibit No. 3 is
18   a posting that was downloaded from the internet
19   dated "July 17, 2000, Subject: Ursula Caberta to
20   speak in Clearwater," and according to what I saw
21   on the internet it was posted by you.
22 A. Okay.
23 Q. Could you please take a look at this and see if
24   this looks like something you posted to the

Page 55

1  internet?
2  A. It does because it says it is from me.
3  Q. Do you remember now posting to the internet a
4    press release about Ursula Caberta --
5  A. But I don't remember --
6  Q. -- eight days before the press conference?
7  A. I don't remember if this was when Ursula was in
8    Florida or not.
9  Q. Well, it says "Monday, July 17th." Was she there
10   that early?
11 A. I don't know. I don't really remember. She
12   could have been, but I'm not sure. Is it
13   important? I don't know.
14 Q. I'm just trying get the chronology straight here.
15      Is this the press release that you put
16   out?
17 A. Well, that is not actually the one I was talking
18   about.
19 Q. You put out another press release also?
20 A. Yes.
21 Q. Before or after this one?
22 A. Well, I think it was after.
23 Q. Did you put out this press release, Exhibit 3?
24 A. It looks like I did.

Page 56

1  Q. What was the other press release that you put
2    out?
3  A. Well, it is in -- responsive to your document
4    request (indicating).
5  Q. Can I see that?
6      (Document handed to counsel.)
7      MR. LEIPOLD: It's the same thing.
8      THE WITNESS: No, it's not -- is it?
9      MR. LEIPOLD: Different text.
10     (Off the record discussion between the
11   witness and her attorney.)
12     THE WITNESS: Sorry, it is the same
13   thing.
14     MR. LEIPOLD: The same thing in a
15   different format, Counsel.
16     MR. MOXON: And we'll mark this as
17   Exhibit 4.
18     (Exhibit No. 4 was marked for
19   identification.)
20     THE WITNESS: So, yes, it must have
21   been before she got to Florida because that is
22   dated the 14th. I thought it was closer to when
23   she was actually doing it.
24 Q. Exhibit 4 is a press release on Lisa McPherson

*Law Offices*
*of*

# MERKLE & MAGRI, P.A.

5510 W. LaSalle Street
Tampa, Florida 33607
(813) 281-9000
Clearwater (727) 441-2699
Telecopier (813) 281-2223

April 22, 2002

**VIA FACSIMILE TRANSMISSION**
**(305) 347-3222**

Transperfect Translations
200 South Biscayne Boulevard
Miami, FL  33131

      Re:   Heller vs. Caberta

Dear Sir:

     Please find enclosed enlarged copies of the paragraph previously forwarded to you this morning for translation from German to English, which translation is needed by noon today. Thank you for your assistance.

                            Very truly yours,

                            Ward A. Meythaler



DEFENDANT'S
EXHIBIT
19
ALL-STATE LEGAL®

Sie ermittelt bereits seit Oktober letzten Jahres gegen Gabare wegen Verdachts der Vorteilsannahme, bestätigte Oberstaatsanwalt Rüdiger Bagger. Gaberta hat von dem US-Millionär und ebenfalls erklärten Scientology-Gegner Robert Minton rund 150 000 Mark als persönliches Darlehen angenommen, gab sie vor einem US-Gericht zu. Dabei hat sie möglicherweise Dienst- und Privates nicht genügend voneinander getrennt.

Sie ermittelt bereits seit Oktober letzten Jahres gegen Cabana wegen Verdachts der Vorteilsannahme, bestätigte Oberstaatsanwalt Rüdiger Bagger. Cabana bat von dem US-Millionär und ebenfalls erklärten Scientology-Gegner Robert Minton rund 150 000 Mark als persönliches Darlehen angenommen, gab sie vor einem US-Gericht zu. Dabei hat sie möglicherweise Dienst und Privates nicht genügend voneinander getrennt.

Sie ermittelt bereits seit Oktober letzten Jahres gegen Cohen wegen Verdachts der Vorteilsannahme. Beteiligte Oberstaatsanwalt Rüdiger Bagger. Aberta hat von dem US-Milliardär und ebenfalls erklärten Scientology-Gegner Robert Minton rund 150 000 Mark als persönliches Darlehen angenommen, gab sie vor einem US-Gericht zu. Dabei hat sie möglicherweise Dienst und Privates nicht genügend voneinander getrennt.

**Emerson Weber Barroca**
Account Manager
TransPerfect Translations, Inc.
200 S. Biscayne Boulevard
Suite 850
Miami, FL 33131
Phone: 305-347-3344
Fax:   305-347-3222
Email:  ebarroca@transperfect.com



# FAX

| To: | Mr. Ward Meythaler | From: | Emerson W. Barroca |
|-----|--------------------|-------|--------------------|
| Company: | Merkle & Magri, P.A. | Date: | April 22, 2002 |
| Fax: | 813-281-2223 | Phone: | 813-281-9000 |
| Re: | Translation | Pages: | 02 (including this page) |

Message:

Dear Mr. Meythaler,

Attached please find the translation you requested earlier today. Please let me know if you have any questions. Thank you for the opportunity to provide you with our services.

Best regards,



ATLANTA

BOSTON

BRUSSELS

CHICAGO

DALLAS

DETROIT

FRANKFURT

HONG KONG

HOUSTON

LONDON

LOS ANGELES

MIAMI

MINNEAPOLIS

NEW YORK

PARIS

PHILADELPHIA

SAN DIEGO

SAN FRANCISCO

SEATTLE

WASHINGTON, D.C.

This facsimile transmission is intended only for the recipient indicated above. It may contain information that is privileged, confidential or otherwise protected from disclosure. Any review, dissemination or use of this transmission or its contents by persons other than the intended recipient is strictly prohibited. If this transmission has been received in error, please notify the sender immediately.

...has already been investigating Caberta since last October for suspicion of bribery, Senior State Attorney Rüdiger Baggel confirmed. Caberta admitted before a U.S. court that she had accepted about DM 150,000.00 as a personal loan from U.S. millionaire and likewise committed anti-Scientologist Robert Minton. It is possible that she did not sufficiently separate her official and private spheres.